Roger A. Denning (SBN 228998)
denning@fr.com
Christopher S. Marchese (SBN 170239)
marchese@fr.com
Seth M. Sproul (SBN 217711)
sproul@fr.com
John W. Thornburgh (SBN 154627)
thornburgh@fr.com
Ryan P. O'Connor (SBN 253596)
oconnor@fr.com
Daniela Glaser (SBN 341535)
glaser@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099

*Additional Counsel listed on Signature Page*

Attorneys for Defendant Apple Inc.

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TACTION TECHNOLOGY, INC.,<br>Plaintiff,<br><br>v.<br><br>APPLE INC.<br>Defendant. | Case No. 3:21-cv-00812-TWR-JLB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT APPLE INC.'S AMENDED MOTION FOR SUMMARY JUDGMENT, *DAUBERT* MOTION TO EXCLUDE OPINIONS OF PLAINTIFF'S EXPERTS JAMES H. OLIVER, PH.D. AND PATRICK F. KENNEDY, PH.D., AND MOTION TO STRIKE**<br><br>**FILED UNDER SEAL**<br><br>Hearing Date: July 13, 2023<br>Hearing Time: 1:30 p.m.<br>Courtroom: 3A<br>Judge: Hon. Todd W. Robinson |

# TABLE OF CONTENTS

**PAGE**


I. INTRODUCTION ........ 1
II. APPLE DOES NOT INFRINGE THE ASSERTED PATENTS ........ 2
  A. Relevant factual background ........ 3
    1. The Court's claim construction order ........ 3
    2. The accused products are fundamentally different from the claimed system ........ 3
    3. Taction's infringement contentions ........ 5
    4. Dr. Oliver's report presented new infringement theories ........ 5
  B. The Court should strike Taction's new infringement theories presented in Dr. Oliver's report ........ 6
    1. Dr. Oliver's infringement theory for the "highly damped output" limitation is new and should be stricken ........ 6
    2. Dr. Oliver's infringement theories for the Monolithic Products are new and should be stricken ........ 10
  C. Apple's accused products do not meet two claim limitations ........ 13
    1. The accused products do not infringe because they do not include a "transducer with highly damped output" ........ 14
      a. Without Dr. Oliver's new theory, Taction has no viable claim of infringement ........ 14
      b. Apple's Taptic Engines are not "highly damped" by ferrofluid ........ 14
        i. Ferrofluid is the claimed damping mechanism ........ 15
        ii. Taptic Engines do not use ferrofluid to "highly damp" the output ........ 16
        iii. Taction's infringement argument also renders the claim invalid for lack of written description ........ 17
      c. Apple's Taptic Engines are not "highly damped" using the standard set forth in the patent specifications ........ 21
        i. "Highly damped" requires a mechanical Q-factor less than 1.5 ........ 21
        ii. Apple's Taptic Engines do not have a mechanical Q-factor less than 1.5 ........ 27

iii. Taction's new infringement arguments render the claims invalid as indefinite....28

2. The Monolithic Products do not have "a plurality of magnets" ....31

a. The Monolithic Products do not literally infringe....31

b. The Monolithic Products also do not infringe under the doctrine of equivalents ....32

III. TACTION CANNOT OBTAIN PRE-SUIT DAMAGES ....33

A. Relevant Factual Background: Taction failed to mark the patent numbers on the outside of the Corsair HS60 ....34

B. Taction failed to satisfy the marking statute ....34

1. Patent markings on the *packaging* of the HS60 headsets are legally insufficient ....34

2. Any patent marking on the Taction Transporter is out of the public view and legally insufficient....35

3. Taction fails to show consistent and continuous marking....36

4. Taction fails to provide evidence that shows any efforts to police Corsair's compliance with the marking statute....37

C. Taction failed to provide actual notice to Apple....38

IV. THE COURT SHOULD ALSO EXCLUDE UNRELIABLE OPINIONS FROM TACTION'S EXPERTS ....38

A. Taction relies on unreliable expert opinions ....38

1. Dr. Oliver conducted unreliable testing and offers an unreliable analysis of "technical apportionment"....38

a. Dr. Oliver's testing of just six iPhone accused products is unreliable and should be not be allowed at trial....39

b. Dr. Oliver's "technical apportionment" opinions are unreliable and should be excluded ....41

c. Dr. Kennedy's reliance on Dr. Oliver's flawed technical apportionment renders Dr. Kennedy's reasonable royalty opinion unreliable....43

V. CONCLUSION ....45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgen Inc. v. Sanofi*,
No. 21-757, 2023 WL 3511533 (U.S. May 18, 2023) ....................................... 18

*Apotex, Inc. v. Cephalon, Inc.*,
No. 2:06-cv-02768, 2015 WL 12645745 (E.D. Pa. May 26, 2015) ..................... 6

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ........................................................................... 45

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ......................................................................... 36

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc) ............................................. 17, 19, 20

*Berkheimer v. HP*,
881 F.3d 1360 (Fed. Cir. 2018) .................................................................... 22, 28

*Black & Decker Corp. v. Positec USA Inc.*,
No. 11-CV-5426, 2015 WL 1543262 (N.D. Ill. Mar. 31, 2015) ........................ 35

*Broadcom Corp. v. Qualcomm Inc.*,
543 F.3d 683 (Fed. Cir. 2008) ........................................................................... 16

*Cellspin Soft, Inc. v. Fitbit, Inc. et al.*.,
Nos. 4:17-cv-05928, -05931-34, -05936, 2022 WL 2784467 (S.D. Cal. Apr. 21, 2010) ........................................................................................... 40

*Daubert II*,
43 F.3d 1311, 1315-16 (9th Cir. 1995) .............................................................. 41

*Dolly, Inc. v. Spalding & Evenflo Companies*
16 F.3d 394 (Fed. Cir. 1994) ............................................................................. 33

*Dow Chem. Co. v. Nova Chem. Corp.*,
803 F.3d 620 (Fed. Cir. 2015) ...................................................................... 28, 29

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
323 F.3d 956 (Fed. Cir. 2002) ........................................................................... 18

*Gen. Elec. Co. v. Wabash Appliance Corp.*,
304 U.S. 364 (1938)....20

*General Electric Co. v. Joiner*,
522 U.S. 136 (1997)....45

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244, 1256 n.7 (Fed. Cir. 2008)....20

*Halliburton Oil Well Cementing Co. v. Walker*,
329 U.S. 1 (1946)....20

*Hansen Cold Storage Constr. v. Cold Sys., Inc.*,
No. 2:19-CV-07617-SB-MAA, 2021 WL 6536672 (C.D. Cal. Dec. 19, 2021)....36

*Hutchinson v. Groskin*,
927 F.2d 722 (2d Cir. 1991)....42

*Interval Licensing LLC v. AOL, Inc.*
766 F.3d 1364 (Fed. Cir. 2014)....22, 28

*Kadant Johnson, Inc. v. D'Amico*,
No. CIV.A. 10-2869, 2012 WL 38319 (E.D. La. Jan. 9, 2012)....35

*Lizardtech, Inc. v. Earth Resource Mapping*,
424 F.3d 1336 (Fed. Cir. 2005)....18, 20

*Lucent Techs., Inc. v. Gateway, Inc.*,
No. CIV 02CV2060-B....14

*Media Rights Techs., Inc. v. Capital One Fin. Corp.*,
800 F.3d 1366 (Fed. Cir. 2015)....28, 32

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
248 F. App'x 199 (Fed. Cir. 2007)....40

*My Health, Inc. v. Gen. Elec. Co.*,
No. 15-CV-80-JDP, 2015 WL 9474293 (W.D. Wis. Dec. 28, 2015)....37

*NetFuel, Inc. v. Cisco Sys. Inc.*,
No. 5:18-cv-02352, 2020 WL 1274985 (N.D. Cal. Mar. 17, 2020)....45

*Nike, Inc. v. Walmart*,
138 F.3d at 1446....36

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
467 F.3d 1355 (Fed. Cir. 2006) ....................2, 14, 16, 24

*Panduit Corp. v. HellermannTyton Corp.*,
451 F.3d 819 (Fed. Cir. 2006) ....................33

*Polaris PowerLED Techs., LLC v. VIZIO, Inc.*,
2020 WL 4258663 (C.D. Cal. May 14, 2020)....................6, 12

*Poly-America, L.P. v. API Indus., Inc.*,
839 F.3d 1131 (Fed. Cir. 2016) ....................23

*Rivera v. Int'l Trade Comm'n*,
857 F.3d 1315 (Fed. Cir. 2017) ....................18, 19, 20, 21

*Rotman v. Progressive Ins. Co.*,
955 F. Supp. 2d 272 (D. Vt. 2013) ....................41, 42, 43

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001) ....................33

*Shalaby v. Irwin Indus. Toll Co.*,
No. 07CV2107-MMA, 2009 WL 7452756 (S.D. Cal. July 28, 2009)...40, 41, 43

*Sitrick v. Dreamworks, LLC*,
516 F.3d 993 (Fed. Cir. 2008) ....................33

*Ex Parte Skszek*,
No. 2009-000662, 2009 WL 1892584 (B.P.A.I. June 29, 2009) ....................26

*Sound View Innovations, LLC v. Hulu, LLC*,
No. LACV1704146JAKPLAX, 2019 WL 9047211 (C.D. Cal. Nov. 18, 2019), *aff'd*, 33 F.4th 1326 (Fed. Cir. 2022) ....................43

*Symbol Techs., Inc. v. Proxim Inc.*,
No. CIV.A.01-801-SLR, 2002 WL 1459476 (D. Del. June 25, 2002) ....................35

*Taction v. Apple*,
ECF No. 265 (S.D. Cal. April 17, 2023) ....................15, 18

*Team Worldwide Corp. v. Acad., Ltd.*,
No. 219CV00092JRGRSP, 2021 WL 1897620 (E.D. Tex. May 3, 2021) ....................37

*Terlep v. Brinkmann Corp.*,
418 F.3d 1379 (Fed. Cir. 2005) .......... 13

*Teva Pharms. USA Inc. v. Sandoz Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) .......... 28, 29

*Tronzo v. Biomet, Inc.*
156 f.3D 1154 (Fed. Cir. 1998) .......... 18, 20, 21

*Trussell Mfg. Co. v. Wilson-Jones Co.*,
50 F.2d 1027 (2d Cir. 1931) .......... 35

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) .......... 45

**Statutes**

35 U.S.C. § 112 17, 20, 25

35 U.S.C. § 287 .......... *passim*

**Other Authorities**

37 C.F.R. § 1.57 .......... 25, 26

Fed. R. Evid. 702 .......... 40

# I. INTRODUCTION

This is a motion for summary judgment, *Daubert* motion, and motion to strike.

Summary Judgment: Apple moves for summary judgment of non-infringement (or, in the alternative, invalidity) and no pre-suit damages. As this motion will make clear, these issues turn on the Court's existing claim construction and undisputed facts, and thus should be resolved on summary judgment.

As a matter of law, Apple does not infringe the two Taction patents (the '885 and '117 patents) asserted in this case. Apple's accused Taptic Engines offer a fundamentally different approach to vibration control than disclosed in Taction's patents. The inventor of those patents, Dr. James Biggs, also Taction's founder, worked on an electromagnetic headphone module that vibrates at bass frequencies. Dr. Biggs wanted the vibration module to operate evenly across the bass range, and he used ferrofluid to mechanically damp the vibrations to achieve that goal. Indeed, each claim in the Taction patents recites the use of *ferrofluid* for damping, and the Court construed the claims to require a "transducer with *highly damped* output." Apple does not infringe because the ferrofluid in Apple's accused products does not produce highly damped output, and also because Apple does not achieve highly damped output *at all* using the only test recited in the patent specification. Taction's infringement arguments, which were introduced for the first time in expert reports, should also be stricken because they violate the Patent Local Rules. If not stricken, they should nonetheless be rejected because they depend on misreading the Court's claim construction, the claim language, and the patent specification.

