Roger A. Denning (SBN 228998)
denning@fr.com
Christopher S. Marchese (SBN 170239)
marchese@fr.com
Seth M. Sproul (SBN 217711)
sproul@fr.com
John W. Thornburgh (SBN 154627)
thornburgh@fr.com
Ryan P. O'Connor (SBN 253596)
oconnor@fr.com
Daniela Glaser (SBN 341535)
glaser@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099

*Additional Counsel listed on Signature Page*

Attorneys for Defendant Apple Inc.

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TACTION TECHNOLOGY, INC.,<br>Plaintiff,<br><br>v.<br><br>APPLE INC.<br>Defendant. | Case No. 3:21-cv-00812-TWR-JLB<br><br>**DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE OPINIONS OF DEFENDANT'S EXPERTS**<br><br>Hearing Date: July 13, 2023<br>Hearing Time: 1:30 p.m.<br>Courtroom: 3A<br>Judge: Hon. Todd W. Robinson<br><br>**REDACTED VERSION** |

# TABLE OF CONTENTS


I. Introduction ..... 1

II. Legal Standards ..... 2

III. Taction's request to strike Apple's Technical Analysis should be denied ..... 2

A. Dr. Zinn's and Dr. Visell's opinions regarding the iPhone 6 and iPhone 6 Plus should not be excluded ..... 3

1. Dr. Zinn and Dr. Visell properly analyzed the iPhone 6 and iPhone 6 Plus ..... 3

2. Taction's alleged differences between vibration modules analyzed by Drs. Zinn and Visell do not exist ..... 5

a. The iPhone 6 modules all have flux guides ..... 6

b. The iPhone 6 Plus modules identified by Taction have the same suspension ..... 8

c. The iPhone 6 modules all have the same housing ..... 9

d. The iPhone 6 Plus modules all have a flux guide ..... 12

3. Dr. Zinn's and Dr. Visell's expert opinions are based on a robust factual record, and they are the product of reliable principles and methods ..... 14

a. Dr. Zinn and Dr. Visell do not combine configurations of the iPhone prior art to reach their opinions ..... 15

b. Dr. Zinn offered a proper invalidity analysis supported by Dr. Visell's testing ..... 19

B. Dr. Zinn's obviousness opinions are more than sufficient to establish the obviousness of the asserted claims ..... 20

1. Dr. Zinn offered a properly supported obviousness analysis for the Zarrabi reference ..... 21

2. Dr. Zinn demonstrated motivations to combine Zarrabi and known vibration motors with a reasonable expectation of success ..... 22

3. Dr. Zinn demonstrated motivations to combine Zarrabi, known vibration motors, and Raj1990 with a reasonable expectation of success ..... 25

4. Dr. Zinn demonstrated motivations to make the "additional combinations" with a reasonable expectation of success ..... 26

5. Taction's case law again does not support exclusion ........ 29

IV. Taction's request to strike Apple's damages analysis should be denied ........ 30

A. Ms. Knox's "illustrative adjustments" to Dr. Kennedy's reasonable royalty calculations are proper critiques of his work and should not be excluded ........ 31

B. Ms. Knox's discussion of a license agreement between Apple and [redacted], neglected by Dr. Kennedy, is also a proper criticism, and is reliable and admissible ........ 35

C. Ms. Knox's discussion of feature usage, required by *Georgia-Pacific* Factor 11 and neglected by Dr. Kennedy, is proper and is reliable and admissible ........ 39

D. Ms. Knox's discussion of the market value of Taction, ignored by Dr. Kennedy, is also a proper criticism, and is reliable and admissible ........ 41

V. Conclusion ........ 43

# TABLE OF AUTHORITIES

**Cases** **Page(s)**


*1st Source Bank v. First Res. Fed. Credit Union*,
167 F.R.D. 61 (N.D. Ind. 1996)....................33

*Am. Med. Sys., Inc. v. Laser Peripherals, LLC*,
712 F. Supp. 2d 885 (D. Minn. 2010) ....................29, 30

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ....................34

*Apple Inc. v. Wi-Lan, Inc.*,
No. 14-CV-2235-DMS-BLM, 2019 WL 13162735
(S.D. Cal. Oct. 1, 2019) ....................34

*Caluori v. One World Technologies, Inc.*,
No. CV 07-2035-CAS VBKX, 2012 WL 630246 (C.D. Cal. 2012)....................36

*Commonwealth Sci. & Indus. Research Organization v. Cisco Sys*
*809 F.3d 1295, 1303-04 (Fed. Cir 2015)* ....................38

*Datatreasury Corp. v. Wells Fargo & Co.*,
No. CIV.A. 2:06-CV-72 DF, 2010 WL 903259 (E.D. Tex. 2010) ....................36

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)....................*passim*

*Digital Reg of Texas, LLC v. Adobe Sys., Inc.*,
No. C 12-1971 CW, 2014 WL 4090550 (N.D. Cal. Aug. 19, 2014) ....................39

*Elder v. Tanner*,
205 F.R.D. 190 (E.D. Tex. 2001) ....................29, 30

*In re Epstein*,
32 F.3d 1559 (Fed. Cir. 1994) ....................5

*Ericsson, Inc. v. D-Link Sys.*,
733 F.3d 1201 (Fed. Cir. 2014) ....................38, 39

*Everlight Electronics Co., Ltd., and Emcore Corp. v. Nichia Corp.*,
No. 12-CV-11758, 2014 WL 4707053 (E.D. Mich. 2014) ....................36

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010) .......... 39

*Finjan, Inc. v. Sophos, Inc.*,
No. 14-CV-01197-WHO, 2016 WL 4560071
(N.D. Cal. Aug. 22, 2016) .......... 29, 30

*Fresenius Medical Care Holding Inc. v. Baxter Intern., Inc.*,
224 F.R.D. 644 (N.D. Cal., 2004) .......... 42

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) .......... 37, 40, 41

*GPNE Corp. v. Apple, Inc.*,
No. 12-CV-02885-LHK, 2014 U.S. Dist. LEXIS 53234
(N.D. Cal. 2014) .......... 36

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91, 131 S. Ct. 2238
(2011) .......... 18, 20

*Innogenetics, N.V. v. Abbott Labs.*,
512 F.3d 1363 (Fed. Cir. 2008) .......... 29, 30

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
331 F.3d 860 (Fed. Cir. 2003), 545 U.S. 193 (2005) .......... 42

*Julius v. Luxury Inn & Suites, LLC*,
535 F. Supp. 3d 600 (S.D. Miss. 2021) .......... 14

*KSR Int'l Co. v. Teleflex Inc.*,
*550 U.S. 398 (2007)* .......... 22

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .......... 2

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) .......... 34, 35

*Lloyd v. Conseco Fin. Corp.*,
No. CV 00-10452 MMM(RNBx), 2001 U.S. Dist. LEXIS 26234
(C.D. Cal. Oct. 18, 2001) .......... 19

*In re MSTG, Inc.*,
675 F.3d 1337 (Fed. Cir. 2012) .......... 36

*In re Nexium Esomeprazole*,
662 F. App'x 528 (9th Cir. 2016) .......... 18

*Pelican Int'l, Inc. v. Hobie Cat Co.*,
No. 320-CV-02390-RSH-MSB, 2023 WL 2130379
(S.D. Cal. Feb. 10, 2023) .......... 33

*Reedhycalog UK, Ltd., LP v. Diamond Innovations Inc.*,
727 F.Supp.2d 543 (E.D. Tex. 2010) .......... 36

*ResQNet.com, Inc. v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) .......... 33, 36

*Sheffield v. Int'l Paper Co.*,
No. 2018CV02701JPMCGC, 2020 WL 1882906
(W.D. Tenn. Feb. 26, 2020) .......... 35

*Stragent, LLC v. Intel Corp.*,
No. 6:11-CV-421, 2014 WL 1389304 (E.D. Tex. 2014) .......... 36

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015) .......... 17, 20

*TCL Commc'ns Tech. Holdings Ltd v. Telefonaktenbologet LM Ericsson*,
No. ATEDWITHCV1502370JVS, 2017 WL 11598725
(C.D. Cal. Feb. 2, 2017) .......... 35

*Tech Pharmacy Servs., LLC v. Alixa Rx LLC*,
No. 4:15-CV-766, 2017 WL 3283324 (E.D. Tex. Aug. 2, 2017) .......... 29, 30

*U.S. Bank, N.A. v. Glogowski Law Firm, PLLC*,
339 F.R.D. 579 (W.D. Wash. 2021) .......... 33

*Uniloc USA, Inc. v. Microsoft Corp.,*
*632 F.3d 1292 (Fed. Cir. 2011)* .......... 33, 34, 35, 39

*United States v. 14.38 Acres of Land Situated in Leflore County, Miss.*,
80 F.3d 1074 (5th Cir. 1996) .......... 14

*United States v. Artero*,
121 F.3d 1256 (9th Cir. 1997) .......... 18, 19

*In re Zyprexa Prod. Liab. Litig.*,
489 F. Supp. 2d 230 (E.D.N.Y. 2007) .......... 33

**Other Authorities**

Fed. R. Evid. 702 (b), (c) ........................................................................2, 14, 20

## I. INTRODUCTION

Taction has moved to strike certain portions of Apple's technical expert reports from Dr. Zinn and Dr. Visell. Taction's first complaint is that Apple's experts failed to account for differences in the vibration modules used in the prior art iPhone 6 and 6 Plus products, but these alleged differences *do not exist* and, even if they did, would not justify striking Dr. Zinn's or Dr. Visell's opinions. In fact, two of the four alleged differences are simply errors committed by Taction based on its incomplete analysis of certain modules. Dr. Zinn's and Dr. Visell's opinions rely primarily on analyses of the actual physical modules and documents produced in this case, which are easily examined and tested. There is no confusion about Dr. Zinn's or Dr. Visell's opinions, and their opinions are reliable.

Taction's second complaint is that Dr. Zinn failed to identify sufficient motivations to combine the prior art with a reasonable expectation of success. This ground is meritless as well. Dr. Zinn provided numerous reasons to combine the prior art and explained in detail why a person of ordinary skill in the art would have expected to succeed.

Finally, Taction moves to strike portions of Ms. Knox's report on four grounds. None holds water. Taction's first complaint regarding Ms. Knox's discussion of "illustrative adjustments" to Dr. Kennedy's reasonable royalty calculations is meritless. Taction argues that Ms. Knox is disqualified from offering numeric criticisms of Dr. Kennedy because she does not offer her own affirmative damages opinion. This is legally wrong and ignores the fact that Taction has the burden of proving damages, while Apple does not.

Taction's second complaint regarding Ms. Knox's discussion of a license agreement between Apple and [redacted] is also meritless. Taction's challenge again flows from its legally incorrect position that Ms. Knox may not criticize Dr. Kennedy without offering her own affirmative damages opinion. In addition, Taction ignores

Federal Circuit precedent holding that settlements may be the best evidence of damages in patent cases.

