1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                        SOUTHERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11 TACTION TECHNOLOGY, INC., | Case No.: 21-CV-812 TWR (JLB) |
| 12                          Plaintiff, | **ORDER (1) GRANTING** |
| 13 v. | **DEFENDANT'S AMENDED** |
| | **MOTION FOR SUMMARY** |
| 14 APPLE INC., | **JUDGMENT OF NON-** |
| | **INFRINGEMENT, (2) VACATING** |
| 15                          Defendant. | **REMAINING PRETRIAL AND** |
| 16 | **TRIAL DATES AND DEADLINES,** |
| | **AND (3) DENYING AS MOOT** |
| 17 | **REMAINING MOTIONS PENDING** |
| 18 | **BEFORE THE UNDERSIGNED** |
| 19 | |
| 20 | (ECF Nos. 281, 299, 350, 357, 365, 367, |
| 21 | 369, 371) |

22          Presently before the Court is the Amended Motion for Summary Judgment ("Mot.,"

23  ECF Nos. 299 (public), ECF No. 313 (sealed)) filed by Defendant Apple Inc. ("Apple"),

24  as well as the Response in Opposition ("Opp'n," ECF Nos. 323 (public), ECF No. 333

25  (sealed)) filed by Plaintiff Taction Technology, Inc. ("Taction") and Apple's Reply in

26  Support of ("Reply," ECF Nos. 330 (public), ECF No. 334 (sealed)) the Motion.  The Court

27  issued a Tentative Revised Claim Construction Order ("the Tentative Order," ECF No.

28  338) on July 11, 2023, following which Taction requested that the Court continue the

hearing scheduled for July 13, 2023, and permit it the opportunity to respond.  (*See* ECF No. 340.)  The Court granted Taction's request, (*see* ECF No. 342), and the Parties filed Supplemental Briefs ("Def.'s Supp. Br.," ECF No. 353; "Pl.'s Supp Br.," ECF Nos. 356 (public), ECF No. 363 (sealed)).  The Court heard oral argument on July 27, 2023.  (*See* ECF No. 360; *see also* ECF No. 373 ("Hearing Tr.").)  For the reasons discussed below, the Court **GRANTS** Apple's Motion and, accordingly, **VACATES** the remaining Pretrial and Trial Dates and Deadlines (ECF No. 281) and **DENIES AS MOOT** the Parties' remaining motions pending before the undersigned.[1]

# BACKGROUND

## I.    The Asserted Patents

Taction is the owner and assignee of U.S. Patent No. 10,659,885 ("the '885 Patent") and U.S. Patent No. 10,820,117 ("the '117 Patent") (collectively, "the asserted patents"). (*See* ECF No. 1 ("Compl.") ¶¶ 68, 72); *see also* U.S. Patent No. 10,659,885, at [73] (issued May 19, 2020); U.S. Patent No. 10,820,117, at [73] (issued Oct. 27, 2020).  The '885 Patent is entitled "Systems and Methods for Generating Damped Electromagnetically Actuated Planar Motion for Audio-Frequency Vibrations" and was issued on May 19, 2020.  '885 Patent at [45], [54].  The '117 Patent is entitled the same and was issued on October 27, 2020.  '117 Patent at [45], [54].  The '885 Patent and the '117 Patent share a common specification, and both patents claim priority to Provisional Application No. 62/054,712 filed on September 24, 2014.  '885 Patent at [60]; '117 Patent at [60].

/ / /

---

[1]    Specifically, the Parties' remaining motions pending before the undersigned are Apple's Unopposed Motion to File Under Seal Portions of Apple's Memorandum of Contentions of Fact and Law (ECF No. 350), Taction's Unopposed Motion to File Portions of Its Memorandum of Law and Fact and Exhibit List Under Seal (ECF No. 357), Apple's Objections to Magistrate Judge's Order Granting Non-Parties' Motion to Quash (ECF No. 344) Pursuant to Fed. R. Civ. P. 72(a) (ECF No. 367) and attendant Motion to Seal (ECF No. 365), and Apple's Objections to Magistrate Judge's Order Granting in Part and Denying in Part Apple's Motion to Compel (ECF No. 348) Pursuant to Fed. R. Civ. P. 72(a)  (ECF No. 371) and attendant Motion to Seal (ECF No. 369).  To the clear, this Order does not dispose of any motions pending before the Honorable Jill L. Burkhardt.

1    The invention described in the '885 Patent and the '117 Patent "relates to tactile

2    transducers that produce bass frequency vibrations for perception by touch." '885 Patent

3    col. 1 ll. 20–21.[2]  The specification of the asserted patents explains:

4        Below about 200 Hz, the lower the frequency of sound, the more it is
5        perceived not only by vibration of the ear drum but also by touch receptors in
         the skin.  This sensation is familiar to anyone who has "felt the beat" of strong
6        dance music in the chest, or through the seat of a chair, or has simply rested a
7        hand on a piano.  The natural stimulus is both auditory and tactile, and a true
         reproduction of it is possible only when mechanical vibration of the skin
8        accompanies the acoustic waves transmitted through the air to the ear drum.

9    *Id.* at col. 1 ll. 25–33.  The specification then details the problems with the prior art audio-

10   frequency tactile transducers, which include "axial shakers," "un-damped eccentric

11   rotating motors ('ERMs')," and "un-damped linear resonant actuators ('LRAs')."  *See id.*

12   at col. 1 l. 34–col. 2 l. 46.  With respect to "axial shakers," the specification explains a

13   "drawback" of using axial shakers "is the production of unwanted acoustic noise."  *Id.* at

14   col. 1 ll. 43-56.  The specification further explains that this problem "is typically made

15   worse by a lack of mechanical damping."  *Id.* at col. 2 ll. 1–2.

16       With respect to ERMs and LRAs, the specification explains that they are also

17   "problematic."  *Id.* at col. 2 ll. 11–13.  Specifically, undamped "ERMs are incompatible

18   with high-fidelity audio," *id.* at col. 2 ll. 14–16, and the "main drawback of LRAs is the

19   dependence on 'resonance.'"  *Id.* at col. 2 ll. 25–26.  LRAs are designed for tactile alerts,

20   not fidelity, and they can have a "high Q-factor" that renders those devices "useless for

21   high fidelity reproduction of low frequency tactile effects" in the relevant range.  *See id.* at

22   col. 2 ll. 25–34; *see also id.* at col. 2 ll. 63–67 (describing a "lack of critically damping"

23   and "a claimed Q-factor of 1.5 to 3" as a "drawback").  In light of these problems with the

24   prior art, the specification asserts: "there exists a need for novel audio-frequency tactile

25   transducers and devices."  *Id.* at col. 3 ll. 46–47.

26

27   _____

28   [2]    Because the '885 Patent and the '117 Patent share a common specification, the Court will cite to
     only the '885 Patent's specification for ease of reference.

3

The asserted patents aim to overcome the problems of the prior art by disclosing "a thin, flat vibration module with a movable member that is electromagnetically actuated to produce motion in-plane." *See id.* at col. 3 ll. 51–53; *see also id.* at col. 2 ll. 47–49. "[T]he module may consist of a mass and thin magnets, polarized through their thickness, where the mass and magnets are movably suspended inside a housing." *Id.* at col. 3 ll. 63–66. Further, the suspension may include flexures or a ferrofluid layer. *Id.* at col. 3 ll. 66–67. In addition, "the vibration of the moving portion may be damped" using a suitable approach, such as the layer of ferrofluid. *Id.* at col. 4 ll. 6–8. The specification states: "Motion of the movable member can be damped so that the steady-state sinusoidal voltages applied to the module at different frequencies produce an acceleration response of the movable member that is substantially uniform over the range of 40–200 Hz." *Id.* at col. 3 ll. 53–58; *see also id.* at [57] ("Motion of the movable member can be damped so that the steady-state sinusoidal voltages applied to the module at different frequencies produce an acceleration response of the movable member that is substantially uniform over the range of 40–200 Hz.").

Independent claim 1 of the '885 Patent recites:

1.     An apparatus for imparting motion to the skin of a user, the apparatus comprising:

a housing;

a plurality of coils capable of carrying electrical current;

a plurality of magnets arranged in operative proximity to the plurality of coils;

a moving portion comprising an inertial mass and the plurality of magnets;

a suspension comprising a plurality of flexures that guides the moving portion in a planar motion with respect to the housing and the plurality of conductive coils;

wherein movement of the moving portion is damped by a ferrofluid in physical contact with at least the moving portion; and

/ / /

4

wherein the ferrofluid reduces at least a mechanical resonance within the frequency range of 40-200 Hz in response to electrical signals applied to the plurality of conductive coils.

'885 Patent col. 14 ll. 48–65.

Independent claim 1 of the '117 Patent recites:

1.      An apparatus comprising:

a housing;

a plurality of conductive coils capable of carrying electrical current;

a plurality of magnets arranged in operative proximity to the plurality of conductive coils;

a moving portion comprising an inertial mass and the plurality of magnets;

a suspension comprising a plurality of flexures that guides the moving portion in a planar motion with respect to the housing and the plurality of conductive coils;

wherein vibration of the apparatus imparts vibrations to a user's skin;

wherein vibration of the apparatus is damped by a viscous ferrofluid in physical contact with at least the moving portion;

wherein the viscous ferrofluid reduces at least a resonance within a frequency range of 40-200 Hz in response to signals applied to the plurality of conductive coils;

wherein said moving portion includes at least a pocket that provides space for at least a magnet;

wherein each of said plurality of flexures is more resistant to motion transverse to a plane of the moving portion than it is to linear motion in the plane of the moving portion; and

wherein said housing is generally cuboid in shape.

'117 Patent col. 14 l. 47–col. 15 l. 5.

/ / /

/ / /

5

## II.     Procedural History

On April 26, 2021, Taction filed its operative Complaint against Apple, alleging infringement of the asserted patents. (*See generally* Compl.)  Specifically, Taction alleges that Apple has directly infringed and induced or contributed to the infringement of the asserted patents by making, using, selling, and offering for sale Apple products, including the iPhone and Apple Watch, that implement haptics technology, (*see id.* ¶¶ 77, 80), which refers to the science of enabling interaction with technology through the sense of touch, such as, for example, through the use of vibrations. (*See* ECF No. 73 at 1.)  Apple answered the complaint and filed counterclaims against Taction on July 8, 2021. (*See generally* ECF No. 17.)