Apple developed state-of-the-art vibration modules for its mobile devices, called "Taptic Engines," that use proprietary "[redacted]" electronics and software to control vibrations. Taction's patents do not disclose [redacted] *of any kind*; they focus solely on mechanical damping. This has forced Taction to stretch its patents impermissibly in an attempt to capture Apple's Taptic Engines, arguing that the [redacted] provides the required "highly damped output." Taction did

not disclose this theory during discovery, and Apple now moves to strike the new opinions of Taction's expert Dr. Oliver. But even this new theory does not save Taction because no accused product is "highly damped" by ferrofluid as the claims require, and no accused product has "highly damped output" using the standard in the patent specification. Taction does not contend otherwise. But if Taction is allowed to exceed the scope of the patent, then the asserted claims are invalid.

Separately, certain Taptic Engines have only a single, *monolithic* magnet ("Monolithic Products"), and they do not infringe for another reason: every asserted claim requires "a *plurality* of magnets." The Court construed this phrase to mean "at least two physically distinct magnets" wherein each magnet is "a body that produces a magnetic field based on the body's dipolar nature." ECF No. 141 at 29. There is no genuine dispute that these Monolithic Products do not have a "plurality of magnets" because they include only one magnet. In addition, Taction's theory of infringement under the doctrine of equivalents should be precluded because it is new and, if not precluded, should be rejected because it vitiates an express claim limitation.

In addition, the Court should enter summary judgment that Taction is not entitled to pre-suit damages. To recover pre-suit damages, a patent owner must provide actual pre-suit notice of infringement to the defendant or mark patented products with the numbers of the patents-in-suit. 35 U.S.C. § 287. Taction did neither. Thus, Taction cannot seek pre-suit damages.

Daubert: Apple moves to exclude certain opinions of Taction's experts under *Daubert*. Taction's technical infringement expert, Dr. James Oliver, has offered opinions underlying Taction's infringement and damages theories that are unreliable and should be excluded from trial. Taction's damages expert, Dr. Patrick Kennedy, relies on Dr. Oliver's unreliable opinions, and his opinions too should be excluded.

## II. APPLE DOES NOT INFRINGE THE ASSERTED PATENTS

### A. Relevant factual background

#### 1. The Court's claim construction order

On September 28, 2022, the Court issued a Claim Construction Order. First, the Court found that each asserted claim requires "a transducer with highly damped output." ECF No. 141 at 13. This construction stemmed from a disavowal of claim scope during prosecution of a related patent. Second, the Court addressed the claim terms "magnet" and "plurality of magnets." Apple argued that magnet was a single body, and that plurality of magnets required multiple bodies. Taction argued that a magnet could be defined by magnetic polar regions, and that the plurality of magnets could be satisfied by a single body with multiple magnetic polar regions. The Court construed the phrase "plurality of magnets" to mean "at least two physically distinct magnets" wherein each "magnet" is "a body that produces a magnetic field based on the body's dipolar nature." ECF No. 141 at 29. As explained by the Court, "Taction's contention that the claimed 'magnets' can be subsidiary pieces of material on a single body is not supported by the claim language." *Id.* at 22-23.

#### 2. The accused products are fundamentally different from the claimed system

Apple's Taptic Engines are electromagnetic actuators that enable haptic interactions on a variety of Apple devices, including the iPhone and Watch. Each Taptic Engine includes a vibration motor with a moving mass that vibrates to simulate tactile sensations in relation to user actions, such as tapping, scrolling, or pressing buttons. *See* Ex. 1 (Zinn Reb. Rpt.) at ¶¶ 48-62 (accused product overview).

One of Apple's major innovations underlying the Taptic Engine is "[redacted] of vibration motors through circuitry and software. This offers a fundamentally different control method than that described in the Taction patents, which use ferrofluid to damp movement of the moving mass to achieve a flat acceleration frequency response to a constant input. Apple is not trying to damp the output like the patents, but instead uses a [redacted]

[redacted]. Unlike the mechanical damping in the Taction patents, which alters the *output* of the motor by creating drag on the moving mass, [redacted] alters the *input signal* (voltage) to achieve a desired movement. *See* Ex. 2 (Oliver Rep.) at ¶ 609 (admitting that "the current applied to the coil [of the Taptic Engine] is modified [by the [redacted]] to take into account the [redacted]"); Ex. 3 (Okamura Tr.) at 47:2-14 ("[redacted] that actively modifies a signal"); Ex. 1 (Zinn Reb. Rpt.) at ¶ 108; Ex. 4 (Harrison Tr.) at 178:16-180:23.

One way to think of this is in terms of pushing a child on a swing. A child can drag her feet while being pushed to slow the swing down. This is like mechanical damping, and this is what Taction's patents are doing. In fact, ferrofluid damping in the Taction patents is akin to the child dragging her feet in the same way at a constant pressure on every oscillation. [redacted] is like holding on to the child at all times and moving her to the desired position, regardless of whether she drags her feet or not. Because the [redacted], the focus is not on damping the output as in the Taction patents, but on controlling the input signal. Ex. 1 (Zinn Reb. Rept.) at ¶¶ 106-107. Finally, although Apple includes ferrofluid in the Taptic Engine [redacted], it has no impact on the [redacted] of the Taptic Engine because of the [redacted]. *See id.* at ¶¶ 108-109 (showing the same Taptic Engine performance with and without ferrofluid); Ex. 5 (Oliver Tr.) at 93:13-94:24. Taction is aware of this fact and has dropped the theory from its infringement contentions that Apple's ferrofluid provides the highly damped output.

Taction's patents do not teach, disclose, or mention [redacted]. Ex. 6 (Biggs Day 1 Tr.) at 179:16-18 [redacted]); *see also* Ex. 3 (Okamura Tr.) at

50:9-12, 144:16-21 (confirming same).

In the Monolithic Products, Apple uses single, monolithic magnets in place of multiple magnets. Monolithic magnets provide multiple benefits over multiple, individual magnets, and allow Apple to create smaller, more powerful Taptic Engines.

**3. Taction's infringement contentions**

Taction asserts infringement of U.S. Patent Nos. 10,820,117 and 10,659,885 by Apple's iPhones (Version 8 and later) and Watches (Series 4 and later) based on their inclusion of Apple's haptic (or vibration) module, branded as the "Taptic Engine." *See, e.g.,* ECF No. 1 at 14, 21. Taction served initial infringement contentions on August 23, 2021, and pre-claim construction amended contentions on September 20, 2021, October 29, 2021, and December 3, 2021. Each of these amendments accused new products with Taptic Engines but maintained the *same infringement theory*.

On September 28, 2022, the Court issued a Claim Construction Order. The Court found that the claims require "a transducer with highly damped output." ECF No. 141 at 13. The Court construed "plurality of magnets" as "at least two physically distinct magnets" wherein each "magnet" is "a body that produces a magnetic field based on the body's dipolar nature." *Id.* at 29. The Court rejected Taction's position that "magnets" can be "subsidiary pieces of material on a single body." *Id*. at 22-23.

On October 31, 2022, Taction served Post-Claim Construction Amended Infringement Contentions ("Post-CC Amended Contentions") to address the "transducer with highly damped output" and "plurality of magnets" limitations. Ex. 7. But as explained below, Taction's contentions were brief and conclusory and, most importantly, did not include the new theories in Dr. Oliver's report at issue here.

**4. Dr. Oliver's report presented new infringement theories**

On April 3, 2023, Taction served Dr. Oliver's corrected infringement report. *See* Ex. 2. He addressed (a) "transducer with highly damped output" for all accused products and (b) "plurality of magnets" for the Monolithic Products. *Id*. at ¶¶ 759-

797. For each limitation, he offered extensive opinions that are new and different from the analysis in Taction's Post-CC Amended Contentions.

**B. The Court should strike Taction's new infringement theories presented in Dr. Oliver's report**

In violation of the Patent Local Rules, Taction asserted new infringement theories for the first time in Dr. Oliver's report. Courts will strike infringement theories in expert reports that are inadequately disclosed in infringement contentions. *See Polaris PowerLED Techs., LLC v. VIZIO, Inc.*, 2020 WL 4258663, at *3-4 (C.D. Cal. May 14, 2020) (striking parts of plaintiff's expert report where expert disclosed detailed infringement theory for the first time). Taction did not include these theories in its infringement contentions, nor did it seek leave to amend to add these new theories, which relate to two requirements in each asserted claim in Taction's patents: "transducers with highly damped output" and "plurality of magnets."

Given the late disclosure—well after the factual record closed—Apple was not able to take discovery on Taction's new theories and thus has been prejudiced. *See Apotex, Inc. v. Cephalon, Inc.*, No. 2:06-cv-02768, 2015 WL 12645745, at *2 (E.D. Pa. May 26, 2015) ("Prejudice is inherent when deadlines are disregarded in complex cases with extensive discovery…."). Taction should not be permitted to overhaul its infringement case in expert discovery. Thus, Apple requests that the Court strike the following parts of Dr. Oliver's corrected report: (1) Paragraphs 192, 545-584, 603-632, 638-639, 814, 831, 1161, 1244-1245 and Appendices D-F, H-S, W ("highly damped output"); and (2) Paragraphs 764-770, 772-773, and 759-797 ("plurality of magnets").

**1. Dr. Oliver's infringement theory for the "highly damped output" limitation is new and should be stricken**

Taction's infringement contentions posited a ferrofluid-based theory of infringement. According to this theory, the ferrofluid provided the "highly damped output" required by the Court's claim construction. Taction's original infringement

contentions used specific frequency response graphs—generated by vibrating the Taptic Engine module (removed from the iPhone) using a constant, sinusoidal input—to show the alleged effect of ferrofluid in the Taptic Engine. Ex. 8 at 15 (blue lines represent the output with ferrofluid and red without); Ex. 9 (Taction's Objections and Responses to Apple's Second Set of Interrogatories (No. 14)) at 4-6. These allegedly show a reduction in the resonant peak with ferrofluid present. Ex. 9 at 4-6; *see* Ex. 5 (Oliver Tr.) at 183:25-184:2. After the Court's claim construction, Taction addressed the "highly damped" limitation in ***two sentences*** in its Post-CC Amended Contentions. Ex. 7 at 10. Taction relied on the *same* "response graphs" from its original contentions, stating they "show that the Taptic Engines are transducers that have a '***highly damped output***.'" Ex. 7 at 10.[1]

Dr. Oliver's infringement opinions discard Taction's previously disclosed testing and graphs and build from whole cloth a new infringement theory. He introduces a new definition of "highly damped output," identifies a new alleged damping mechanism (closed loop control), and runs new and different tests, for which he developed new software to create custom, frequency response graphs. Ex. 2 (Oliver Rpt.) at ¶¶ 545-584, 602-619, 626, 1244-1245. Dr. Oliver's new theories stand in sharp contrast to the ferrofluid theory in Taction's infringement contentions.

Dr. Oliver starts with a new definition of "highly damped output:"

> [T]he phrase "highly damped output" would have been understood by a person of ordinary skill in the art at the time of the invention, particularly in view of the relevant intrinsic evidence, as an ***output that is generally uniform or flat over the normal operating frequency range of the device in question***, as for example shown in Figure 5C above. Some variation in flatness or uniformity is obviously allowed.

Ex. 2 at ¶ 607. This definition was not in Taction's infringement contentions. Taction's infringement contentions make no mention of "generally uniform or flat," and instead rely on a mere reduction in the peak resonance, as shown in the response

[1] All emphasis added unless noted.

graphs referenced above. Dr. Oliver's new theories build on this new definition.

Dr. Oliver offers new frequency response graphs that he says show a "generally uniform or flat [response] over the frequency range of 80-230 Hz." *Id*. at ¶ 575; *see also id.* at ¶¶ 573, 577, 579, 580, 582, 584, 608-609, 618. Dr. Oliver generated these graphs using different techniques than used by Taction in its contentions. He used a Taptic Engine *inside* the iPhone (unlike the contentions, which tested it outside the iPhone), applied a *variable* voltage input (unlike the contentions, which used a fixed input), and plotted frequency versus mechanical power (which is not in the contentions), resulting in a differently shaped curve that is allegedly flat. *Id*. at ¶¶ 550, 545, 609. Dr. Oliver generated these graphs using software programs called "HapticSweep" and "ToneSeriesAnalyzer" that he created for this litigation and first disclosed in his report. *Id.* at ¶ 550. The frequency response graphs for the iPhone SE from Taction's contentions (left) and Dr. Oliver's report (right) (Ex. 2 at ¶ 575) show how Taction's theories have changed.