Taction's third complaint regarding Ms. Knox's discussion of a "usage" adjustment based on the amount of time the Taptic Engines are actively vibrating is equally meritless. Taction's criticisms all go to weight, not admissibility. Patent damages law *requires* consideration of the amount an accused feature is used.

Taction's fourth complaint regarding Ms. Knox's discussion of separate valuations of Taction as a company is meritless as well. Ms. Knox relies on the well-accepted premise that the market value of a company reflects how the market values the company's assets, including its intellectual property. Ms. Knox observes Taction as a company has a market valuation far less than what Dr. Kennedy says its claim against Apple is worth. This strongly suggests Dr. Kennedy's analysis is flawed and inflated. Again, Taction's criticisms go to weight not admissibility.

Taction's motion lacks merit and should be denied.

## II. LEGAL STANDARDS

Federal Rule of Evidence 702, as amended in light of *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591-92 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), provides that an expert may give opinion testimony if (1) the opinion is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702. In the *Daubert* case, the Supreme Court noted that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

## III. TACTION'S REQUEST TO STRIKE APPLE'S TECHNICAL ANALYSIS SHOULD BE DENIED

Taction's request to strike Apple's technical expert opinions is not justified. Taction's first request, to strike the expert opinions of Dr. Zinn and Dr. Visell

regarding the iPhone 6 and iPhone 6 Plus, is a swing-for-the-fences demand that is out of proportion with even Taction's evidence and unwarranted in view of the thorough analyses presented by Dr. Zinn and Dr. Visell. Similarly, Taction's *Daubert* challenges to Dr. Zinn's obviousness analyses are either incorrect or, at most, go to the weight of the evidence. Dr. Zinn's and Dr. Visell's analyses are based on reliable methodologies. The challenges raised by Taction are not grounds to strike. They are, at most, subjects for cross examination.

### A. Dr. Zinn's and Dr. Visell's opinions regarding the iPhone 6 and iPhone 6 Plus should not be excluded

Each iPhone 6 and iPhone 6 Plus includes a vibration motor that includes all the structural limitations of the asserted claims when combined with other prior art.[1] Taction asks the Court to strike all of Apple's expert opinions related to the iPhone 6 and iPhone 6 Plus. Taction Mot. at 25. In support of this request, Taction argues that Apple's experts "mix and match" modules with different designs to meet the claim limitations. *Id*. at 10. Taction suggests that alleged differences in the vibration modules are unaccounted for and nullify the opinions of Apple's experts. Yet Taction identifies only two alleged differences for each vibration module and as shown below, those alleged differences are *not real*. But even if they were, they would have no impact on the opinions that Taction seeks to strike.

#### 1. Dr. Zinn and Dr. Visell properly analyzed the iPhone 6 and iPhone 6 Plus

Taction's patent claims are directed to a conventional haptic transducer with ferrofluid that damps the motion of the moving portion. ECF. No. 141 (Claim

---

[1] Although the Court has stricken the portions of Apple's invalidity contentions that rely on the presence of ferrofluid in the iPhone 6 and 6 Plus, those products are still primary prior art references and, when they are combined with other prior art that teaches the use of ferrofluid, the combinations render the asserted claims obvious.

Construction Order) at 13. Apple's iPhone 6 and 6 Plus phones predate the Taction patents and invalidate the asserted claims when combined with other prior art. Apple launched both phones on September 14, 2014, and then sold millions of each before Taction filed for any of its patents. The iPhone 6 and 6 Plus are key prior art.

Apple's iPhone 6 and 6 Plus each used a vibration module from [redacted]. The vibration modules for the iPhone 6 and 6 Plus models all had to conform to specific engineering requirements for their respective model and thus had to operate in the same way and according to the same criteria. Ex. 1 (Zinn Rpt.) at ¶¶ 85, 88, 119, 134; Ex. 2 (iPhone 6 [redacted] at -1075480 [redacted]; Ex. 3 (iPhone 6 Plus [redacted] at -1674873 (same). Though minor differences exist between the modules, each module includes the elements recited in the asserted claims (*e.g.*, a housing, coils, flexures, magnets, etc.). Ex. 1 (Zinn Rpt.) at pp. 46-268.

Apple offered the reports of two experts who analyzed the iPhone 6 and 6 Plus: one from Dr. Yon Visell, a professor at the University of California, Santa Barbara, and one from Dr. Michael Zinn, a professor at the University of Wisconsin. Dr. Visell performed frequency response testing on vibration modules in the iPhone 6 and 6 Plus like the testing presented in Taction's infringement contentions for the accused Taptic Engines. Dr. Visell opined that there were damping effects in the vibration modules and that the haptic controller reduced the ringdown response of the vibration modules. Taction Mot., Ex. B (Visell Rpt.) at ¶¶ 29-33. Dr. Zinn compared the iPhone 6 and iPhone 6 Plus models to the asserted claims and opined that the asserted claims are obvious in view of the iPhone 6 and iPhone 6 Plus when combined with other references. Ex. 1 (Zinn Rpt.) at ¶¶ 83-88, 107-140, 191-288. As support for that opinion, Dr. Zinn relied on Apple's documents, third party documents, as well as the testing by Dr. Visell. *Id.*

**2. Taction's alleged differences between vibration modules analyzed by Drs. Zinn and Visell do not exist**

The alleged differences Taction identified between the vibration modules in the iPhone 6 and iPhone 6 Plus do not support the assertion that Dr. Zinn's and Dr. Visell's analyses are unreliable. Taction's alleged differences distill down to four distinct complaints (two for the iPhone 6 modules and two for iPhone 6 Plus modules). For the iPhone 6, Taction identifies alleged differences in the flux guides and the housings.[2] For the iPhone 6 Plus, Taction identifies alleged differences in the flux guides and the suspension. Taction's criticisms go to the weight of Dr. Zinn and Dr. Visell's analysis, not to its admissibility. A review of these modules shows that none of the alleged differences exist, except in one instance for the iPhone 6 Plus where the difference is trivial at best. These alleged differences do not impact the output of the module and are not material to the claim analysis. *See e.g., In re Epstein*, 32 F.3d 1559, 1567 (Fed. Cir. 1994) (rejecting argument that prior art should not be considered based on alleged differences where "the features relied upon are not of the type that would be altered over the life of the product" and "relate to the central purposes of the systems in which the features appear").

---

[2] In a footnote, Taction also alleges, without any supporting evidence, that "many other differences exist that cannot be seen in a picture or schematic, such as the material used for the magnets, suspension, and mass." Taction Mot. at 10, n.3. Taction does not identify any such differences, let alone identify how these differences would have affected Dr. Zinn's or Dr. Visell's analysis. More importantly, any alleged difference between the material used for the magnets, suspension, and mass is irrelevant. As explained in Sections III.A.2-3, each vibration module was required to meet the same performance specifications and was operated using the [redacted]

**a. The iPhone 6 modules all have flux guides**

Taction alleges there are differences between the flux guides in the iPhone 6 vibration modules. Taction's argument is factually—and facially—wrong, as is evident by simply turning over the module to see the feature Taction says is missing.

Dr. Zinn's report demonstrates that each iPhone 6 module includes the same flux guides by analyzing both physical samples and supporting technical documentation. For example, claim 5 of the '885 patent recites, "wherein at least one magnetic flux guide comprises a portion of said housing and is coupled to at least a coil." Analyzing this limitation, Dr. Zinn showed where a disassembled vibration module in the iPhone 6 had a flux guide and provided engineering documents to show flux guides are present in each module:




[redacted]

Ex. 1 (Zinn Rpt.) at pp. 81-82, 88-89 (citing APL-TACT-PHYS_007 (left image), APL-TACT_01156938 (center image), and APL-TACT_03582748 (right image)).

Taction argues that Dr. Visell tested "an iPhone 6 vibration module without the alleged flux guides." Taction Mot. at 12. This confuses the issue. Taction cites to the photo below on the left, which is from Dr. Visell's report. As an initial matter, the image Taction copied from Dr. Visell's report does not show a module that Dr. Visell tested. It is a module that Dr. Visell completely disassembled to reveal certain internal components. Taction Mot., Ex. B (Visell Rpt.) at ¶ 21. More importantly, the flux guides are present in the modules Dr. Visell tested—they are just not visible

in his photo. As shown in the photo below on the right from Dr. Zinn's report, if one flips the components over, the flux guides are visible ***underneath*** the components on the left and the right in the image Taction copied from Dr. Visell's report. Taction's argument is like saying there is no handle on the inside of a door because you cannot see it from the outside.



iPhone 6 linear motor module

Taction Mot. at 12




Ex. 1 (Zinn Rpt.) at p. 88

To be clear, in testing the modules without ferrofluid, Dr. Visell had to remove the upper flux guide, but that is no different from the testing in Taction's infringement contentions that Dr. Visell was mimicking, nor does Taction show that it would impact the vibration of the module. Moreover, as shown to the right, the lower flux guide is still present on the modules that Dr. Visell tested and made available for inspection during his deposition. Taction has no support for its assertion that there is any difference between the flux guides in the iPhone 6 modules tested by Dr. Visell and those analyzed by Dr. Zinn.



**b. The iPhone 6 Plus modules identified by Taction have the same suspension**

As shown below, Dr. Zinn provided an image of a disassembled iPhone 6 Plus vibration module, and Dr. Visell also provided a similar image of an iPhone 6 Plus module that he tested.




Ex. 1 (Zinn Rpt.) at p. 176




Taction Mot., Ex. B (Visell Rpt.) at p. 7

In addition, Dr. Zinn cited Apple documentation confirming that each vibration module includes a suspension comprising flexures. Ex. 1 (Zinn Rpt.) at p. 176. For example, APL-TACT_00002797 (Ex. 4) confirms that project [redacted] (the code for each iPhone 6 Plus vibration module) includes "dual flexures." The following documents illustrate examples of the flexures (highlighted by red boxes):

[redacted]

Ex. 5 (APL-TACT_00002796) | Ex. 6 (AAC_TACTION_0077396)

Taction does not dispute that all the modules have flexures, but instead argues that the suspension—*i.e.*, the flexures—in the iPhone 6 Plus modules tested by Dr. Visell are "completely different" from the suspension in the modules that Dr. Zinn analyzed because they "attach[] in a different position in relation to the mounting bracket." Taction Mot. at 13. As previously explained, however, Dr. Zinn showed that each of the vibration modules in the iPhone 6 Plus includes the claimed suspension. Thus, the modules analyzed by Dr. Visell are the same as the corresponding modules analyzed by Dr. Zinn.