On August 10, 2021, the Honorable Jill L. Burkhardt issued a Scheduling Order. (*See* ECF No. 34.)   On October 21, 2022, after this action was transferred to the undersigned, (*see* ECF No. 48), Apple filed before the Patent Trial and Appeal Board ("PTAB") four petitions for *inter partes* review ("IPR"), challenging the validity of all the asserted claims of the asserted patents. (*See* ECF No. 53-1 ("Kete Decl.") Exs. 1–4.)  On January 26, 2022, the Court stayed the action, including further claim construction briefing, pending the PTAB's decision on whether to institute the IPRs. (*See* ECF No. 76 at 6.)  The PTAB issued decisions denying institution of IPR for all four IPR proceedings related to the asserted patents on April 18, 2022. (*See generally* ECF No. 97.)

On June 2, 2022, the Court lifted the stay and reset the Claim Construction and Tutorial Hearing for August 18, 2022, (*see generally* ECF No. 98), which the Court subsequently continued to September 15, 2022. (*See* ECF No. 119.)  After issuing a tentative ruling, (*see* ECF No. 122), the Court held the *Markman* hearing on September 15, 2022. (*See* ECF No. 126.)   The Court's Claim Construction Order followed on September 28, 2022. (*See generally* ECF No. 141.)

Fact discovery closed on February 10, 2023, (*see* ECF No. 174 at 1), and expert discovery closed on April 21, 2023. (*See* ECF No. 174 at 2.)  The Court set a trial date of October 16, 2023, along with attendant pretrial deadlines. (*See generally* ECF No. 281.)

By the present Motion, Apple moves for summary judgment of non-infringement and no pre-suit damages.  (Mot. at 1, 45.)

## LEGAL STANDARDS

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Material facts are facts that, under the governing substantive law, may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Id.*  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of demonstrating that there is no genuine dispute as to any material fact.  *Celotex*, 477 U.S. at 323.  A moving party without the ultimate burden of proof at trial can satisfy its burden in two ways: (1) by presenting "evidence negating an essential element of the nonmoving party's claim or defense;" or (2) by demonstrating "that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  Once the moving party establishes the absence of a genuine dispute as to any material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'"  *T.W. Elec. Serv.*, 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); *accord Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007).  To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings."  *Anderson*, 477 U.S. at 256; *see also Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).  Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor."  *Anderson*, 477 U.S. at 256.

1   When ruling on a motion for summary judgment, the court must view the facts and
2   draw all reasonable inferences in the light most favorable to the non-moving party.  *Scott*
3   *v. Harris*, 550 U.S. 372, 378 (2007).  The court should not weigh the evidence or make
4   credibility determinations.  *See Anderson*, 477 U.S. at 255.  "The evidence of the non-
5   movant is to be believed." *Id.*  Further, the court may consider other materials in the record
6   not cited to by the parties, but it is not required to do so.  *See* Fed. R. Civ. P. 56(c)(3); *see*
7   *also Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1017 (9th Cir. 2010) ("[A] district court has
8   no independent duty 'to scour the record in search of a genuine issue of triable fact.'").

## ANALYSIS

9   Apple moves for summary judgment of non-infringement of the asserted patents.  A
10   patent infringement analysis proceeds in two steps.  *Niazi Licensing Corp. v. St. Jude Med.*
11   *S.C., Inc.*, 30 F.4th 1339, 1350 (Fed. Cir. 2022); *JVW Enters., Inc. v. Interact Accessories,*
12   *Inc.*, 424 F.3d 1324, 1329 (Fed. Cir. 2005).  In the first step, the court construes the asserted
13   claims as a matter of law.  *See Niazi*, 30 F.4th at 1351; *JVW*, 424 F.3d at 1329.  In the
14   second step, the factfinder compares the properly construed claims to the accused device.
15   *See id.*

17   Here, each of the asserted claims in this action from the '885 Patent and the '117
18   Patent includes one of the four following claim limitations:

19   1.   "wherein the ferrofluid reduces at least a mechanical resonance within the
20   frequency range of 40–200 Hz in response to electrical signals applied to the plurality of
21   conductive coils," '885 Patent col. 14 ll. 62–65, col. 16 ll. 13–16;

22   2.   "wherein the ferrofluid reduces the Q-Factor of the response of the apparatus
23   over at least a portion of the frequency range of 40–200 Hz in response to signals applied
24   to the coil," *id.* at col. 16 ll. 39–42;

25   3.   "wherein the viscous ferrofluid reduces at least a resonance within a frequency
26   range of 40–200 Hz in response to signals applied to the plurality of conductive coils,"
27   '117 Patent col. 14 ll. 63–65, col. 15 ll. 48–50; or

28   / / /

8

4.      "wherein the ferrofluid damps at least a resonance in response to signals applied to the conductive coil." *Id.* at col. 16 ll. 55–56.

In the Claim Construction Order, the Court gave each of the four claim terms "wherein the ferrofluid reduces at least a mechanical resonance within the frequency range of 40–200 Hz," "wherein the ferrofluid reduces the Q-Factor of the response of the apparatus over at least a portion of the frequency range of 40–200 Hz," "wherein the viscous ferrofluid reduces at least a resonance within a frequency range of 40–200 Hz," and "wherein the ferrofluid damps at least a resonance" their plain and ordinary meaning. (ECF No. 141 at 16–17, 22.)   The Court also held that these claim constructions were entered with the acknowledgement of the following disclaimer of claim scope: "that the claimed invention is directed to 'transducers with highly damped output." (*Id.* at 17.)

As for the second step of the infringement analysis, "[t]he patentee bears the burden of proving infringement by a preponderance of the evidence." *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1314 (Fed. Cir. 2011); *see Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 193 (2014) ("A patentee ordinarily bears the burden of proving infringement."). "To prove infringement, the plaintiff bears the burden of proof to show the presence of every element or its equivalent in the accused device." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011); *accord Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1378 (Fed. Cir. 2011).

"'Infringement is a question of fact.'" *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1327 (Fed. Cir. 2021) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1309 (Fed. Cir. 2009)). "Summary judgment of noninfringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim is found in the accused device either literally or under the doctrine of equivalents." *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1317 (Fed. Cir. 2015); *see EMD Millipore Corp. v. AllPure Techs., Inc.*, 768 F.3d 1196, 1201 (Fed. Cir. 2014).

/ / /

Apple contends that it is entitled to summary judgment of non-infringement because the accused products do not include a "transducer with highly damped output" as required by the Court's Claim Construction Order. (Mot. at 6–31.) Apple's argument in this respect is two-fold. First, Apple contends that the opinions of Taction's technical expert, Dr. Oliver, regarding the "highly damped output" limitations must be stricken for containing new infringement theories in violation of this District's Patent Local Rules, without which Taction has not viable claim of infringement. (*See id.* at 6–13.) Second, Apple argues that it is entitled to summary judgment of non-infringement because the accused products do not include a "transducer with highly damped output" as required by the Court's Claim Construction Order. (*See id.* at 13–31.)

## I.   Apple's Request to Strike Dr. Oliver's Infringement Theories

As an initial matter, Apple moves to strike portions of Taction's technical expert Dr. Oliver's expert report on infringement on the grounds that those portions improperly contain a new infringement theory for the "highly damped output" limitation in violation of the Court's Patent Local Rules. (Mot. at 6–10.) In response, Taction argues that it properly disclosed its infringement theories in its final infringement contentions under Patent Local Rule 3.1(c) and that, in his expert report, Dr. Oliver simply applies and explains those properly disclosed infringement theories. (Opp'n at 3–9.)

As the Court previously explained to the Parties, (*see* ECF No. 265 at 6, 17), "[t]he Court's Patent Local Rules are designed to require parties to crystallize their theories of the case early in the litigation and to adhere to those theories once they have been disclosed." *CliniComp Int'l, Inc. v. Cerner Corp.*, No. 17CV02479GPCDEB, 2022 WL 16985003, at *12 (S.D. Cal. Nov. 15, 2022) (quoting *Wi-LAN Inc. v. LG Elecs., Inc.*, No. 18-CV-01577-H-BGS, 2019 WL 5790999, at *2 (S.D. Cal. Sept. 18, 2019)); *see also O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366 n.12 (Fed. Cir. 2006); *AntiCancer, Inc. v. Pfizer, Inc.*, 769 F.3d 1323, 1331 (Fed. Cir. 2014). "'The Local Rules are also designed to provide structure to discovery and to enable the parties to move efficiently toward claim construction and the eventual resolution of their dispute.'" *Bell*

10

*Semiconductor, LLC v. NXP USA, Inc.*, No. 22-CV-00594-H-KSC, 2023 WL 2342037, at *2 (S.D. Cal. Feb. 27, 2023) (quoting *Pelican Int'l, Inc. v. Hobie Cat Co.*, No. 320CV02390RSHMSB, 2023 WL 2127995, at *2 (S.D. Cal. Feb. 10, 2023)).

> The Patent Local Rules accomplish this "by requiring both the plaintiff and the defendant in patent cases to provide early notice of their infringement and invalidity contentions, and to proceed with diligence in amending those contentions when new information comes to light in the course of discovery. The rules thus seek to balance the right to develop new information in discovery with the need for certainty as to the legal theories."

*Pelican*, 2023 WL 2127995, at *2 (quoting *O2 Micro*, 467 F.3d at 1365–66).

Under Patent Local Rule 3.1, a party claiming patent infringement must serve on all parties a "Disclosure of Asserted Claims and Infringement Contentions," and those contentions must disclose specific information regarding the party's theories of infringement in the case. *Bell Semiconductor*, 2023 WL 2342037, at *2; *Pelican*, 2023 WL 2127995, at *3; *see* S.D. Cal. Patent L.R. 3.1. Patent Local Rule 3.1(c) requires "[a] chart identifying specifically where each element of each asserted claim is found within each Accused Instrumentality," Patent L.R. 3.1(c), as well as "sufficient specificity to provide notice to the defendant why the plaintiff believes it has a reasonable chance of proving infringements." *Zest IP Holdings, LLC v. Implant Direct Mfg, LLC*, No. 10-CV-0541-GPC-WVG, 2013 WL 1626111, at *5 (S.D. Cal. Apr. 15, 2013); *see Multimedia Pat. Tr. v. Apple Inc.*, No. 10-CV-2618-H (KSC), 2012 WL 12868249, at *4 (S.D. Cal. Oct. 19, 2012) ("[A] plaintiff claiming patent infringement must identify its particular theories of infringement with sufficient specificity[.]"); *Ameranth, Inc. v. Papa John's USA, Inc.*, 946 F. Supp. 2d 1049, 1057 (S.D. Cal. 2013) ("[Patentees] are obligated to state with specificity the theories upon which they plan to rely, and to do so early in the litigation."). Therefore, to comply with Patent Local Rule 3.1(c), a patentee "must identify with specificity where in the accused system the alleged infringement occurs and how the claim elements are met." *Ameranth, Inc. v. Pizza Hut, Inc.*, No. 12CV1627 JLS NLS, 2013 WL 3894880, at *9 (S.D. Cal. July 26, 2013) ("[The patentee] must 'articulate the precise way in which it

believes the products to be infringing.'"); *see also Scripps Rsch. Inst. v. Illumina, Inc.*, No. 16-CV-661 JLS (BGS), 2016 WL 6834024, at *6 (S.D. Cal. Nov. 21, 2016) ("As Plaintiff explains, its infringement contentions 'will provide information concerning how each limitation of the asserted claims [is] met by the accused products.'"). Rule 3.1(c), however, does not require the patent holder to produce proof or direct evidence of infringement. *See AntiCancer*, 769 F.3d at 1338*; see also Ameranth*, 946 F. Supp. 2d at 1057 (noting that infringement contentions "need not be so detailed as to transform the [contentions] into a 'forum for litigation of the substantive issues'").