Figure 1-3. Synthesized compliance FRFs for a single-DOF system having the dynamic characteristics of the isolated mass from the iPhone SE Taptic Engine.

*Taction's Infringement Contentions*

(Ex. 8 at 15)




*Dr. Oliver's Expert Report*

Ex. 2 at ¶ 575

In Taction's contentions, the response is clearly peaked both with and without ferrofluid. Notably, under Dr. Oliver's new definition of "highly damped output," which requires a "generally uniform or flat" response, these graphs from Taction's contentions ***do not show infringement***. Ex. 2 (Oliver Rpt.) at ¶ 615. As a result, Dr. Oliver confirmed in deposition that he did ***not rely*** on these original graphs. Ex. 5

(Oliver Depo.) at 93:13-94:24 ("Q. You didn't cite any of these graphs in your expert report; correct? A. That's correct.").

Dr. Oliver's new theory focuses on Apple's closed loop control—not ferrofluid—to satisfy the "highly damped output" limitation. Ex. 2 (Oliver Rept.) at ¶ 607. Dr. Oliver now says that Apple's "closed loop controller"—sophisticated circuitry and software that is separate from ferrofluid—is the primary mechanism that "damp[s] the haptic output of the Taptic Engine." *Id.* at ¶ 608; *see also id.* at ¶¶ 609, 612-616. To measure this alleged damping from the closed loop controller, Dr. Oliver created a new metric—"an actual output Q-factor" (or "effective Q-factor")—and measured it using a new frequency response—"mechanical power in decibels". *Id.*; *see also id.* at ¶¶ 575, 577, 579, 580, 582, and 584. Using this new metric and graph, he argued that Taptic Engines satisfy the requirement of "highly damped output," an argument not previously disclosed in Taction's infringement contentions. Ex. 2 (Oliver Rept.) at ¶ 618; Ex. 5 (Oliver Depo.) at 222:6-12.

The only mention of closed loop control in Taction's Post-CC Amended Contentions is a quote from *Apple's* interrogatory responses: "Apple itself, for example, has stated that '[t]he frequency response of the module is controlled, including the frequency response at the resonant frequency, through the use of a closed loop software controller….'" Ex. 7 at 10. However, Taction did not say that Apple's closed loop controller produced "highly damped output," nor did it contend or explain how Apple's closed loop controller meets the requirement of "highly damped output." Taction's only reference to satisfying the "highly damped output" limitation was to refer to Taction's *old* ferrofluid graphs, which Dr. Oliver did not rely on. Ex. 7 at 10 (the "response graphs" from the original contentions "show that the Taptic Engines are transducers that have a '***highly damped output***.'")

In short, Dr. Oliver's report discloses new theories and associated test data for "highly damped output." The new material covers 16 pages of affirmative analysis, 13 pages of "rebuttal" to noninfringement arguments from an Apple interrogatory

response, and 14 appendices related to HapticSweep and ToneSeriesAnalyzer. Because Taction failed to disclose these new theories in its infringement contentions, they should be stricken from Dr. Oliver's report. *See, e.g.*, *Pelican*, 2023 WL 2127995, at *3 (stating that "an expert report [may not be used] to introduce new infringement theories" "not disclosed in the parties' infringement contentions").

**2. Dr. Oliver's infringement theories for the Monolithic Products are new and should be stricken**

Dr. Oliver offers new, undisclosed theories for why Apple's accused products with a single monolithic magnet ("Monolithic Products") meet the "plurality of magnets" limitation. They were not in Taction's contentions and should be stricken.

The Court construed "plurality of magnets" to require "at least two physically distinct magnets." *See* ECF No. 141 at 29. This construction created an issue for Taction because the Monolithic Products have only a single magnet.

Taction's original infringement contentions did not differentiate between the Monolithic Products and those with multiple physically distinct magnets. *Compare* Ex. 10 at 7-9 *with* Ex. 11 at 8-10. For the Monolithic Products, Taction simply repeated the "plurality of magnets" claim language and then showed various photos of a deconstructed Taptic Engine with a single magnet. *See, e.g.*, Ex. 11 ('885 Claim Chart for iPhone 12) at 8. Taction did not explain how a single magnet could literally meet the requirement of a "plurality of magnets."

Instead of providing any literal infringement analysis, Taction stated that the Monolithic Products "would nevertheless [meet the "plurality of magnets" limitation] under the doctrine of equivalents." Ex. 7 at 11. But the only doctrine of equivalents ("DOE") analysis in Taction's contentions relates to all of the accused products; Taction's DOE analysis is not specific to the Monolithic Products. Moreover, Taction's DOE analysis consisted of just two sentences:

> The accused products perform the same function (e.g., producing magnetic fields proximate to one or more conductive coils), in the same way (e.g., by including a plurality of magnetically polarized areas in the moving mass), to

> achieve the same result (e.g., allowing the moving mass to be urged laterally when electrical current is applied to one or more conductive coils) as the claimed "a plurality of magnets." The difference between the claimed "a plurality of magnets" and the configurations of magnets in the accused products is insubstantial.

Ex. 7 at 11; *see* Ex. 12 at 13-14.

Dr. Oliver's report provides multiple, new theories for literal infringement and DOE infringement. Dr. Oliver's analysis of the "plurality of magnets" limitation for the Monolithic Products spans approximately 33 pages—15 pages for literal infringement and 18 pages for DOE infringement. Ex. 2 at ¶¶ 764-797.

For literal infringement, Dr. Oliver effectively ignores the Court's claim construction and provides a new definition of "magnet" as one defined solely by "magnetic domains," not physical bodies. He states the Monolithic Products literally "include multiple magnets, which are magnetic domains arranged next to each other on a substrate." *See* Ex. 2 at ¶ 764. Dr. Oliver further states, "although the magnets appear visually as a single piece of material, they are separated into subsidiary magnets with distinct magnetic domains." *Id.* Each domain includes "a north and south pole" and is therefore "a body that produces a magnetic field based on the body's dipolar nature." *Id.* at ¶ 765. Each is "physically distinct" from another because each is separated by a "dead zone," which he quantifies by analyzing Apple's use of ferrofluid, *id.* at ¶ 766, and Apple's use of the "flux density profile" and "zero crossing point." *Id.* at ¶ 767. He also analyzes the way Apple models each monolithic magnet. *Id.* at ¶¶ 768-70. Not only was this analysis absent from Taction's infringement contentions, it is also inconsistent with the claim construction order: "Taction's contention that the claimed 'magnets' can be subsidiary pieces of material on a single body is not supported by the claim language." ECF No. 141 at 22-23.

To support this new theory, Dr. Oliver relies extensively on two Apple documents that describe properties of the single magnet in the Monolithic Products. (Ex. 13 (APL-TACT_00423674) and Ex. 14 (APL-TACT_00423264).) Taction's

infringement contentions never referenced either document (*see, e.g.*, Ex. 11 at 8-10), despite Apple producing them on September 22, 2022, before Taction served its Post-CC Amended Contentions. Ex. 15. That these two never-before-cited documents play such a prominent role in Dr. Oliver's analysis shows that his theory is new.

In addition, Dr. Oliver offers new theories for DOE infringement. He provides three pages of previously undisclosed analysis of the purported "insubstantial differences" between the "plurality of magnets" and the single magnet in the Monolithic Products. Ex. 2 at ¶¶ 774-777. He opines that the "reliability," "thermal demagnetization behavior," "process quality," "mechanical robustness," and magnetization process between the two types of magnets is the same or similar. *Id.* at ¶ 775. And he states that "Apple documents draw numerous parallels between multiple unipolar magnets separated by a spacer and monolithic magnets on a common substrate, which indicates to me that the two are equivalents." *Id.* Dr. Oliver then purportedly "responds" to Apple's DOE positions with 15 pages of new material.

All told, Dr. Oliver offers five new DOE theories: (1) the alleged equivalent is a monolithic magnet with distinct magnetic domains separated by dead zones, *id.* at ¶¶ 764, 766, 768, 773; (2) each magnetic domain is equivalent to a unipolar magnet, *id.* at ¶ 784; (3) each magnetic domain in a monolithic magnet produces a dipolar magnetic field, *id.* at ¶ 786; (4) reliability and testing show no substantial differences, *id.* at ¶ 775; and (5) Apple documents allegedly equating multiple unipolar magnets separated by a spacer and monolithic magnets show no substantial differences, *id*. at ¶ 776. Taction did not disclose these theories in its infringement contentions.

Taction is without excuse here. Back in October 2021, Apple sent a letter to Taction warning that its DOE disclosure was insufficient, but Taction dismissed it. Ex. 16 (10/4/2021 Letter to Taction) at 3. It is "[Taction's] burden to comply with its discovery obligations, including its contention disclosures." *Polaris PowerLED* at *4. Taction should not be allowed to add nearly 20 pages of new DOE theories in Dr. Oliver's report. *See Pelican* at *6 (striking DOE contentions that failed "to provide

any analysis under either the function-way-results test or the insubstantial differences test"). Taction's new theories for the Monolithic Products and the "plurality of magnets" limitations should be stricken.

### C. Apple's accused products do not meet two claim limitations

Apple's noninfringement grounds rest on purely legal questions, and existing claim construction. The Court construed the claims as limited to "transducers with highly damped output," and construed "plurality of magnets" to mean multiple physically distinct bodies. The asserted claims require ferrofluid to provide the "highly damped output" and the applicants disclaimed transducers with a mechanical Q-factor of 1.5 or more. There is no genuine issue of material fact that Apple's Taptic Engines do not provide "highly damped output" using ferrofluid, that Apple's Taptic Engines do not have a mechanical Q-factor less than 1.5, or that Apple's Monolithic Products do not include a "plurality of magnets." There is no infringement if the plaintiff cannot demonstrate "the presence of every element or its substantial equivalent in the accused device." *Terlep v. Brinkmann Corp*., 418 F.3d 1379, 1384-85 (Fed. Cir. 2005). Taction cannot do so here, and summary judgment is warranted.

One basis for summary judgment is that the asserted claims require using ferrofluid (or at least mechanical damping) to produce highly damped output. Apple acknowledges it proposed inserting "highly" into a ferrofluid damping limitation during claim construction (*see* ECF No. 127 at 40-41 (proposing four variants)), and the Court did not adopt Apple's proposal. ECF No. 141 at 17-18. But applying the Court's claim construction to the asserted claims still results in non-infringement as a matter of law. When one combines the disclaimer ("highly damped output") with the plain language of the asserted claims (which mention only ferrofluid damping), it is clear ferrofluid must produce the highly damped output. At a minimum, mechanical damping (and not computer hardware or software) must produce the highly damped output. Closed loop control like Apple's is *not* disclosed and is *not* a mechanical damper. Thus, Apple does not infringe. If the Court rejects this view, then the

asserted claims are invalid for lack of written description, and Apple also does not infringe for other reasons, as detailed herein.

### 1. The accused products do not infringe because they do not include a "transducer with highly damped output"

#### a. Without Dr. Oliver's new theory, Taction has no viable claim of infringement

Without Dr. Oliver's new theories, Taction is left with the "ferrofluid theory" disclosed in its infringement contentions, which—as described above—Dr. Oliver does not endorse or adopt because they do not show a "transducer with highly damped output." Ex. 5 at 94:25-96:13. Limited to the "ferrofluid theory" in its infringement contentions, Taction cannot show infringement. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1369 (Fed. Cir. 2006) (affirming grant of summary judgment after untimely infringement theories were struck from expert report); *Lucent Techs., Inc. v. Gateway, Inc.*, No. CIV 02CV2060-B CAB, 2007 WL 1877982, at *4 (S.D. Cal. June 27, 2007) (granting summary judgment where theory was not in the infringement contentions). Thus, summary judgment of no infringement is warranted.

If the Court does not strike Taction's new infringement theory, Apple is still entitled to summary judgment of no infringement. Apple's products are not "highly damped" under the Court's construction.