Moreover, Taction's complaint is overblown because there is no meaningful difference between the two specific modules Taction identified. The claims simply recite "a suspension comprising a plurality of flexures." As shown below, the iPhone 6 modules have hairpin-shaped flexures (the springs at each end of each module highlighted with red boxes), and the only difference is that they are mounted as mirror images of each other. Moreover, as explained below in Section III.A.3, this difference has no impact on the experts' test results.[3]



*Taction Mot. at 13 (citing Visell Rpt.)*



*Taction Mot. at 14 (citing Zinn Rpt.)*

**c. The iPhone 6 modules all have the same housing**

As Dr. Zinn noted, "Taction has admitted that the linear motor modules in the iPhone 6 have a housing." Ex. 1 (Zinn Rpt.) at p. 60 (citing Taction Resp. to Apple

[3] In the pictures below, the flexures appear in the same orientation (as opposed to mirror images of each other) because the picture on the left shows the flexures as viewed through the bottom of the housing, and the picture on the right shows the flexures as viewed through the top of the housing.

RFA No. 21). Dr. Zinn also showed that each iPhone 6 vibration module includes the same housing. Dr. Zinn provides the following exemplary photos of the housing:






*Id*. (citing Apple documentation). And Dr. Zinn identifies the following schematic of the housing used for each iPhone 6 vibration module:

[redacted]

*Id*. at p. 61 (citing APL-TACT_01156800). The housing used in each iPhone 6 vibration module does not differ in any way. *Id*.

Despite this evidence, Taction argues that the vibration modules for the iPhone 6 have different "housings." Taction Mot. at 15. However, the alleged difference identified by Taction is not a difference at all—it is again a result of Taction failing to look at the entire module. Taction argues that "[t]he primary photograph that Dr. Zinn relies on to show the internal configuration of the iPhone 6 vibration module has a different housing than all of the other iPhone 6 vibration modules that Dr. Zinn reviews." *Id.* Taction provides the images to the right to show the alleged difference. *Id.* at 19. According to Taction, "[t]he modules are structurally distinct, as the module on the left is missing the two-hole bracket." *Id.* Again, Taction is incorrect. The module on the left is not missing the two-hole bracket. The two holes in the bracket of the module on the left are present—just not visible. As shown in the image below of the same component on its side, the two-hole bracket was bent during the tear down process and thus not visible in the top-down view shown above.





Ex. 13 (photo of APL-TACT-PHYS_007 made available for inspection).

Taction also takes issue with a document cited by Dr. Zinn, but this argument is again mistaken. Taction notes that Dr. Zinn cited a "presentation document" illustrating a housing for the iPhone 6 vibration module that is different (in an inconsequential way) from the housing in the manufacturing specifications and the actual vibration modules. Taction Mot. at 7-9. Taction, however, misunderstands Dr.

Zinn's report. The "presentation document" is merely one piece of evidence that supports Dr. Zinn's separate opinion that the iPhone 6 modules included various features of the asserted claims that are ***inside*** the housing. Ex. 1 (Zinn Rpt.) at pp. 62, 64, 65, 90, 98, 99, 114, 117, 118, 133, 139, 141, 172, 174, 175, 198, 205, 206, 207, 221, 223, 224, 240, 245, 247. Dr. Zinn did not cite the "presentation document" as evidence that any iPhone 6 module includes the claimed "housing," and Taction does not identify any discrepancies between the internal features illustrated in the presentation document and any actual iPhone 6 vibration module.

At most, the alleged discrepancy in the "presentation document" goes to the weight of the "presentation document" itself, not the admissibility of Dr. Zinn's entire opinion regarding the validity of the asserted claims in view of the iPhone 6. The "presentation document" is but one of many documents cited by Dr. Zinn, and it is not critical to his analysis. Taction does not contend otherwise.

**d. The iPhone 6 Plus modules all have a flux guide**

Taction's complaint about the "flux guide" in the iPhone 6 Plus is equally flawed. Taction argues that "Dr. Zinn relies on a manufacturing specification that he contends shows multiple configurations of flux guides in the iPhone 6 Plus." Taction Mot. at 20. Taction also complains that "Dr. Zinn never specifies which 'bottom shield' configuration he is opining on, or how the configurations of alleged flux guides relate to any specific vibration module." Taction Mot. at 22. Taction is incorrect.

In the portion of Dr. Zinn's report identified by Taction, Dr. Zinn identifies a flux guide in a physical iPhone 6 Plus module. Ex. 1 (Zinn Rpt.) at pp. 190-92 (citing APL-TACT-PHYS_021, which is shown below). Dr. Zinn then identifies engineering drawings that show the shield assembly for each vibration module and are consistent with the image of the actual module. Ex. 1 (Zinn Rpt.) at pp. 190-92; *see also* Ex. 7 (iPhone



6 Plus bill of materials) at APL-TACT_1075670-71 (confirming that drawing nos. [redacted] (Taction Mot., Ex. G), [redacted] (Taction Mot., Ex. H), and [redacted] (Taction Mot., Ex. I) correspond to [redacted] respectively). As shown below, each of the engineering documents confirms the presence of the flux guide identified by Dr. Zinn:

[redacted]

| Taction Mot., Ex. H | Taction Mot., Ex. G | Taction Mot., Ex. I |
|---|---|---|

Dr. Zinn further provides a citation to an internal Apple presentation confirming that each module includes "shields that represent flux guides." Ex. 1 (Zinn Rpt.) at p. 191 (citing APL-TACT_03582748); Taction Mot., Ex. N (APL-TACT_03582748) at -2762-63. Contrary to Taction's assertions, these documents do not demonstrate that Dr. Zinn combined different modules to meet the "at least one flux guide" limitation for the iPhone 6 Plus. Instead, the documents confirm that each iPhone 6 Plus vibration module meets this limitation.

Taction further complains that Apple has never produced a "manufacturing specification sheet" showing the internal parts of any of the multiple iPhone 6 Plus vibration modules." Taction Mot. at 22. This is a red herring and irrelevant. As Taction is aware, Apple did not design or manufacture the iPhone 6 Plus vibration modules, and the manufacturers of the iPhone 6 Plus vibration modules did not produce "manufacturing specification sheets" for the iPhone 6 Plus vibration modules in response to Apple's subpoenas. Accordingly, Apple does not have "manufacturing specification sheets" showing the internal parts of the vibration modules. Apple, however, has produced actual iPhone 6 Plus vibration modules and the

contemporaneous documentation cited by Dr. Zinn describing and illustrating the internal parts of the iPhone 6 Plus vibration modules that are consistent with the actual vibration modules. *See, e.g.*, Ex. 1 (Zinn Rpt.) at pp. 55-162, 167-268.

**3. Dr. Zinn's and Dr. Visell's expert opinions are based on a robust factual record, and they are the product of reliable principles and methods**

To be admissible at trial, an expert's testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods." Fed. R. Evid. 702 (b), (c). Nothing in Rule 702 or any of the cases cited by Taction support excluding the testimony of Dr. Zinn or Dr. Visell simply because the iPhone 6 and 6 Plus phones allegedly use vibration modules with minor differences. Apple's experts based their opinions on a robust factual record and performed their analyses consistent with accepted principles and methods. Application of Rule 702 is meant to protect the jury from unsound technical testimony, not "ultimately replace the adversarial system." *See, e.g., Julius v. Luxury Inn & Suites, LLC*, 535 F. Supp. 3d 600, 604 (S.D. Miss. 2021); *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). Taction's complaints should be addressed on cross examination, if at all.

Having allegedly enumerated "differences" in the iPhone 6 and 6 Plus vibration modules, Taction argues that the opinions of Dr. Zinn and Dr. Visell are unreliable because they combined features of various vibration modules to reach their opinions. Taction Mot. at 9-10. Taction is wrong. As shown above, the alleged differences are non-existent (or trivial). Furthermore, Dr. Zinn and Dr. Visell did not combine vibration modules to reach their conclusions. Dr. Zinn and Dr. Visell each focus on individual vibration modules in their analysis. Contrary to Taction's assertion, there is no mixing and matching or "plucking" of features from one module to combine with another. Accordingly, Dr. Zinn's and Dr. Visell's opinions are proper and should not be excluded.

**a. Dr. Zinn and Dr. Visell do not combine configurations of the iPhone prior art to reach their opinions**

Contrary to Taction's assertions, Dr. Zinn expressly acknowledged that multiple different vibration modules existed for the iPhone 6 and iPhone 6 Plus. For example, Dr. Zinn cited correspondence confirming the use of both [redacted] and [redacted] modules. Ex. 1 (Zinn Rpt.) at ¶ 117. Dr. Zinn provided experiments conducted by [redacted] on its iPhone 6 Plus vibration modules. *Id*. at p. 183. Dr. Zinn provided Bills of Materials, which identify each vibration module. *Id*. at ¶ 119 (citing APL-TACT_01090883 and APL-TACT_01075496 – bills of materials for the iPhone 6 and 6 Plus, respectively). And Dr. Zinn provided product specifications for the [redacted] and [redacted] vibration modules. *Id*. at ¶ 119.

Taction argues that Dr. Zinn's opinion runs afoul of "hornbook" anticipation and obviousness law because it allegedly treated the iPhone 6 and 6 Plus modules as one. Taction Mot. at 24. Taction's premise for this assertion is wrong. Dr. Zinn provided evidence for each vibration module. Ex. 1 (Zinn Rpt.) at ¶¶ 107-140. Dr. Zinn did not combine different iPhone 6 or 6 Plus vibration modules. Rather, his analysis demonstrated that each iPhone 6/6 Plus with each vibration module invalidates the asserted claims when combined with other prior art.

Nonetheless, Taction argues, without support, that the alleged differences between the vibration modules "have a meaningful effect on other claim limitations." Taction Mot. at 25. The only example Taction provides is the "highly damped output" limitation. *Id*. Dr. Zinn's report, however, provides ample evidence demonstrating that each vibration module in the iPhone 6 and iPhone 6 Plus has a "highly damped output" under Taction's incorrect theory of infringement.

For example, Dr. Zinn's report cites numerous examples of Apple documents that confirm damping of each module consistent with his reliance on Dr. Visell's testimony. *Id*. at ¶ 117 (citing multiple Apple documents, including APL-TACT_01806802 (email [redacted] APL-TACT_01806801

(noting design of [redacted]); APL-TACT_01678413); *see also id*. at ¶ 132 (citing APL-TACT_01156900 (iPhone 6 plus vibration module schematics); APL-TACT_01806802 (email re damping in certain vibration modules); APL-TACT_01678413 (showing damping mechanism); APL-TACT_01678389 (email re testing); APL-TACT_01678366 (email re [redacted]); APL-TACT_01678382 (emails re [redacted])).

Dr. Zinn's report also shows that the iPhone 6 and 6 Plus each include a [redacted] for each vibration module and explains that "[redacted]" *Id*. at ¶ 119; *see also id*. at ¶ 134.

Finally, Dr. Zinn's report provides the data obtained from testing that Dr. Visell performed on iPhone 6 and 6 Plus vibration modules and explains how that data confirms damping in the modules. *See, e.g., id*. at ¶¶ 116, 118, 120; *see also id*. at ¶¶ 132-134. An example of the data Dr. Visell obtained for the iPhone 6 Plus modules is shown below:




*Id*. at ¶ 134.