"In a lawsuit for patent infringement in the Southern District of California, a patentee is limited to the infringement theories and the accused products it sets forth in its infringement contentions." *Pelican*, 2023 WL 2127995, at *3; *accord Echologics, LLC v. Orbis Intelligent Sys., Inc.*, No. 21-CV-01147-H-AHG, 2023 WL 2756492, at *8 (S.D. Cal. Mar. 27, 2023); *see also LookSmart Grp., Inc. v. Microsoft Corp.*, No. 17-CV-04709-JST, 2019 WL 7753444, at *2 (N.D. Cal. Oct. 17, 2019) ("Once served, the infringement contentions constitute the universe of infringement theories."). Any infringement theories not properly disclosed pursuant to the Court's Patent Local Rules are barred from presentation at trial (whether through expert opinion testimony or otherwise). *Echologics*, 2023 WL 2756492, at *8 (citing *Pelican*, 2023 WL 2127995, at *3); *see, e.g.*, *BookIT Oy v. Bank of Am. Corp.*, 817 F. App'x 990, 995 (Fed. Cir. 2020) (affirming district court's striking of expert report that contained a theory of infringement that was "considerably different" from the infringement contentions); *Phigenix, Inc. v. Genentech, Inc.*, 783 F. App'x 1014, 1018 (Fed. Cir. 2019) (same).

"'A district court has wide discretion in enforcing the Patent Local Rules.'" *Bell Semiconductor*, 2023 WL 2342037, at *3 (quoting *Pelican*, 2023 WL 2127995, at *4); *see Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1320 (Fed. Cir. 2016) (reviewing "a district court's application of its local rules for abuse of discretion"). The Federal Circuit will "affirm decisions in which [a] district court enforced its own local rules, unless it is 'clearly unreasonable, arbitrary, or fanciful; based on erroneous

conclusions of law; clearly erroneous; or unsupported by any evidence.'"  *Howmedica Osteonics*, 822 F.3d at 1324; *see also Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1321 (Fed. Cir. 2016) ("'[T]his court defers to the district court when interpreting and enforcing local rules so as not to frustrate local attempts to manage patent cases according to prescribed guidelines.'").

On October 31, 2022, Taction served Apple with its final infringement contentions in the action, "Taction's Post-Claim Construction Amended Infringement Contentions." (ECF No. 313-4, Ex. 7.)  In those October 31, 2022 infringement contentions, Taction provided the following infringement analysis regarding the "highly damped output" limitation:

> To the extent that the Court's statement concerning "transducers with highly damped output" is ultimately imposed as a requirement of any asserted claim, Taction contends that the Taptic Engines in the accused products are "transducers with highly damped output."  Apple itself, for example, has stated that "[t]he frequency response of the module is controlled, including the frequency response at the resonant frequency, through the use of a closed loop software controller . . . ."  Apple's First Supplemental Response to Taction's Interrogatory No. 9 at 20.  So, too, the frequency response graphs included in Taction's infringement claim charts, show that the Taptic Engines are transducers that have a "highly damped output."  Taction anticipates that fact and expert discovery will provide additional corroborating information. Additionally, Taction contends that, to the extent that the Court's statement concerning "transducers with highly damped output" is ultimately determined to be a requirement of any asserted claims, that the requirement for a "highly damped output" may be satisfied by any mechanism.

(*Id.* at p. 344.)  This is the entirety of the analysis regarding the "highly damped output" limitation in Taction's final infringement contentions.

In the referenced frequency response graphs included in Taction's infringement claim charts, Taction asserted: "In the Taptic Engine in [the accused products], the ferrofluid reduces at least a mechanical resonance within the frequency range of 40–200 Hz in response to electrical signals applies to the plurality of conductive coils."  (*See, e.g.*, ECF No. 313-5, Ex. 8 at p. 370.)  As support for this assertion, Taction included several

frequency response graphs in its claim charts.  An example frequency response graph is set forth below:



Figure 1-3. Synthesized compliance FRFs for a single-DOF system having the dynamic characteristics of the isolated mass from the iPhone SE Taptic Engine.

(*Id.* at p. 371; *see also id.* at pp. 370–74.)  In the above graph, Taction compares the frequency response of an assembled unit with the response of a unit with the "covers, coils, and ferrofluid removed."[3]  (*See id.* at p. 370.)

On April 3, 2023, Taction served Apple with the Corrected Infringement Expert Report of its technical expert, Dr. Oliver.  (ECF No. 313-2 Ex. 2 ("Oliver Expert Report").)  In the report, Dr. Oliver opines that "the Taptic Engines in the Accused Products are 'transducers with highly damped output'" as required by the Court's Claim Construction Order.  (*Id.* ¶¶ 603, 619.)  As support for this opinion, Dr. Oliver explains:

---

[3]     Taction asserts that these frequency charts "demonstrate the effect of ferrofluid in mechanically damping the output of the accused Apple Tactic Engines."  (Opp'n at 7 n.4.)

It is . . . my opinion that the phrase 'highly damped output' would have been understood by a person of ordinary skill in the art at the time of the invention, particularly in view of the relevant intrinsic evidence, as an output that is generally uniform or flat over the normal operating frequency of the device in question, as for example shown in Figure 5C above.   Some variation in flatness or uniformity is obviously allowed.

(*Id.* ¶ 607.)   Dr. Oliver then opines that "[t]he Accused Products produce such a 'highly damped output'—one that is generally uniform or flat." (*Id.* ¶ 608.)   Dr. Oliver asserts, "in the Accused Products, the closed loop control system combined with damping provided by ferrofluid produces a generally uniform frequency response."   (*Id.* ¶ 618; *see also id.* at ¶¶ 608–18.)   To support these opinions, Dr. Oliver presents certain frequency response graphs in his expert report.   (*See id.* ¶¶ 575, 577, 579, 580, 582, 584.)   An example frequency response graph is set forth below:



Apple argues that these infringement opinions in Dr. Oliver's report regarding the "highly damped output" limitation should be struck because they disregard Taction's final infringement contentions and offer new theories of infringement in violation of the District's Patent Local Rules.   (Mot. at 6–10.)   In response, Taction argues that Dr. Oliver's challenged opinions are consistent with Taction's infringement contentions and, consequently, are not "new" infringement theories.   (Opp'n at 6–9.)

The Court agrees with Apple that Dr. Oliver's expert report improperly contains a new theory of infringement that is materially different from what was presented in Taction's final infringement contentions, and, therefore, the opinions should be struck for violating Patent Local Rule 3.1(c).  At its core and distilled down to a single sentence, Dr. Oliver's theory of infringement as to the "highly damped output" limitation is that the accused products satisfy that limitation because the limitation requires an output that is "generally uniform or flat" and "the closed loop control system combined with damping provided by ferrofluid produces a generally uniform frequency response."  (Oliver Expert Report ¶¶ 609, 618; *see also* Hearing Tr. at 53:6–10 (Taction stating: "[I]n one sentence, his position is that the highly damped output is caused by the combination of the ferrofluid damping on the moving member, in conjunction with the closed-loop control, which also affects – both of which affect the output.").)  That specific theory of infringement, however, is not set forth anywhere in Taction's final infringement contentions.  (*See generally* Ex. 7 at p. 344.)  For example, Taction never asserted in its infringement contentions that the "highly damped output" limitation requires an output that is "generally uniform or flat."  (*See id.*)  Indeed, the phrase "generally uniform or flat" cannot be found anywhere in the contentions.  (*See id.*)  And in its Opposition, Taction even concedes that Dr. Oliver's definition of "highly damped output" is not contained in its infringement contentions.  (*See* Opp'n at 13 ("Apple did not dispute the sufficiency of Taction's infringement contentions concerning 'transducers with highly damped output' when Taction served them, despite the contentions not reciting a proposed definition of the disclaimer language").)

It is true that in its final infringement contentions, Taction identified the closed loop controller and its frequency response graphs (which focused on the accused products' use of ferrofluid) as being relevant to the "highly damped output" limitation.  (*Id.*)  But the mere identification of these two components is insufficient to adequately disclose Taction's current theory of infringement for at least two reasons.  First, Taction never expressly asserted or explained in its contentions that it is the closed loop controller combined with the ferrofluid that satisfies the "highly damped output" limitation.  In his expert report,

Dr. Oliver specifically opines that "the closed loop control system combined with damping provided by ferrofluid" satisfies that limitation.  (Oliver Expert Report ¶ 618.)  Taction never made that specific disclosure in its final infringement contentions.  (*See* ECF No. 313-4, Ex. 7 at p.344); *cf. MLC Intell. Prop., LLC v. Micron Tech., Inc.*, No. 14-CV-03657-SI, 2019 WL 1865921, at *4 (N.D. Cal. Apr. 25, 2019) ("'[I]mplicit disclosures are contrary to the purpose of the local patent rules, which require parties to disclose the basis for their contentions in order to make them *explicit* and streamline patent litigation.'" (emphasis in original) (quoting *KlausTech, Inc. v. Google LLC*, No. 10-CV-05899-JSW-DMR, 2018 WL 5109383, at *4 (N.D. Cal. Sept. 14, 2018)).  Second, in its infringement contentions, Taction failed to provide the explanation for "how" the closed loop controller and the ferrofluid satisfy the "highly damped output" claim limitation that is currently contained in Dr. Oliver's expert report.  As explained above, Dr. Oliver's current theory of infringement as to the "highly damped output" limitation is that the accused products satisfy that limitation because the limitation requires an output that is "generally uniform or flat" and "the closed loop control system combined with damping provided by ferrofluid produces a generally uniform frequency response."  (Oliver Expert Report ¶¶ 609, 618.)  That explanation of "how" the "highly damped output" limitation is satisfied by the closed loop controller and the ferrofluid is not contained anywhere in Taction's final infringement contentions.  (*See generally* Ex. 7 at p. 344; *see also* Opp'n at 13 (conceding that the infringement "contentions [did] not recit[e] a proposed definition of the disclaimer language").)