#### b. Apple's Taptic Engines are not "highly damped" by ferrofluid

Taction asserts that Apple's Taptic Engines satisfy the "highly damped output" limitation because Apple's [redacted] moves the movable mass in such a way that the frequency response of the system is "flat and substantially uniform." Apple disputes this, but even taking it as true, there is still no infringement because the asserted claims require the ferrofluid to cause the "highly damped output," and Taction does not allege the ferrofluid in the Taptic Engines does this.

#### i. Ferrofluid is the claimed damping mechanism

Taction's infringement arguments depend on misreading the claims and the Court's construction. Each asserted claim recites "wherein movement of the moving portion is *damped by a ferrofluid* in physical contact with at least the moving portion." *See*, *e.g.*, Cl. 1 ('885 at 14:48-65). No other damping is claimed. Thus, when the Court construed the claims to require a "transducer with *highly damped* output, it logically required *the claimed ferrofluid* to produce a highly damped output.

Taction's argument to the contrary ignores the claim language and contradicts the intrinsic record. The focus of the asserted patents was on overcoming unwanted resonance in haptic actuators by using ferrofluid to mechanically damp the movement of the vibration module. As this Court recently stated, "the specification explains that ***a lack [of] mechanical damping [in the prior art] is 'problematic***.'" *Taction v. Apple*, ECF No. 265, *2 (S.D. Cal. April 17, 2023) (citing '885 patent at 2:1–2 ("The problem of uneven frequency response is typically made worse ***by a lack of mechanical damping***."), 2:11–13 ("Another approach in the prior art, also problematic, is the use of … un-damped linear resonant actuators ('LRAs')."')).

The patents purportedly overcome this problem by claiming a specific mechanical damper—ferrofluid. As explained in the patents, "[t]he viscosity and volume of the damping fluid (*e.g.*, viscous ferrofluid 410 of FIG. 4B) in vibration module 500 were adjusted to damp resonance that would be evidenced at 30-50 Hz, to achieve the relatively uniform, non-peaked, response evident in FIG. 5C between 40 and 200 Hz in range 503." '885 patent at 9:36-44.

Even if the Court does not find that ferrofluid must provide the "highly damped output," the intrinsic record makes clear that the "highly damped output" must at least be provided by "mechanical damping." As this Court recognized, the patents complain of a "lack of mechanical damping" in the prior art. *See* Taction, ECF No. 265 at *2. And the patents focus exclusively on mechanical damping techniques (and

on ferrofluid in particular). '885 patent at 4:6-9 ("The vibration of the moving portion may be damped using a suitable approach, such as the shearing of a layer of ferrofluid, oil, grease, gel, or foam, or the passage of air through an orifice, for example."), 9:36-41 ("The viscosity and volume of the damping fluid (e.g., viscous ferrofluid 410 … were adjusted to damp resonance … to achieve the relatively uniform, non-peaked, response evident in FIG. 5C between 40 and 200 Hz."); Ex. 3 (Okamura Tr.) at 144:14-15 ("Yes, within this sentence [col. 4 lines 6-9] I would characterize the examples as mechanical in nature."). As described below, ferrofluid is the only mechanical damping in the accused products at issue here, and Taction does not allege that Apple achieves highly damped output through mechanical damping techniques, so whether the claim is limited to damping by ferrofluid or other mechanical means, the infringement analysis is the same.

Here, the problem to be solved, the method in which it is solved, and the claims themselves all point to ferrofluid as the damping mechanism. Under such clear disclosure, that means ferrofluid must produce highly damped output.[2]

**ii. Taptic Engines do not use ferrofluid to "highly damp" the output**

Taction no longer contends that Apple's ferrofluid produces highly damped

[2] Apple submits the result is clear under the Court's claim construction and the plain claim language, so no additional construction is required. *See Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 696 (Fed. Cir. 2008) (ordinary meaning governs infringement where terms have not been construed). However, to the extent the Court believes expert discovery has created a new claim construction dispute, it should resolve it now. *O2 Micro*, 521 F.3d at 1362 ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."). This would be especially justified in light of Taction's new infringement theories, should the Court not strike them.

output. In its infringement contentions, Taction proffered frequency response graphs of each accused Taptic Engine with and without ferrofluid and argued they show damping resonance. Ex. 8 at 15. A representative graph is shown above in Sec. II.B.1. In its post-claim construction amended contentions, Taction relied on these graphs once again, this time as proving a "highly damped output." Ex. 7 at 10.

However, Taction's expert, Dr. Oliver, did not adopt or rely on these graphs, testifying instead that the graphs such as the one above show the use of ferrofluid to merely reduce the resonance peak of the products, and not to produce a "highly damped output." Ex. 5 (Oliver Tr.) at 95:25-96:13 ("The frequency response functions [in Taction's infringement contentions] … do not represent highly damped output."). Instead, according to Dr. Oliver, the [redacted] provides the "highly damped output." Ex. 2 (Oliver Rpt.) at ¶ 608 ("All Accused Products employ a [redacted] system to damp the haptic output of the Taptic Engine.").

Thus, Apple does not infringe any asserted claim of the asserted patents because the Taptic Engine does not use ferrofluid to provide the "highly damped output" required by this Court's construction.

**iii. Taction's infringement argument also renders the claim invalid for lack of written description**

Taction's broad view of the "highly damped" limitation would also render the claims invalid for inadequate written description. There is no question that the patents fail to disclose [redacted] of any kind. They do not use the words, describe the concept, or demonstrate [redacted] in any way. The Court should reject Taction's infringement arguments, but if not, the Court should find the claims lack written description support.

35 U.S.C. § 112 requires a "written description" of the invention to demonstrate the patentee had "possession" of the claimed invention when the patent was filed. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Importantly, the specification must support the "full scope" of the claimed invention,

so broader claims require more disclosure. *Lizardtech, Inc. v. Earth Resource Mapping*, 424 F.3d 1336, 1345 (Fed. Cir. 2005); *see also Amgen Inc. v. Sanofi*, No. 21-757, 2023 WL 3511533, at *9 (U.S. May 18, 2023) ("In other words, the specification must enable the full scope of the invention as defined by its claims. The more one claims, the more one must enable."). This requirement is part of the *quid pro quo* of the patent grant and ensures the public receives a meaningful disclosure in exchange for being excluded from practicing an invention. *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 970 (Fed. Cir. 2002).

*Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998) provides an important illustration. In that case, the Federal Circuit found no written description where the claims were broad enough to encompass any cup shape, but the patent described only conical-shaped cups. *Id.* at 1159. The patent there touted the advantages of a conical shape and distinguished the prior art as inferior. *Id.*

As in *Tronzo*, the written description here is inadequate to support a broadening of the claims that would ensnare [redacted] because: (1) every embodiment and teaching in the specification shows the "highly damped output" provided by mechanical damping (specifically ferrofluid); (2) using mechanical damping to provide a "highly damped output" is fundamental to the problem and solution taught in the specification; and (3) the patents disparaged the prior art for lack of mechanical damping ([redacted]). Indeed, Taction expressly disclaimed transducers that lack mechanical damping. *See Taction*, ECF No. 265 at *2 ("the specification explains that ***a lack [of] mechanical damping [in the prior art] is 'problematic.'***").

Taction's position is also very much like the patentee's in *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315 (Fed. Cir. 2017). There, the patentee improperly expanded the claims by accusing features that had no written description support. *Id.* at 1320. Here, Taction has expanded its claims to cover "highly damped" output from Apple's [redacted], but Apple's [redacted]

[redacted]. Ex. 17 (Ma Tr.) at 71:6-11; Ex. 1 (Zinn Reb. Rpt.) at ¶105; *see* Ex. 3 (Okamura Tr.) at 45:13-24; 56:8-21 ("It is not easy at any time to develop a [redacted] to produce any desired output[.]"). And, as in *Rivera*, the accused feature ([redacted]) is not described in the Taction patents. Ex. 6 (Biggs Day 1 Tr.) at 179:16-18 [redacted]); *see also* Ex. 3 (Okamura Tr.) at 50:9-12, 144:16-145:4 (same).

Nor is it enough to show that the undisclosed feature "would have been obvious." *See Ariad*, 598 F.3d at 1352 ("[A] description that merely renders the invention obvious does not satisfy the [written description] requirement."). But that is exactly what Taction's validity expert, Dr. Okamura, argued. *See* Ex. 3 (Okamura Tr.) at 73:24-6 ("I can only say that [the patent] shows an electronic signal, and it would be obvious to a person of ordinary skill in the art that that signal would have to be generated from some source [*i.e.*, [redacted]]."); 62:10-22 ("The signals don't specify by themselves how the signal is generated."); 68:5-10 (same). Dr. Okamura's "electronic signal" is not a mechanical damping mechanism, and in any case is a far cry from the sophisticated [redacted] implemented by Apple.

The bottom line is Taction's patents provide no disclosure of [redacted], much less Apple's sophisticated implementation. The only embodiment and teaching in the specification of a transducer with highly damped output is damped by ferrofluid—a mechanical damper. And mechanical damping is fundamental to the problem and solution in Taction's patents. However, instead of identifying a mechanical damper that provides the "highly damped output," Taction reaches outside of the patents to claim [redacted] as the mechanism for providing the highly damped output. *See* Ex. 2 (Oliver Rpt.) at ¶ 626 (arguing that "the 'highly damped output' required by the Court's disclaimer is not restricted to mechanical damping" and that [redacted] provides "electrical damping"); Ex. 3

(Okamura Tr.) at 50:5-23; 62:10-22. This means Taction's patents lack written description support if they cover Apple's [redacted], which is not a mechanical damper. *See Rivera*, 857 F.3d at 1320. Thus, if this Court does not enter summary judgment of no infringement, it should find the asserted claims invalid for lack of written description, just as the Federal Circuit did in *Tronzo* and *Rivera*.

In addition, although the "highly damped output" is the defining feature of Taction's patents, it is purely functional. Dr. Okamura testified that the "most succinct and clear" way to describe the patents was "to say that the invention's related to transducers with highly damped output." Ex. 3 (Okamura Tr.) at 29:7-21. For Taction, the "highly damped output" is an empty vessel that can be filled with anything. Thus, under Taction's view, the "most succinct and clear" description of Taction's purported invention is a function that can be satisfied by *any structure*.

Patent law does not allow pure functional claiming like this. *E.g.*, *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 12 (1946). In 1952, Congress responded by creating a narrow exception, 35 U.S.C. § 112 ¶ 6 (now ¶ f), which allowed functional claim elements but *restricted them to the structure disclosed in the specification*. *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1256 n.7 (Fed. Cir. 2008). The Federal Circuit has also emphasized that broad claims with functional or result-oriented language cannot be used to extend an invention beyond what the inventor described in the specification. For example, where genus claims are defined by functional language, the specification must show both "that the applicant has made a generic invention that achieves the claimed result" and "that the applicant has invented species sufficient to support a claim to the functionally-defined genus." *Ariad*, 598 F.3d at 1349. Thus, a specification describing "a particular fuel-efficient automobile engine"—even in great detail—"would not necessarily support a broad claim to every possible type of fuel-efficient engine." *LizardTec.*, 424 F.3d at 1346. It cannot be that the central, allegedly novel feature of the patent—*i.e.*, how the "highly damped output" is generated—is not described at all in the patent. *Gen.*

*Elec. Co. v. Wabash Appliance Corp.*, 304 U.S. 364, 371 (1938) (finding claim invalid where it "uses conveniently functional language at the exact point of novelty"). This is also the teaching of *Tronzo* and *Rivera*.

By seeking to include features not described or contemplated by the patents, Taction has enlarged the scope of the claims beyond what is supported in the specification, and the claims must be invalid.

**c. Apple's Taptic Engines are not "highly damped" using the standard set forth in the patent specifications**

The question of whether the Taptic Engines are *highly damped* (regardless of whether ferrofluid does it) can also be resolved on summary judgment.

Taction's infringement theory is contrary to the only test for "highly damped" in the patents and can be resolved as a matter of law. Because "highly damped" is a term of degree that does not have a plain and ordinary meaning, it is necessary to look to the patent specifications to understand it. In this context, "highly damped" requires a mechanical Q-factor less than 1.5, as explained below.