Absent a material difference between the modules that would change its output or the alleged damping effect of the [redacted], the minor differences (if any) identified by Taction do not suggest there is anything wrong with Dr. Zinn's reliance on Dr. Visell's testing.

Taction may try to argue an equivalence between the iPhone 6 opinions offered by Apple's experts and the opinions offered by Dr. Oliver that Apple challenges in its *Daubert* motion, but these are not equivalent. *See, e.g.*, ECF No. 299-1 (Apple Motion for Summary Judgment) at 39-40. There is a significant difference between the way Dr. Zinn and Dr. Visell analyze the iPhone 6/6 Plus and the way Taction's expert, Dr. Oliver, has analyzed the accused products. Dr. Zinn relied in part on Dr. Visell's measurements of iPhone 6 and iPhone 6 Plus vibration modules to determine whether, under Taction's theory of infringement, each module has a "highly damped output." As shown here, there are no meaningful distinctions between the vibration modules in the iPhone 6 and 6 Plus. Certainly, Taction has identified no meaningful distinctions, nor how they would impact the output of the vibration modules. Thus, Dr. Visell's analysis applies to all iPhone 6 and 6 plus modules.

In contrast, Dr. Oliver's infringement analysis, which Apple has challenged in its *Daubert* motion, relies on testing of only six iPhones out of 40 different, separate accused products, to establish the alleged output of all accused products (iPhones and Watches). ECF No. 299-1 (Apple Motion for Summary Judgment) at 40. He tested no Apple watches because the Apple Watch uses different software, and his testing methodology simply did not apply. *Id*. Dr. Oliver's problems are thus real, as Dr. Oliver lumps different modules together from different models, years, and product categories with different overall module designs—not merely minor differences in the way flexures attach to the housing, for instance—without documents or testing to justify his conclusions. Here, Drs. Zinn and Visell address only two distinct iPhone models from the same year, each of which they analyze separately. And Dr. Visell's testing merely confirms what is already stated in Apple's documentation. Taction's approach is much different from Apple's and cannot stand up to its own scrutiny.

In addition, Taction's argument, unlike Apple's motion, goes only to the weight of Apple's expert testimony, not its admissibility. *See, e.g., Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1299 (Fed. Cir. 2015) (affirming district court's

denial of a JMOL motion to exclude expert's testimony and explaining that "[t]o the extent [the expert]'s credibility, data, or factual assumptions have flaws, these flaws go to the weight of the evidence, not to its admissibility"); *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91, 131 S. Ct. 2238 (2011) (affirming district court's denial of *Daubert* and explaining that "[w]hen the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.").

Taction posits a broad proposition that failure to consider "material" or "important" facts is grounds to strike an expert's opinion. Taction Mot. at 24-25. Taction does not support this assertion, as it has done nothing to show the alleged differences at issue here are "material" or "important," and instead offers the bare conclusion. As shown above, the alleged differences either do not exist, or are exceedingly trivial and do not impact the analysis.

Taction relies on three cases for this broad proposition, but these cases do not support exclusion here. *Id.* (citing *In re Nexium Esomeprazole*, 662 F. App'x 528, 530 (9th Cir. 2016), *United States v. Artero*, 121 F.3d 1256, 1262 (9th Cir. 1997), and *Lloyd v. Conseco Fin. Corp.*, 2001 U.S. Dist. LEXIS 26234 (C.D. Cal. Oct. 18, 2001)). *In re Nexium* involved an expert orthopedic surgeon who "failed to explain how he inferred a causal relationship from … studies that did not come to such a conclusion themselves." 662 F. App'x at 530. The Court took issue with his reliance on studies that "were all over the map" and "that came to a different conclusion" than he did. *Id.* *Artero* involved determining "whether Hispanics eligible to serve on federal juries were unreasonably underrepresented because of systematic exclusion." *Id*. at 1261. The defendant's expert did not analyze that question, but instead answered "a different question, whether Hispanics, whether eligible to serve on federal juries or not, were represented in jury wheels at a lower rate than their proportion of the population as a whole." *Id*. This produced an "irrelevant answer"

and was excluded. *Id.*; *see also id.* at 1262. *Lloyd* was a wrongful termination case wherein the expert's study on employee retention improperly included individuals who voluntarily left the company. 2001 U.S. Dist. LEXIS 26234, at *18-19. These cases all involve different questions and egregious errors by experts that go well beyond the minor differences in iPhone 6 and 6 Plus modules alleged by Taction.

**b. Dr. Zinn offered a proper invalidity analysis supported by Dr. Visell's testing**

Dr. Visell's testing of iPhone 6 and 6 Plus modules is relevant to Dr. Zinn's analysis of the iPhone 6 and 6 Plus. Dr. Visell measured frequency responses of individual iPhone 6 and iPhone 6 Plus vibration modules. Taction Mot., Ex. B (Visell Rpt.) at 11-12. Dr. Visell also analyzed the structure of the various modules and found them "highly similar." Ex. 8 (Visell Dep. Tr.) at 90:13-14. Nothing suggests that the various vibration modules will operate differently.

As established above, the alleged physical differences between the iPhone 6 modules, or the iPhone 6 Plus modules, are minor, if they exist at all. In most instances, Taction is wrong about alleged physical differences because there are none, and in the one instance where there is a physical difference (mirror image flexures in the iPhone 6 Plus module), the difference is immaterial. Nonetheless, Taction incorrectly characterizes Dr. Visell's testimony regarding the similarities between the modules, saying that Dr. Visell testified that he "did not see any physical distinctions between the *outsides* of the modules." Taction Mot. at 23 (citing Visell Rough Dep. Tr. at 85:11-25 (emphasis added)). Dr. Visell also stated: "I observed the weight of the actuators informally myself, found them to be identical. The – ***I dismantled quite a number of them. The internals are highly similar across different actuators***." Ex. 8 (Visell Dep. Tr.) at 90:10-14.

More importantly, Apple designed the modules to be interchangeable—they were meant to go into the same models of iPhone 6 (or 6 Plus) and provide uniform functionality and user feedback, as each works with the same [redacted]

[redacted] and was required to meet the same engineering requirements specifications. *See, e.g.*, Ex. 1 (Zinn Rpt.) at ¶¶ 85, 88, 119, 134; *see also, e.g.*, Ex. 2 (APL-TACT_01075478); Ex. 3 (APL-TACT_01674870). Furthermore, Dr. Visell measured gross, physical effects (including damping of movement by the haptic controller) that are not affected by the minor physical differences identified by Taction and apply to every iPhone 6 and 6 Plus vibration module.

Taction's own testing of the iPhone 6 and 6 Plus confirms the reliability of Dr. Visell's testing. Taction's expert, Dr. Oliver, performed similar tests on iPhone 6 and 6 Plus vibration modules and obtained results similar to Dr. Visell's. *Compare* Ex. 9 (Oliver Rpt.) at ¶¶ 593, 595 (measuring Q-factors of 22.3 and 23.0 for the iPhone 6 and 6 Plus, respectively) *with* Taction Mot., Ex. B (Visell Rpt.) at 11-12 (measuring Q-factors of 17 and 23.2 for the iPhone 6 and 6 Plus, respectively). And, contrary to Taction's arguments here, Dr. Oliver based his conclusions regarding all iPhone 6 and iPhone 6 plus modules on measurements of only two iPhone 6/6 Plus vibration modules without any reference to differences between any modules. Ex. 9 (Oliver Rpt.) at ¶¶ 585-96.

Because there are no meaningful differences between the vibration modules for each iPhone 6 model, and because the modules were designed with the goal of creating uniformity across the iPhone 6/6 Plus products, Dr. Visell's testing of iPhone 6 modules is applicable to all iPhone 6 modules, and his testing of iPhone 6 Plus modules is applicable to all iPhone 6 Plus modules. Taction can challenge this in cross examination, but Apple's experts have provided sufficient analysis to satisfy the reliability requirement of Rule 702. *See, e.g., Summit 6*, 802 F.3d at 1299; *i4i*, 598 F.3d at 852.

**B. Dr. Zinn's obviousness opinions are more than sufficient to establish the obviousness of the asserted claims**

As with its challenge to the iPhone 6/6 Plus analysis, Taction's challenge to Dr. Zinn's obviousness argument simply ignores the detailed analysis in Dr. Zinn's

report. Taction says that Dr. Zinn offered conclusory opinions regarding the motivation to combine the prior art with a reasonable expectation of success. Taction Mot. at 26. Taction is wrong. In each instance Dr. Zinn provided detailed reasoning to support his combinations.

**1. Dr. Zinn offered a properly supported obviousness analysis for the Zarrabi reference**

Dr. Zinn offered an opinion that the asserted claims were obvious over International Publication No. WO2011013570 to Zarrabi, et al. ("Zarrabi"). Ex. 1 (Zinn Rpt.) at ¶¶ 99-102, 192-222, 246-50, 269-78, 284-88. Zarrabi is a patent assigned to Artificial Muscle Inc., the former employer of Taction's named inventor (James Biggs), and it describes a planar vibration module for use in headphones, as do the Taction patents. *Id*. at ¶¶ 99-102. Zarrabi discloses an electroactive polymer as the vibration mechanism (instead of an electromagnetic actuator). *Id*. Dr. Zinn opined that Zarrabi would be combined with prior art electro-mechanical vibration motors, like those in the iPhone 6/6 Plus, and the Yoshikane, Miyazaki, and Lee references, and ferrofluid as described in a 1990 white paper from Ferrotec (Raj1990). *Id*. at ¶¶192-200, 218-222. Importantly, the Zarrabi actuator is the same overall size and shape as that disclosed in Taction's patents and provides similar design goals as well. *Id*. For this and other reasons, Dr. Zinn explained why a person of ordinary skill in the art would have been motivated to combine Zarrabi with those references and why they would have reasonably expected to succeed. *Id.* at ¶¶ 196-200, 218-222, 246-50, 269-78, 284-88.

Dr. Zinn also identified combinations with other prior art references to address other limitations (*e.g*., "transducer with highly damped output," "a thickness less than one-third of a width," "flux guides," "plurality of [conductive] coils," and "wherein each of said plurality of coils is an elongated oval with substantially flat sides"). *Id.* at ¶¶ 223-288. Importantly, in addition to explaining how these combinations disclose each limitation of the asserted claims, Dr. Zinn explained why a person of ordinary

skill in the art would have been motivated to combine each reference and why they would have reasonably expected to succeed. *Id*. Taction challenges these combinations as unsupported, but Dr. Zinn's analysis is more than sufficient.

**2. Dr. Zinn demonstrated motivations to combine Zarrabi and known vibration motors with a reasonable expectation of success**

Dr. Zinn's analysis is consistent with controlling law on obviousness. In *KSR Int'l Co. v. Teleflex Inc.*, the Supreme Court rejected a rigid approach to assessing obviousness, and instead adopted an "expansive and flexible approach." 550 U.S. 398, 421-425 (2007). In adopting this "functional" approach, the Court allowed consideration of, among other things, market demand, whether the combination was a result of common sense, whether there were recognized problems with known solutions, and whether the combination was obvious to try. *Id.* at 419-21. Taction argues that Dr. Zinn failed to sufficiently explain why and how Zarrabi could be combined with other prior art references. Taction Mot. at 25-26. But, as shown below, Dr. Zinn provided detailed analysis supporting the Zarrabi combinations.