Taction argues that the disclosures in its final infringement contentions were adequate because Patent Local Rule 3.1(c) does not require an explanation of "how" or "why" the identified components satisfy each claim element/limitation.  (Opp'n at 4.)  Taction is wrong—courts in this District have held that, to comply with Patent Local Rule 3.1(c), a patentee "must 'articulate the precise way in which it believes the products to be infringing.'"  *Ameranth*, 2013 WL 3894880, at *8 (quoting *Tessenderlo Kerley, Inc. v. OR-Cal, Inc.*, No. C 11-04100 WHA, 2012 WL 1253178, at *4 (N.D. Cal. Apr. 13, 2012)).  A

patentee therefore "must identify with specificity where in the accused system the alleged infringement occurs and how the claim elements are met."[4]  *Id.* at \*9; *see also Scripps Rsch. Inst.*, 2016 WL 6834024, at \*6 ("[I]nfringement contentions 'will provide information concerning how each limitation of the asserted claims [is] met by the accused products.'").  As such, to adequately disclose its current theory of infringement in its final infringement contentions, Taction needed to identify not only "where" in the accused products the "highly damped output" limitation is found, but also precisely how those components satisfy the limitation.  Taction failed to provide the requisite "how" in its final infringement contentions, which is why the opinions at issue in Dr. Oliver's expert report constitute an improper new theory of infringement in violation of the Court's Patent Local Rules.  Because these opinions violate the Court's Patent Local Rules, the Court **GRANTS** Apple's Motion and **STRIKES** Dr. Oliver's infringement opinions regarding the "highly damped output" limitation.  *See, e.g.*, *Echologics*, 2023 WL 2756492, at \*9–10 (striking new theory of infringement that was presented for the first time in expert report); *see also, e.g.*, *BookIT Oy*, 817 F. App'x at 995 (affirming district court's striking of expert report that contained a theory of infringement that was "considerably different" from the infringement contentions); *Phigenix*, 783 F. App'x at 1018 (same).

---

[4]     Taction notes that Southern District of California Patent Local Rule 3.1(c) merely requires an identification of "specifically *where* each element of each asserted claim is found within each Accused Instrumentality," S.D. Cal. L.R. 3.1(c) (emphasis added), whereas Northern District of California Patent Local Rule 3.1(c) requires an identification of "specifically *where and how* each limitation of each asserted claim is found within each Accused Instrumentality." N.D. Cal. Pat. L.R. 3.1(c) (emphasis added); (*see also* Opp'n at 4 n.1).  The Court acknowledges that there is a difference in language between those two Patent Local Rules.  Nevertheless, courts in this District have held that that, to comply with Patent Local Rule 3.1(c), a patentee "must identify with specificity where in the accused system the alleged infringement occurs and how the claim elements are met."  *Ameranth*, 2013 WL 3894880, at \*8.

       Indeed, the record in this action demonstrates that Taction is well aware of this requirement.  For example, in its initial infringement contentions, Taction did not simply identify ferrofluid (*i.e.*, the relevant component) as satisfying the "wherein the ferrofluid reduces at least a mechanical resonance with the frequency range of 40–200 Hz" limitation.  (*See, e.g.*, ECF No. 299-13, Ex. 10 at pp. 397–401.)  Rather, Taction identified the ferrofluid and explained how the ferrofluid satisfied that limitation through the frequency response graphs it included in its infringement contentions.  (*See id.*)

1    Taction argues that the disclosures in its final infringement contentions were
2    adequate because infringement expert reports need not have the same scope as and can be
3    more detailed than infringement contentions.  (Opp'n at 3–5; *see also* Hearing Tr. at
4    68:17–70:3.)  It is true that the scope of infringement contentions and expert reports are
5    not "coextensive." *Echologics*, 2023 WL 2756492, at *9; *Wi-LAN*, 2019 WL 5790999, at
6    *2.  "'Contentions need not disclose specific evidence, whereas expert reports must include
7    a complete statement of the expert's opinions, the basis and reasons for them, and any data
8    or other information considered when forming them.'"  *Wi-LAN*, 2019 WL 5790999, at *2
9    (quoting *Apple Inc. v. Samsung Elecs. Co.*, No. 5:12-CV-0630-LHK-PSG, 2014 WL
10   173409, at *1 (N.D. Cal. Jan. 9, 2014)); *see also Digital Reg of Texas, LLC v. Adobe Sys.*
11   *Inc.*, No. CV 12-01971-CW (KAW), 2014 WL 1653131, at *5 (N.D. Cal. Apr. 24, 2014)
12   ("In patent litigation, expert reports are expected to provide more information than is
13   contained in infringement contentions.").   "Thus, in determining whether to strike
14   challenged portions of an expert report, a court must consider whether the report advances
15   a new theory, or whether the challenged report section merely provides an evidentiary
16   example or complementary proof in support of the infringement contentions." *Echologics*,
17   2023 WL 2756492, at *9 (internal quotation marks omitted) (quoting *Cal. Inst. of Tech. v.*
18   *Hughes Commc'ns, Inc.*, No. 213CV07245MRPJEM, 2015 WL 11120845, at *1 (C.D. Cal.
19   Apr. 13, 2015); *Genentech, Inc. v. Trustees of Univ. of Penn.*, No. C 10-2037 LHK PSG,
20   2012 WL 424985, at *2 (N.D. Cal. Feb. 9, 2012)).  But the issue here is not that Dr. Oliver
21   provides evidentiary examples or complementary proof in his expert report; rather, the
22   issue here is that viewing Dr. Oliver's theory of infringement regarding the "highly damped
23   output" limitation even at a very high level—generalizing the theory down to a single
24   sentence (*i.e.*, that the limitation is satisfied because the closed loop control system
25   combined with damping provided by ferrofluid produces a generally uniform frequency
26   response)—that specific theory of infringement is not contained anywhere in Taction's
27   final infringement contentions.  Although the Court agrees with Taction that infringement
28   contentions need not disclose specific evidence, *see Wi-LAN*, 2019 WL 5790999, at *2,

infringement contentions do need to disclose specific "theories" of infringement, and, ultimately, Taction's final infringement contentions failed to disclose the specific "theory" of infringement contained in Dr. Oliver's expert report.

Taction also contends that Apple has not been prejudiced by the purported new theories of infringement contained in Dr. Oliver's expert report. (Opp'n at 12–13.) Courts have held, however, that "prejudice is inherent" in the assertion of a new theory of infringement in an expert report after the close of fact discovery. *MLC Intell. Prop.*, 2019 WL 1865921, at *2; *see, e.g.*, *Echologics*, 2023 WL 2756492, at *10; *KlausTech*, 2018 WL 5109383, at *8; *Power Integrations, Inc. v. ON Semiconductor Corp.*, 396 F. Supp. 3d 851, 884 (N.D. Cal. 2019); *see also Junker v. Med. Components, Inc.*, No. CV 13-4606, 2020 WL 1308299, at *4 (E.D. Pa. Mar. 19, 2020) ("'Prejudice is inherent when deadlines are disregarded in complex cases with extensive discovery.'"). "Requiring a party to show prejudice in the assertion of a new theory after the close of [fact] discovery would incentive parties to make untimely disclosures, and contravene the spirit of the patent local rules, which require early crystallization of infringement theories." *KlausTech*, 2018 WL 5109383, at *8. Further, even if a showing of prejudice was required, Apple has adequately explained how it has been prejudiced by the untimely disclosure of Taction's current theory of infringement. Apple explains, for example, that it was prevented from conducting responsive testing or obtaining responsive invalidity expert testimony. (*See* Reply at 4–5; *see also* Hearing Tr. at 67:19–68:10.)

Finally, Taction argues that if Apple thought Taction's infringement contentions were insufficient, then Apple should have told Taction rather than waiting until summary judgment to raise the issue. (Opp'n at 13.) In response, Apple argues that Taction bears the burden of adequately disclosing its infringement theories and under no circumstances does that burden shift to Apple. (Reply at 5.) Apple is correct—Taction cannot shift the responsibility of its infringement disclosures to Apple. "Under the plain language of Patent Local Rule 3.1, it is the responsibility of the 'party claiming patent infringement' (here, [Taction]) to provide the information required by Rule 3.1(c)." *See DNA Genotek*, 2023

WL 3445207, at *12 n.8; *KlausTech*, 2018 WL 5109383, at *6 ("KlausTech attempts to shift the blame to Google for not complaining earlier about the inadequacy of its accused browser disclosures.  This argument is contrary to the patent local rules[,] which place the burden on the patentee to make explicit disclosures regarding all infringement theories."); *see also MLC Intellectual Prop.*, 2019 WL 1865921, at *7 (recognizing that the "onus" is not on the defendant to "grasp" scope of the patentee's theory "by piercing together bits of different contentions" "and then figure out how the various contentions align (or not)" with expert report).

Further, Dr. Oliver's opinion regarding the meaning of the phrase "highly damped output" is improper and should be struck for two additional reasons.  First, Dr. Oliver's opinion regarding the meaning of the phrase "highly damped output" is improper as it represents an improper attempt to argue claim construction to the jury.  "[I]t is improper to argue claim construction to the jury because the 'risk of confusing the jury is high when experts opine on claim construction.'"  *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009) (quoting *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172–73 (Fed. Cir. 2005)); *see also Teva*, 574 U.S. at 326 ("[T]he ultimate question of claim construction is for the judge and not the jury.").  In light of that principle, courts have held that expert testimony about the meaning of a claim term "'supported by reference to specification and prosecution history'" constitutes an improper attempt to argue claim construction to the jury.  *DNA Genotek*, 2023 WL 3445207, at *7 n.2 (quoting *CAO Lighting, Inc. v. Gen. Elec. Co.*, No. CV 20-681-GBW, 2023 WL 1930354, at *7 (D. Del. Jan. 30, 2023)); *see Contour IP Holding, LLC v. GoPro, Inc.*, No. 3:17-CV-04738-WHO, 2020 WL 5106845, at *4 (N.D. Cal. Aug. 31, 2020); *Not Dead Yet Mfg., Inc. v. Pride Sols., LLC*, 222 F. Supp. 3d 657, 661–62 (N.D. Ill. 2016); *Ferring Pharms. Inc. v. PAR Pharm., Inc.*, No. 1:15-CV-00173-RGA, 2016 WL 6471246, at *1 (D. Del. Oct. 28, 2016); *MediaTek inc. v. Freescale Semiconductor, Inc.*, No. 11-CV-5341 YGR, 2014 WL 971765, at *5 (N.D. Cal. Mar. 5, 2014).  Consequently, those courts have struck and excluded such testimony.  *See, e.g.*, *DNA Genotek*, 2023 WL 3445207, at *7 n.2; *CAO Lighting*, 2023 WL

21

1930354, at *7; *see also, e.g.*, *Cordis*, 561 F.3d at 1337 (affirming district court's refusal to permit defendant to argue the prosecution history of the asserted patent to the jury).