Taction's expert Dr. Oliver has allegedly demonstrated only that the accused products have a so-called "effective Q-factor" or "actual output Q-factor" ranging from [redacted]. Ex. 2 (Oliver Rpt.) at ¶¶ 571, 1244. These alleged Q-factors fall squarely within the range of Q-factors that the applicants expressly distinguished from the claimed invention in the background of the asserted patents. *See* '885 patent at 2:63-67. Thus, even if Taction is allowed to rely on Dr. Oliver's testing, summary judgment would still be required because Taction cannot demonstrate infringement.

**i. "Highly damped" requires a mechanical Q-factor less than 1.5**

Although the Court has already found a disavowal of claim scope involving the phrase "highly damped," the term does not have a plain and ordinary meaning to a person of skill in the art. ECF No. 141 at 13; Ex. 18 (Zinn Op. Rpt.) at ¶ 71 ("'highly damped' outside the context of the Asserted Patents has no quantitative meaning."); Ex. 5 (Oliver Tr.) at 211:10-20: ("Q. Would you characterize your proposed

construction as the plain and ordinary meaning of highly damped output? A. Again, that term was -- that term was pulled from the prosecution history...”); Ex. 3 (Okamura Tr.) at 152:20-24 (“Q. Prior to this case, had you heard the term ‘highly damped’ used in the context of electromagnetic haptic actuators? A. Not really in the context of the actuator itself, I think.”); Ex. 19 (Visell Rpt.) at ¶ 16 (“Outside the context of the Asserted Patents, the term highly damped would have no particular meaning.”); Ex. 20 (Lee Day 1 Tr.) at 124:9-12 (“It’s not a phrase that has any specific meaning to me relative to damping.”); Ex. 21 (Biggs Day 2 Tr.) at 438:18-440:25 [redacted]), 448:12-17 [redacted]).

Furthermore, “highly damped” is a term of degree. Terms of degree are indefinite where the patent does not include specific examples that embody the claim term and provide a necessary objective baseline through which one can interpret the claims. *See Berkheimer v. HP*, 881 F.3d 1360, 1364 (Fed. Cir. 2018). When faced with another term of degree, “unobtrusive manner,” the Federal Circuit explained in *Interval Licensing LLC v. AOL, Inc.* that “we must look to the written description for guidance.” 766 F.3d 1364, 1371 (Fed. Cir. 2014). Thus, it is necessary to look to the written description to see whether “highly damped” is definite. If the written description contains a specific test, it must be applied for the infringement analysis.

Here, the written description contains a specific test to determine whether a transducer has “highly damped output”—the mechanical Q-factor of the transducer must be less than 1.5. The patents distinguish prior art transducers because of their “lack of mechanical damping” and because “no provision was made for critically damping those transducers. Accordingly, the tactile acceleration frequency response [of those prior art transducers] was underdamped, with a claimed [mechanical] Q-factor of 1.5 to 3.” ’885 patent at 2:1–2, 2:60-67; *see also id.* at pg. 2 (incorporating

the U.S. Provisional Application No. 62,054,712 by reference); Ex. 22 (U.S. Provisional App. No. 62/054,712 ("the '712 provisional") at 4-5 (confirming that Taction distinguished the prior art transducer disclosed in WO 2012/173669 (Zarrabi), which had a mechanical Q-factor between 1.5 and 3). By disparaging prior art transducers with a mechanical Q-factor of 1.5 to 3, the patents disclaim transducers with a mechanical Q-factor of 1.5 or more. *See Poly-America, L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016) ("[A]n inventor may disavow claims lacking a particular feature when the specification distinguishes or disparages prior art based on the absence of that feature."). The intrinsic record clearly shows that a mechanical Q-factor of less than 1.5 is required to be highly damped.

**1. Taction's proposed test should be rejected**

In its expert report, Taction relies on a different test to assess "highly damped output." Ex. 2 (Oliver Rpt.) at ¶ 602-610; *see also id*. at ¶¶ 545-596. According to Taction, the phrase "highly damped output" means an output that is "generally uniform or flat over the normal operating frequency of the device, as for example shown in Figure 5C." *Id*. at ¶ 607. Notably, Taction argues that (1) the claimed output can be, among other things, a power frequency response, (2) the output can be generated by varying the input to generate a desired response, and (3) the output is "generally uniform or flat" if it is within +/- 10 decibels over the operating range. *Id*. at ¶¶ 545-584, 607-619; *see also id*. at ¶ 609 (admitting that "the current applied to the coil [of the Taptic Engine] is modified [by the [redacted]] to take into account the [redacted]").

Taction's test is a creation of Dr. Oliver and should be rejected. As an initial matter, the term "highly damped" clearly refers to an amount of damping, not the uniformity or flatness of a line drawn on a graph. Ex. 1 (Zinn Reb. Rpt.) at ¶ 90. Moreover, Taction's test removes the damping requirement from the claim limitation entirely. *Id*. In fact, under Taction's test, the term "transducer with highly damped output" does not depend on the amount of damping at all. *Id*. A transducer can be

undamped, but still be considered a transducer with highly damped output under Taction's test if its input is modified to generate an output that is "generally uniform or flat." *Id*. Likewise, a transducer can be critically damped (Q-factor = 0.5) or even overdamped (Q-factor < 0.5), but not be considered a transducer with highly damped output if the input is modified to generate an output that is not "generally uniform or flat." *Id*. Each result is inconsistent with the intrinsic evidence, which, as previously explained, describes using mechanical damping (specifically ferrofluid) to critically damp a transducer and does not describe modifying the input provided to the transducer to generate a "generally uniform or flat" output. *Id*.

Taction's test is also incorrect because the phrase "generally uniform or flat" does not appear in the asserted patents and their file histories. As support for this language, Taction cites to the deposition testimony of Dr. Biggs, which was given years after the alleged priority date of the asserted patents. Ex. 2 (Oliver Rpt.) at ¶ 607. However, "an inventor's self-serving statements are rarely relevant to the proper construction of a claim term." *See O2 Micro*, 521 F.3d at 1362 n. 3. Moreover, if not ignored, Dr. Biggs's testimony confirms he used "'highly damped' to indicate a ***relatively*** flat and uniform frequency response." Ex. 6 (Biggs Day 1 Tr.) at 177:23-25; *see also* Ex. 21 (Biggs Day 2 Tr.) at 440:19-441:9, 448:2-7, 448:12-17. Thus, Dr. Biggs's testimony, if relied on, confirms that "generally uniform or flat" means relatively flat. More importantly, the actual language used in the patents and the file history is "relatively uniform, non-peaked" and "substantially uniform." *See, e.g.*, '885 patent at Abstract, 3:53-58, 9:39-40; ECF No. 72-5, Ex. D at 65.

**2. If not rejected, Taction's proposed test must conform to the written description**

Taction's test swaps one term of degree ("highly damped") with another (relatively/substantially uniform). As explained above in Sec. II.C.1.c.i, terms of degree are indefinite where the patent does not include specific examples that embody the claim term and provide a necessary objective baseline through which one can

interpret the claims. Thus, if Taction's test is applied (it should not be for the reasons explained above), we must look to the specification for further guidance. *Id*.

Here, the only example of a relatively/substantially uniform response in the asserted patents is Figure 5C. '885 patent at 5:49-52. As shown in Figure 5C, the acceleration response is within +/- 0.15 g pk-pk over the range of 40-200 Hz. Ex. 1 (Zinn Reb. Rpt.) at ¶¶ 82, 97-98. Notably, unlike Taction's test, the test shown in Figure 5C measured the acceleration response using a constant input. *Id.* Thus, the written description shows that the relatively/substantially uniform response is an acceleration response within +/- 0.15 g pk-pk over the operating range that is measured using a constant input. *Id*.

Instead of looking to the written description for guidance, Taction instead looked for guidance in the '985 provisional patent application. Ex. 2 (Oliver Rpt.) at ¶ 573 (citing '985 provisional at [00072]). Unlike the asserted patents, the '985 provisional describes the transducer's acceleration response to a constant input as "substantially uniform with +/- 10 decibels over the frequencies 40-200 Hz." *Id*. However, reliance on the +/- 10 decibels test from the '985 provisional, which Taction intentionally omitted from the written description of the asserted patents, is legally prohibited because it is essential material under Taction's theory of infringement.

"'Essential material' is material that is necessary to: … Describe the claimed invention in terms that particularly point out and distinctly claim the invention as required by 35 U.S.C. 112(b)." *See* 37 C.F.R. 1.57(d). Under Taction's argument, the +/- 10 decibels test is required to particularly point out and distinctly claim the alleged invention. Indeed, Taction contends that "highly damped output" is not limited to a mechanical Q-factor less than 1.5 or to the acceleration response shown in Fig. 5C. And the +/- 10 decibels test is the only test identified by Taction for determining whether an output is generally uniform. Thus, under Taction's argument, the "highly damped output" would be indefinite without this disclosure. Accordingly, the +/- 10 decibels test is "essential material."

"'Essential material' may be incorporated by reference, but only by way of an incorporation by reference to *a U.S. patent or U.S. patent application publication*…." *Id*. The '985 provisional, however, is not a U.S. patent or a U.S. patent application publication. Thus, the "essential material" in the '985 provisional cannot be incorporated by reference. *Id*.; *see Ex Parte Skszek*, No. 2009-000662, 2009 WL 1892584, at *2 (B.P.A.I. June 29, 2009) (incorporation by reference to a provisional application for "essential material" is not permitted under 37 C.F.R. § 1.57).

Furthermore, even if Taction could rely on the '985 provisional to save its otherwise indefinite construction (it cannot), the same paragraph of the '985 provisional that Taction cites expressly states that the "the motion can be damped, so that the mechanical system has a Q-Factor of less than 1.5, and therefore provides vibrational accelerations with a frequency response that may be substantially uniform with +/- 10 decibels over the frequencies 40-200 Hz." '985 provisional at [0072]; *see also id*. at [0016] ("Motion of [] the movable member can damped so that the steady-state sinusoidal voltages applied to the module at different frequencies produce an acceleration response of the movable member that may be substantially uniform over the range 40-200 Hz."). That is, the same intrinsic record relied on by Dr. Oliver confirms that a "transducer with highly damped output" has a mechanical Q-factor less than 1.5. Ex. 1 (Zinn Reb. Rpt.) at ¶ 100. And, because of that level of damping, the transducer provides a substantially uniform *acceleration* response to a *constant* input. *Id*. Thus, there is no basis in the '985 provisional for Taction's conclusion that the output can be a power frequency response or that the input can be varied to generate a desired output. Instead, like the asserted patents, the '985 provisional describes the transducer's acceleration response to a constant input.

Based on the foregoing, a person of ordinary skill in the art would have understood that the mechanical Q-factor must be less than 1.5. If this test is used to evaluate whether an output is "highly damped," the claims will not be indefinite. Similarly, if the Court agrees that "highly damped output" refers to the shape of an

output graph rather than or in addition to the amount of damping (it should not for the reasons explained above), then "highly damped output" must refer to an acceleration response within +/- 0.15 g when measured using a constant input. This test will save the claims from indefiniteness if applied in evaluating infringement.

**ii. Apple's Taptic Engines do not have a mechanical Q-factor less than 1.5**

Taction does not allege, and Dr. Oliver does not opine, that the accused products have a mechanical Q-factor less than 1.5. Instead, Dr. Oliver says they have a so-called "effective Q-factor" or "actual output Q-factor" ranging from [redacted]. Ex. 2 (Oliver Rpt.) at ¶ 571 ("The measured Q-Factors across all iPhones tested ranged from [redacted]."). Although the "effective Q-factor" and "actual output" were made up by Dr. Oliver and are not accepted parameters in the art, even using these parameters, Dr. Oliver cannot show that any Taptic Engine has a Q-factor less than 1.5. Dr. Oliver's alleged Q-factors for the Taptic Engine are more than three times higher than the Q-factor of a critically damped transducer, and they fall squarely within the range of Q-factors that the applicants distinguished from the claimed invention in the background of the patents. Thus, even if Taction is allowed to rely on Dr. Oliver's new theories of infringement, summary judgement is still appropriate.