Dr. Zinn identified no fewer than six reasons why a person of ordinary skill in the art would look to the references disclosing electromagnetic actuators to combine with Zarrabi. Ex. 1 (Zinn Rpt.) at ¶¶ 196-201. "**First**, Zarrabi (at 17:15-17) expressly teaches that 'linear resonant motors … can be used' as the actuator in Zarrabi's headphones. Zarrabi, however, does not describe the structure of any linear resonant motors. Accordingly, a person of ordinary skill in the art would have considered known linear resonant motors…." *Id*. at ¶ 196. "**Second**, '[a] person of ordinary skill in the art would have been motivated to substitute a vibration motor, such as the iPhone 6 vibration motor … in place of Zarrabi's EAP actuator … to reduce complexity and reduce costs." *Id*. at ¶ 197. "The corresponding power electronics are more expensive and complicated tha[n] those used for an electromagnetic actuator" because "EAP actuators require higher supply voltages." *Id*. "**Third**, each

proposed combination merely combines the prior art elements according to known methods to yield entirely predictable results." *Id*. at ¶ 198. "**Fourth**, each proposed combination requires only a simple substitution of one known element (Zarrabi's linear resonant motor) for another known element (the iPhone 6 vibration motor, [etc.]) to obtain entirely predictable results…." *Id*. at ¶ 199. "**Fifth** … a person of ordinary skill in the art would been motivated to develop … headphones [similar to the award-winning headphones disclosed in Zarrabi] to capitalize on that potential market opportunity." *Id*. at ¶ 200. "**Finally** … a linear resonant motor would have been obvious to try" because "there would have been a need in the art to provide replacement actuators to ViviTouch customers." *Id*. at ¶ 201.

Each of these provides support for Dr. Zinn's opinion that Zarrabi in combination with known linear resonant actuators (like the iPhone 6 or 6 Plus vibration modules, or those in Yoshikane, Miyazaki, or Lee) renders the asserted claims invalid as obvious. Taction ignores Dr. Zinn's analysis and asserts that Dr. Zinn failed to explain why one of ordinary skill would look to known linear resonant actuators to combine with Zarrabi. Taction specifically challenges Dr. Zinn's opinion that the power electronics for EAP actuators are more expensive and complicated that those used for an electromagnetic actuator as again "being without explanation," but Dr. Zinn did explain (they are more expensive and complicated because EAP actuators require higher supply voltages), and this fact is not in dispute—Taction admits it in the asserted patents. *See, e.g.*, ECF No. 1-2 ('885 patent) at 2:61-62 ("dielectric elastomer actuators … are expensive and complex devices that require high voltage electronics").

Dr. Zinn also explained how a known linear resonant motor could be substituted into Zarrabi's headphone design: "Zarrabi teaches a person of skill in the art to incorporate a linear resonant motor into the earcup of headphones and that the actuator 'can be directly driven by the drive circuit to track and enhance an audio signal or to produce specifically tailored effects independent of the audio signal.'"

Ex. 1 (Zinn Rpt.) at ¶ 198 (quoting Zarrabi at 17:22-24). The rationale given by Dr. Zinn—that existing circuitry can drive linear resonant motors placed into the headphones—is alone sufficient to support Dr. Zinn's combination.

As further support, Dr. Zinn notes that "the Asserted Patents concede that headphones with linear resonant motors were known in the prior art." *Id*. (citing '885 patent at 1:34-42, Fig. 1). And Dr. Zinn explained why a person of ordinary skill would have reasonably expected to succeed in making the proposed substitutions:

> 203. A person of ordinary skill in the art combining Zarrabi with the iPhone 6 vibration motor, the iPhone 6 Plus vibration motor, the Yoshikane vibration motor, the Miyazaki-Yoshikane vibration motor, or the Lee-Yoshikane vibration motor as described above also would have reasonably expected to succeed. Given that the principles of operation of vibration motors and the underlying physical characteristics that describe their behavior are well known, the simple substitution of one vibration motor for another would have been well-within the abilities of a person having ordinary skill in the art and would have yielded the predictable result of providing audio frequency vibrations in Zarrabi's headphones.
>
> 204. A person of ordinary skill in the art also would have reasonably expected to succeed in making the proposed substitutions due to the similarities between the devices. For example, each reference teaches actuators for haptic devices including a moving portion and a suspension within a housing. The moving portion of each actuator includes a weight that is supported by a suspension and actuated by an electric current flowing through actuator. Given these architectural and functional similarities, the proposed modification would have been straightforward and simple. The use of the iPhone 6 vibration motor, the iPhone 6 Plus vibration motor, the Yoshikane vibration motor, or the Miyazaki-Yoshikane vibration motor in place of Zarrabi's vibration motor is the substitution of one known technique for another, and such a modification would not have required undue experimentation and would have yielded predictable results.

*Id*. at ¶¶ 203-204. Yet despite these detailed explanations, Taction asserts that Dr. Zinn did not explain how known vibration motors would be combined with headsets.

Taction Mot. at 26 (citing Zinn Rpt. at ¶ 198). Even a cursory review of Dr. Zinn's analysis shows he provided ample disclosure supporting his combinations.

Dr. Zinn also explained how and why ferrofluid would be modified in his proposed combinations to achieve a lower Q factor. Zinn Rpt. at ¶ 205. Taction argues that Dr. Zinn did not do this, but Taction is wrong. Taction Mot. at 27 (citing Zinn Rpt. at ¶ 205). Dr. Zinn noted that ferrofluids have long been commercially available for a range of applications, and specifically that [redacted] provided ferrofluid for the iPhone 6 and 6 Plus. *Id*. at 206. Accordingly, "a person of ordinary skill in the art would have understood how to adjust the properties of a ferrofluid for a given application." *Id*.; *see also id*. at ¶¶ 207-213. In fact, Dr. Zinn even cited a textbook ("Magnetic Fluids: Engineering Applications"), which "'provide[s] guidance for selection of the appropriate magnetic fluid' 'once application objectives [*e.g.*, providing a mechanical Q-factor between 1.5 and 3] are defined.'" *Id*. at ¶ 206; *see also id*. at ¶ 208 (citing another textbook). Dr. Zinn also explained that use of ferrofluid involved a known trial-and-error method, and that this method was endorsed by the inventor of the patents in suit. *Id*. at ¶ 212-213.

Thus, Dr. Zinn did far more than simply describe the prior art; he identified several reasons to combine the references in the manner claimed, and stated how and why a person of ordinary skill in the art would have found the claims obvious. Contrary to Taction's assertions, Dr. Zinn's testimony regarding obviousness will be immensely helpful to the jury in determining whether the asserted claims are obvious and therefore should not be stricken.

**3. Dr. Zinn demonstrated motivations to combine Zarrabi, known vibration motors, and Raj1990 with a reasonable expectation of success**

Taction's only basis for arguing that Dr. Zinn's opinions regarding "Zarrabi in view of known vibration motors and Raj1990" is that the opinions are based on Dr. Zinn's analysis of "Zarrabi in view of known vibration motors." Taction Mot. at 29.

Taction's arguments regarding "Zarrabi in view of known vibration motors" should be rejected for the same reasons explained above in Section III.B.2.

**4. Dr. Zinn demonstrated motivations to make the "additional combinations" with a reasonable expectation of success**

Taction also takes issue with Dr. Zinn's obviousness analysis for various claim limitations, but each of these challenges is without merit.

Taction first argues that, for the "transducer with highly damped output" limitation, Dr. Zinn "simply lists twelve prior art references and then fails to provide any discussion of eight of those references. … And even for the four other references, he simply quotes from those references without providing any analysis or explanation of the references." *Id*. at 29 (citing Zinn Rpt. at ¶¶ 227-233). Not so. The list of references identified by Taction immediately follows Dr. Zinn's description of prior art controllers that adjust the drive signal of a haptic transducer. Ex. 1 (Zinn Rpt.) at ¶¶ 224-226. Accordingly, it was sufficient for Dr. Zinn to provide pin cites to the relevant disclosures in the additional references and note that they "disclose similar functionality." *Id*. at ¶ 227. Moreover, contrary to Taction's argument, Dr. Zinn explained why a person of skill in the art would have been motivated to combine each of those references with Yoshikane, Miyazaki-Yoshikane, or Lee-Yoshikane with a reasonable expectation of success. *Id*. at ¶¶ 228-233.

For the claim limitations that recite "a thickness less than one-third of a width," Taction argues that Dr. Zinn offers only a conclusory opinion as to why a person of ordinary skill would have a reasonable expectation of success in making various combinations. Taction Mot. at 29 (citing Zinn Rpt. at ¶ 249). Once again, Taction is wrong. Dr. Zinn explained that "[t]he proposed actuator's greater width is not a problem [thus, a POSITA would have reasonably expected to succeed] because recent smart phones with broad display panels have extra space in the width direction." Ex. 1 (Zinn Rpt.) at ¶ 249 (quoting Lee at 2010); *see also id*. at ¶ 248 ("The proposed actuator uses space in the horizontal direction of vibration. Thereby, it does not

impose a restriction on thickness reduction due to the thickness of the vibrating actuator."). Dr. Zinn further explained that "in the Zarrabi combinations … designing the actuator's thickness to be less than one-third the width would not have been a problem because Zarrabi's headphones do not constrain the width and length dimensions of the actuator relative to the thickness. Indeed, the Vivitouch modules that AMI and its customers incorporated into headphones had a thickness less than one third the width." *Id*. at ¶ 250. Thus, contrary to Taction's arguments, Dr. Zinn's opinions are far from conclusory.

For the "flux guide" limitations, Taction argues that "Dr. Zinn's opinions regarding 'Yoshikane, Miyazaki-Yoshikane, Lee-Yoshikane in view of iPhone 6/6 Plus' … relies on teachings from the Park and Degner references to provide a purported motivation to combine without explanation of whether the combination includes either reference or how the jury should evaluate those references with respect to the combination." Taction Mot. at 30 (citing Zinn Rpt. at ¶ 253). Taction, however, mischaracterizes Dr. Zinn's report. Dr. Zinn expressly states that the "flux guide" limitations would have been obvious in view of the iPhone 6/6 Plus. Ex. 1 (Zinn Rpt.) at ¶ 253. Dr. Zinn's combination *does not* include flux guides from Park or Degner. Instead, Dr. Zinn explains that a person of ordinary skill in the art would have been motivated to include flux guides (as taught by the iPhone 6/6 Plus) in Yoshikane, Miyazaki-Yoshikane, Lee-Yoshikane because: (1) "it was known that the 'magnetic return paths [created by the flux guides] may reduce the amount of flux that extends beyond the housing and thereby enhance the magnetic field within the housing that, in turn, may enhance the velocity that the central magnet array may reach within a given period of time or given distance of travel;" and (2) "magnetic flux guides were known 'to prevent the flux generated by the each magnet … from being leaked to the outside and [to] function as flux paths as well.'" *Id*. Dr. Zinn cites Degner and Park as support for his opinion that these facts were known. *Id*.