In his expert report, Dr. Oliver opines that a person of ordinary skill in the art ("POSITA") would understand the phrase "highly damped output" "as an output that is generally uniform or flat over the normal operating frequency range of the device in question." (Oliver Expert Report ¶ 607.)  In an effort to support his opinion regarding the meaning of the term "highly damped output," Dr. Oliver cites the specification and the prosecution history of the asserted patents.  (*See id.* ¶¶ 605–607.)  Those opinions are an improper attempt to argue claim construction to the jury, and, therefore, the Court also strikes those opinions on this basis.  *See Cordis*, 561 F.3d at 1337; *DNA Genotek*, 2023 WL 3445207, at *7 n.2; *CAO Lighting*, 2023 WL 1930354, at *7.

Second, Taction waived the claim construction that Dr. Oliver attempts to assert in his expert report.  In his expert report, Dr. Oliver opines that the phrase "highly damped output" means "an output that is generally uniform or flat over the normal operating frequency range of the device in question."  (Oliver Expert Report ¶ 607.)  As Taction acknowledges, (*see* Opp'n at 15), a party waives any argument with respect to the construction of a claim term when the party fails to raise that issue during the claim construction phase of the case.  *See CliniComp*, 2022 WL 16985003, at *9; *DNA Genotek*, 2023 WL 3445207, at *7; *see, e.g.*, *Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1356 (Fed. Cir. 2007) ("The district court found that ACS waived any argument with respect to th[e] term ["maintaining"] by failing to raise it during the claim construction phase.  We agree.").  Sound practical reasons counsel against construing terms based on claim construction arguments raised for the first time in summary judgment briefs or expert reports.  *See DNA Genotek*, 2023 WL 3445207, at *7; *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-cv-630, 2014 WL 252045, at *3 (N.D. Cal. Jan. 21, 2014); *see also O2 Micro*, 467 F.3d at 1364 (explaining that patent local rules are designed to "prevent the shifting sands approach to claim construction").

/ / /

At the claim construction hearing in this case, Taction not only failed to present and propose the claim construction that is currently contained in Dr. Oliver's expert report, but Taction expressly argued that the Court should not try to "separately define" the term "highly damped output." (*See* ECF No. 130 at 84:16–22 (Taction: "But even if you were to conclude that they did and you to put in some sort of a disclaimer, perhaps in a jury instruction down the road, we think it should use the word in the statement, 'highly damped.' [¶] We shouldn't try now, in the context of a hearing on the fly, to separately define that term.").)   Contrary to Taction's representations to the Court at the claim construction hearing, Taction is now attempting, via Dr. Oliver's report, to separately define and construe "highly damped output" to mean "an output that is generally uniform or flat over the normal operating frequency range of the device in question." (Oliver Expert Report ¶ 607.) That is improper. *See Cent. Admixture Pharmacy Servs.*, 482 F.3d at 1356; *DNA Genotek*, 2023 WL 3445207, at *7; *Pelican Int'l, Inc. v. Hobie Cat Co.*, No. 320CV02390RSHMSB, 2023 WL 2127994, at *8, 11 (S.D. Cal. Feb. 10, 2023).  As such, Taction waived the claim construction contained in Dr. Oliver's expert report, and that is yet another reason why Dr. Oliver's opinions regarding the "highly damped output" limitation is improper.

For all these reasons, the Court **STRIKES** the opinions in Dr. Oliver's expert report regarding the "highly damped output" limitation.  Further, Apple argues that if the Court strikes these portions of Dr. Oliver's expert report, then Apple is entitled to summary judgment of non-infringement because, without Dr. Oliver's opinions, Taction has no viable claim of infringement.  (Mot. at 14.)  The Court agrees with Apple.  *See, e.g.*, *Phigenix*, 783 F. App'x at 1020 ("Without its expert report, Phigenix's direct infringement case fails, so we affirm the district court's grant of summary judgment of noninfringement on that basis."); *O2 Micro*, 467 F.3d at 1369 (affirming grant of summary judgment where untimely infringement theories were struck from expert report); *see also e.g.*, *DNA Genotek*, 2023 WL 3445207, at *7 ("Because Genotek's theory of infringement relies on an untimely claim construction that it waived, its current theory of infringement fails as a

matter of law."). Without Dr. Oliver's opinions regarding the "highly damped output" limitation, Taction's infringement case fails. Accordingly, the Court **GRANTS** Apple's motion for summary judgment of non-infringement on this basis.

## II.   The "Highly Damped Output" Limitation

Even if the Court declined to strike Dr. Oliver's opinions, Apple would still be entitled to summary judgment of non-infringement. Apple argues that, even when Dr. Oliver's opinions are considered, the accused products do not satisfy the "highly damped output" limitation.

### A.   *Revised Claim Construction*

Apple contends that the accused products fail to satisfy the "highly damped output" limitations for two reasons. First, Apple argues that the accused products' Taptic Engines are not "highly damped" by ferrofluid. (Mot. at 14–17.) Second, Apple argues that the phrase "highly damped" requires a mechanical Q-factor of less than 1.5, and the accused products do not have a mechanical Q-factor of less than 1.5. (*Id.* at 21–28.)

In response, Taction argues that the Court should reject Apple's non-infringement positions because they are based on new claim construction arguments that either Apple waived or the Court has already rejected. (Opp'n at 15–16, 19; *see also* Pl.'s Supp. Br. at 3.) Taction further argues that, even if the Court were to revisit its claim constructions, the Court should reject the claim constructions advanced by Apple and its expert and instead adopt the claim constructions advanced by Taction and its experts. (*See* Opp'n at 15–24.)

The Court agrees with Taction that Apple's motion for summary judgment of non-infringement contains new claim construction positions that it did not properly present during the claim construction phase of this case. (*See, e.g.*, Mot. at 15–16, 21–23.) A party waives any argument with respect to the construction of a claim term when the party fails to raise that issue during the claim construction phase of a patent infringement action. *DNA Genotek*, 2023 WL 3445207, at *7; *Pelican*, 2023 WL 2127994, at *8; *CliniComp*, 2022 WL 16985003, at *9; *see also, e.g.*, *Cent. Admixture Pharmacy*, 482 F.3d at 1356. But, as explained in the preceding section, *see supra* Section I, Taction and its expert, Dr. Oliver,

also advance a new claim construction for the phrase "highly damped output" that Taction waived by not properly presenting during the claim construction phase of the case.  So, if the Court were to overlook Taction's claim construction waiver and not strike Dr. Oliver's expert report, then—in fairness—the Court would also overlook any potential claim construction waiver by Apple and fully revisit the Court's claim constructions without considering waiver by either side.  Indeed, the Federal Circuit has explained that "a district court may (and sometimes must) revisit, alter, or supplement its claim constructions . . . to the extent necessary to ensure that final constructions serve their purpose of genuinely clarifying the scope of claims for the finder of fact." *In re Papst Licensing Digit. Camera Pat. Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015) (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008); *Pfizer, Inc. v. Teva Pharm., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir. 2005)); *see Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006) ("[D]istrict courts may engage in 'rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves.'" (quoting *Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002))).  Therefore, the Court will revisit its claim constructions of the relevant claim terms.

Claim construction is an issue of law for the court to decide.  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 326 (2015); *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  Although claim construction is ultimately a question of law, "subsidiary factfinding is sometimes necessary." *Teva*, 574 U.S. at 326.

"It is a 'bedrock principle' of patent law that the 'claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citations omitted).  "The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro*, 521 F.3d at 1360 (citation omitted).

Claim terms "'are generally given their ordinary and customary meaning[,]'" which "is the meaning that the term would have to a person of ordinary skill in the art in question

at the time of the invention." *Phillips*, 415 F.3d at 1312–13.  "In some cases, the ordinary meaning of claim language as understood by a [POSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.  "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent." *O2 Micro*, 521 F.3d at 1360.  If the meaning of the term is not readily apparent, the court must look to "'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *Phillips*, 415 F.3d at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  "Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence.'" *Id.* (quoting *Innova*, 381 F.3d at 1116); *see Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1217–18 (Fed. Cir. 2014).

In determining the proper construction of a claim, a court should first look to the claim language itself.  *See Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019) ("[C]laim construction must begin with the words of the claims themselves."); *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) ("[A] claim construction analysis must begin and remain centered on the claim language itself[.]").  The context in which a disputed term is used in the asserted claims may provide substantial guidance as to the meaning of the term.  *See Phillips*, 415 F.3d at 1314.

A court must also read claims "in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979; *see* 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.").  "'Apart from the claim language itself, the specification is the single best guide to the meaning of a claim term.'" *Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014) (quoting *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1272 (Fed. Cir. 2011)).

/ / /

In addition to the claim language and the specification, the patent's prosecution history may be considered if it is in evidence. *Phillips*, 415 F.3d at 1317. The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office ('PTO')] and includes the prior art cited during the examination of the patent." *Id.* "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* "Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* In addition, a court should also consult the prosecution history "so that the court can exclude any interpretation that was disclaimed during prosecution." *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378 (Fed. Cir. 2005) (citing *Phillips*, 415 F.3d at 1317).

In most situations, analysis of the intrinsic evidence will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583; *see also Teva*, 574 U.S. at 331; *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence."). However, "[w]here the intrinsic record is ambiguous, and when necessary," district courts may "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1360 (Fed. Cir. 2013) (quoting *Phillips*, 415 F.3d at 1317). A court must evaluate all extrinsic evidence in light of the intrinsic evidence. *Phillips*, 415 F.3d at 1319. "'[E]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims.'" *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1373 (Fed. Cir. 2022); *see also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1290 (Fed. Cir. 2015) ("Extrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'"). In cases where subsidiary facts contained in the extrinsic evidence "are in

dispute, courts will need to make subsidiary factual findings about that extrinsic evidence." *Teva*, 574 U.S. at 332.

"[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." *O2 Micro*, 521 F.3d at 1362; *see also Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."). In certain situations, it is appropriate for a court to determine that a claim term needs no construction and its plain and ordinary meaning applies. *O2 Micro*, 521 F.3d at 1360; *Phillips*, 415 F.3d at 1314. But "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro*, 521 F.3d at 1361. If the parties dispute the scope of a certain claim term, it is the court's duty to resolve the dispute. *Id.* at 1362; *Eon*, 815 F.3d at 1318.