Similarly, Taction does not allege, and Dr. Oliver does not opine, that the accused products have an acceleration frequency response that is within +/- 0.15 g pk-pk (as disclosed in the patents) when measured using a constant input. Indeed, Dr. Oliver performed no such testing. Instead, Dr. Oliver says they have a power frequency response that is within +/- 10 decibels when the input is varied to generate the desired output. Even using his own made-up testing, Dr. Oliver cannot show that any Taptic Engine has an acceleration frequency response that is within +/- 0.15 g pk-pk even when measured using a variable input. Ex. 1 (Zinn Reb. Rpt.) at ¶ 83. Thus, even if the Court agrees that "highly damped output" refers to the shape of output graph rather than or in addition to the amount of damping and Taction is allowed to

rely on Dr. Oliver's new testing, summary judgement is still appropriate.

**iii. Taction's new infringement arguments render the claims invalid as indefinite**

As previously explained, terms of degree or approximation are indefinite where the patent does not include specific examples that embody the claim term and provide a necessary objective baseline through which one can interpret the claims. *See Berkheimer*, 881 F.3d at 1364 (finding "minimal redundancy" indefinite where the "specification contains no point of comparison for skilled artisans to determine an objective boundary of 'minimal'"). And, in *Interval Licensing*, when faced with another term of degree, "unobtrusive manner," the Federal Circuit similarly "look[ed] to the written description for guidance" but found it "hazy." 766 F.3d 1371-74. The court therefore held "unobtrusive manner" indefinite because, "when viewed in light of the specification and prosecution history," the phrase fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Id.*

Here, Taction argues that term of degree "highly damped output" is not limited to a specific Q-factor or to the output illustrated in Figure 5C (*i.e.*, an acceleration frequency response within +/- 0.15 g measured using a constant input). And, as explained above in Sec. II.C.1.c.i.1-2, Taction has not identified a point of comparison in the intrinsic record for a skilled artisan to determine an objective boundary. Thus, like "minimal redundancy" in *Berkheimer* and "unobtrusive manner" in *Interval Licensing*, "highly damped output" is indefinite under Taction's theory of infringement because it fails to inform those skilled in the art about the scope of the claimed invention with reasonable certainty.

Even apart from terms of degree, a claim is indefinite when there are multiple methods of measurement that produce different results and the patent does not provide guidance as to which method should be used. *Teva Pharms. USA Inc. v. Sandoz Inc.*, 789 F.3d 1335, 1338-44 (Fed. Cir. 2015); *Dow Chem. Co. v. Nova Chem. Corp.*, 803 F.3d 620, 630–31 (Fed. Cir. 2015); *see also Media Rights Techs., Inc. v. Capital One*

*Fin. Corp.*, 800 F.3d 1366, 1371 (Fed. Cir. 2015) ("a claim is indefinite if its language might mean several different things and no informed and confident choice is available among the contending definitions") (internal quotations marks omitted)).

In *Teva*, for example, the Federal Circuit found claims that recited the term "molecular weight" indefinite because there are multiple formulas used to calculate molecular weight but nothing in the claims, specification, or prosecution history to identify which formula to apply. 789 F.3d at 1341. Similarly, in *Dow*, the Federal Circuit found claims indefinite where the claims recited "a slope of strain hardening" but the patent failed to teach which of four unstated formulas to use for measuring slope of strain hardening. 803 F.3d at 633. The court explained that this made the claims indefinite, stating that "[b]ecause the methods do not always produce the same results, the method chosen for calculating the slope of strain hardening could affect whether or not a given product infringes the claims." *Id*. at 634.

Here, as in *Dow* and *Teva*, the claims require a certain Q-factor (*i.e.*, a mechanical Q-factor less than 1.5). Taction, however, has argued that "highly damped output" is not limited to a specific Q-factor. Ex. 2 (Oliver Rpt.) at ¶ 624. The following known methods exist for measuring the Q-factor: (1) determining the mechanical Q-factor; (2) determining the electrical Q-factor; (3) determining the total Q-factor (*i.e.*, the combination of mechanical and electrical damping); and, under Taction's new theory of infringement, (4) determining a so-called "effective Q-factor" or "actual output Q-factor." *Id.* at ¶ 625. And the value of each Q-factor can be significantly different. Ex. 1 (Zinn Reb. Rpt.) at ¶¶ 319-321. For example, the Apple Watch Series 6 has an electrical Q-factor of [redacted], a mechanical Q-factor of [redacted], a total Q-factor of [redacted], and an alleged "effective Q-factor" or "actual output Q-factor" between [redacted]. *Id.*; Ex. 2 (Oliver Rpt.) at ¶ 571.

Moreover, under Taction's argument, "highly damped output" requires an output that is "generally uniform or flat." Ex. 2 (Oliver Rpt.) at ¶ 607. Taction itself, however, has identified at least two completely different ways to measure the output:




*Taction's Infringement Contentions*
Ex. 8 ('885 Claim Chart) at 15




*Dr. Oliver's Report*
Ex. 2 at ¶ 575

For its infringement contentions, Taction measured various frequency responses of each Taptic Engine (removed from its iPhone or Watch) by shaking the Taptic Engine with a constant input and measuring the acceleration. Ex. 9 (Taction Resp. to Apple Interrogatory No. 14). In contrast, Dr. Oliver measured various frequency responses, including an alleged power frequency response that was not included in Taction's infringement contentions, by exciting the Taptic Engine with a variable input and measuring the force. Ex. 2 (Oliver Rpt.) at ¶¶ 545-584. Unlike Taction's method, Dr. Oliver's method did not remove the Taptic Engines from the iPhone. *Id.* As shown above, these two methods produce completely different results—one that Taction now admits does not show a highly damped output and one that allegedly does.

Moreover, even using Dr. Oliver's testing method, the alleged uniformity or flatness of the graph depends heavily on the type of output. The asserted patents identify (1) an acceleration frequency response, and Dr. Oliver has identified the following additional outputs: (2) displacement frequency response; (3) velocity frequency response; and (4) mechanical power frequency response. *E.g.,* Ex. 2 (Oliver Rpt.) at ¶ 582. However, the shape of each output is significantly different. Ex. 1 (Zinn Reb. Rpt) at ¶¶ 76-84; *see also* Ex. 18 (Zinn Op. Rpt.) at ¶ 321. Examples of the acceleration frequency response and the power frequency response obtained from Dr. Oliver's testing are shown below:




*Acceleration frequency response*
Ex. 1 (Zinn Reb. Rpt.) at ¶ 83




*Power frequency response*
Ex. 2 (Oliver Rpt.) at ¶ 575

Under Taction's infringement argument, the asserted claims are broad enough to cover all these approaches. However, a person of ordinary skill in the art would not know which approach to select. Indeed, Taction's approach, which was concocted specifically for this case, is not even mentioned in the asserted patents. Thus, the asserted claims are indefinite under Taction's infringement argument.

**2. The Monolithic Products do not have "a plurality of magnets"**

The Court construed the phrase "plurality of magnets" to mean "at least two physically distinct magnets" wherein each "magnet" is "a body that produces a magnetic field based on the body's dipolar nature." *See* ECF No. 141 at 29. As explained by the Court, "the claim language supports Apple's contention that the claimed 'magnets' must be separate, physically distinct bodies." *Id.* at 23.

Under the Court's construction, the Monolithic Products do not include a "plurality of magnets" literally or under the doctrine of equivalents.

**a. The Monolithic Products do not literally infringe**

The Monolithic Products do not literally include at least two physically distinct magnets. As shown in the example image to the below, which is the only purported evidence of literal infringement included in Taction's infringement contentions, there is only one physically distinct magnet in the Monolithic Products. Ex. 23 (iPhone 14 '885 claim chart) at 8. Taction's infringement contentions do not argue that the

Monolithic Products include "at least two physically distinct magnets" that are "separate, physically distinct bodies." Instead, they assert only that infringement is established by "the photographs contained in Taction's infringement claim charts." Ex. 7 (Post-CC Contentions) at 11. However, as shown above, those photographs confirm there is only *one* "physically distinct bod[y]." *Compare* ECF No. 141 at 23. Literal infringement is thus precluded. *See* ECF No. 141 at 29.




Nonetheless, Taction's expert, Dr. Oliver, subsequently opined that the Monolithic Products literally include "a plurality of magnets." ECF No. 141 at 22-23; Ex. 2 (Oliver Rpt.) at ¶ 764 ("The Monolithic Magnet Accused Products include multiple magnets, which are multiple magnetic domains arranged next to each other on a substrate"). However, Dr. Oliver's new opinion is both procedurally improper (subject to Apple's motion to strike) and legally wrong. Indeed, during claim construction, the Court rejected Dr. Oliver's argument that "the claimed 'magnets' can be subsidiary pieces of material on a single body [because that argument] is not supported by the claim language." *See* ECF No. 141 at 22-23. As the Court previously held, "Taction cannot rely on expert testimony to contradict this clear meaning from the claim language." *Id.* at 26. Summary adjudication of no literal infringement is thus warranted here.

**b. The Monolithic Products also do not infringe under the doctrine of equivalents**

Taction also cannot demonstrate infringement under the doctrine of equivalents ("DOE"). As shown below, Taction's DOE contentions consist of two sentences:

> The accused products perform the same function (e.g., producing magnetic fields proximate to one or more conductive coils), in the same way (e.g., by including a plurality of magnetically polarized areas in the moving mass), to achieve the same result (e.g., allowing the moving mass to be urged laterally when electrical current is applied to one or more conductive coils) as the claimed "a plurality of magnets." The difference between the claimed "a

> plurality of magnets" and the configurations of magnets in the accused products is insubstantial.

Ex. 7 (Post-CC Contentions) at 17. These contentions are insufficient as a matter of law to demonstrate equivalence.

First, such conclusory assertions—even if supported by expert testimony—are insufficient as a matter of law to avoid summary judgment. *E.g.*, *Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) ("Conclusory expert assertions cannot raise triable issues of material fact on summary judgment.").

Second, Taction has attempted to cure its defective contentions by introducing new opinions from its expert. Again, these are subject to Apple's motion to strike and should be excluded.

Finally, by resurrecting the argument the Court rejected during claim construction—that "the claimed 'magnets' can be subsidiary pieces of material on a single body"—Taction would vitiate an express claim limitation. This is an issue of law and is not permitted. *E.g.*, *Panduit Corp. v. HellermannTyton Corp.*, 451 F.3d 819, 826 (Fed. Cir. 2006). Indeed, "the concept of equivalency cannot embrace a structure that is specifically excluded from the scope of the claims." *Dolly, Inc. v. Spalding & Evenflo Companies*, Inc., 16 F.3d 394, 400 (Fed. Cir. 1994). Such an equivalency vitiates the claim's specific exclusions, especially where, as here, the Court rejected the equivalency as part of claim construction. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1346 (Fed. Cir. 2001) (a metallic device cannot be the equivalent of the claimed "non-metallic" device as a matter of law; affirming summary judgment).

This Court should reject Taction's attempt to end-run the claim construction order and hold that Apple's Monolithic Products do not infringe, either literally or under the doctrine of equivalents.

## III. TACTION CANNOT OBTAIN PRE-SUIT DAMAGES

To obtain pre-suit damages, a patentee must show either consistent and

continuous marking of the patented products or actual notice of infringement (not merely notice of its patents). 35 U.S.C. § 287. Taction did neither.

### A. Relevant Factual Background: Taction failed to mark the patent numbers on the outside of the Corsair HS60

On October 15, 2020, Taction's licensee, Corsair, began selling the HS60 headset, which Taction alleges to practice the asserted patents. Ex. 33 (2022-11-04 Resp. Rog. 18) at 100. ECF No. 272 at 3. Taction alleges compliance with the marking statute based on the Corsair product box or on a label on the "Transporter" module hidden inside the Corsair headset, not visible to the public. *See* ECF No. 272 at 3-4; Ex. 26 (HS60 inspection photos); Ex. 27 (Steinberg Day 4 Tr.) at 533:11-19.