Similarly, for the "plurality of [conductive] coils" limitation, Taction argues that Dr. Zinn's opinions regarding "Yoshikane in view of Degner and/or iPhone 6/6 Plus" should be rejected because Dr. Zinn "relies on the Dong reference to establish a reasonable expectation of success … [b]ut Dong is not a part of his proposed combination." Taction Mot. at 30 (citing Zinn Rpt. at ¶ 257). This argument also lacks merit. As an initial matter, Dong is not the only reference Dr. Zinn relied on to establish a reasonable expectation of success. Ex. 1 (Zinn Rpt.) at ¶ 257 ("As demonstrated by the implementation of the iPhone 6 and 6 Plus, a person of ordinary skill in the art would have reasonably expected to succeed."). And Taction's Motion does not dispute that Dr. Zinn's opinion regarding reasonable expectation of success is supported by the implementation of the iPhone 6 and iPhone 6 Plus alone. Thus, even if the Court struck Dr. Zinn's opinion regarding the Dong reference (it should not), Taction has identified no reason for the Court to strike Dr. Zinn's opinions regarding Yoshikane in view of Degner and/or iPhone 6/6 Plus.

More importantly, Dr. Zinn identified the Dong reference as "another example of side-by-side coils" in the prior art. *Id.* The existence of this additional example further supports Dr. Zinn's opinion that a POSITA using side-by-side coils in the proposed combinations (as taught by the iPhone 6/6 Plus) would have reasonably expected to succeed because multiple individuals did in fact succeed prior to the alleged priority date of the asserted patents. The fact that Dong is not part of the proposed combination (*i.e.*, that Dr. Zinn did not propose combining Yoshikane's transducer with Dong's coils) is irrelevant.

Finally, for the "elongate oval with substantially flat sides" limitation, Taction argues that "Dr. Zinn's opinions regarding 'Yoshikane, Miyazaki-Yoshikane in view of iPhone 6/6 Plus, or Lee and iPhone 6/6 Plus in view of Yoshikane or Miyazaki' … lack any mention, cursory or otherwise, of expectation of success or motivation to combine." Taction Mot. at 31 (citing Zinn Rpt. at ¶¶ 265-268). Like each of Taction's previous arguments, this argument lacks merit. Dr. Zinn explains in detail that "[t]he

selection of coil fabrication method," which primarily dictates the coil shape, "would have been an obvious design choice." Ex. 1 (Zinn Rpt.) at ¶ 267. Dr. Zinn further explains why it would have been obvious to make the portion of the coil that runs perpendicular to the motion axis longer than the portion that runs parallel to the motion axis and a flat as possible—*i.e.*, to generate a uniform form. *Id*. at ¶ 268.

**5. Taction's case law again does not support exclusion**

In addition to being factually incorrect, Taction's arguments fail as a matter of law. Taction cites the following cases as support for its *Daubert* motion: *Innogenetics, N.V. v. Abbott Labs*., 512 F.3d 1363, 1373 (Fed. Cir. 2008); *Elder v. Tanner*, 205 F.R.D. 190, 193-94 (E.D. Tex. 2001); *Finjan, Inc. v. Sophos, Inc*., No. 14-CV-01197-WHO, 2016 WL 4560071, at *7 (N.D. Cal. Aug. 22, 2016); and *Tech Pharmacy Servs., LLC v. Alixa Rx LLC*, No. 4:15-CV-766, 2017 WL 3283324, at *2 (E.D. Tex. Aug. 2, 2017); *Am. Med. Sys., Inc. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 901 (D. Minn. 2010). Taction Mot. at 27-28. Each is inapposite.

In *Innogenetics*, for example, the expert "merely list[ed] a number of prior art references and then conclude[d] with the stock phrase 'to one skilled in the art it would have been obvious to perform the genotyping method in [claims 1-9 & 12-13] of the '704 patent.'" 512 F.3d at 1373 (noting also that the expert did not state how or why a POSITA would have found the claims obvious in view of some combination of those particular references). In *Elder*, "[t]he reports of Plaintiffs' experts [were] conclusory. They state[d] the experts' ultimate opinions regarding infringement, anticipation, and obviousness and, generally, the authorities and evidence upon which they rel[ied], but without any elaboration or reasoning." 205 F.R.D. at 194. In *Finjan*, the expert's obviousness opinions were "entirely conclusory" and therefore lacked "an explanation or foundation so that a fact finder [could] evaluate and assess the opinion." 2016 WL 4560071, at *7. In *Tech Pharmacy*, the expert did not "offer a specific combination of prior art" or "any reason why a person of ordinary skill in the art would have been motivated to combine the single reference cited." 2017 WL

3283324, at *2. And, in *Am. Med. Sys*., the expert "identifie[d] no reason to combine the references in the manner claimed, and fail[ed] to 'state how or why a person ordinarily skilled in the art would have found the claims ... obvious in light of some combination of those particular references.'" 712 F. Supp. 2d at 901.

Dr. Zinn's report is not even remotely comparable to the expert reports in *Innogenetics*, *Elder*, *Finjan*, *Tech Pharmacy*, and *Am. Med. Sys*. As explained above, unlike the experts in those cases, Dr. Zinn analyzes in painstaking detail: the specific combinations of prior art; where and how each prior art reference discloses each limitation of the asserted claims; the reasons why a person of ordinary skill in the art would have been motivated to combine those references; and the reasons why a person of ordinary skill in the art would have reasonably expected to succeed. Accordingly, unlike Taction's cases, there is no risk here that the jury would need to examine any prior art references and determine whether there were differences between it and the asserted patents. Once again, Taction's criticisms at most go to weight.

Taction's attempt to exclude Dr. Zinn's opinions should be rejected.

## IV. TACTION'S REQUEST TO STRIKE APPLE'S DAMAGES ANALYSIS SHOULD BE DENIED

The burden of proving damages falls on Taction, as the plaintiff, not Apple. Taction's damages expert—Dr. Kennedy—submitted a report expressing his opinions as to the damages amount. Apple's damages expert—Ms. Knox—submitted a report critiquing Dr. Kennedy's analysis and stating what Dr. Kennedy's damages number would be had he performed a proper analysis. Ms. Knox's report presents her critique of Dr. Kennedy's opinions, including quantitative data points he failed to consider or improperly disregarded in coming to his damages conclusion.

Taction asks the Court to exclude this criticism because Ms. Knox does not offer an affirmative opinion on what damages should be. Taction's argument ignores the burden of proof and is contrary to law, which permits Ms. Knox to critique Taction's damages analysis and the mistakes Taction's expert made, including his

failure to consider alternative data points as to the amount of damages, without performing her own damages analysis from scratch. In addition, all of Taction's other criticisms go to weight, not admissibility, and involve issues that the jury must decide.

**A. Ms. Knox's "illustrative adjustments" to Dr. Kennedy's reasonable royalty calculations are proper critiques of his work and should not be excluded**

Dr. Kennedy bases his damages opinions on the agreement between Taction and Corsair even though Taction licensed [redacted] to Corsair: for example, Corsair [redacted] That approach is plainly subject to criticism, and Apple will ask the jury to reject it. In addition, even if the Corsair agreement is deemed relevant, Dr. Kennedy's analysis of the agreement is itself deeply flawed. Ms. Knox explains this in Section VI.B of her report:

> For the reasons discussed above, the Corsair OEM Agreements are not instructive to the determination of a reasonable royalty in this matter. However, even if one were to accept Dr. Kennedy's conclusion that the Corsair OEM Agreements are technically and economically comparable to the hypothetical negotiation at issue, Dr. Kennedy's analysis of the Corsair OEM Agreements under the market approach is flawed, speculative and fails to account for the significant economic differences between the Corsair OEM Agreements and the license resulting from the hypothetical negotiation at issue.

Ex. 10 (Knox Rpt.) at ¶ 107; *see also id.* at ¶¶ 108-34.

For example, "Dr. Kennedy begins with the [redacted] royalty rate from the Corsair OEM Agreements and makes two quantitative adjustments to arrive at his 'initial royalty rate conclusion' of [redacted] deduction to account for [redacted] of damping fluid (i.e., ferrofluid); and [a] 73% apportionment to account for value of [redacted], which would not be in the scope of the hypothetical negotiation." *Id.* at ¶ 108. However, as Ms. Knox points out, "Dr. Kennedy fails to make any adjustments to the [redacted] starting point to reflect Apple's

significantly larger sales volume," *id.* at ¶ 110, even though "[d]ocuments in the record indicate Taction's [redacted]," *id.* at ¶ 111. Notably, Taction [redacted]. *Id.*

In the section of her report that is the subject of the present motion, Ms. Knox illustrates how Dr. Kennedy's errors affect his calculations. For example, Ms. Knox shows what happens if one starts with the [redacted]. *Id.* at ¶ 231. With this change and other necessary adjustments to account for other errors Dr. Kennedy makes, Ms. Knox concludes that Dr. Kennedy's [redacted] damages opinion (excluding pre-suit damages) would be reduced to [redacted] to [redacted]. *Id.* at ¶ 232; Taction Mot., Ex. C (Knox Attachment 9). Dr. Kennedy's other errors include failing to account for [redacted] included in the Corsair license (Ex. 10 at ¶¶ 113-129); failing to account for the fact the Corsair headphones incorporated two Taction Transporters, while the Accused Products only contain one Taptic Engine (*id.* ¶¶ 130-133); and misunderstanding how much the accused technology contributes to damping, based on the analysis of Apple's technical expert (*id.* ¶¶ 137-147). *See also id.* ¶ 231. The numerical data points resulting from correcting Dr. Kennedy's errors represent permissible criticism of Dr. Kennedy—for the jury to evaluate—even if they do not form part of an affirmative opinion on damages.

Taction argues that Ms. Knox's criticisms of Dr. Kennedy, and especially her numerical criticisms, should be excluded because she did not develop her own opinion from scratch as to what damages (if any) should be. This is wrong as a matter of law because the patentee has the burden of proving damages, and defendants have no obligation to offer their own damages calculation. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) ("The district court seems to have been heavily influenced by Lansa's decision to offer no expert testimony to counter Dr. David's opinion. But it was ResQNet's burden, not Lansa's, to persuade the court

with legally sufficient evidence regarding an appropriate reasonable royalty.").