In the Claim Construction Order, the Court gave the four claim terms "wherein the ferrofluid reduces at least a mechanical resonance within the frequency range of 40–200 Hz," "wherein the ferrofluid reduces the Q-Factor of the response of the apparatus over at least a portion of the frequency range of 40–200 Hz," "wherein the viscous ferrofluid reduces at least a resonance within a frequency range of 40–200Hz," and "wherein the ferrofluid damps at least a resonance" their plain and ordinary meaning. (ECF No. 141 at 16–17, 22.) In addition, the Court held that these claim constructions were entered with the acknowledgement of the following disclaimer of claim scope: "that the claimed invention is directed to 'transducers with highly damped output." (*Id.* at 17.) The Court's finding of disclaimer was based on the patentee's statements in the prosecution history distinguishing the claimed invention from the prior art reference Morris and additional statements in the asserted patents' specification. (*See id.* at 11–14); *see also Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1141 (Fed. Cir. 2021) ("'[A]n applicant's argument that a prior art reference is distinguishable on a particular ground can

serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.'"); *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("A patentee could [make a disclaimer], for example, by clearly characterizing the invention in a way to try to overcome rejections based on prior art."); *MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1330 (Fed. Cir. 2007) ("Prosecution arguments like this one which draw distinctions between the patented invention and the prior art are useful for determining whether the patentee intended to surrender territory, since they indicate in the inventor's own words what the invention is not."); *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998) ("The public has a right to rely on" "global comments made to distinguish the applicants' 'claimed invention' from the prior art[.]").

In its briefing, Taction contends that the Court should further construe the phrase "highly damped output" to mean "output that is generally uniform or flat." (Opp'n at 20–24.)  In its briefing, Apple contends that the Court should interpret the phrase "highly damped output" to specifically require that the claimed "ferrofluid" produce the "highly damped output." (Mot. at 15–16.)  Apple also contends that the phrase "highly damped" requires "a mechanical Q-factor of less than 1.5." (*Id.* at 21–23.)  The Court addresses these three claim construction positions in turn below.

### 1.    *Substantially Uniform or Flat*

First, Taction contends that the Court should construe the phrase "highly damped output" to mean "output that is generally uniform or flat" over the normal operating frequency range of the device. (Opp'n at 20–24; *see also* Oliver Expert Report ¶ 607.) Taction argues that this construction is proper because it is derived from the relevant disclaimer in the prosecution history. (*Id.* at 20–21.)

During the prosecution of a parent application, the patentee—in an effort to distinguish the claimed invention from the prior art reference Morris—asserted:

> Applicant's invention, in contrast, is directed to transducers with highly damped output.

> "Motion of the movable member can be damped so that the steady-state sinusoidal voltages applied to the module at different frequencies produce an acceleration response of the movable member that is substantially uniform over the range of 40-200 Hz." Column 3, lines 56–61.

(ECF No. 72-5, Ex. D at p. 65); *see also* '885 Patent col. 3 ll. 53–58.  Taction is correct that these arguments in the prosecution history support its proposed construction.  In the passage, the patentee links transducers with highly damped output to the specification's discussion of damping the motion of the movable member to produce a response of the member that is "substantially uniform" over the range at issue.

Apple notes that the passage at issue from the specification cited in the prosecution history specifically says "substantially uniform," not "generally uniform or flat" as proposed by Taction.  (Mot. at 24.)  Apple is correct.  *See* '885 Patent col. 3 l. 57 ("substantially uniform").  In response, Taction clarifies that it does not see a distinction between the two phrases and that they have an "equivalent meaning."  (Opp'n at 23 ("Taction submits that the phrase 'substantially uniform,' which was used in the prosecution history and specification, has the equivalent meaning."); *see also* Pl. Supp. Br. at 1–2.)  In light of this concession by Taction, the Court modifies Taction's proposed construction by changing the phrase "generally uniform or flat" to "substantially uniform or flat" in order to better match the actual language in the specification and the prosecution history.

With that modification to Taction's proposed construction, the claim construction is well supported by the intrinsic record—in particular the specification and the prosecution history.  In addition, it is supported by Apple's own previous proposed constructions for the relevant claim terms.  At claim construction, for example, Apple proposed that the claim term "wherein the ferrofluid reduces at least a mechanical resonance within the frequency range of 40–200 Hz" be construed as "wherein the ferrofluid produces a substantially uniform, non-peaked response over the frequency range of 40–200 Hz." (ECF No. 72 at 7; *see also* ECF No. 130 at 40:4–6 (arguing "the consequences of those disclaimers is that you're left with a reduction that is substantially uniform and non-

30

1   peaked").)  That proposed construction by Apple for the most part aligns with Taction's

2   current modified construction.  As such, the Court further construes the phrase "highly

3   damped output" as "the output of the transducer is highly damped (*i.e.*, the output is

4   substantially uniform or flat over the normal operating frequency range of the device)."

5                    *2.    Ferrofluid or Mechanical Damping*

6          Second, Apple contends that the Court should construe the phrase "highly damped

7   output" specifically to require that the claimed "ferrofluid" produce the "highly damped

8   output." (Mot. at 15–16.)  In response, Taction argues that the Court should reject Apple's

9   proposal because the "highly damped output" disclaimer was made in the context of a

10  pending claim that did not include a ferrofluid limitation and, therefore, it would be

11  improper to limit the disclaimer in the manner proposed by Apple.  (Pl.'s Supp. Br. at

12  3–4.)

13         Taction is correct.  Although all the asserted claims in this action have a "ferrofluid"

14  limitation, the "highly damped output" disclaimer was made in relation to claim 15 of U.S.

15  Application No. 15/222,394.  (ECF No. 72-5, Ex. D at pp. 64–65.)  Claim 15 of the '394

16  Application does not contain a "ferrofluid" limitation.  (*Id.* at pp. 75–76; *see also* ECF No.

17  130 at 55:24–56:9.)  It would therefore be improper for the Court to limit the "highly

18  damped output" disclaimer from the prosecution history to specifically require that

19  "ferrofluid" produce the "highly damped output."  *See Mass. Inst. of Tech. v. Shire*

20  *Pharms., Inc.*, 839 F.3d 1111, 1119–20 (Fed. Cir. 2016) (finding no disclaimer where the

21  statements at issue in the prosecution history were made in the context of claims that did

22  not include the relevant claim terms).  Accordingly, the Court rejects Apple's proposal to

23  construe the asserted claims to specifically require that the "ferrofluid" produce the "highly

24  damped output."

25         Alternatively, Apple argues that, even if the claims do not require that the "highly

26  damped output" be specifically produced by ferrofluid, in light of the other disclosures in

27  the specification, the asserted claims should be limited to a "highly damped output" that is

28  produced by mechanical damping.  (*See* Mot. at 15–16; *see also* Hearing Tr. at 38:15–19.)

21-CV-812 TWR (JLB)

The Court agrees.  The only disclosures of damping in the specification are all forms of mechanical damping.  *See* '885 Patent col. 2 ll. 1–2, col. 4 ll. 6–9, col. 9 ll. 36–41; *see also* ECF No. 299-6 Ex. 3 ("Okamura Depo.") at 144:3–21 (Taction's validity expert stating that column 4, lines 6 through 9 of the specification only provide examples of damping that are "mechanical in nature" and that "[c]losed loop control is not explicitly mentioned").  The specification never refers to any other type of damping.  Therefore, the asserted claims must be limited to requiring that the "highly damped output" be achieved by mechanical damping.  *See, e.g.*, *Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1309 (Fed. Cir. 2017) (limiting scope of claims on grounds that it was "necessary to 'tether the claims to what the specification[] indicate[s] the inventor actually invented'"); *AquaTex Indus., Inc. v. Techniche Sols.*, 419 F.3d 1374, 1381–82 (Fed. Cir. 2005) (limiting scope of claims to synthetic fibers where the specification "describe[d] numerous examples of commercial grade fiberfill, all of which are comprised entirely of synthetic materials"); *Tap Pharm. Prod., Inc. v. Owl Pharms., L.L.C.*, 419 F.3d 1346, 1353 (Fed. Cir. 2005) (limiting scope of claims where "all of the 31 examples in the specification describe[d] the use of particles" in a certain manner); *see also Eon*, 815 F.3d at 1320–21 ("A party is . . . 'not entitled to a claim construction divorced from the context of the written description and prosecution history.'" (quoting *Nystrom v. TREX Co., Inc.*, 424 F.3d 1136, 1144–45 (Fed. Cir. 2005)); *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1480 (Fed. Cir. 1998) ("[C]laims may be no broader than the supporting disclosure, and therefore . . .  a narrow disclosure will limit claim breadth.").

Taction contends that there is no clear and unmistakable disclaimer in the specification limiting the asserted claims to mechanical damping.  (Opp'n at 18.)  This argument misses its mark.  The issue is not whether there is a disavowal in the specification related to mechanical damping; rather, the issue is whether the specification discloses any form of damping other than mechanical damping.  It does not.  As such, the claims should be limited to mechanical damping.

/ / /

Taction also argues that Apple's proposal is wrong because the asserted claims contemplate damping by electronic means since the claims recite "electrical signals applied to the conductive coil." (Opp'n at 17.) In response, Apple argues that Taction misconstrues the relevant claim language. (Reply at 7.) The Court agrees with Apple. For example, independent claim 1 of the '885 Patent recites, "wherein the ferrofluid reduces at least a mechanical resonance . . . in response to electrical signals applied to the plurality of conductive coils." '885 Patent col. 14 ll. 62–65. Here, the claim language states that the claimed "electric signals" and "conductive coils" are used to generate a mechanical resonance. The specification is consistent with that as well. *See id.* at col. 3 l. 67–col. 4 l. 2 ("The housing may include one or more conductive coils that carry electrical current used to vibrate the movable portion."), col. 8 ll. 22–24 ("Lateral forces can be imparted to magnets 402 by virtue of a Lorentz force generated by passing current through an coil 407[.]"). The claim language at issue says nothing about using electrical signals for damping. As such, the Court rejects Taction's argument.