Taction has also admitted the Corsair HS60 headset, and not just the internal Transporter module, practices the patents. *E.g.*, Ex. 2 (Oliver Rpt.) at ¶ 991; ECF 272-2 at 1 (8/14/20 first amendment to [redacted]); ECF 273-2 at 4 (box for Corsair headset lists Taction patents). Paragraph 991 from Dr. Oliver's report states: "As I detail below, the Taction Kannon headsets and ***Corsair HS60 headsets practice the asserted claims***." Ex. 2 at ¶ 991 (emphasis added). Taction's website states in multiple places that headphones containing Transporter modules are covered by the patents. Ex. 24 (Taction patent marking web page: "Taction Transporters ***and products that include them*** may be covered by one or more of the following patents: [listing '885 and '117 patents]" (emphasis added)); Ex. 25 (Taction announcement of HS60 headset: "Transporter-equipped ***headphones*** may be covered by one or more of the following patents . . . US 10,659, 885 . . . ." (emphasis added)).

### B. Taction failed to satisfy the marking statute

#### 1. Patent markings on the *packaging* of the HS60 headsets are legally insufficient

Patent markings placed on the *packaging* of the Corsair headsets are not on the "patented article" as 35 U.S.C. § 287(a) requires. The statute requires marking the

"patented article"—not the packaging—unless "from the character of the article, this can not be done." 35 U.S.C. § 287(a). There is no dispute there is no visible patent marking on the HS60 headsets, which Taction contends practice the asserted patents. *See* previous section (citing evidence). There is also no dispute the HS60 headset could have been marked. ECF No. 272 at 8-10. Indeed, other information is printed on the HS60 headset, including the "Corsair" brand name, "//60HAPTIC," and text inside the headphone bow that includes FCC information; part, model, and lot numbers; and "Made in China." *See* Ex. 26, APL-TACT_04957352 (HS60 photos).

Where, as here, the patented article contains non-patent information printed or labeled on it, courts hold as a matter of law that marking of packaging and not the patented article is legally insufficient. *See, e.g.*, *Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2015 WL 1543262, at *24 (N.D. Ill. Mar. 31, 2015) (granting summary judgment on this basis); *Kadant Johnson, Inc. v. D'Amico*, No. CIV.A. 10-2869, 2012 WL 38319, at *3-6 (E.D. La. Jan. 9, 2012) (same).

**2. Any patent marking on the Taction Transporter is out of the public view and legally insufficient**

As established above, Taction and its expert Dr. Oliver assert that the Corsair headset practices the asserted patents, so it must be marked. Marking on the internal Transporter is not visible unless a user tears down the headset and effectively destroys it. Ex. 26 (HS60 inspection photos) at APL-TACT_04957354, 357, 360, 361 (annotated); *see also* ECF No. 272 at 11-12; *see also* Ex. 21 (Biggs Day 2 Tr.) at 457:14-25. Thus, there is no genuine factual dispute that marking on the Transporter is invisible from the public and improper under 35 U.S.C. § 287, which requires marking to be "fix[ed] thereon," not therein. *See also Symbol Techs., Inc. v. Proxim Inc.*, No. CIV.A.01-801-SLR, 2002 WL 1459476, at *1 (D. Del. June 25, 2002) ("labels are not visible to the public and, therefore, are not 'markings' at all"); *Trussell Mfg. Co. v. Wilson-Jones Co.*, 50 F.2d 1027, 1030 (2d Cir. 1931) (need for a magnifying glass to read the patent number was not "sufficient notice to the public").

In fact, as the Federal Circuit made clear in *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1366 (Fed. Cir. 2017), the marking statute serves three related purposes that are focused on public notice. Hidden patent marking, invisible to the public, fails this policy.[3]

**3. Taction fails to show consistent and continuous marking**

Taction cannot establish the patent markings on the HS60 headset were done in a "consistent and continuous" manner as § 287(a) requires. *Nike, Inc. v. Walmart*, 138 F.3d at 1446. Mr. Steinberg admitted that "[redacted]. Ex. 27 (Steinberg Day 4 Tr.) at 534:6-13. Yet, nowhere in the record has Taction explicitly identified when the alleged marking on the Corsair HS60 headset began. ECF No. 272 at 13-14. Taction also fails to establish when Corsair started distributing marked HS60 headsets to the public or when distribution of the unmarked HS60 headsets ceased. *See American Med. Sys.*, 6 F.3d at 1537-38. As to the alleged "virtual marking" with a web address hidden inside the HS60, Taction offered two archived webpages from the Wayback Machine (a third-party archive) to support its marking contentions. However, Taction has not established when it began virtually marking the Transporters or that substantially all of the Transporters have had the virtual marking web address. Taction cannot genuinely dispute these facts. Moreover, the archived webpages from the Wayback Machine are not admissible without proper authentication and supporting affidavits (which Taction failed to provide during discovery). *See, e.g.*, *Hansen Cold Storage Constr. v. Cold Sys., Inc.*, No. 2:19-CV-

---

[3] If Taction argues the *combination* of physical marking on the box and virtual marking on the hidden Transporter satisfies § 287(a), that argument fails. Multiple ineffectual "markings" do not magically result in legally sufficient markings under § 287(a). *See Zadro*, 514 F. Supp. 3d at 1217 (finding insufficient markings where none of the alleged markings (physical and virtual) were "on the product itself").

07617-SB-MAA, 2021 WL 6536672, at *3 (C.D. Cal. Dec. 19, 2021) ("Plaintiff must properly authenticate the evidence obtained from the Wayback Machine for its admission at trial."); *My Health, Inc. v. Gen. Elec. Co.*, No. 15-CV-80-JDP, 2015 WL 9474293, at *4 (W.D. Wis. Dec. 28, 2015). Last week, Taction produced an untimely declaration purporting to authenticate its archived web page, but Apple never had a chance to probe this in discovery, so it should be excluded.

Given Taction's failure to demonstrate continuous and consistent patent marking of the HS60, Taction fails to satisfy § 287(a) as a matter of law.

#### 4. Taction fails to provide evidence that shows any efforts to police Corsair's compliance with the marking statute

Throughout discovery, Taction identified no evidence that shows any efforts to police Corsair's compliance with the marking statutes, let alone any "reasonable efforts" as the law requires. *See U.S. Ethernet Innovations*, 2013 WL 4456161, at *7. The facts here are particularly compelling since Taction [redacted]. ECF No. 272 at 9. After the initial launch of the HS60, Mr. Steinberg testified having noticed that [redacted] Ex. 27 (Steinberg Day 4 Tr.) at 584:17-25; ECF No. 272-2 ([redacted]) at TACTION019225 (addressing [redacted]) and [redacted]). Clearly, it was so important for Taction to have its brand in public view on the headset that [redacted]. Summary judgment is warranted. *See Team Worldwide Corp. v. Acad., Ltd.*, No. 219CV00092JRGRSP, 2021 WL 1897620, *4 (E.D. Tex. May 3, 2021) (granting summary judgment where

patentee failed to present evidence licensee properly marked).

### C. Taction failed to provide actual notice to Apple

The patent owner must provide specific notice of the alleged infringement to the defendant. *Amsted Industries Inc.*, 24 F.3d at 186. Taction did not do so before filing this lawsuit. Nor has Taction alleged any actual pre-suit notice. *See* Ex. 28 (2023-02-10 Taction Resp. Rogs) at 10, 12). Thus, Taction failed to provide either constructive or actual notice as a matter of law, and Apple is entitled to summary judgment of no pre-suit damages.

## IV. THE COURT SHOULD ALSO EXCLUDE UNRELIABLE OPINIONS FROM TACTION'S EXPERTS

Defendant Apple respectfully requests that the Court exclude the testimony of Plaintiff Taction's technical expert, Dr. James Oliver, as well as the entirety of the opinions and testimony of Plaintiff Taction's damages expert, Dr. Patrick Kennedy.

***First***, Dr. Oliver bases his opinions upon: (1) unreliable testing of only a subset of Apple products, and (2) arbitrary technical apportionment factors that rely on this testing, irrelevant Apple testimony, hearsay inventor conversations, and *ipse dixit* conclusions on technologies in Taction's licensee's product versus Apple's products.

***Second***, because Dr. Kennedy bases his necessary apportionment analysis on Dr. Oliver's unreliable opinions, his damages conclusions should also be excluded.

Neither cross-examination nor careful jury instructions can cure these flaws that render Dr. Oliver and Dr. Kennedy's opinions insufficiently reliable for admission at trial. Apple therefore requests that the Court grant this motion.

### A. Taction relies on unreliable expert opinions

#### 1. Dr. Oliver conducted unreliable testing and offers an unreliable analysis of "technical apportionment"

Dr. Oliver conducted a series of tests to estimate the "effective Q-factor" of the accused products to support his infringement opinions. Ex. 2 (Oliver Rpt.) at ¶¶ 545-84, 625. His tests are flawed and should be excluded. He also analyzes "technical

apportionment," which Taction's damages expert, Dr. Kennedy, uses in his royalty rate calculations. *Id*. at ¶¶ 1233-45. The underpinnings of his analysis are flawed and unreliable, and Dr. Oliver's apportionment opinions should be excluded from trial.

**a. Dr. Oliver's testing of just six iPhone accused products is unreliable and should be not be allowed at trial**

"To ascertain the dynamic behavior of the Accused Products" (Ex. 2 (Oliver Rpt.) at ¶ 545), Dr. Oliver tested only six of the over 40 Apple products that Taction accuses of infringement, completely omitting testing of any Apple Watches and numerous Apple iPhones (*id.* at ¶¶ 159, 184, 545-584, 1244). Notably, Dr. Oliver used Apple's Core Haptics application programming interface (API) to test the six iPhones. *Id.* at ¶ 550. However, he admits that, "[b]ecause the Core Haptics Library is not available for third-party Apple Watch apps, [he] was not able to test the Apple Watch Products in the same manner." *Id*. at ¶ 551. Indeed, Dr. Oliver did not test the Watches *in any manner*. Instead of devising a different test for the Watches, Dr. Oliver took the easy way out and assumed they are all the same as the six iPhones he did test: "given the technical commonalities between the Taptic Engines in the Apple Watch Accused Products, as well as commonalities between the tested Taptic Engines and other Taptic Engines in the Accused Products, ***I believe my results are generally applicable to all Accused Products***." *Id.* at ¶ 551; *see also id*. at ¶ 618 (similar); Ex. 5 (Oliver Tr.) at 248:20-23 (confirming Dr. Oliver simply relied on his "expertise"). This is classic *ipse dixit*—it's true because Dr. Oliver says so.

Yet the Taptic Engine in each accused product is distinct in size, shape, and components that impact measurements of damping. Ex. 29 (Feb. 8, 2023 Production of Physical Samples); Ex. 30 (Pl.'s 12/3/21 iPhone 8 Inf. Chart) at 8; Ex. 31 (Pl.'s 10/31/22 iPhone 14 Pro Max Inf. Chart) at 7; Ex. 32 (Pl.'s 10/31/22 Apple Watch Series 8 Inf. Chart) at 6. Dr. Oliver makes no effort to support his conclusory assertion that test results for any iPhone would be the same for any other iPhone, let alone for an Apple Watch, despite their obvious differences. *Id.*

Dr. Oliver's testing methodology does not meet Rule 702's threshold for admissibility and should be excluded from trial. By testing only six iPhones out of over 40 physically distinct accused product models, which have different Taptic Engines, Dr. Oliver's testing methodology is not "based on sufficient facts or data" and does not apply "reliable principles and methods." Fed. R. Evid. 702. Dr. Oliver concludes his "test results are generalizable to all of the Accused Products," Ex. 2 (Oliver Rpt.) at ¶¶ 551, 618, based only on his "expertise" and no evidence, Ex. 5 (Oliver Tr.) at 248:20-23. He even extends this conclusion to the accused Watch products without testing a single one, because admittedly his test would not work on those products. Ex. 2 (Oliver Rpt.) at ¶ 551. In doing so, Dr. Oliver ignores Taction's burden to prove that every accused product, not just six of the more than 40 accused products, allegedly infringe. *See Cellspin Soft, Inc. v. Fitbit, Inc. et al.*., Nos. 4:17-cv-05928, -05931-34, -05936, 2022 WL 2784467, at *7 (S.D. Cal. Apr. 21, 2010) ("Where a patent holder accused multiple models of a defendant's accused product of infringing on the patented product, the patent holder must prove that each and every accused model contains every limitation.").