District courts routinely reject challenges like Taction's. *E.g.*, *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007) (denying *Daubert* motions; "defendants' experts have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts. Contradiction is to be expected and is often unresolvable without trial."); *1st Source Bank v. First Res. Fed. Credit Union*, 167 F.R.D. 61, 65 (N.D. Ind. 1996) (declining to exclude portions of damages report; "as a rebuttal expert witness, Mr. Willis may criticize [Plaintiff]'s damages theories and calculations without offering alternatives."); *see also Pelican Int'l, Inc. v. Hobie Cat Co.*, No. 320-CV-02390-RSH-MSB, 2023 WL 2130379, at *29 n. 17 (S.D. Cal. Feb. 10, 2023) (citing *ResQNet* and holding "the accused infringer 'ha[s] no obligation to rebut' [plaintiff's damages arguments] until the patentee meets its burden with reliable and sufficient evidence. As such, Hobie is under no obligation to provide its own royalty calculations or profit improvement analysis."); *U.S. Bank, N.A. v. Glogowski Law Firm, PLLC,* 339 F.R.D. 579, 581 (W.D. Wash. 2021) ("Defendants . . . will often produce expert reports solely for the purpose of contradicting or rebutting a plaintiff's report because defendants generally need not produce any evidence to prevail.").

By contrast, Taction cites *not a single case* where a defendant's damages expert has been excluded for offering only critiques, including numerical critiques, without offering an affirmative damages opinion. Indeed, by ignoring its own burden of proof, Taction turns its cited patent damages cases on their head. For example, in *Uniloc USA, Inc. v. Microsoft Corp.*, the Federal Circuit vacated a damages award because the plaintiff's expert relied upon an arbitrary 25% profit split and also misled the jury by referring to billions of dollars in Microsoft revenue that was unrelated to the accused functionality. 632 F.3d 1292, 1311-21 (Fed. Cir. 2011). Mentioning billions of dollars of unaccused revenue is where the phrase "skew the damages horizon" comes from. *Id.* at 1320-21. It has nothing to do with Taction's argument that a

defense expert should not be allowed to advance numerical critiques without offering an affirmative opinion.

*Apple Inc. v. Wi-Lan, Inc.*, No. 14-CV-2235-DMS-BLM, 2019 WL 13162735 (S.D. Cal. Oct. 1, 2019), likewise addressed whether an expert had met *the plaintiff's burden* of proving damages. Taction quotes this case for the proposition that "[t]he touchstone for reliability, and hence admissibility, of a reasonable royalty analysis is whether it "'carefully tie[s] proof of damages to the claimed invention's footprint in the marketplace.'" *Id.* at *5. Apple very much agrees Taction has the burden of tying damages to its claimed invention, and Ms. Knox's critique addresses exactly that—*i.e.*, whether Taction has met its burden. But *Wi-Lan* says nothing to suggest a defense expert must offer her own damages opinion before criticizing the plaintiff's expert.[4]

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012), likewise vacated a damages award where the patentee failed to meet its burden of proof. The quote Taction truncates refers to *Uniloc* and states in full: "Admission of [defendant's] overall revenues, which have no demonstrated correlation to the value of the patented feature alone, only serve to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation beyond that which is 'adequate to compensate for the infringement.'" *Id.* at 68. *LaserDynamics* does not suggest in any way that a defendant's damages expert must offer an affirmative damages opinion before criticizing the plaintiff's numbers.

Finally, Taction's cites regarding "checks" refer to *plaintiffs' experts* using irrelevant data to check their own work. *Uniloc*, 632 F.3d at 1321 (Fed. Cir. 2011) (new trial ordered where plaintiff's expert used Microsoft's irrelevant total revenue

[4] Taction also does not mention the subsequent history of this Apple case. In *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 973 (Fed. Cir. 2022), the Federal Circuit ordered a new trial because the opinions of the plaintiff's damages experts were "untethered to the facts of this case," much like Dr. Kennedy's opinions here.

as "check" of his arbitrary 25% profit split); *Sheffield v. Int'l Paper Co.*, 2020 WL 1882906, at *2 (W.D. Tenn. Feb. 26, 2020) (plaintiff's expert in personal injury case excluded for "cherry-picking an isolated and self serving data point rather than responding to the reality of the case"); *TCL Commc'ns Tech. Holdings Ltd v. Telefonaktenbologet LM Ericsson*, 2017 WL 11598725, at *6 (C.D. Cal. Feb. 2, 2017) (excluding testimony of patentee expert after court found "the flaws here are not ones of degree going only to weight, but rather undermine the fundamental reliability of the analysis"; moreover, the expert's characterization *of his own analysis* as a "sanity check" "diminishes its usefulness to the Court as the trier of fact."). Again, these cases say nothing about numerical *criticism* offered by a defense expert.

Taction's motion to exclude Ms. Knox's criticisms of Dr. Kennedy just because she did not offer her own affirmative damages opinion should be denied.

**B. Ms. Knox's discussion of a license agreement between Apple and [redacted] neglected by Dr. Kennedy, is also a proper criticism, and is reliable and admissible**

Taction is not the only party at the hypothetical negotiation—Apple is also there. Thus, in addition to addressing Taction's agreement with Corsair, Dr. Kennedy should also have factored in Apple's agreements for similar technology. But he did not. Most notably, Dr. Kennedy fails to account for Apple's agreement with [redacted], which Ms. Knox opines "provides a relative data point in the determination of a reasonable royalty in this matter and demonstrates the unreasonableness of Dr. Kennedy's royalty conclusion." Ex. 10 (Knox Rpt.) at ¶ 152. She further explains that [redacted] provided Apple a patent license in 2018 (*id.* at ¶ 153); that the [redacted] patents are technically comparable to Taction's patents based on review by Apple's technical expert Dr. Zinn (*id.* at ¶¶ 158-161); and that the [redacted] agreement is economically comparable to the hypothetical negotiation (*id.* at p. 74, heading 3 and ¶¶ 162, 167-169). Ms. Knox addresses the impact of differences between the hypothetical license to Taction's patents and the [redacted] Agreement, and also

adjusts the payment Apple made to [redacted] upwards, to [redacted], to account for the longer duration of the license to Taction's patents. *Id.* at ¶¶ 170-177; Ex. 11 (Knox Dep. Tr.) at 181:3-182:5. She concludes by faulting Dr. Kennedy for failing to explain why Apple would agree to pay Taction [redacted] times more at the hypothetical negotiation. Ex. 10 at ¶ 177. This a fair criticism and goes to the weight of the evidence supporting Dr. Kennedy's conclusions.

Taction does not argue the [redacted] agreement should be excluded simply because it is a settlement agreement—and that is correct because the Federal Circuit permits consideration of settlement agreements when they are relevant to the value of the technology at hand. *E.g.*, *ResQNet.com*, 594 F.3d at 872 ("This court observes as well that the most reliable license in this record arose out of litigation."); *In re MSTG, Inc.*, 675 F.3d 1337, 1348 (Fed. Cir. 2012) ("Our cases appropriately recognize that settlement agreements can be pertinent to the issue of reasonable royalties."). Numerous district courts following *ResQNet* have held the same. *E.g.*, *GPNE Corp. v. Apple, Inc.*, 2014 U.S. Dist. LEXIS 53234, *35-42 (N.D. Cal. 2014); *Everlight Electronics Co., Ltd., and Emcore Corp. v. Nichia Corp.*, 2014 WL 4707053, *12-13(E.D. Mich. 2014); *Stragent, LLC v. Intel Corp.*, 2014 WL 1389304, *3 (E.D. Tex. 2014); *Caluori v. One World Technologies, Inc.*, 2012 WL 630246, *4-5 (C.D. Cal. 2012); *Reedhycalog UK, Ltd. and Reedhycalog, LP V. Diamond Innovations Inc.*, 727 F.Supp.2d 543, 546-47 (E.D. Tex. 2010); *Datatreasury Corp. v. Wells Fargo & Co.*, 2010 WL 903259, *2 (E.D. Tex. 2010).

Instead, Taction again faults Ms. Knox because she does not reach a final conclusion on damages based on the [redacted] agreement. But, as explained above, Ms. Knox was not required to opine on what damages should be to criticize Dr. Kennedy's damages analysis for failing to include the [redacted] agreement in his calculations. *See* Ex. 10 (Knox Rpt.) at ¶¶ 152-177. In her report, Ms. Knox evaluated Dr. Kennedy's opinions, and the royalty Apple paid to [redacted] demonstrates that Dr. Kennedy's approach is flawed and overstated. *Id.* at ¶¶ 152,

177; Ex. 11 (Knox Dep. Tr.) at 38:1-4. Ms. Knox demonstrated the [redacted] patents are technically comparable to the Taction patents. Ex. 10 (Knox Rpt.) at ¶¶ 158-161 (relying on input from Dr. Zinn); Ex. 11 (Knox Dep. Tr.) at 40:24-41:11, 207:11-16, 213:18-19, 214:14-20). She also demonstrated the Apple/[redacted] agreement is economically comparable to the hypothetical negotiation. Ex. 10 (Knox Rpt.) at ¶¶ 167-169; Ex. 11 (Knox Dep. Tr.) at 213:19-214:12. And she adjusted the [redacted] Apple paid to [redacted] to [redacted], to account for differences between the hypothetical license and the [redacted] Agreement. Ex. 10 (Knox Rpt.) at ¶¶ 170-177. Ms. Knox concluded this [redacted] figure "would be something that the parties would consider as they're sitting at the negotiating table." Ex. 11 (Knox Dep. Tr.) at 37:3-5.

Taction criticizes Ms. Knox for allegedly failing to adjust the [redacted] royalty to account for the assumption of validity and infringement at the hypothetical negotiation, but this is demonstrably incorrect. Ms. Knox adjusts the royalty of the [redacted] agreement—in Taction's favor—to account for the greater duration of the Taction patents. *See* Ex. 10 (Knox Rpt.) at ¶ 175. Ms. Knox also considers qualitative adjustments based on the *Georgia-Pacific* factors, some of which place downward pressure and others that place upward pressure. *Id.* at ¶¶ 170-177; Ex. 11 (Knox Dep. Tr.) at 181:3-182:5, 182:11-19. Factors that place downward influence on the rate include: (1) the [redacted] patents are of greater technical value, based on input from Apple's technical expert Dr. Zinn (Ex. 12 (Zinn Reb. Rpt.) at ¶ 361; Ex. 11 (Knox Dep. Tr.) at 41:9-42:4, 44:13-24, 181:23-25, 215:3-7); (2) the [redacted] agreement includes many more licensed patents (Ex. 10 (Knox Rpt.) at ¶ 172; Ex. 11 (Knox Dep. Tr.) at. 181:22-23, 215:2-3); (3) the agreement [redacted] included worldwide rights (Ex. 10 (Knox Rpt.) at ¶173; Ex. 11 (Knox Dep. Tr.) at 215:1-2, 215:8-12); and (4) the [redacted] agreement included more Apple products (Ex. 10 (Knox Rpt.) at ¶ 174). Factors that place upward pressure on the rate include: (1) the term of the [redacted] license is shorter (*id.* at ¶175; Ex. 11 (Knox Dep. Tr.) at 181:15-17, 215:13-15); and

(2) the Taction patents are assumed valid and infringed (Ex. 10 (Knox Rpt.) at ¶ 176; Ex. 11 (Knox Dep. Tr.) at 182:11-19, 215:15-17). Ms. Knox makes an adjustment based on term (as discussed above) but concludes the downward pressure outweighs the upward pressure from the assumption of validity and infringement. Ex. 10 (Knox Rpt.) at ¶ 177; Ex. 11 (Knox Dep. Tr.) at 181:3-182:5. Thus, Taction is wrong that Ms. Knox did not consider validity and infringement.