Taction also cites to opinions and testimony from its experts and asserts that a POSITA reading the intrinsic evidence would have been aware of compatible electronic damping mechanisms. (Opp'n at 17–18, 27 (citing Oliver Expert Report ¶ 626; ECF No. 323-6 Ex. 5 ("Okamura Depo.") at 47, 56).) There are a couple problems with this assertion. First, neither of Taction's experts actually say this in the cited testimony. Dr. Oliver and Dr. Okamura simply acknowledge that electrical damping is another possible form of damping. (*See* Oliver Expert Report ¶ 626; ECF No. 323-6 Ex. 5 ("Okamura Depo.") at 47, 56.) Neither expert adequately explains how a POSITA would purportedly contemplate that electrical damping was possible based on the disclosures in the specification. Further, extrinsic evidence cannot be used to expand the scope of the claims. *See Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1373 (Fed. Cir. 2001). As such, Taction's reliance on this extrinsic evidence is not persuasive.

Finally, Taction argues that the "net effect" of adopting Apple's proposed construction would be to apply the logic and law of means-plus-functions claiming under

35 U.S.C. § 112, ¶ 6 to the claims at issue here, which are indisputably not means-plus-function claims.  (Pl.'s Supp. Br. at 5.)  The Court rejects this argument.  The Court has not engaged in any means-plus-function analysis in resolving this claim construction dispute.  Rather, the Court's analysis is based on a plain reading of the claim language itself.

In sum, Apple's alternative proposal that the claim language requires that mechanical damping be used to achieve the highly damped output is well supported by the claim language.  As such, the Court revises its claim constructions specifically to require that the highly damped output be achieved by mechanical damping.[5]

### 3.    Mechanical Q-Factor of Less Than 1.5

Third, Apple also contends that the Court should construe the phrase "highly damped" to specifically require "a mechanical Q-factor of less than 1.5."  (Mot. at 21–23.)  To support this proposed construction, Apple argues that the specification of the asserted patents disparages prior art transducers with a mechanical Q-factor of between 1.5 and 3, and, therefore, the patents disclaim transducers with a mechanical Q-factor of 1.5 or more.  (*Id.* at 22–23.)  The Federal Circuit has explained that claims may be limited if there is a disavowal of claim scope in the specification.  *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1136 (Fed. Cir. 2016); *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  "[T]he standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature."  *Poly-Am.*, 839 F.3d at 1136.  The Federal Circuit has explained that such a disavowal can occur where the specification "distinguishes or disparages" prior art based on the absence or presence of certain features.  *Id.*; *see Techtronic Indus. Co. v. Int'l Trade*

---

[5]     In its Motion, Apple argues that Taction's broad view of the "highly damped" limitation would render the asserted claims invalid for lack of written description.  (Mot. at 17–21; Reply at 7–9.)  Because the Court revises its claim constructions to specifically require that the "highly damped output" by achieved by mechanical damping, Apple's written description challenge is moot.  (*See* Reply at 7 ("[W]hen 'highly damped' is understood to be limited to ferrofluid (or at most mechanical means), there is no written description problem.").)

1  *Comm'n*, 944 F.3d 901, 907 (Fed. Cir. 2019) ("An inventor may also disavow claim scope
2  'by distinguishing the claimed invention over the prior art.'").

3       In the background of the invention section of the specification, it describes "a low-
4  profile, vibrating module which moves a mass in-plane." '885 Patent col. 2 ll. 47–49.  The
5  specification then disparages these transducers, explaining that the "drawback of this
6  approach was that no provision was made for critically damping those transducers.
7  Accordingly, the tactile acceleration frequency response was underdamped, with a claimed
8  Q-factor of 1.5 to 3." *Id.* col. 2 ll. 63–67.  Here, the specification clearly and unequivocally
9  disparages transducers with a claimed Q-factor of 1.5 to 3, describing such a Q-factor as a
10 "drawback."  (*See* Hearing Tr. at 21:12–13 (Taction conceding that "[t]here is clearly
11 disparagement of the prior art" in the relevant portion of the specification).)  As such, this
12 disparagement of the prior art is sufficient to constitute a disavowal of transducers with a
13 Q-factor of 1.5 or more.  *See Poly-Am.*, 839 F.3d at 1136.

14       Taction asserts that a disclaimer does not arise where "the applicant simply describes
15 features of the prior art but does not distinguish the claimed invention based on those
16 features."  (Pl.'s Supp. Br. at 2–3 (citing *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d
17 1325, 1337 (Fed. Cir. 2005))); *see also Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 798
18 (Fed. Cir. 2019) ("[C]omparing and contrasting the present technique to that of the prior
19 art does not 'rise to the level of [a] clear disavowal' of claim scope."); *Thorner*, 669 F.3d
20 at 1366 ("Mere criticism of a particular embodiment encompassed in the plain meaning of
21 a claim term is not sufficient to rise to the level of clear disavowal.").  But in the passages
22 at issue, the specification is not simply describing features of the prior art transducers.
23 Rather, the specification is clearly disparaging certain features, describing them as a
24 "drawback." '885 Patent col. 2 ll. 63.  And it is worth nothing that the specification makes
25 clear that it is an important drawback.  The specification explains that the goal of the
26 invention is to provide "novel audio-frequency tactile transducers and devices." *Id.* at col.
27 3 ll. 46–47.  Elsewhere, the specification explains that a "high Q-factor" will render
28 transducers "useless for high fidelity reproduction of low frequency tactile effects in the

15-120 Hz range." *Id.* at col. 2 ll. 31–34.  These additional passages in the specification make clear that having a transducer that is "underdamped" with a Q-factor of 1.5 to 3 is not just a drawback, but a significant drawback for the purposes of the invention claimed in the asserted patents.  As such, those statements in the specification are sufficient to constitute a disavowal of claim scope.  *See Poly-Am.*, 839 F.3d at 1136.  In sum, the specification contains a disavowal of transducers with a Q-factor of 1.5 or more, and this disavowal strongly supports Apple's proposed claim construction.[6]

Taction argues that Apple's proposal should be rejected because those sentences in the specification have no connection to the "highly damped output" disclaimer in the prosecution history.  (Opp'n at 19–20; *see* Pl.'s Supp. Br. at 2, 3-4.)  There two problems with this argument.  First, the Q-factor of less than 1.5 disclaimer does not need to be connected to the "highly damped output" disclaimer.  The specification's disparagement of prior art transducers with a claimed Q-factor of 1.5 to 3 is its own independent disavowal of claim scope that applies across the asserted patents' claims.  *See Poly-Am.*, 839 F.3d at 1136.  Second, the two disclaimers are related.  When the patentee stated during the prosecution history that the claimed invention was "directed to transducers with highly damped output," the patentee was doing so in an effort to distinguish the claimed invention from the "highly resonant" "linear resonant actuators" disclosed in the Morris reference. (ECF No. 72-5 ("Ex. D") at pp. 64–65.)  In the passage in the specification containing the disavowal, the specification is specifically disparaging certain prior art linear resonant actuators on the grounds that they are underdamped and have a claimed Q-factor of 1.5 to 3.  *See* '885 Patent col. 2 ll. 63–67.  Further, Taction's expert Dr. Oliver has explained that Q-Factor is "a well-known parameter . . . that describes the extent to which an apparatus is

---

[6]      Taction argues that, absent a clear and unmistakable disclaimer, limiting the claims to require a Q-Factor of less than 1.5 would commit the "cardinal sin" of claim construction, namely, reading a limitation from the written description into the claims.  (Pl.'s Supp. Br. at 3.)  As explained above, there is a clear and unmistakable disavowal of claim scope.  Therefore, the Court must limit the scope of the claims in light of that disavowal.  *See Poly-Am.*, 839 F.3d at 1136.

underdamped."   (ECF No. 73-2 ("Oliver Decl.") ¶ 51; *accord* ECF No. 73 at 10.) Accordingly, the Q-factor of an apparatus relates to how highly damped—or not—it is.  As such, the two disclaimers at issue are related and have a connection to each other.[7]

In addition, Taction argues that the Court should not find a disclaimer of a Q-factor of less than 1.5 in light of the claim language in the asserted patents.  (Opp'n at 20.)  Taction notes that, for example, claim 20 of the '885 Patent claims "wherein the ferrofluid reduces the Q-Factor of the response of the apparatus over at least a portion of the frequency range of 40-200 Hz."  '885 Patent col. 16 ll. 39–41.  Taction argues that this claim language demonstrates that when the patentee wanted to claim a specific effect on the Q-factor, it knew how to do so.  (Opp'n at 20.)  The Court rejects this argument.  There is nothing in the identified claim language that contradicts or alters the disavowal in the specification of transducers with a claimed Q-factor of 1.5 to 3.  The identified claim language simply refers to "reduc[ing]" the Q-factor of the apparatus.  '885 Patent col. 16 ll. 39–41.  It says nothing about the appropriate Q-factor range for the claimed apparatus.  The disavowal at

---

[7]   At the hearing, Taction argued that adopting Apple's proposal would exclude a preferred embodiment from the scope of the claims, which is disfavored.  (Hearing Tr. at 24:18–25:22, 28:2–4.)  "A claim construction that excludes a preferred embodiment is rarely, if ever[,] correct and would require highly persuasive evidentiary support."  *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022) (quoting *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 1338, 1347 (Fed. Cir. 2014)).

To support its argument, Taction presented the Court with a demonstrative from its slide deck at the hearing asserting that figure 5C of the specification displays a Q-factor of 2.35.  (*See* ECF No. 361-1 at 27.)  The Court rejects Taction's reliance on this slide.  Taction's reliance on the slide is improper because it appeared for the first time at the hearing; it was not previously part of the record in this action, and it was not produced by Taction during the discovery phase of this case.  *See, e.g.*, *ABS Glob., Inc. v. Cytonome/ST, LLC*, 984 F.3d 1017, 1027 (Fed. Cir. 2021) (finding argument waived because it was "raised for the first time during oral argument"); *CliniComp*, 2022 WL 16985003, at *21 (same).  In addition, Taction has not provided the Court with any expert testimony or opinion to support the math shown in the slides.  At the hearing, Taction asserted that the slide utilizes "well-known math" that "can be calculated by anyone."  (Hearing Tr. at 32:14–17.)  The Court disagrees.  The math displayed in slide 27 requires specialized knowledge to perform, and, therefore, for it to be considered admissible evidence, it would need to be supported by expert testimony.  *Cf. United States v. Corona*, 359 F. App'x 848, 851 (9th Cir. 2009) (explaining the difference between lay and expert testimony (citing Fed. R. Evid. 701 advisory committee's note (2000 amendments)).  In sum, the Court rejects Taction's assertion that limiting the claims to require a Q-factor of less than 1.5 would exclude a preferred embodiment.

1    issue in the specification explains that the Q-factor should not be as high as 1.5 to 3, and
2    there is no language in the claims of the asserted patents contradicting or varying that
3    disclaimer.