Similarly, Dr. Oliver's testing methodology—measuring a module's power frequency response to a variable input voltage and calculating a purported "effective Q-factor"—does not apply "reliable principles and methods." Fed. R. Evid. 702; *see Shalaby v. Irwin Indus. Toll Co.*, No. 07CV2107-MMA, 2009 WL 7452756, at *5 (S.D. Cal. July 28, 2009) (finding testing cut against reliability where expert failed to actually test for design defect in question); *see also MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 248 F. App'x 199, 203 (Fed. Cir. 2007) (affirming exclusion of expert opinions for "fail[ure] to demonstrate that his testing methodology was scientifically reliable"). As explained above in Sec. II.C.1.c.i, Dr. Oliver's testing, which varies the input to achieve a desired output, is not described anywhere in the asserted patents. Nor can Taction identify any publication, peer review, generally accepted standard, or known or potential rate of error that supports Dr.

Oliver's test method. *See, e.g.*, *Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 284-85 (D. Vt. 2013); *Shalaby*, 2009 WL 7452756, at *6-8, 10. In fact, Dr. Oliver testified that he does not know what the "effective Q-factor" is and, prior to this case, had never even measured or seen anyone else measure an "effective Q-factor." Ex. 5 (Oliver Tr.) at 78:16-80:16. Dr. Oliver's testing thus "carries special dangers to the fact-finding process because it 'can be both powerful and quite misleading because of the difficulty in evaluating it.'" *Daubert II*, 43 F.3d at 1321 n.17 (citations omitted).

Dr. Oliver failed to perform any scientifically accepted measurement to determine an actual Q-factor or an acceleration response to a constant input. Instead, he invented a metric to suit his desired result for this case. He did not do even that much for the Apple Watch products, which he did not test at all but simply declared would have behaved the same as the six iPhones that were tested. The Court should not allow each of these departures from the Federal Rules of Evidence.

**b. Dr. Oliver's "technical apportionment" opinions are unreliable and should be excluded**

Dr. Oliver provides opinions attempting to isolate the contribution of the asserted patents to Apple's accused products and to Taction's licensee's product, the Corsair HS60 headset. Ex. 2 (Oliver Rpt.) at ¶¶ 1233-1245. This alleged contribution forms the basis of his "technical apportionment," which Dr. Kennedy then uses. To arrive at his technical apportionment factor, Dr. Oliver makes computations concerning the accused products and the HS60 and then compares the two. However, both computations are unreliable, and his technical apportionment is fatally flawed.

***Apple Accused Products.*** Dr. Oliver uses a combination of his unsound testing data and a few lines of testimony from an Apple witness, Jere Harrison, to opine that "[redacted]" in all of the Apple accused products. Ex. 2 (Oliver Rpt.) at ¶ 1244. Specifically, Dr. Oliver sets forth several equations to calculate these damping percentages based on decibels of power

associated with damping by "ferrofluid" ($dB_{FerroFluid}$) and damping by "electronic damping means" ($dB_{Electronic}$). *Id.* at ¶¶ 1238-39. These decibel values, in turn, require inputting into his equations Q-factors associated with: (1) an undamped version of the accused products ($Q_{undamped}$), (2) a version of the accused products that uses only ferrofluid for damping ($Q_{FF}$), and (3) a version of the accused products that contains both ferrofluid and "electronic" damping ($Q_{FF\&E}$). Dr. Oliver plugs all three inputs into his equations to arrive at the 40% factor. For $Q_{FF\&E}$, Dr. Oliver relies on an "effective Q-factor" [redacted] for ***all*** 40+ accused products. Ex. 2 (Oliver Rpt.) at ¶ 1244. As explained above, Dr. Oliver's "effective Q-factor" analysis is unreliable.

***Licensed*** [redacted] ***Product.*** Dr. Oliver's technical apportionment opinions also assume that the [redacted] product practices a non-asserted patent, the '139 patent, in addition to the asserted patents, but here he relies on *non-disclosed* testing and conversations with a biased witness: Taction's founder and the named inventor of the asserted patents, Dr. Biggs. Ex. 2 (Oliver Rpt.) at ¶¶ 1236, 1243. Dr. Oliver identifies a 73% apportionment factor to isolate the contribution of the asserted (and related) patents from the '139 patent in the [redacted] product. *Id.*

However, Dr. Oliver conducts no testing or independent assessment of these technologies within the [redacted] product. *Id.* Rather, as stated, Dr. Oliver's sole basis for the 73% factor is a conversation with Dr. Biggs, a fact witness, regarding testing and measurements performed by Dr. Biggs that have not been disclosed or produced. *Id.*; *see Hutchinson v. Groskin*, 927 F.2d 722, 725 (2d Cir. 1991) (holding it improper to use expert "as a conduit for hearsay testimony"); *Rotman*, 955 F. Supp. 2d at 283-85 (excluding expert opinion that "merely repeats or recasts the testimony of [a biased fact witness] in order to arrive at a theory of causation" as "he is not testifying as an expert witness based upon specialized knowledge, but rather is acting as a conduit for another witness's testimony in the guise of an expert's opinion"). Dr. Oliver does not identify the test protocol or equipment Dr. Biggs used, or even the identity or number of the modules tested—***none of which Taction produced***. Ex. 5 (Oliver Tr.) at 239:7-

242:14. Dr. Oliver did not inspect any of the tested modules, did not address any assumptions Dr. Biggs made during testing, and was not involved in developing Dr. Biggs' testing methodology. *Id.* at 242:15-243:23. Though Dr. Oliver admitted he could have tested these modules, he did not undertake any independent verification of Dr. Biggs' conclusions. *Id.* at 243:24-244:16. We are left to wonder what Dr. Biggs did and how he did it. And it appears Dr. Oliver is, too.

These are precisely the kind of circumstances where an expert's opinions should be excluded. Dr. Oliver's 73% figure comes solely from a conversation with Dr. Biggs, relies on an alleged Q-factor measurement of [redacted] (which represents an error of +/-33%), and refers to tests allegedly performed by Dr. Biggs that Dr. Oliver did not inspect, test, or otherwise verify—much less disclose details sufficient for Apple to replicate. Ex. 5 (Oliver Tr.) at 239:7-244:16. Dr. Oliver's reliance on conversations with Dr. Biggs' about testing that was not disclosed during discovery or described in Dr. Oliver's report is alone sufficient to exclude Dr. Oliver's opinions. *See Sound View Innovations, LLC v. Hulu, LLC*, No. LACV1704146JAKPLAX, 2019 WL 9047211, at *13-14 (C.D. Cal. Nov. 18, 2019), *aff'd*, 33 F.4th 1326 (Fed. Cir. 2022) (excluding expert testimony that "relies on discussions with [another person] that are not described in any [other] reports"). But here Dr. Oliver's errors are compounded by his limited review of the accused products and lack of scientific testing and analysis involving unreasonably large errors, and thus his opinions based on insufficient information that does not assist the trier of fact must be excluded. *See Rotman*, 955 F. Supp. 2d at 284-85; *Shalaby*, 2009 WL 7452756, at *6-8.

In sum, Dr. Oliver's technical apportionment opinions are unreliable, and he should be precluded from presenting them at trial.

**c. Dr. Kennedy's reliance on Dr. Oliver's flawed technical apportionment renders Dr. Kennedy's reasonable royalty opinion unreliable**

Dr. Kennedy's [redacted] per unit royalty rate originates from an [redacted]

[redacted]. To arrive at the [redacted] rate, he uses as a starting point the [redacted]," and apportions down. Ex. 34 (Kennedy Rpt.) at ¶¶ 135, 163. His apportionment starts by subtracting the estimated cost of ferrofluid per headset ([redacted]) from the [redacted]. He then applies the 73% factor based upon Dr. Oliver's opinion that "no more than 27% of the benefits enjoyed by the HS60 Haptic headset through the licensed patents are derived from the '139 Patent." *Id.* at ¶¶ 173, 304-05, Am. Sched. 1.4 ("apportion[ing] out 27% of the royalty rates from the [redacted] to isolate the value of the Patents-in-Suit"). This reduces Dr. Kennedy's proposed rate down to [redacted].

Next, Dr. Kennedy applies the 40% factor based upon his understanding "from Dr. Oliver that the Patents-in-Suit contribute to 40 percent of the reduction in the Q factor in the Accused Products." *Id.* at 304-05, Am. Sched. 1.4; Ex. 35 (Kennedy Tr.) at 273:6-275:23, 280:11-281:23. When applying the 40% factor in his analysis, Dr. Kennedy multiplies his royalty rate by the ratio of 40% to 73% (*i.e.*, 55%) "to account for the relatively smaller contribution the patented technology has on the lowering of the Q factor in the Accused Products versus in the Corsair HS60 Haptic Headset." Ex. 34 (Kennedy Rpt.) at ¶ 305. He multiplies [redacted] to reach [redacted] per unit.

Dr. Kennedy admits that his reasonable royalty analysis necessarily relies upon the 40% and 73% allocation factors and technical apportionment assumptions of Dr. Oliver. Ex. 35 (Kennedy Tr.) at 273:6-275:23, 280:11-281:23. However, as explained above, Dr. Oliver's 40% figure comes from: (1) his own flawed testing and (2) his interpretation of an Apple witness's testimony in response to questions concerning non-accused iPhone 7 products, not any accused iPhone or Watch product. Ex. 2 (Oliver Rpt.) at ¶ 1244 & n.1018 (citing lines 174:3-9, 190:10-17 from deposition of Mr. Harrison); Ex. 4 (Harrison Tr.) at 172:11-18.

Moreover, Dr. Kennedy's calculations rely on Dr. Oliver and his *ipse dixit* argument that "the technological contribution of the '139 patent compared to Apple's

[redacted] is technologically equivalent." *Id.* at ¶ 305, Am. Sched. 1.4 (citing Dr. Oliver in footnotes [c] and [d]); Ex. 2 (Oliver Rpt.) at ¶ 1245; Ex. 35 (Kennedy Tr.) at 280:11-23. However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" or prevents a court from concluding that "there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022) (requiring new trial when expert damages opinions were untethered to facts of the case).

Dr. Kennedy's apportionment methodology falls apart without Dr. Oliver's technical apportionment as an input. And since Dr. Oliver's technical apportionment opinions are unreliable and inadmissible, Dr. Kennedy's reasonable royalty analysis falls with them. Here, the Court should "exercise[] its gatekeeping authority to ensure that only theories comporting with settled principles of apportionment … reach the jury" by excluding Dr. Kennedy's entire damages opinion along with the unreliable opinions from Dr. Oliver. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328-29 (Fed. Cir. 2014). None of Dr. Kennedy's or Dr. Oliver's opinions seeking to apportion the reasonable royalty to the patented invention provide a testable opinion that can be meaningfully cross-examined at trial given their reliance on undisclosed testing by Dr. Biggs, testimony about the non-accused iPhone 7, and Dr. Oliver's unsound testing methodologies. *See NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-cv-02352, 2020 WL 1274985, at *7, 9-11 (N.D. Cal. Mar. 17, 2020) (excluding opinions not backed by sufficient facts or reliable methods).

## V. CONCLUSION

Apple respectfully requests that the Court strike the new infringement theories in Dr. Oliver's report, grant Apple's motions for summary judgment of non-infringement and no pre-suit damages, and grant Apple's *Daubert* motion to exclude Dr. Oliver and Dr. Kennedy's unreliable opinions and testimony at trial.

Dated: May 19, 2023

FISH & RICHARDSON P.C.

By: /s/ Seth M. Sproul

Roger A. Denning (SBN 228998)
denning@fr.com
Christopher S. Marchese (SBN 170239)
marchese@fr.com
Seth M. Sproul (SBN 217711)
sproul@fr.com
John W. Thornburgh (SBN 154627)
thornburgh@fr.com
Ryan P. O'Connor (SBN 253596)
oconnor@fr.com
Daniela Glaser (SBN 341535)
glaser@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099

Joy B. Kete *(pro hac vice)*
kete@fr.com
Qiuyi Wu (*pro hac vice)*
qwu@fr.com
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
Tel: 516-542-5070/Fax 617-542-8906

Jacqueline Tio (*pro hac vice)*
tio@fr.com
FISH & RICHARDSON P.C.
1180 Peachtree Street, N.E., 21st Floor
Atlanta, GA 30309
Tel: 404-892-5005/Fax 404-892-5005

*Counsel for Defendant Apple Inc.*