In addition, because Taction has the burden of proving damages, it was the job of Dr. Kennedy to make any adjustment to the [redacted] agreement he deemed necessary. The fact that Dr. Kennedy failed to do this—and fails to factor the [redacted] agreement into his calculations at all—is a proper critique of Dr. Kennedy's opinions. Moreover, while the hypothetical negotiation requires assuming infringement of a valid patent claim, real world agreements will almost never make that assumption. Parties typically dispute infringement and validity but make a compromise to reach a deal. *That does not mean real world licenses should be excluded*. To the contrary, the Federal Circuit has emphasized the importance of basing patent damages on real-world market pricing even if agreements are not perfectly analogous to the hypothetical negotiation. For example, in *Ericsson, Inc. v. D-Link Sys.*, the Federal Circuit explained that "[m]aking real world, relevant licenses inadmissible on the grounds D–Link urges would often make it impossible for a patentee to resort to license-based evidence." 773 F.3d 1201, 1228 (Fed. Cir. 2014). In *Commonwealth Sci. & Indus. Research Organization v. Cisco Sys*, the Federal Circuit continued with the same theme. 809 F.3d 1295, 1303-04 (Fed. Cir. 2015). There, the court held excluding the challenged agreements "would necessitate exclusion of comparable license valuations that—at least in some cases—may be the most effective method of estimating the asserted patent's value." *Id.* at 1303.

Finally, the Federal Circuit has been clear that except in extreme cases, the comparability of benchmark agreements is a question for the jury: "Prior licenses . . . are almost never perfectly analogous to the infringement action. . . . Testimony

relying on licenses must account for such distinguishing facts when invoking them to value the patented invention. Recognizing that constraint, however, *the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility*." *Ericsson,* 773 F.3d at 1227 (emphasis added); *accord*, *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010) ("multiple differences between the Finjan-Microsoft licensing scenario and a hypothetical negotiation with Defendants . . . permitted the jury to properly discount the Microsoft license").

Again, Taction's cited cases are not to the contrary. As discussed above, *Uniloc* turned on the patentee's use of an arbitrary 25% profit split and billions of dollars in unaccused revenue. 632 F.3d at 1311-21. It had nothing to do with a defendant's reliance on a comparable license agreement. Likewise, in *Digital Reg of Texas, LLC v. Adobe Sys., Inc.*, the court precluded the patentee's expert from citing the amount paid by patent aggregator RPX because RPX was too far removed from the hypothetical negotiation. 2014 WL 4090550, at *4-5 (N.D. Cal. Aug. 19, 2014). While RPX had sublicensed the patent-in-suit to its members, it did not use the patented technology itself and was not a defendant. In addition, *Digital Reg of Texas* says nothing about adjusting royalties based on the assumption of validity and infringement at the hypothetical negotiation.

In short, no rule of law requires exclusion of Ms. Knox's criticism of Dr. Kennedy for failing to account for this agreement in his calculations. The relevance of Apple's [redacted] license is for the jury to consider at trial.

**C. Ms. Knox's discussion of feature usage, required by *Georgia-Pacific* Factor 11 and neglected by Dr. Kennedy, is proper and is reliable and admissible**

As Ms. Knox explains, "[a]s part of his analysis of *Georgia-Pacific* factor 11, Dr. Kennedy relies on Apple data related to usage of the Taptic Engine, which Dr. Kennedy concludes 'indicates that the patented feature is widely used in the Accused

Products.'" Ex. 10 (Knox Rpt.) at ¶ 214.[5] However, "[d]ocuments in the record indicate that the expected usage of the Taction Transporter module is orders of magnitude higher than the extent of use of the Taptic Engine in the Accused Products." *Id.* at ¶ 215. Indeed, "[a]ccording to Taction's own estimates, it expected its Transporters to be actively vibrating for [redacted] per day, or [redacted] per day. In contrast, Apple's data indicates that the Taptic Engines in the Accused Products were actively vibrating for [redacted] per day." *Id.* at ¶ 216. Yet Dr. Kennedy fails to include this difference in his calculations. Ms. Knox concludes "the amount of time the Taptic Engines in the Accused Products are actively vibrating is at most 1.2% of the amount of time the Taction Transporters were expected to vibrate in headphone products. Applying a 1.2% usage adjustment to Dr. Kennedy's per unit royalty of [redacted] results in an adjusted per-unit royalty of [redacted] and reduces Dr. Kennedy's damages to approximately [redacted]." *Id.* at ¶ 216. This too is a relevant criticism of Dr. Kennedy's damages analysis.

Both parties agree the *Georgia-Pacific* factors are relevant to determining a reasonable royalty. Factor 11 of this seminal case is "[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use." 318 F. Supp. at 1120. This makes Ms. Knox's analysis of how often Apple's accused feature is used relevant. The same is true of her comparison of how often Apple customers use the accused feature versus how often Corsair customers use Taction's licensed technology since Dr. Kennedy bases damages on the Taction/Corsair license agreement. *See* Ex. 10 (Knox Rpt.) at ¶¶ 214-26. Ms. Knox's analysis is in response to Dr. Kennedy's failure to address the difference in extent of

---

[5] *Georgia-Pacific* is the seminal case for determining a reasonable royalty in a patent case. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). *Georgia-Pacific* factor 11 contemplates "the extent to which the infringer has made use of the invention; and any evidence probative of the value of that use."

use. Dr. Kennedy only looks at the extent of use of the Taptic Engine of the Accused Products but does not compare to the extent of use in the Corsair headphones. *Id.*; *see also* Ex. 11 (Knox Dep. Tr.) at 226:24-227:11, 227:16-23, 228:7-229:2. Ms. Knox concludes that a 1.2% usage adjustment is appropriate. Ex. 10 (Knox Rpt.) at ¶ 216.

Taction does not dispute the inputs, assumptions, or calculations that lead to Ms. Knox's 1.2% usage adjustment. Taction's only reason for excluding Ms. Knox's analysis is that she does not use it to form her own conclusion about the amount of damages. As demonstrated above, that is legally wrong. In addition, as Ms. Knox explains, her assignment was to evaluate Dr. Kennedy's royalty analysis, and if one were to accept that the Corsair license is an appropriate starting point, then it is necessary to consider the different extent of use under *Georgia-Pacific* Factor 11. Ex. 11 (Knox Dep. Tr.) at 228:7-229:2. The jury should be permitted to consider Ms. Knox's criticism of Dr. Kennedy for his failure to account for the large difference in use between the accused and licensed products.

**D. Ms. Knox's discussion of the market value of Taction, ignored by Dr. Kennedy, is also a proper criticism, and is reliable and admissible**

Ms. Knox also points out that Dr. Kennedy neglects other indicators of the value of Taction's patents. After discussing the lack of market interest in Taction's products, Ex. 10 (Knox Rpt.) at ¶ 218, she considers contemporaneous information about the market valuation of Taction as a whole, which is far less than Dr. Kennedy's damages number. *Id.* at ¶¶ 219-24. Because market valuation is an objective indicia of the value of *all* the company's assets, including its patents, Ms. Knox concludes "[i]t is unreasonable for Dr. Kennedy to conclude that a nonexclusive license to practice a subset of Taction's patents (such as the license subject to the hypothetical negotiation in this case) would be worth many multiples of the value of Taction as a company." *Id.* at ¶ 223. This too is a fair criticism, which the jury should consider.

The Federal Circuit has expressly recognized the validity of a critique like Ms. Knox's based on company value. In *Integra Lifesciences I, Ltd. v. Merck KGaA*, it

vacated a damages award on precisely this basis, holding that a $15 million royalty was inflated when compared to the $20 million paid to purchase the patentee company, with "all of its products, patents and know-how." 331 F.3d 860, 871 (Fed. Cir. 2003), *vacated on other grounds* (liability) 545 U.S. 193 (2005); *see also Fresenius Medical Care Holding Inc. v. Baxter Intern., Inc.*, 224 F.R.D. 644, 653-54 (N.D. Cal., 2004) (citing *Integra* and holding "[t]he amount paid to acquire a company with desired patents, and the amount of the acquisition amount allotted to a particular patent is relevant to the establishment of a reasonable royalty"; granting motion to compel related to plaintiff's acquisition of patentee). Compared to *Integra*, Dr. Kennedy's damages number is much further from the total value of the patentee. Rather than $15 million versus $20 million, he posits damages should be [redacted] (excluding pre-suit damages) when the total value of Taction and all of its assets at the relevant time was *at most* [redacted]. Ex. 10 (Knox Rpt.) at ¶ 221 (discussing valuations in the record). While neither Apple nor Ms. Knox is saying Taction's valuation is a cap on damages, this disparity is a data point the jury needs to consider.

In addition, while Taction questions whether particular valuations considered the impact of this litigation, an efficient market is assumed to consider all available information. If Taction thinks its real-world valuations overlooked relevant data, that is fodder for cross. In other words, it goes to weight, not admissibility.

Finally, Taction is wrong to suggest Apple's market valuation is similarly relevant. Apple does not own the asserted patents, so Apple's value does not include these patents. In addition, Apple offers such a wide variety of products and services that it would be impractical to derive the value of the accused Taptic Engine from the company's total value. By contrast, Taction is built around its patented haptic technology. In any event, Apple's valuation is not at issue in this motion.

The jury should be permitted to consider the disparity between the market's valuation of Taction as a whole and Dr. Kennedy's valuation of a non-exclusive license to use a subset of Taction's patented technology.

## V. CONCLUSION

For the foregoing reasons, the Court should deny Taction's *Daubert* motions.

Dated: June 9, 2023

FISH & RICHARDSON P.C.

By: /s/ Seth M. Sproul

Roger A. Denning (SBN 228998)
denning@fr.com
Christopher S. Marchese (SBN 170239)
marchese@fr.com
Seth M. Sproul (SBN 217711)
sproul@fr.com
John W. Thornburgh (SBN 154627)
thornburgh@fr.com
Ryan P. O'Connor (SBN 253596)
oconnor@fr.com
Daniela Glaser (SBN 341535)
glaser@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070
Fax: (858) 678-5099

Joy B. Kete *(pro hac vice)*
kete@fr.com
Qiuyi Wu *(pro hac vice)*
qwu@fr.com
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
Tel: 516-542-5070/Fax 617-542-8906

Jacqueline Tio *(pro hac vice)*
tio@fr.com
FISH & RICHARDSON P.C.
1180 Peachtree Street, N.E., 21st Floor
Atlanta, GA 30309
Tel: 404-892-5005/Fax 404-892-5005

*Counsel for Defendant Apple Inc.*