4        Taction also argues that adopting the Q-factor disclaimer would violate the doctrine
5    of claim differentiation.  (Pl.'s Supp. Br. at 4.)  But "the presumption of differentiation in
6    claim scope is 'not a hard and fast rule.'"  *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29
7    F.4th 1376, 1380 (Fed. Cir. 2022) (quoting *Seachange*, 413 F.3d at 1369).  "Indeed, any
8    presumption created by the doctrine of claim differentiation will be overcome by a contrary
9    construction dictated by the written description or prosecution history."  *Id.* (internal
10   quotation marks omitted) (quoting *Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
11   653 F.3d 1296, 1305 (Fed. Cir. 2011)).  As explained above, that the claims require a Q-
12   factor of less than 1.5 is dictated by the disavowal of claim scope in the specification.
13   Accordingly, the Court includes in its revised construction for the relevant claim terms that
14   the invention requires a Q-factor of less than 1.5.[8]

15                            *    *    *

16       In sum, the Court revises its constructions of the terms "wherein the ferrofluid
17   reduces at least a mechanical resonance within the frequency range of 40–200 Hz,"
18   "wherein the ferrofluid reduces the Q-Factor of the response of the apparatus over at least
19   a portion of the frequency range of 40–200 Hz," "wherein the viscous ferrofluid reduces at
20   least a resonance within a frequency range of 40–200Hz," and "wherein the ferrofluid
21   damps at least a resonance."  The Court construes the term "wherein the ferrofluid reduces
22   at least a mechanical resonance within the frequency range of 40–200 Hz" as "wherein the
23   ferrofluid reduces at least a mechanical resonance within the frequency range of 40–200

---

25   [8]      In its motion, Apple argues that if the Court does not construe the asserted claims to be limited to
26   transducers with a Q-factor of less than 1.5, then the claims are indefinite.  (Mot. at 24–31; Reply at
     11–12.)    Because the Court construes the claims to require a Q-factor of less than 1.5, Apple's
27   indefiniteness argument is moot.  (*See* Mot. at 26 ("[A] person of ordinary skill in the art would have
     understood that the mechanical Q-factor must be less than 1.5.  If this test is used to evaluate whether an
28   output is 'highly damped,' the claims will not be indefinite.").)

Hz, and wherein the output of the transducer is highly damped (*i.e.*, the output is substantially uniform or flat over the normal operating frequency range of the device), that highly damped output is achieved by mechanical damping, and the transducer has a Q-factor of less than 1.5." The Court construes the term "wherein the ferrofluid reduces the Q-Factor of the response of the apparatus over at least a portion of the frequency range of 40–200 Hz" as "wherein the ferrofluid reduces the Q-Factor of the response of the apparatus over at least a portion of the frequency range of 40–200 Hz, and wherein the output of the transducer is highly damped (*i.e.*, the output is substantially uniform or flat over the normal operating frequency range of the device), that highly damped output is achieved by mechanical damping, and the transducer has a Q-factor of less than 1.5." The Court construes the term "wherein the viscous ferrofluid reduces at least a resonance within a frequency range of 40–200Hz" as "wherein the viscous ferrofluid reduces at least a resonance within a frequency range of 40–200Hz, and wherein the output of the transducer is highly damped (*i.e.*, the output is substantially uniform or flat over the normal operating frequency range of the device), that highly damped output is achieved by mechanical damping, and the transducer has a Q-factor of less than 1.5." The Court construes the term "wherein the ferrofluid damps at least a resonance" as "wherein the ferrofluid damps at least a resonance, and wherein the output of the transducer is highly damped (*i.e.*, the output is substantially uniform or flat over the normal operating frequency range of the device), that highly damped output is achieved by mechanical damping, and the transducer has a Q-factor of less than 1.5."

### B. *Infringement Analysis*

With those claim construction disputes resolved, it is clear that Apple's accused products do not infringe the asserted patents. Under the Court's revised constructions, all of the asserted claims include the limitation that the claimed "transducer has a Q-factor of less than 1.5." In his expert report, Taction's infringement expert Dr. Oliver states, "The measured Q-Factors across all iPhones tested ranged from 1.6 to 2.2." (Oliver Expert Report ¶ 571; *see id.* ¶ 625 ("As I described above in Section XI and extensively tested,

the actual output Q-Factor of the Accused Products is around 2, due at least partially to the effects of ferrofluid and also to the effects of the closed loop control system."), ¶ 1244 ("their effective Q-Factor was around 2"); *see also* ECF No. 322-3 ("Zinn Rebuttal Expert Report") ("[N]o Accused Product has a mechanical Q-factor (or even a Total Q-factor) lower than 1.5[.]").) Specifically, Dr. Oliver states that the results of his testing showed (1) the Q-Factor for the iPhone SE is 1.6, (Oliver Expert Report ¶ 575); (2) the Q-Factor for the iPhone 8 is 1.7, (*id.* ¶ 577); (3) the Q-Factor for the iPhone XS is 1.9, (*id.* ¶ 579); (4) the Q-Factor for the iPhone 12 Pro is 2.2, (*id.* ¶ 580); (5) the Q-Factor for the iPhone 13 is 2.1,, (*id.* ¶ 582); and (6) the Q-Factor for the iPhone 14 Pro Max is 1.9, (*id.* ¶ 584). The numbers 1.6, 1.7, 1.9, 2.1, and 2.2 are all greater than—not less than—1.5. As such, based on Taction's own evidence, no reasonable juror could conclude that the accused products satisfy the limitation at issue. Apple is therefore entitled to summary judgment that the accused products do not infringe the asserted claims of the '885 and '117 Patents. *See Advanced Steel Recovery*, 808 F.3d at 1317; *EMD Millipore*, 768 F.3d at 1201.

Taction argues that Apple's motion for summary judgment of non-infringement should be denied because its expert Dr. Oliver opines that there would still be infringement even under Apple's contention that a "highly damped output" indicates a low Q-factor. (Opp'n at 14.) In his expert report, Dr. Oliver opines that, "even if Apple's interpretation of the scope of 'transducers with highly damped output' as being specifically directed to a Q-Factor 'less than 1.5 to 3' was adopted by the factfinder, the Accused Products would fit that definition." (Oliver Expert Report ¶ 625.) This opinion is insufficient to defeat summary judgment. "'[A] party may not avoid summary judgment simply by offering an opinion of an expert that states, in effect, that the critical claim limitation is found in the accused device.'" *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1380–81 (Fed. Cir. 2021). Rather, "[t]o satisfy the summary judgment standard, a patentee's expert must set forth the factual foundation for his infringement opinion in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement under the claim construction adopted by the court."

*Intellectual Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1183 (Fed. Cir. 2009); *accord SIMO*, 983 F.3d at 1381; *see also United States v. Various Slot Machines on Guam*, 658 F.2d 697, 700 (9th Cir. 1981) ("In the context of a motion for summary judgment, an expert must back up his opinion with specific facts."). The specific facts that Dr. Oliver relies on to support his infringement opinions are that the accused products he specifically tested all had a purported Q-factor of between 1.6 and 2.2. (*See* Oliver Expert Report ¶ 571.) As explained above, those facts are clearly insufficient to satisfy the Court's claim constructions, which require that the accused products' transducers have "a Q-factor of less than 1.5."

In addition, under the Court's revised constructions, all of the asserted claims require that the highly damped output be achieved by mechanical damping. Taction has failed to provide the Court with any evidence from which a reasonable juror could find that the mechanical damping in the accused products achieves a highly damped output. In his expert report, Taction's expert Dr. Oliver opines that, "in the Accused Products, the closed loop control system combined with damping provided by ferrofluid produces a generally uniform frequency response." (Oliver Expert Report ¶ 618.) Dr. Oliver also opines that "the ferrofluid of the Accused Products contributes to the highly damped output." (*Id.* ¶ 623.) These opinions are insufficient. In these opinions, Dr. Oliver at most opines that the ferrofluid combined with the closed loop control system achieves the required highly damped output. (*See* Opp'n at 18 n.10 ("Dr. Oliver's opinion is that the **combination** of the closed loop controller and ferrofluid provides the highly damped output." (emphasis in original)).) But Dr. Oliver concedes that "electrical damping," such as damping by "a closed-loop feedback control system" is not a form of "mechanical damping." (*See* Oliver Expert Report ¶ 626.) Therefore, by relying on the closed loop control system in part to opine that the accused products satisfy the highly damped output disclaimer, Dr. Oliver fails to provide any specific opinion that the mechanical damping in the accused products

/ / /

/ / /

is itself sufficient to achieve a highly damped output.[9]  As such, this is an additional reason why the accused products do not infringe the asserted claims of the '885 and '117 Patents. *See Advanced Steel Recovery*, 808 F.3d at 1317; *EMD Millipore*, 768 F.3d at 1201; *see also Anderson*, 477 U.S. at 257 ("[T]he plaintiff must present affirmative evidence . . . to defeat a properly supported motion for summary judgment.").  In sum, the Court **GRANTS** Apple's motion for summary judgment of non-infringement for the above reasons.[10]

## CONCLUSION

For the reasons above, the Court **GRANTS** Apple's Amended Motion for Summary Judgment of Non-Infringement (ECF No. 299) and **DIRECTS** the Clerk of Court to enter Judgment in favor of Defendant Apple and against Plaintiff Taction and close the case. Accordingly, the Court **VACATES** the remaining Pretrial and Trial Dates and Deadlines (ECF No. 281) and **DENIES AS MOOT** the Parties' remaining motions pending before the undersigned (ECF Nos. 350, 357, 365, 367, 369, 371).

**IT IS SO ORDERED.**

Dated:  August 11, 2023

_____

Honorable Todd W. Robinson
United States District Judge

---

[9]    Taction argues that because all of the asserted claims are "comprising" claims, an accused infringer cannot defeat infringement by merely adding additional unclaimed components (like the closed loop controller).  (Pl.'s Supp. Br. at 1 (citing *Stiftung v. Renishaw PLC*, 945 F.2d 1173, 1178 (Fed. Cir. 1991) ("'It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device.'")).)  But the issue here is not that the closed loop controller is an additional unclaimed component.  A patent infringement analysis requires that the factfinder compare the properly construed claims to the accused device.  *See Niazi*, 30 F.4th at 1351; *JVW*, 424 F.3d at 1329.  The Court's revised claim construction requires that the highly damped output be achieved by mechanical damping.  In light of that, the issue is that Taction does not have any evidence showing that mechanical damping in the accused products is what achieves the purported highly damped output.

[10]    In its Motion, Apple also moves for summary judgment that the "Monolithic" subset of accused products do not infringe the "plurality of magnets" limitation and moves for summary judgment of no pre-suit damages.  (Mot. at 31–38.)  Because the Court grants Apple's Motion for the foregoing reasons, the Court need not address these additional grounds for summary judgment.