1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

TACTION TECHNOLOGY, INC.,        )
                                 )
            Plaintiff,           ) Case No. 21-cv-0812-TWR
                                 )
vs.                              ) San Diego, California
                                 )
APPLE, INC.,                     ) Thursday,
                                 ) November 20, 2025
            Defendant.           ) 1:47 p.m.
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

BEFORE THE HONORABLE TODD W. ROBINSON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:    QUINN EMANUEL URQUHART & SULLIVAN, LLP
                      BY:  JOHN F. BASH, Esq.
                           JONATHAN TSE, Esq.
                           LANDON A. SMITH, Esq.
                      865 S. Figueroa Street
                      10th Floor
                      Los Angeles, CA  90017

For the Defendant:    FISH & RICHARDSON, P.C.
                      BY:  ROGER DENNING, Esq.
                           SETH SPROUL, Esq.
                           JOY KETE, Esq.
                           RYAN O'CONNOR, Esq.
                      12860 El Camino Real
                      Suite 400
                      San Diego, CA  92130

Reported by:  CAMERON P. KIRCHER
              CSR NO. 9427, RPR, CRR, RMR
              333 W. Broadway, Suite 420
              San Diego, CA  92101
              e-mail: cpkirchercsr@gmail.com


COMPUTER-AIDED TRANSCRIPTION

2

San Diego, California - Thursday, November 20, 2025

1:47 p.m.

THE CLERK: Calling Matter No. 1, 21-cv-812, Taction Technology, Inc. v. Apple, Inc., for motion hearing.

THE COURT: Okay. Once everyone gets situated, if you can make your appearances, please.

MR. BASH: Hi, your Honor. This is John Bash from Quinn Emanuel, representing the Plaintiff, Taction. I have my colleagues Jonathan Tse and Landon Smith with me here at counsel's table.

For the benefit of the Court and opposing counsel, representatives of my client, including the founder, Dr. James Biggs, and the CEO, John Steinberg, are in the room. That could become relevant if we talk about information that they are not allowed to hear because it's under protective order.

THE COURT: Okay. Good afternoon. Thank you.

MR. BASH: Thank you.

MR. DENNING: Good afternoon, your Honor. Roger Denning of Fish & Richardson here on behalf of Apple. I have with me at counsel table my colleagues Seth Sproul, Ryan O'Connor and Joy Kete. And I also have my client, Pete Maggiore, from Apple with us as well today.

THE COURT: Okay. Good afternoon to all of you as well.

3

Okay.  We are here this afternoon to hold argument on Apple's remaining motions that were not addressed when I issued the original order in this case.  I found that the remaining bases for summary judgment were moot given the ruling that I issued.  However, the case is now back before us, and I appreciate all of the supplemental briefing that the parties have submitted.

And I do have some specific questions.  And, again, after I go through all of my specific questions, I'll invite the parties to advance any additional arguments or supplement the record in any way in which the respective parties see fit.

And I'll start my questions with one to Apple.  And Taction addresses in their response to your supplemental memo, at ECF filing 430, that the disclaimer at issue that you claim is indefinite is not properly covered under 35 United States Code Section 112(b), because that specifically deals with claims, as opposed to disclaimers of claims.

What is your response to that?

MR. DENNING:  Thank you, your Honor.  Roger Denning on behalf of Apple.  I'll handle that question.

So it is noteworthy that that statement by Taction in its brief is without citation either to case law or to statute, because there is no case law or statute that supports that proposition.

4

We cited a case in our initial briefing, and I can get the cite for your Honor -- it was the *Nautilus* case -- that basically says that it is the scope of the claim that is at issue.  It doesn't say it has to be the exact words of the claim in order to be the subject of a 112 indefiniteness.  It is we consider the scope of the claim.

And that only makes sense because it is the scope of the claim that the public and the potential defendants like Apple are looking at in order to determine whether they infringe or not, whether they can launch a product or not. It's not necessarily just the claim language.  It's the, quote, scope of the claim, as the Court decided in the *Nautilus* case.

So I disagree, and I think Taction's position is unsupported.

THE COURT:  Okay.  With regard to the scope of the claim, isn't the disclaimer part of the claim that must be analyzed for definiteness or indefiniteness?

MR. BASH:  Thank you, your Honor.

I actually don't think it is formally part of the claim.  I mean -- and I'll give an answer that I think is even more direct on this point in a second, but just to answer that.

The way that the Supreme Court has thought about prosecution history disclaimers is that the claims cover a

COMPUTER-AIDED TRANSCRIPTION

certain zone, but you can come in and say, regardless of what that claim says, I'm disclaiming X subject matter.  In this case, non-highly damped output is what the Court has found to have been disclaimed.  That's very different than what's called a lexicographical definition in the prosecution history, where you say, hey, this claim means X, and then you're bound to that.

The argument in this case was not that some claim in the language means X.  It was that we just, regardless of the claim language, said, sorry, we're not going to cover this scope.

But let me give you the answer that I think is more on point to this question and a little less abstract than, you know, what does 112 mean.  The standard, as you know, because you applied it for a disclaimer, is clear and unmistakable evidence.  And what's really important about that is that the Federal Circuit has held that clarity and unmistakability goes not only to the intent to disclaim, like I disclaim this, it also goes to the scope of what is disclaimed.

And so the case we cite is *Avid Technologies*.  And in that case, the Federal Circuit said, well, there was an intent to disclaim here, but we're also going to apply the clarity standard to what was disclaimed.  And there is an argument that X thing was disclaimed, but it's just not clear

enough.  We can't find a clear and unmistakable disclaimer.

I think the unavoidable logic of that reasoning is that where it is entirely uncertain what was disclaimed, it doesn't -- my friend talked about *Nautilus*.  That's the Supreme Court case on indefiniteness.  A skilled artisan couldn't even tell what this means.  You couldn't have a clear and unmistakable disclaimer.

To put it in functional terms, the whole idea of disclaimer is that there is a patent, it has claims, but the public's entitled to go look at the prosecution history and say, regardless of what those claims say, this patentee disclaimed X subject matter, and I can -- I can practice that subject matter because he disclaimed it.

But if it turns out not even a skilled artisan could make heads or tails of what was disclaimed, that function isn't implicated.  You couldn't rely on the prosecution history because nobody knows what it means.  So the bottom line is, in this case, the Court already said there is a clear and unmistakable disclaimer.  That's logically and legally inconsistent with a complete lack of certainty.

They talked about the case law.  Neither side has come up with a case on point.  They haven't found a single case in history that said the actual language of the disclaimer is so uncertain that it's indefinite.

They cite three cases in their response supplemental

7

brief, so we didn't get a chance to respond to those. *PureChoice*, Federal Circuit case; *IBSA*, a District of Delaware case, and *Halliburton*, another Federal Circuit case.

I'm happy to go into the details, but let me just give you the bottom line on those case. All of those cases are about vagueness of a claim term.

In *PureChoice*, for example, there was a term called "air quality." And it was given a particular definition based on the prosecution history, but when that definition was plugged into the claims, it ended up being nonsensical because it was environmental/not environmental.

*Halliburton*, fragile gel was in the preamble, and the Court only relied on the prosecution history to say the preamble was limiting. Normally a preamble is not limiting. Sometimes it is. They said, well, they intended it to be limiting. That has nothing to do with our argument.

Our argument is if you found, as you did, and as the Federal Circuit affirmed --

THE REPORTER: I'm sorry. I need you to slow down.

MR. BASH: I'm sorry.

-- and as the Federal Circuit affirmed, that highly damped output is clear and unmistakable, that it cannot be that it is also so uncertain that nobody knows what it means. None of the cases they cite have that problem with them.

Thank you.

COMPUTER-AIDED TRANSCRIPTION

8

THE COURT:  Okay.

MR. DENNING:  Your Honor, we have some slides. Would now be an okay time for me to approach and offer these to the Court?

THE COURT:  Sure.

MR. DENNING:  Thank you.

Your Honor, I guess I would first address the point with regard to the *Avid* case that counsel for Taction mentioned.  The *Avid* case says you cannot find prosecution history estoppel if it's not clear that there is prosecution history estoppel, if it's not clear and unmistakable.

The *Avid* case does not say, if you find prosecution history estoppel, you cannot find that term indefinite.  It does not have that holding.  Taction's brief doesn't say that it has that holding.  That's not what *Avid* is addressed to.

Here, the Federal Circuit has said there is clear and unmistakable disavowal, or there is prosecution history disclaimer that applies to this term, so that's why we're dealing with the term --

THE COURT:  Is it the term that's clear and unmistakable, or is it the disavowal that's clear and unmistakable?

MR. DENNING:  It's the second, your Honor.  It's the disavowal that needs to be clear and unmistakable.  And I think the *Avid* case says it cannot even be subject of debate

9

whether this is disavowal or not or this is prosecution history estoppel or not.

That's a very separate issue than, okay, after you've done that, can that prosecution history estoppel, can that disclaimer still be indefinite?  You know, properly construed, in light of the prosecution history estoppel, is it still possible that one of skill in the art doesn't understand, and cannot with reasonable certainty understand what that means.

And the Federal Circuit has done exactly that.  The *Halliburton* case -- and I would direct your Honor's attention to, in our slide deck, we're on Slide 16 and 17 discuss the *Halliburton* case.  And that's exactly what happened there.

"Fragile gel" was a claim term that the parties agreed is part of the preamble in the claims and it applies to limit the scope of the claim.  The Federal Circuit found the disclaimer in the prosecution history that limited all of the claims to this term "fragile gel."

And you can see the quote from the file history on the bottom of Slide 16, where it says "All of Applicants' claims are directed to, and thus also limited to, a fragile gel drilling fluid or a method of using a fragile gel drilling fluid or a drilling fluid having fragile gel characteristics."  That's part of the disclaimer that the Federal Circuit found.

COMPUTER-AIDED TRANSCRIPTION

10

They then went on, in Slide 17, to apply that disclaimer to the terms, to the claims, and found the claims indefinite. They said, "In this case, the district court found that the asserted claims, which contained the limitation that the drilling fluid be a fragile gel were indefinite. We agree with the district court that claims containing that term are indefinite."

It's also worth noting the procedural history there. This was a summary judgment determination of indefiniteness by the district court that was affirmed by the Federal Circuit. That's one of the three cases.

My colleague said that our cases were all cited in our supplemental brief. That's not true. He may have overlooked the *Halliburton* case was cited in our original brief submitted four weeks ago.

We also then submitted the *PureChoice* and the *IBSA*, those nonprecedential cases. Those non -- the Delaware case and the nonprecedential Federal Circuit case in our supplemental, but we had the *Halliburton* case in the original, because it's so instructive and so informative and directly on par with what is happening here.

Here, the Federal Circuit has found that there was disclaimer, that the claims are limited to "transducer with highly damped output." And now we address the next question, which the Federal Circuit never weighed in on, which is,

11

okay, is "highly damped output" a term that one of skill in the art can understand with reasonable certainty.

We submit that it's not.  I'm happy to go into that now, but I expect your Honor has other questions.

THE COURT:  I do have questions in that regard, but I'm going to piecemeal this up so that the argument as to each point is a little clearer.  So I appreciate that.

MR. DENNING:  Thank you.

MR. BASH:  Can I just respond to a couple of those?

THE COURT:  Absolutely.

MR. BASH:  Gosh, I just think opposing counsel is really wrong about the cases he just cited.  He is right that he cited *Halliburton* in the original brief, and we responded on that one; that's true.  *IBSA* and *PureChoice* were the new ones.  He's just wrong about these cases.

I mean, I'm looking at *Halliburton* right here in front of me.  This is at page 514 F.3d 1246.  Fragile gel is a claim term.  It's in the preamble of the claim.  That's not the problem we're identifying.  The problem we're identifying is that you can't have a disclaimer that is clear and unmistakable, and those same words are so uncertain that no one can make heads or tails of them.

And that gets into *Avid*.  My friend said that the *Avid* case is just about -- you gave those two choices.  Is it about the scope, or is it just about the intent to disclaim?

12

It's about both.  I was pulling up the case here.

In *Avid Technology*, the Court iterated the standard of clear and unmistakable.  Then this is at page 812 F.3d 1046 of that case.  The language on its face -- this is of the prosecution history -- does not exclude a central controller that performs only one or the other of the two stated functions.  That was the substantive issue that was in it.

And then the Court says, in any event, it does not do so clearly, as would be required to find a disclaimer. Okay.  So that's about the scope of what's being disclaimed. It's not only about the intent to disclaim.

I think my friend is correct that there is no case that went all the way to say, and so it can't be indefinite; but I think that's the inescapable logic of *Avid*.  If it has to be clear in scope, and it's so unclear as to be indefinite, which is a very high standard, then it can't be a clear and unmistakable disclaimer.  They are wrong about that.

I know you're going to want to talk probably about the subsidiary arguments under this heading about substantially and all that stuff.  I'll reserve until you ask questions about that.

THE COURT:  Okay.

MR. BASH:  But I don't think you have to get there.

13

I think you can get there on the legal ground that a disclaimer is logically inconsistent with indefiniteness of the disclaimer language.

THE COURT:  Okay.

MR. DENNING:  May I just say one final word about the *Halliburton* case --

THE COURT:  Sure.

MR. DENNING:  -- because maybe I described it inaccurately, and I want to make sure that the Court understands what our position is.

And this is on Slide 16 of our slide deck.  The words "fragile gel" does appear in the preamble of these claims, but as your Honor knows, words in the preamble are not always limiting to the scope of the claim itself.

The Federal Circuit in that case said it is limiting because in the prosecution history, *Halliburton* said -- and we gave you the quote from the prosecution history so there can be no doubt -- quote, all of Applicants' claims are directed to, and thus also limited to, a fragile gel drilling liquid.

The Federal Circuit said, okay, that's prosecution history estoppel.  You said your claims are limited to fragile gels, and then moved to the next question, which was, would one of skill in the art know what fragile gel means? And they said, no, that's not -- that's a term of degree and

14

one of skill in the art would not know with reasonable certainty.

The same is the case here.  The claims --

THE COURT:  So your position is that *Halliburton* says that it was clear and convincing that there was the limitation, and then they turned their attention to whether or not it was indefinite?

MR. DENNING:  That's exactly right, your Honor.  And the fact that it was clear and convincing that there was disclaimer did not prevent them from then saying, okay, now that we found disclaimer, what does this disclaimer mean, or what would one of skill in the art understand it to mean?

You can say, I disclaim anything except for the prettiest flowers in the world.  Okay.  That's a clear disclaimer.  You said, I disclaim anything but the prettiest. But now we have to understand, would one of skill in the art agree as to what is the prettiest.  And I would submit the answer is no.  That's -- not with reasonable certainty.

Same thing applies here.

THE COURT:  Okay.  Final word on *Halliburton*.  I understand you disagree.  I'm going -- I've read it twice. I'm going to go back and read it again.

MR. BASH:  Yeah.  I don't want to beat a dead horse, or whatever animal you choose on this one, but *Halliburton* only takes the disclaimer for the proposition that the

15

preamble was meant to be limiting.  That's different than finding some other subject matter that's not a claim term and saying, this was a clear and unmistakable disclaimer.

The last point I'd make on that is that if you look at that discussion on *Halliburton*, which is at page 1246, *Halliburton* had conceded the point; so it wasn't actually even debated in that case.  *Halliburton* concedes that the claimed drilling fluids are limited to those that are fragile gels, which, again, was a claim term in the preamble, and the concession was that the preamble was limiting.

THE COURT:  Okay.  Let's go where we were inevitably headed based on our prior discussion, and that is as to the terms here, definiteness.  If I do find that *Halliburton* stands for the proposition that Apple asserts, as opposed to the position taken by Taction, let's talk a little bit about the definiteness argument that you advance.

So the various ways in which highly damped output can be assessed.

MR. DENNING:  Thank you, your Honor.

I think it's worth noting at the outset the purpose of the definiteness requirement, and I alluded to this earlier, but it is to educate the public as to what the proper bounds of the patent claim is.  What am I prohibited from doing in light of this patent claim.  That's an important public notice function.

16

And if people in the public, if people looking to launch products cannot determine that with reasonable certainty, if one of skill in the art cannot determine the bounds of the claim, then it's indefinite.  And that's the whole purpose of the definiteness requirement of Section 112, and that's the lens through which I think we need to be looking at whether highly damped output is a term that one of skill in the art would understand with reasonable certainty.

Several things we're going to go through, but at a high level, "highly damped output" is a term of degree. "Highly damped," what does that mean?  It doesn't give a specific measurement or any sort of quantitative measurement. It's a term of degree without specific boundaries.

Taction's expert, Taction and its expert have found that that limitation is met or is not met depending on which test you use.  The test that they used in their infringement contentions; the test that he used in his expert report.  One is not highly damped.  One is highly damped.  Two different tests.  Two different results.  The patent does not tell the public which one of those tests you should use.

For that reason, it's indefinite and the Court should find that under Section 112.  Otherwise, how is Apple or any other member of the public to know the scope of those claims.

Okay.  I might direct your Honor to -- and if we can

COMPUTER-AIDED TRANSCRIPTION

17

display the slides at the same time, or if your Honor would rather just look in the handout.  I would direct your Honor's attention to Slide 22.

Slide 22 is the heading where we begin, that the highly damped output is a term of degree without objective boundaries.  Highly damped, like high rate of speed.  What does that mean?  How does one know what highly damped means without any quantitative guidelines?

In Slide 23, we show the statute.  We show Section 112(b).  It shows the claims must particularly point out and distinctly claim the subject matter.

And then the *Nautilus* case that we see at the bottom, this is a Supreme Court case, saying that the patent is invalid for indefiniteness if its claims, read in light of the specifications delineating the patent and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention.  And that's what we're talking about here, how would one of skill in the art understand what highly damped output means.

On Slide 27, we just have a partial listing of terms, and these are just terms from the cases that we cited to your Honor of terms that have been found to be terms of degree without proper guidelines, and, therefore, indefinite.

Fragile gel.  What does "fragile" mean?  Where is the guideline there?  Minimal redundancy from the *Berkheimer*

18

case.  What does "minimal" mean?  Unobtrusive manner.  Well, what is unobtrusive?  Same thing, air quality, half liquid. And in this case, highly damped.  Very similar to all of these terms that the Court has found to be indefinite.

Highly damped, it's undeniable that it is a subjective term.  In fact, Dr. Biggs, the inventor on these patents, who is a person of skill in the art, said repeatedly that he thinks highly damped is a term of degree.

On Slide 28 --

THE COURT:  Isn't that extrinsic evidence where it's a judgment call as to whether or not we need it?

MR. DENNING:  Well, what we're looking at is from the perspective of one of skill in the art, would they understand with reasonable certainty what this claim term means.

I present that it is pertinent that what the inventor -- when the inventor says, as he does on Slide 28, "I would buy that the words 'highly damped' could mean different things to different people," that that's relevant here.

It's not required.  Our argument does not rise or fall depending on whether Dr. Biggs' testimony about his own claims being highly -- I'm sorry, being subjective, but it's a data point I think that's worth noting here.  That even the inventor says that it's not a precise engineering term, that

COMPUTER-AIDED TRANSCRIPTION

19

different people might think that it means different things.

We have some excerpts on Slides 28 to 30 in that regard.

The patents use this term "Q-factor" as a way to describe the amount of damping.  Your Honor is familiar with that.  It was part of one of the disclaimers from your Honor's previous ruling.  The patent talks about things like underdamped and overdamped and critically damped and applies certain Q-factors to those.

The patent doesn't say what highly damped means, but Q-factor is some sort of objective measure that the patents have discussed as being a way to think about whether something is highly damped or not.

The Federal Circuit in their opinion sending the case back removed the limitation regarding Q-factor of less than 1.5 being highly damped.  And Taction now says that there is no particular Q-factor associated with being highly damped.

So we can't look at Q-factor and say, 1.5 or less, that's highly damped.  Taction isn't even taking that position.  So Q-factor provides no guidance in that context for what "highly damped" means.

Dr. Oliver admits -- and this is on Slide 34 -- that in his opinion, highly damped output does not require a specific Q-factor.

20

So what is Taction doing instead then in their attempt to show infringement by Apple?  They can't use Q-factor as -- if they can't use Q-factor, what are they going to use?

They turn to the term "substantially uniform" and they look at whether the output is substantially uniform. That fares no better.  Substantially uniform is another term of degree.  What is substantially uniform?  It's not yes or no.  It's not ten or more.  It's substantially uniform.

And we asked Dr. Biggs again, what does substantially uniform mean to him as the inventor.  And this is on Slide 35.

He answered, "As I said before, the use of those terms 'flat' and 'uniform' would have to be in comparison to some other response.  I don't feel that there is some absolute threshold for flatness or uniformity.  Maybe -- maybe like pornography, one knows it when one sees it.  It depends on the context."

On the next slide, additional testimony from Dr. Biggs.  When he was asked, How uniform does an output need to be in order to be highly damped?  That, by the way, is a question that one of skill in the art would ask themselves looking at the patent deciding, does this product fall within the scope of the claims or not?  How uniform does it have to be to be highly damped?

21

And his answer was, "Relatively uniform." Relatively is just another term of degree.  "I don't think there is a particular measure of the uniformity of the response," Dr. Biggs says.

And then he said, "Variation could be expressed in a variety of ways.  There are no specific lines to draw around a frequency response."

All of that goes to the point that substantially uniform is also a term of degree without any sort of guidelines, without any sort of limits reining it in that one of ordinary skill in the art would understand.

So what does Dr. Oliver rely on then in his expert report when he's looking at what is substantially uniform or not?  This is shown on Slide 37.  He relies on some numbers, the +/- 10 decibels, which were included in the provisional application that is related to the two patents at issue in this case.

What's shown on Slide 37 is this statement that a mechanical system has a Q-factor of less than 1.5 and, therefore, provides vibrational accelerations with a frequency response that may be substantially uniform, within +/- 10 decibels over the frequency 40 to 200 Hz.

He applies that benchmark to his tests on the Apple product to say, as long as it's +/- 10 decibels, that is substantially uniform.

22

There is a problem with that.  As you can see in Slide 38, that language was deleted between the provisional application and the applications for the patents at issue in this case.  That language was taken out of the specification. It does not exist in the specification as we see it now.

That's important, not only because, well, it's not here for us to reference, but the Federal Circuit has said, when you take something out like that, then the public is allowed to rely on that, that it is no longer part of the specification, no longer part of what they should be looking at to make the determination.

This is shown in the *FMC Corp*. case on page 40 of our handout.

There, the Federal Circuit said, "The '979 provisional application contains several disclosures about stable compounds, yet none appear in the asserted patents.  A skilled artisan would have found that evolution meaningful: every textual reference in the provisional application that a skilled artisan might reasonably have relied upon for interpreting 'composition' as covering only stable compounds was removed from the asserted patents.  A skilled artisan, in light of such deletions in the prosecution history, would not understand 'composition' as claimed in the asserted patents to cover only stable formations."

So if you take it out, people are allowed to presume

23

you took it out for a reason that's not in the specifications for the patents at issue.

There is further good reason that that needs to be ignored, and that's in Slide 41.  There is a regulation, C.F.R. Section 1.57(d), that prohibits applicants from relying on information in a provisional application to provide essential material under Section 112.

And this is the language from the *NICOR* case, but it's referencing the Section 1.57(d):  "'Essential material,' which is material necessary to comply with Section 112 (written description, enablement, definiteness, means-plus-function) may only be incorporated by reference to a U.S. patent or U.S. patent application publication, which patent or patent application publication does not itself incorporate such essential material by reference."

And then it goes on to say, "The parties agree that a patent application cannot incorporate by reference 'essential material' found in a provisional application."

So that one -- that +/- 10 decibels that Dr. Oliver relies on cannot be relied upon by Taction to provide some sort of bounds on substantially uniform.

It's worth noting that Dr. Oliver takes that out of context when he applies it in his infringement analysis.  If we look at Slide 42, there are two excerpts from the provisional application.  The one on the top has the language

COMPUTER-AIDED TRANSCRIPTION

24

that Dr. Oliver referenced, the +/- 10 decibels over the frequency, but there are additional things, context, that the provisional application provides when it's talking about the +/- 10 decibels that Dr. Oliver ignores.

For example, we can see in the second sentence from the bottom in the top quotation, it says it "therefore provides vibrational accelerations with a frequency response that may be substantially uniform."

This is an acceleration versus frequency response that the provisional is talking about. Dr. Oliver's infringement analysis is a power versus frequency. He's taking it out of context, using it in a totally different way.

In the bottom quotation from the provisional application, the section highlighted in green makes clear that the provisional is talking about steady-state sinusoidal voltages. We'll talk about that a bit more in a bit. But what that means is you're putting in a constant voltage into the system, and then seeing what the acceleration response is at the various frequencies.

That's not what Dr. Oliver did in his infringement analysis. He varied the voltage on his input at different frequencies to get, intentionally, a result that was +/- 10 decibels.

THE COURT:  Wasn't the result acceleration?

COMPUTER-AIDED TRANSCRIPTION

25

MR. DENNING:  Acceleration is what's discussed in the patent application, the patent specification.  Dr. Oliver's test was power.

He graphed power versus frequency, a totally different analysis, never discussed in the patent specifications.  There is no discussion of graphing power or testing power, determining substantially uniform using power.  It's purely based on acceleration of that moving mass.  A very different test.

And the fact that there are those two different tests, the acceleration is the one that Taction used in their infringement contentions.  It's the one that Dr. Oliver, when he saw it, said that's not highly damped output.

So he abandoned the test talking about the acceleration response from the specification and went to the power-versus-frequency graph, he went to the variable input, so that he could change the input and, therefore, make the output substantially uniform.  That's nowhere described in the patent specification.  It's two different tests.

Honestly, it is irrelevant for the purposes today of which test is right and which test is wrong, but the fact that there are two tests, the fact that Taction itself sanctioned, applied two different tests to determine whether something is a highly damped output, and came up with two different results, two opposite results -- one that is highly

26

damped, one that is not -- is really all we need to know to know that that claim term is indefinite.

How was one of skill in the art, without any of this information, supposed to be able to know, well, if I do Dr. Oliver's test with power and I vary the input voltage, I can get to a substantially uniform output.  Nowhere discussed in the specification.  In fact, the specification talks about something else.

That's why the notice function -- that's why I started with that, that's why it's so important here, because the things that Dr. Oliver did to try to show infringement are things that no person of ordinary skill in the art would ever have thought to do based on reading the prosecution history, the specification, the claims of the patent.

Okay.  I will move forward and talk about -- go to Slide 45.  And this is -- I previewed just a moment ago this point.

So our first basis for finding indefiniteness is that this is a term of degree, and there is no guidelines that say when you've met it or not.  The second basis is this idea that you can measure whether an output is highly damped or not apparently in multiple ways, get different results. The patent doesn't say which one is right.

THE COURT:  I think in your paperwork, you said that at the time that the patents were filed, there were three

COMPUTER-AIDED TRANSCRIPTION

27

different ways of measuring the Q-factor, and that there was an additional one that was employed by Dr. Oliver.

Am I recalling that correctly?

MR. DENNING:  You are recalling that correctly, your Honor.  And I will -- if you would like to see it, I would reference you to maybe Slide 49 of our slide deck.

The patents disclose what we call a mechanical Q-factor.  What the patent calls them and what the experts have agreed, the patent is talking about a mechanical Q-factor.  Every time the patent says "Q-factor," it's talking about a mechanical Q-factor.

On Slide 50, we can see that Apple has three other ways that they measured Q-factor, and I think these are the three your Honor was just referencing.  There is an electrical Q-factor that Apple uses, a mechanical Q-factor, and then a total Q-factor.

THE COURT:  How do those differ from an effective Q-factor, or I believe it was also called an actual output Q-factor?  Am I recalling those correctly?

MR. DENNING:  You are, your Honor.  And that's the very next slide.

We can see on Slide 51 and 52 are references in Dr. Oliver's report where he says, what we really should measure is the effective Q-factor.  Dr. Oliver made that up.  That is not a test that the patents talk about.  It's not a

28

test that Apple does.

In fact, if we go to Slide 53, this is the questioning of Dr. Oliver about -- we just saw on 51 and 52 where he talks about Apple itself does not track the effective Q-factor of these devices, and he says he used MATLAB to determine the effective operational Q-factor, and that he finally produced an effective Q-factor.

He's talking about that repeatedly in his report as part of his analysis, but then in deposition, we asked him on page 53, and this is worth reading through.

Question: Prior to working on this case, had you ever measured the effective Q-factor of a linear resonance actuator?

His answer was, Can you define effective Q-factor.

The lawyer said, Well, can you?

And Dr. Oliver said, I don't use that term. He just used it multiple times in his expert report, which was the subject of this deposition.

The lawyer continued, Do you have a definition of it in any context? No.

Have you ever published a paper that discusses an effective Q-factor? No.

You did not reference any textbooks that reference an effective Q-factor; correct? That's correct.

It's made up. Dr. Oliver did it however he did it;

29

using MATLAB and different sorts of analysis, he created that.  That is a test made for this litigation that is not referenced in any journal, it's not in any paper or scholarly article, no textbook teaches, this is how you measure it.

The patents definitely do not talk about an effective Q-factor.  The prosecution history doesn't either.  The only person who talks about it is Dr. Oliver, and he did that in his analysis to see whether Apple's products meet the claim limitations.

Again, how could one of skill in the art, reading the patent, say, oh, I know how we do Q-factor.  We do an effective Q-factor.  It was never used before.  At the time the patent issued, there was no discussion of effective Q-factor.  Dr. Oliver is the one who brought it in.  That is an indefinite patent claim.

In fact, we show on 54 that it makes a difference. On Slide 54, there are Q-factors shown for just one accused product in this case, the Apple Watch Series 6.  And we've listed the electrical Q-factor, mechanical Q-factor, total Q-factor and effective Q-factor, according to Dr. Oliver. And under his analysis, three of the four showed it's not highly damped.  Only one is.

Those are four different tests with different results, and we cannot rely upon Dr. Oliver's test that has never been used before.  At the very least, it's indefinite;

30

we don't know what that means.

There is a similar problem with what I alluded to a moment ago about the response graph, whether it's acceleration versus power and whether it's a constant input versus a variable input.

On Slide 56 -- and this may be the most important slide. It's in our brief as well. But this shows side-by-side Taction's infringement contentions on the left. When Apple asked Taction, when Taction was obligated to put out its infringement case, in its contentions, it put out this chart showing acceleration mapped against frequency with a constant input.

And you can see that spike. There is a very large spike. That spike is at the resonant frequency. Just to maybe give your Honor some reference, so just like a tuning fork or a glass of wine wants to resonate at a certain frequency, it's easier to make it resonate at that frequency. That's what that peak is. That's the resonant frequency of the haptic engine in question in that chart.

And when that was shown to Dr. Oliver, he said, yeah, that chart is not substantially uniform. That's not a highly damped output. Well, that's the test that the patent talks about. That's the acceleration with a steady-state voltage test.

On the right is what Dr. Oliver did in his expert

report.  He graphed power.  You can see on the Y axis, it's power; not acceleration.  And you can't see it here, but he applied a variable voltage.

It leads to a very different graph.  It leads to a graph that Dr. Oliver could say, well, that looks substantially uniform to me.  But nowhere does the patent say ever to do what Dr. Oliver did here to try to determine whether it's substantially uniform.

And let me show you briefly what the patent does show.  So on Slide 57, this is the graph that's in Figure 5C of the patent.  This is the response graph that shows the highly damped output.

And you can see on the Y axis, it's acceleration that's being graphed.  And the language from Column 9 of the patent explains that it shows the experimental results of the measured acceleration.

That's the term that they were talking about in the patent.  And the fact that in that section marked 503, it's relatively uniform.  That's what the patent was talking about as well.  The acceleration graph is substantially uniform there.

On Slide 58, we see that the patent is talking about a steady-state or a constant input.  And there are other references to this as well.  Column 3, lines 54 to 57.  Even in the summary of the invention Column 2, lines 2 to 6, they

32

talk about a steady-state input.

It might be worth jumping ahead to Slide 64 of the slide deck, because there we can contrast what a steady-state, sometimes called a constant input, is and a variable input.

So this is the sinusoidal wave that is fed into the haptic engine to generate the response. On top, we see what is called a steady-state input or a constant input. The point to take away is, whatever frequency, F1, F2, F3, the amplitude is the same. It's steady state. The magnitude is another word that people sometimes used for that. It's the same. It's a constant input, regardless of the frequency.

On the bottom, we can see something starkly different. The bottom shows that the different frequencies -- slow, medium, fast -- the voltage varies. It can get smaller. It can get bigger. That's not steady state. That's not constant. That's variable.

That's what Dr. Oliver did when he did his test. And why did he do that? Because just like you saw, that resonant frequency on that graph, that at that frequency, it wants to resonate, Dr. Oliver can turn down the power at that frequency. And when it's at a frequency down here, where it doesn't want to resonate, he can turn up the power, turn it all the way up, and it will have a graph that -- it will move the graph up.

33

And by changing the power over time, you can get something that is more substantially uniform.  That's what Dr. Oliver did in his test.  It's not what the patent's specification is talking about.

There is one other -- this is shown on Slide 66. One other difference that's a remnant of the fact that Dr. Oliver was testing something differently, and that is the range of what can be considered substantially uniform.

So I showed your Honor Figure 5C of the patent and I showed you that range, 503.  The experts generally agree, okay, that's what the patent says is substantially uniform. The experts agree that that is +/- .15 g, "g" in this context meaning the force of gravity, 9.8 meters per second squared, I think.  My colleagues will correct me.

+/- 0.15 g variance in that acceleration graph, that's acceptable to be substantially uniform if you're looking at Figure 5C of the patent.

Dr. Oliver knew that that wouldn't work.  I mean, you can see this -- you can see on the graph that that would not result in this being a substantially uniform wave form, so Dr. Oliver instead used the +/- 10 decibels from the provisional application.

Now, remember, the provisional application was talking about a totally different test than Dr. Oliver did. It was talking about steady-state voltage.  It was talking

34

about graphing acceleration.  And, also, they can't rely on that to inform what one of skill in the art would understand steady -- I'm sorry, substantially uniform means in the context of this patent.

But that's what Dr. Oliver does, because 10 decibels -- to help your Honor, a decibel is, in the logarithmic scale, kind of like an earthquake, 10 decibels is an order of magnitude.

And so this range goes from 0.25 to 2.5.  You can't even see the top end of the range of what Dr. Oliver would say is substantially uniform in this graph because he's taking measures from one test and trying to apply it to the other, and they simply don't belong.

THE COURT:  You stated that there was an agreement among the experts that, as represented in Figure 5C, the range of 503, that is substantially uniform.

Doesn't that impinge upon your indefinite argument?

MR. DENNING:  If substantially uniform means an acceleration response graph with a steady-state input that falls within a range of +/- 0.15 g, if that's what we're saying substantially uniform means, okay, then I think we can have a definition of it.

But that's not -- certainly not the definition that Taction wants to use.  That's not the -- that's not in the construction that the Court has offered or that the Federal

COMPUTER-AIDED TRANSCRIPTION

35

Circuit has given us.

If you are talking about specifically what the patent is talking about here, that would be -- we would understand, and one of skill in the art could look at this and say, if you do that test, with that input, and you get this result, that's substantially uniform.

We know what happens when you do that to the accused products. You get that graph with the big spike at the resonant frequency. And that's why Dr. Oliver, presumably, didn't do that. That's why he said that graph isn't highly damped.

Slide 59 shows the testimony from Dr. Oliver where he agrees it's +/- 0.15 g's. I don't have testimony handy where he said that that is substantially uniform, but I think the experts said, okay, that's what the patent is talking about with that test is substantially uniform.

So after all of that is said and done, I mean, it's pretty clear that "highly damped," "substantially uniform" are terms of degree. The patent doesn't give any guidance, or to the extent that it does, Dr. Oliver has ignored it. Dr. Oliver has gone his own way, done different tests, and those different tests result in opposite results. How can that be something that one of skill in the art, that a person of the public can rely upon to understand the scope of the claims?

36

For that reason, based on their own positions advocated in this case, Taction has invalidated these claims under Section 112, under indefiniteness.

I'll stop there unless your Honor has additional questions.

THE COURT:  Circling back to Figure 5C from our earlier discussion.

MR. DENNING:  Yes.

THE COURT:  If there is agreement that, as reflected in that figure, that +/- .15 g's peak-to-peak is substantially uniform, then isn't there a factual dispute between Dr. Oliver and the way in which he calculates it and Apple in that regard that would not be appropriate for summary judgment?

MR. DENNING:  I would say that that's not the case, that it is a matter of law for the Court to determine this issue.

And I would cite the Court to -- beginning with the *ePlus* case, which is shown on Slide 68, that indefiniteness is a question of law and in effect part of claim construction.

The Court has to determine, okay, if that's talking about substantially uniform, but it's applying a particular test with a particular input, you can't use that out of context and apply it to power, apply it to a variable input

COMPUTER-AIDED TRANSCRIPTION

where you get to control how much voltage you put in at different frequencies to try to get a result that matches that. That's not -- that's not a question for the jury. That's a question for this Court to determine

THE COURT: Okay. Thank you very much.

MR. DENNING: Thank you, your Honor.

MR. BASH: Your Honor, may I approach? We have a PowerPoint. I'm just going to approach with the paper part, but we're going to put up on the screen the PowerPoint. I want to make sure opposing counsel has it.

I'm told I should ask the court reporter to switch on something.

THE CLERK: So I will. I need to know where you're plugged in and what input you're using.

MR. TSE: It's this one (indicating).

MR. BASH: Amazing. You all can see it?

MR. DENNING: Just fine.

MR. BASH: So thank you, your Honor. You have it in front of you, I take it?

THE COURT: I do, yes.

MR. BASH: We heard a lot there. You know, I think a lot of that was deeply mistaken. What I'm going to try to do is divide out what different points Apple is making there and show why each of them are wrong, but I just want to make two preliminary comments, and then bottom-line something

38

based on the question you just asked my colleague.

The first preliminary comment is the whole maybe first half of that presentation was in this world where this Court hadn't already construed the term "highly damped output."  There was a lot about highly damped output.  This Court has given that term a construction, "substantially uniform or flat."

We got to that sort of at the end of that presentation.  That was not something the Court made up out of thin air.  It did that construction because the relevant passage of the prosecution history refers to a part of the specification that says "substantially uniform or flat."  So that was an objective, kind of normal way to define that term.  So I think the terrain we're arguing on is really substantially uniform or flat.

The second point is just kind of an aside, but it is funny to hear my colleague criticize my clients, or Dr. Biggs' comment about, you know it when you see it.  Because, of course, Justice Stewart in *Jacobellis vs. Ohio* made that comment to make the point that those of skill in that art, namely, judges, can, even when the First Amendment is at stake, easily discern what's pornography and what's not without a more precise definition.

And that's true in a lot of patent cases, where it says a term of degree that those of skill in the art have a

39

general sense.  And one example that I'm going to come back to, because it's similar, is a substantially flat surface.

And so you can imagine a patent of a table, and it says a substantially flat surface.  And, yes, it's true that if you took an electron microscope and looked at the surface blown up a zillion times, it would look like the Himalayas.  But any carpenter of skill in the art has a general sense of a substantially flat surface, especially if there is a picture that shows basically what that means in the context of the patent.  It's going to be very similar here.

The question you asked that I wanted to respond to before I dug into some quite technical stuff, fortunately or unfortunately, is you referenced 5C.  Here is why -- this is going to come up in the presentation, but here is the bottom line on Figure 5C.

THE REPORTER:  I need you to slow down.

MR. BASH:  Sorry.

The bottom line on Figure 5C in the patent, is that gives an image of what a substantially flat response looks like, the same way the image of the table might show generally what a flat table is.  And you know you're not talking about blowing it up under an electron microscope to see if it's flat at that level.

That does not mean, though, that you chuck the principle that embodiments in the patent aren't meant to be

40

limiting.  So the fact that another flat response might be a little less flat than that, the .15 g's, which is the figure in that illustration, that's not limiting.

But it does give a general sense to a skilled artisan of what we mean, just like if you saw a flat table, you would say, okay, I know what you mean by a flat table.  I don't think whatever measure of flatness is in that embodiment is the absolute limit, but I have a general sense.  So that's the overall answer.

Let me get into this.  Apple essentially makes two arguments.  Okay.  I guess -- oh, here is the clicker.  Sorry.

Apple makes two arguments on this point.  Where am I clicking?

MR. SMITH:  We're having some technical issues.

MR. BASH:  Can you hit "next."

So they have essentially made two arguments about indefiniteness.  The first is that the word "substantially" in the context of this patent is indefinite.  The second is that, even aside from that, because there is multiple ways to measure output, and maybe they would say damping, it's indefinite for that separate reason.  Those are both wrong, but let me take those seriatim.

So here is substantially.  The Federal Circuit has repeatedly -- and this is both before and after the Supreme

41

Court tweaked the indefiniteness standard in *Nautilus* -- has frequently said substantially is fine.  It doesn't mean it's always fine, but it is totally common to say something that says "substantially" can be understood by those of skill in the art based on their experience and based on whatever else is in the patent.

In fact, when my friend -- I'm sure they can find some case, although I'm not sure they have, where substantially was indefinite.  The list of terms he showed in his PowerPoint, if I'm remembering correctly, didn't even have one of those.  It was things that were extremely subjective, like "unobtrusive."

"Substantially" is a very common patent term.  The Federal Circuit frequently upholds it.  And it's not just the Federal Circuit -- can we go to the next one.

This is -- well, this is a district court case -- sorry.  I'll get to the other case in a second.  This is just a recent case from this district pointing out that even after *Nautilus* in 2014, the Federal Circuit has continued to think substantially is generally okay.

Next, please.

It's not just the Federal Circuit.  This is a 1923 U.S. Supreme Court case, where the term was "substantial pitch."  And in one of the cases my friend cites, *Interval*, the Court said, look, generally terms of degrees are fine,

42

and it cites this Supreme Court case about substantial.  In *Interval*, it was "unobtrusive," which is a totally different kind of subjective term about whether something is too obtrusive.

Next, please.

Okay.  So here is 5C.  So this is what I was just saying.  We do think this provides a general idea of what flat response means in the context of this patent.

Again, that doesn't mean the precise figures of this are limiting, because the rule is that embodiments don't limit the claims, but what it does mean is that an expert looking at this and saying, what generally is meant by "flat" in this context, has a sense from this 5C graph.  And this is going to become very important based on some things that Apple showed.

But, again, just to reiterate, I'm going to the table analogy.  If it showed a table with the dimensions of a normal table and said, the surface on this patented table is flat, a person of skill in the art, a carpenter let's say, could look at that and say I have a general idea what you mean by flat.  That's enough for certainty.

That doesn't mean if there were some dimensions there the carpenter would say, well, if it's a millimeter less flat than this example, that means it doesn't satisfy it.  It means it's in the same general ballpark, enough to

43

give a general sense of what we mean by flat in this context.

Next, please.

And this is -- I don't want to put too much weight on this.  But Apple's experts did not sit there and throw up their hands and say, This is like reading Greek.  I have no idea what substantially uniform or flat, or at this point in the case, it was generally uniform or flat, but the Court ended up saying those terms are equivalent.

They didn't say, We can't respond to this.  This is like another language.  They knew what it meant.  It's clear what it means.  People of skill in the art have a general sense of what flat is.

And the one aside I want to say here is, just because there could be some disagreement in application, does not mean that it's uncertain.  All the time in patent cases they go to trial and, say it's the table thing again, there may be an expert that says, you know, in my experience, this just isn't flat enough to be substantially flat.  The other side's expert says, yes, it is.

That kind of disagreement alone on infringement in application does not render a claim uncertain.  That happens all the time.  You would be deciding every case on indefiniteness if that sort of a disagreement was enough. It's got to be something where an expert looks at it and just throws up their hands and says, I have no idea what that

COMPUTER-AIDED TRANSCRIPTION

44

means.

Let's go to the next slide.

So I mean, that's what I wanted to say about substantially.  I think 5C does provide an objective way to understand what substantially means.  We have expert testimony to that effect.  So if this Court even reaches this question, despite our preliminary discussion, I think they lose on substantially.  And I don't think they have cited a case remotely analogous to this one.

So let me get to the methods of measurement, and this is where it gets a little hairy technically, so I'll do my best.

Here is the preliminary point that I think is really important.  The cases they cite about multiple methods of measurement being -- rendering a claim indefinite were ones where the claim term had a number in it.  And the problem was that the multiple methods of measurement would give different answers as to whether that number was satisfied.

THE COURT:  Is that not the case here with the Q-factor?

MR. BASH:  No, your Honor.  It would have been the case under the construction you had originally adopted that limited the Q-factor to 1.5.  But the Federal Circuit reversed that limitation and said --

THE COURT:  No.  But the different tests that are

45

administered that results -- the slide that I'm recalling was the Apple Watch slide with the different tests resulting in a different Q-factor.

Is that not the case here?

MR. BASH:  Well, I don't think it would be.

Now, we don't think Q-factor applies at all, so I'll get to that in a second.  But even if it did, the problem would be if it said Q-factor 1.5 and one test said it's 2 and one test said it's 1.  If it's only a relative term, like substantially -- take inches and centimeters.

I mean, suppose that flatness is governed by inches, and I guess it would be millimeters and nanometers or nano inches.  Those are two different methods of measurement.  And if the patent said, you know, the flatness has to be 3, you'd have a big problem if you didn't know if it was centimeters or inches, or whatever their nano equivalents are.

Whereas, if it just says it has to be substantially flat, an expert carpenter can come in say, I don't care if you measure that in inches or centimeters, it's substantially flat.  I work with this stuff all the time.  I looked at the picture in the patent; that's what that means.  So I don't think they are right about that once you eliminate 1.5 as the number.

And I'm going to show you in a second that the thing they actually argued on the motion for summary judgment,

COMPUTER-AIDED TRANSCRIPTION

46

which is what we're here on after all, even though it was filed years ago, was that if you assign the number to Q-factor as a limitation on the claim, then you have a problem with measurement on the Q-factor. So we'll get to that in a second.

But the claim terms here don't have any numbers, unlike *Teva*, where it was 5 to 9 kilodaltons, and you could measure molecular weight in different ways and get a different answer to whether that was met; and it's not the slope figure in *Dow*, which had the number 1.3 in the actual claims.

And you see *Halliburton*, which is one of their favorite cases. It cites this principle that a numeric limitation without disclosing methods of measurement is problematic.

Next slide.

And this is just a quick aside, but the Federal Circuit even with numeric measurements has on occasion upheld patents as nonindefinite -- I guess that means definite -- even though there were multiple methods of measurement. So we give you those cases there.

Okay. So here are Apple's three arguments, and they kind of blended together, so I want to tease them out. There is three different areas where they say, Taction has created too much uncertainty, there is too many ways to do this. I

think they are all wrong, but they are wrong for different reasons.

So Q-factor is the first one that we were just discussing.  This is Apple's argument from their summary judgment brief.

Here, as in *Dow* and *Teva*, which were the two number cases we were just talking about, the claims required a certain Q-factor.  And that was their view, and that was your view, but the Federal Circuit disagreed.  A mechanical Q-factor of less than 1.5.

Then they went through the four and said, well, these all give different answers to that, and so that's a problem under *Teva* and *Dow*.  And they were probably right, that if the claims had actually said a number, that might have been a problem, depending on the Q-factor analysis.

Although in my very lay understanding of the Q-factors, they are pretty closely related to each other.  And I think the "effective" was just trying to get the combined effect of the ferrofluid and the closed loop controller; although I don't pretend to be an expert on this, and we are not at all relying on that point.

Our point here is that that argument entirely hinged on the idea that the Q-factor was numerically limited.  That has been now disagreed with by the Federal Circuit.  And I don't know if my friend was making a different argument

48

today, but that's not really what they argued at summary judgment, which is why, in our supplemental, we just said, hey, Q-factor is out now.

They also say that our expert did a bunch of Q-factor testing and had this term "effective Q-factor." That wasn't because we were saying this is the right way to measure it. It's because they were saying that, and we were doing the testing to respond to their legal arguments.

So this is not the right way to measure it. This is not what 5C shows, a Q-factor measurement. So we just think Q-factor is out.

Let's go to the next slide.

This is just -- okay. So this is the second point. This is the slide they showed, and I think my friend said this was maybe the most important slide in their deck.

They showed a slide that was our expert's analysis at one point where he used a constant input. So just a certain amount of power going into these devices that's constant. And you'll remember, it showed it going up and then down. It was peaked.

Then we have another one that our expert did later that shows it flat. That was variable input. It's going in and out at different powers, going in and out at different amounts. And they say, aha, that shows it's indefinite. You're being inconsistent.

49

Your Honor understands what that's all about.  The first test was before this Court had found a highly damped output, so we didn't need to show highly damped output, in our minds, at least.  We didn't think that was a requirement of the claims.

The only thing we needed to do was to show -- in our minds, was to show that the ferrofluid had some damping effect.  And so what our expert did is just take their little taptic engine out of their device and show, if I shake this thing, the ferrofluid has a damping effect.  That was all that was necessary.  More complex testing wasn't going to be important at that point, based on how we understood the claim limitations.

Then this Court construes the claims.  The Court says, nope, sorry -- and you were affirmed on this one -- you need highly damped output.  So then we said, okay, we have to see how these devices actually work in practice to see if they have highly damped output.

So we left it in with the closed loop controller, which varies the amount of input.  That's where you get the variable input, their closed loop controller.  And you remember, this is part of what went upstairs.  There was a debate about whether we had properly flagged that our infringement theory was both the closed loop controller and the ferrofluid.  The Federal Circuit said we did enough.

50

That's what we were doing there.  And so I was kind of like startled when my friend just said that our expert just kind of monkeyed with it to turn it on and off to make it work.  We just modeled what the phones do.  We just got their phones and did what their phones do.

It's not like our expert was like, I'm just going to jury-rig flatness by varying the input to make it flat.  He was trying to simulate what the phones do with the closed loop controller to show that they infringe.  And so when you combine the closed loop controller and the ferrofluid together, it creates the flat output.

So that's this issue.  And the reason we have the patent claims up there is to show the Court, input is not an element of this claim.

So it's not as if their devices, they couldn't have an argument that their devices only infringe if there is constant input or only infringe if it's variable input.  The only question for these purposes is whether their devices produce highly damped output, which this Court said means "substantially uniform" and "flat."

And what our expert showed is that if they work the way they are supposed to work, with the closed loop controller, what is produced is highly damped output.

And so the reason we're giving you the claim language is just to show something that I think is

51

uncontroversial, which is that input is not a limitation on these claims.  If the device produces highly damped output, that infringes, at least that limitation, regardless of the input.  There is no limitation in that way.

Next please.

Okay.  So I just wanted to show the Court where I think Apple is getting the limitation that it has to be constant input, so we're back to our favorite 5C.  And the example being shown in 5C has constant input.

So I will admit I was told this, I didn't know this off the top of my head, but sinusoidal voltage connotes a constant input.  So what they are saying is, well, this picture is constant input, so that's a limitation.

The problem with that is what we've said before, embodiments aren't claim limitations.  And it would be especially bizarre if it was a claim limitation here, because nothing in the language of the claims talks about input. That's just the example they happen to give, had a constant input.  But that doesn't even link in, in any meaningful way, to any claim limitations.  It doesn't link into the disclaimer.  It's just what this example happened to be.

So that's where they are getting input.  They are wrong about that.  As I said, our expert did what he did for sensible reasons, which is he only tested the things -- the way their thing works in practice once it mattered to see how

52

highly damped the output was, to see how substantially uniform it was.  He did the other test when that didn't matter, at least when we thought it didn't matter.

Next, please.

Okay.  So the last thing -- and this is where it gets a little technically thorny, more so, I should say.  The last thing they say is, well, there is lots of different ways to measure output.  Four.

Let's go to the next one.

There is displacement.  And in my layman's understanding, that means this moved from here to there.  The amount it moved is the displacement.

Velocity, that's how fast it's moving from here to there, so that movement per second.

Acceleration, which is how fast the velocity is changing over time.

And power, which is essentially how much force it takes to move it a certain distance over a certain amount of time.

So those are the sort of -- we've seen all these graphs.  Those are the Y axes of these graphs.  And what Apple says is who knows what to pick among these four options.  If you don't know what to pick, how can you know if it's substantially uniform or flat.

The primary and straightforward answer to that is,

53

it doesn't matter.  These are all closely related, and they all produce similar flat outcomes for similar devices.

So I want to show that.  Let's go to the next slide.

This is Dr. Oliver's report.  This has three of those four ways.  Displacement, that's top left.  Velocity is bottom left.  And mechanical power, that's in decibels, is right.  They all show a flat response.

These are Apple's devices, I just want to make sure; correct.  These are Apple's devices.  So these all show a flat response.  And I didn't hear my colleague, either in the briefs or at the podium, to disagree on these three.  So these all produce flat responses.

So it's kind of like there is different ways to measure the flatness of the table, but if they all generally show it's flat, it doesn't really matter that there is different ways to do it.

Let's go to the next slide.

This is something I heard my friend say that I just think is totally wrong.  He said that nothing in the patent discloses power as one of the methods to measure these values of flatness.  I don't think that's true.

This is a figure from -- and I'm sure it was just a mistake, but I don't think that's true.

This is a figure from the specification depicting prior art.  So this is what the patent is trying to overcome.

54

That's why it's not flat; you see that big bump.  But it's the same kind of graph.  They are just saying, we want one that's more flat than this big bump.  That's done in power, in decibels.  We highlighted it in green on the side.

So my friend showed 5C, which is done with acceleration, but this is 2B, which is done with power.  And I know my friend is going to get up and say, well, then the patent's internally contradictory.  It's using two different methods.  But it's not, when you realize that all of these things are closely related, and they are all going to produce essentially similar curves.

And that's why the patent was indifferent essentially between using a graph based on power and using a graph based on acceleration for another point.

Let's go to the next slide.

So here is the graph based on acceleration.  This is the point I want to be really, really precise about, to make sure I don't mess it up.

I want your Honor -- so this is the example that we've been talking about from the patent.  This is the one that we say generally shows an expert in the field or a skilled artisan what flat basically means, just like the picture of the table.

It's what my colleague says, well, this is -- maybe that's okay, but it would have to be the precise limitations

55

from this, .15 peak-to-peak -- g peak-to-peak and so forth. We say that's wrong.  It's not a limitation, but it gives an idea.  But, anyway, this is the one we've been talking about.

I just want you to look on the Y axis, if you would, and notice that the Y axis is three orders of magnitude, so it goes from .01 to .1, .1 to 1 and then 1 to 10.

So you can imagine all kinds of Y axises.  You can imagine a basic one that's just 1, 2, 3, 4, 5.  This one is -- I think the word is "logarithmic."  I might be misusing that.  But it's .01, .1, 1, 10.  Every visually identical length goes up another ten times.  Okay.

So let's go to the next slide.

Here is what Apple says about why, in Apple's view, acceleration is not flat.  Their argument is whatever you say about displacement and velocity and power, acceleration is not flat.  And so this is horribly confusing, because one of them produces a nonflat output and the other three produce a flat output.

So this is the picture they give on the left.  It's from their expert's report.  And it shows one of the iPhones' acceleration mapped against frequency.  And so Apple points to this and says, look how big that slope is.  That's not flat.  What are we going to do?  On the right is one of our graphs under the power metric.  That is flat.  How is anybody going to know which one to use.  That's essentially their

56

argument on this point.

But look at the left axis of the iPhone one, the one on the left.  That's not three orders of magnitude, the way the one from the picture in the patent was.  That is one order of magnitude.  It goes from zero, up to 1 and change, 1.5, but it doesn't go up to 10, it doesn't go up to 100.  It's one order of magnitude on the Y axis.

The left axis -- our picture might look like that to you, but it's actually not.  It says 0, 20, 40, 60, 80, but decibels are themselves logarithmic, and that's in decibels; so that's actually, I believe, four orders of magnitude on the right.  It would be a little different if we had made it exactly three like the patent picture, but it's four orders of magnitude on the right.

So what we did -- and I just want to be very clear.  We have manipulated Apple's picture to make a point.  This is something we have done on our computers.  It's not like their picture.

Let's go to the next one.  That's the table thing.  Let's go to the next one.

We changed their plot to be three orders of magnitude, the same thing as 5C.

MR. DENNING:  Your Honor, this is the first time we've seen this slide.  It wasn't in any of the briefing, certainly wasn't in any expert report.  Something that they

57

made apparently in advance of this hearing but we've never had a chance to even look at this.

THE COURT:  Okay.  Have you been provided with a copy of this slide deck?

MR. DENNING:  We have.  It wasn't part of the briefing for this hearing.  It wasn't in the original briefs or the supplemental or even the reply brief.  So I'm just noting, we've never seen this before.

THE COURT:  Okay.  I think it's been explained how they arrived at this particular figure.  If, upon review, you can have your expert take a look at it, if it's incorrect, you can bring that to my attention, and I'll give it the weight that I think it deserves.

MR. BASH:  And I don't want to put --

MR. DENNING:  Thank you, your Honor.

MR. BASH:  I'm sorry.

I don't want to put too much weight on the picture. You know, if you want to ignore the picture entirely, if the Court decides, too late, you shouldn't have raised that now, just can we go back two.

I'd be happy for the Court to just rely on their picture, which is the left Y axis there on their picture. You can see it's one order of magnitude of acceleration.

Please go to 5C.  And you can see on 5C, the patent picture that we say kind of gives the lodestar of what an

expert would look at, it's three orders of magnitude.

Well, when you change the Y axis, it's going to change the way the graph looks.  And so, you know, I welcome them to come and say why they have some argument that that's different.  But I think the Court could totally ignore that picture and just note that their representation of the iPhones' acceleration response is based on a different set of Y axis values than the 5C picture.

Can we go -- let's just skip past the picture so we don't have to linger on that.  Skip past that.

So before I go on to this, I mean, just to summarize, our expert has said -- and we don't think Apple has refuted -- that these different ways of measuring output response -- displacement, velocity, power and acceleration -- are closely, mathematically related concepts that will all produce a flat curve.

And so this is not a situation where you have totally different measures, and an expert is going to say, well, if you meant X, the table is not flat.  If you meant Y, the table is flat.  These are closely related.  I don't think Apple has pointed to anything in the record.

The last point on output measurement.  This is an independent argument, an alternative argument to what I just said.  We do think we've put into the record expert testimony that the ideal measure is, in fact, power, and that +/- 10

59

decibels is a reasonable understanding of what substantially uniform and flat would be.

So I think the Court only gets to this if it's gone through many other arguments before it gets here and says, well, I do think these are different, you know, all the things we've said. But this is kind of our last alternative argument.

Can you go to the next one.

And so here, we've seen this before. This is Dr. Oliver's frequency response graph on the power metric. I don't hear my colleague to dispute that this shows a substantially uniform or flat curve, you know, if this is the appropriate metric to use. And it's within +/- 10 decibels.

Let's go to the next slide.

We're just showing the Court where in the expert reports our expert said -- you remember, our expert is a skilled artisan. He's as qualified as anybody relevant to talk about what a skilled artisan would think about these terms.

He says -- let's go to the next one, too. This is Dr. Oliver -- that the appropriate measure for the effectiveness of a haptic transducer is power, mechanical power.

So, I mean, if you're to this point, you have evidence in the record saying power is the right way to think

60

about this.  You know, if they put forward -- I don't recall everything they have said about it in their expert reports, but the Court might at the end of the day have a factual dispute between experts about what's the right way to think about this chart if it gets through all these other layers of the argument and ends up here.

Next one.

This is our other expert, Dr. Okamura, and she said, mechanical power is a much better match for force output. And she said that acceleration is not the ideal way experts would measure output in this context.

So, again, I mean, I think if we're at the extrinsic evidence, there may be a factual dispute for the Court to resolve, but we have two experts saying exactly that.  I didn't exactly see what Apple thinks their evidence is that acceleration is the ideal metric, but I'm sure they are going to say that when they get back up.

Next, please.

And this is the point -- well, two points here I wanted to say.  One thing I heard Apple say is that the patent doesn't say anything about power as a metric.  But Figure 2B -- again, this is prior art.  This is the thing the invention is trying to correct or fix or surpass -- has a graph where this is measured in power, in decibels on the right.

61

And they are saying that bump there, we don't want that.  We want it to be flatter than that.  So the patent does disclose, consistent with the testimony of both of our experts, that power is a metric to measure these things.

And I'll note that Figure 2B's discussion describes an undesirable bump, that means going up from the average 10 to 20 decibels.  And that's one piece of evidence that validates our experts in saying that +/- 10 is the range where you want flat.  If it goes 10 to 20 up, that's a problem, because that was the problem in Figure 2B in the prior art.

My friend made a lot of you can't use a provisional application to limit claims, because our expert cited a provisional application as part of his analysis for 10 decibels.  The regulation that I understand them to be citing is about not incorporating into patents by reference material from provisionals, as opposed to from other patents or applications.

Maybe my friend will get up and correct me.  I'm not aware of cases saying an expert, in surveying all the information about understanding what a claim term means, can't, as one piece of information, point to the way a term was used in a provisional, not because it's incorporated by reference into the patent, but because it's part of the universe of information on which an expert can develop an

62

opinion.

But at any rate, even if that were true, there is plenty of support just in the patent itself for a +/- 10 decibels range.

Next one.

THE COURT:  Where would that be?

How do you respond to the argument that because it was in the provisional and it did not make its way into the patent itself, that someone skilled in the art would say, well, there is a reason why that was taken out, and, therefore, that's not an appropriate metric?

MR. BASH:  Your Honor, it's actually the thing I was just pointing to here.

So Figure 2B is the prior art.  That's the stuff the patent is trying to fix.  And what it says in the discussion of Figure 2B is that that device caused an undesirable bump of 10 to 20 decibels.  So I think that's support for the idea that the desirable range is within 10 decibels.  And so that's where it comes from within the patent.

Next, please.

And I just wanted to show Dr. Okamura's deposition transcript.  I want to be transparent about this.  Was this in the summary judgment record?  This was in the summary judgment record.

She says that +/- 10 decibels is a reasonable

COMPUTER-AIDED TRANSCRIPTION

63

description of a generally flat or uniform output.  So, again, this is a skilled artisan.  She is an expert in the field.  She's saying this is how she would understand that claim term.

At minimum, I think that creates a factual dispute, depending on what Apple can marshal about this point, about whether a +/- 10 decibels is a reasonable way to understand all of this.

So let's go to the next one.

And we've talked about this point before.  I think this is the last point on output, if I'm remembering correctly.

Apple -- what you heard my friend say at the very end is, yeah, I'm totally okay with you making Figure C substantially uniform or flat -- Figure 5C substantially uniform or flat if that's what you want to do.  The reason they are saying that is because they believe their devices would not infringe if that's the limitation.

As I've said a couple of times now, Figure 5C is an embodiment.  An embodiment does not limit claims.  That's black-letter patent law.  It's just an example.

I think there is plenty of daylight between saying an embodiment can be part of what gives an expert a reasonable understanding of what is meant by a term without it precisely limiting that term.

64

So the example I keep coming back to, but you can think of anything, is a flat table.  And if there was a drawing of a flat table with dimensions, and it had some precise measurement for the flatness, I think it would be reasonable to say, an expert carpenter can look at that and understand basically what is meant by a flat table, without also saying, well, the precise millimeter of flatness of that example is the absolute limit.  And that's exactly what we have here.

So I'm going to stop there.  I'm just going to recap kind of at least how we see the waterfall of arguments, and I'll take just 30 seconds to do it.

The first is we don't think that a clear and unmistakable disclaimer can be indefinite legally or logically.

The second is, when this Court has already construed a term, I don't think it can be indefinite.

As you know, normally the way it works is at claim construction, the Court says "plain and ordinary meaning," "construction" or "indefinite."  And the idea of being able to construe a term to me is fundamentally inconsistent with indefiniteness, and I think really what Apple is saying is your construction is indefinite, because they are saying substantially flat is indefinite.  So that's two.

Three, the term "substantially" is a term of degree.

65

Substantially has been upheld not only by the Federal Circuit but the Supreme Court many, many times.

And there is nothing here that means a skilled artisan couldn't understand basically what's meant.  They can look at 5C and say, I have a general sense of what is meant by flat, especially in light of the purposes of the device, as described in the written description.

Finally, on methods of measurement, the Q-factor is -- first, you shouldn't even get into that, because the cases they are citing are where there is a number in the actual claim.

If you disagree with that, the Q-factor thing we think is irrelevant.  Q-factor is not a limitation.  Their only argument on summary judgment was that it is a limitation and it's too hard to measure, or there is too many ways to measure it.  We think that's out.

Input, variable versus constant input.  These devices have variable input.  That's why we're measuring it that way.  And there is nothing in the claims that talk about input, that say that a device that produces highly damped output doesn't count because its input is a certain way.  There is nothing in the claims that say that, so that's out.

The last point is the four different types of output measures:  Acceleration, velocity, displacement and power.  They all get you to the same outcome.  We showed why that is.

COMPUTER-AIDED TRANSCRIPTION

66

But even if you disagree with that, we have evidence in the summary judgment record that power of +/- 10 decibels is the right way to understand that term for a skilled artisan.

So for those many alternative reasons, we'd ask the Court to hold that the term is not indefinite.

THE COURT:  Okay.  Thank you very much.

MR. DENNING:  May I address some of those points, your Honor?

THE COURT:  Yes, please.

MR. DENNING:  Thank you.  If we can -- thank you.

So I want to address one thing that I just heard, which was the fact that a claim term can be construed means that it's not indefinite.  That's not true.  Claim construction is just determining what is the construction, the appropriate words, to give to this claim term, just as if it were a part of the claim itself.

The next step is to say, okay, now, now that this is the appropriate construction, would one of ordinary skill in the art understand with reasonable certainty what that means. That's our task here.  And the answer can absolutely be, I understand this means highly damped output.  It's very clear that's what the patent means, but one of skill in the art wouldn't understand with reasonable certainty what is highly damped.  That's the issue before the Court.

There was some reference to the fact that the Court

67

did construe this.  Of course, the Court's construction also contained some guardrails, like a Q-factor of less than 1.5, that would inform one of ordinary skill in the art, that's what highly damped means.  Without that guardrail, which is where we are today, the expert is adrift.  The person of skill would say, I don't understand what highly damped output means.

We heard very little about highly damped output from counsel for Taction in their argument.  They wanted to switch immediately to substantially uniform.  That's fine.  Highly damped output is in the claim construction as well, and for all the reasons that I talked about originally, that's a term of degree that has no bounds now that the 1.5 or less Q-factor has been taken out.

So how about substantially uniform.  We talked a lot about Figure 5C.

And maybe we can pull up Figure 5C.  Are we able to pull that up?

THE CLERK:  Where are you plugged in?

MR. DENNING:  We are plugged in?

THE CLERK:  Where?

MR. O'CONNOR:  Oh, is it either plug?

THE CLERK:  USB C.

MR. DENNING:  Thank you.

And maybe Slide 44, Mr. O'Connor.  Thank you.  We

68

see Figure 5C in the lower right of Slide 44.

One point that counsel for Taction made was that -- I believe he said, to direct quote here, doesn't matter whether it's with a constant input or not.  He said it doesn't matter whether it's constant input or not.  That's the only test, the only analysis that is described in the specification or the prosecution history, is that there is a constant input, a sinusoidal input of constant voltage.

The idea that you can turn up the voltage for some frequencies and turn down the voltage for other frequencies to generate the type of output response that you want to generate is discussed nowhere in the patent.  And that's a totally different test, a test that, as we've seen, yields diametrically opposite results.

Figure 5C, everything else in the patent is talking about a constant sinusoidal input.  That's extremely important.

Counsel says -- and the other thing I'll note is that substantially uniform in the context of Figure 5C is important in that context.  It's talking about the steady-state input.  It's talking about the acceleration. It's talking about this particular range.

Counsel would like to have you believe that substantially uniform is substantially uniform in any context.  It doesn't matter whether we're talking about

69

acceleration or we're talking about power.

Put it in another context.  If you had a chart of your weight over time and you had a chart of your pulse over time, you wouldn't say what is substantially uniform with regard to weight, I'm going to apply the same standard to what's substantially uniform with regard to your pulse.  Of course, your pulse is going to vary over the course of a day, over the course of a week, much more than your weight is.

You can't take substantially uniform from something like acceleration and apply it to something like power and say, oh, one of skill in the art would know that you can take one from the other.  It's not looking at a table and saying whether that's flat or not.  You have to consider the context in which the patent is teaching what is substantially uniform.

Here, it's talking about measuring acceleration with a constant input.  Those can't be pulled away.  Otherwise, you end up with two different results based on two different tests, which is what Taction has given us here.

While this is up here, I'm going to note one thing. Counsel for Taction noted that Figure 5C shows three orders of magnitude or from .01 to 10.  It does show that on the Y axis, but the portion of the graph that the figure is teaching to be substantially uniform, the portion that is 503, is in a very narrow range, very narrow range, to +/-

70

0.15 g.

It's not three orders of magnitude.  It's not a difference of 1,000, as I think counsel for Taction was implying you should read this.  The substantially uniform is +/- 0.15 g.  It's a very small range that this patent teaches to be substantially uniform.

And, again, context matters.  Weight versus pulse versus blood pressure.  They all vary differently. Acceleration is going to be different than power.  You can't use the same standard from acceleration and apply it to something like power that the patent never even contemplates.

We know what this looks like when you apply this standard to the accused devices, and we know that Taction's own expert says that's not highly damped response.

Next, let's move on to Q-factor.  And I heard counsel for Taction running away from Q-factor as fast and far as they can, saying, we're not talking -- we don't want to talk about Q-factor at all.  The only reason we talked about Q-factor is Apple talked about Q-factor.

That's not necessarily true.  Dr. Oliver spent a good portion of his opening expert report, before Apple had filed any expert report, talking about Q-factor.  Dr. Oliver uses a very different Q-factor than is set out in the patent, the mechanical Q-factor, or the other ones that were known in the art at the time.

71

He made up his own Q-factor.  Fine, he can do that. But you can't say one of ordinary skill in the art would have understood, oh, that Q-factor that Dr. Oliver is going to come up with, that's what we should apply.

He did that.  It's in his report.  It's in his opinions.  That's his testimony in this case.  It's remarkable that they are trying to run away from it now.

It's also remarkable because that's the one thing that the patent teaches we should equate with a highly damped output.  That's what the patent says relates to being overdamped, to being underdamped, to being critically damped, is the Q-factor.

And for now to have Taction running away from Q-factor and wanting to act as if it never shows up in the specification whatsoever is really telling.  That's what the patent says you should rely upon.  Dr. Oliver is trying to rely on essentially anything else.

There was some discussion of cases where the claims required a specific numerical measurement, and that our case is different than that, and so you should ignore those cases.

Our case is even simpler.  Our case is one where something is either highly damped or it's not.  It's binary. It's not whether it's 3.5 +/-.  Is it in a range?  Is it close enough?  It's is the acceleration response highly damped, is it not highly damped.  And it just depends on

72

which test you apply.

The test you apply from the patent, even Dr. Oliver admits that's not highly damped.  The one that he made up for this litigation he says is highly damped.  You cannot be more diametrically opposed than that.  Two tests, with two completely different results, and the patent doesn't say one test versus the other.  How would one of skill in the art know that you were supposed to apply Dr. Oliver's test that didn't even exist before.

One clarification point.  Counsel mentioned that that first test, the one that was in their infringement contentions that shows the peak at the resonant frequency, that that's not relevant to highly damped output.  And once this Court construed highly damped output, they jettisoned that.  That's not true.

Dr. Oliver's amended infringement contention -- I'm sorry, Taction's amended infringement contentions, which they served after the Court's claim construction, pointed to that same graph with the peak at the resonant frequency for the limitation requiring highly damped output.

We referenced that in our opening summary judgment brief that we filed several years ago.  It's on page 7 of our opening brief.  We have a citation to that.  And I invite the Court to look at that there.

Taction has been pointing to that chart all along as

73

saying highly damped output.  Only now that Dr. Oliver says, I don't think that's highly damped output have they tried to come up with this totally new and independent test.

The fact that there are two tests with different results, really this is as simple as that.  That is enough to know that this is indefinite, that one of skill can't rely on this.

Counsel showed three other graphs from Dr. Oliver's report.  I think one was velocity, one was displacement and then one was the power graph that we've seen before.  The key takeaway from that is none of those were the acceleration graph.  None of them showed something like Figure 5C, which is what the patent teaches is substantially uniform.

They were all measuring different things.  They were measuring blood pressure and glucose level and your SpO2. You can't apply the same standard for substantially uniform to those things that you apply to something like weight.  You can't apply the same substantially uniform test to power or displacement that you apply to acceleration.

There was a reference to Figure 5B I believe, which was the prior art -- I'm sorry, 2B, your Honor.  The prior art, and it showed that there was a lot of variation.  The patent, by the way, said that's what you want to avoid; right.  This is undesirable.  That was talking about sound. That was audio sound.  It wasn't power.  It was bass audio

74

for prior art headphones.

So for them to say that one of skill would know, okay, that's what I want to apply in this context, it's a very -- it's sound.  It's not acceleration or power.  It's something entirely different.  And the patent is teaching that's what we don't want.

The patent teaches what it wants.  It points you to 5C.

THE COURT:  Well, if that's what they don't want, it was 10 to 20 decibels in that one, which is what they said was the deficiency in the prior art that they were trying to solve.  And the related argument was that zero to 10 decibels is, therefore, the appropriate standard, if I understand the argument correctly.

MR. DENNING:  I think that was the argument.  And I would respond by saying, you can't take something that describes substantially uniform in the context of sound and say I'm going to apply that to something like acceleration.  It's the same thing with regard to blood pressure versus weight.  They mean different things.

Variations in sound that you hear in your headphones are going to be different, are going to be greater than the variations in vibration that you might feel from the little haptic motor that's in their headphones.  You can't compare apples and oranges in that context.

75

Unless your Honor has additional questions for me, I think I've been heard on the indefiniteness point.

THE COURT:  Okay.  Thank you.

MR. BASH:  Thank you, your Honor.

I'm going to be pretty quick, because I know we've got other issues to get through.  I just have five or six quick hitters in response to the rebuttal.

One, my friend said that, well, your original claim construction had guardrails because you also had those two subsidiary constructions.  But, of course, the group that he's leaving out of that narrative is the Federal Circuit, which decided highly damped output was fine without those two guardrails.  So that's a pretty big difference.

Two, constant input doesn't matter.  It doesn't matter because it's not in the claims.  The question is whether there is a device that produces highly damped output and meets the other claim limitations.

There is no question about whether the input is constant or variable.  Their devices use a variable input.  Again, we didn't monkey with the input to try to make a flat curve.  We just used their devices the way they work to see, the way this is supposed to work, does it produce a highly damped output?

That's what that graph is.  It's not us like -- yeah, somebody could monkey with the stuff to just make it

76

flat, sure.  That's not what we did.  We just used their devices.  And I didn't hear a refutation of that, because they can't refute that.  That's what we did.

I heard no answer at all on the fact that their picture supposedly showing that acceleration plotted against frequency is not flat uses a totally different order of magnitude on the Y axis than the 5C picture.

Now, you don't have to credit our Microsoft Paint revision of that at all.  Just forget that if you want to.  But just note that they are using just a totally different scale than what is in 5C to supposedly show that acceleration would produce a different number than these other measures.

And that gets to my next point, which is that we heard a lot of stuff about weight is different than pulse or something.  He's just picking two totally unrelated variables and saying they are not related.  That's not the case here.  These are functions of each other.  They are mathematical functions of each other.

We gave the Court the equations, but ours is much more like saying ticket sales at a Taylor Swift concert and concert revenue at a Taylor Swift concert.  They are correlated.  You multiply one times the price to get the other.

That's what we're saying.  These are related variables.  They are not pulse and weight and people of all

77

different weights can have all different pulses.  They are just picking unrelated variables.

Two more points.

I heard my friend say, well, we're running away from the Q-factor, even though before they filed their reports, our expert had talked about it.  If you open the expert report, you can see that the reason he talked about it is in Apple's response -- supplemental response to Interrogatory No. 9, they previewed their understanding that the Q-factor was the key limitation here, or was a key limitation.

He very explicitly said, I'm responding to that with the Q-factor analysis.  He was not saying, I think Q-factor is the right way to do this.  So they are just wrong about that point.

Two more points.

I didn't understand my friend's response on the fact that their two key cases about measurement, *Teva* and *Dow*, both have numerical limitations in the claim.  You can just see the problem with that.  I mean, if it says this thing is supposed to be five long, and it doesn't tell you whether you're talking about inches or centimeters, you have a real problem in understanding whether you infringe.

If it just says it's supposed to be substantially long, then you have the carpenter come in and say, for this type of device, here is what substantially long means.  And

78

he looks at a picture in the patent and says, I understand what substantially long means.

Maybe that's not the greatest example, but you see what I'm saying.  It's not a better case for them that it doesn't have a number.  The number was the problem in those cases because the number could be satisfied or not depending on the type of measurement you did.

The last point I would say is that I think I heard my friend concede that, at least on velocity, displacement and power, they all produce flat responses; so I think that the dispute on this point comes down to acceleration.  And I would just say, you know, our expert has said these are all functions of each other.

The only thing they put in different with that slope is the picture that uses a totally different Y axis set of values, different levels of magnitude than what 5C uses.  I don't think, based on that very flawed argument, these claims can be declared indefinite.

Thank you.

THE COURT:  Okay.  Thank you.

So the remaining issues are noninfringement and pre-suit damages.  And with respect to those two issues, I apologize.  Unlike this particular subject, I didn't have any follow-up questions.  The briefing was very comprehensive. And if either side wants to argue those points briefly, I'm

79

more than happy to listen, but the analysis of those was comparatively straightforward.

MR. DENNING:  Your Honor, I think we are prepared to submit on the papers on the noninfringement versus -- because of monolithic magnets and because of the damages, the pre-suit damages issue.

I'll just note there also was the issue of written description, that we think that the claims are invalid for written description; somewhat different than the indefiniteness argument.  But we also understand if your Honor felt equipped to deal with that based on the briefing, and we would submit on that, too.

THE COURT:  I did.  I did.  I omitted that by mistake.  Thank you.

MR. DENNING:  Understood.

THE COURT:  Anything additional from Taction?

MR. BASH:  With the Court's indulgence, I'd like to do just five minutes on plurality of magnets, if that's okay.

THE COURT:  Sure.

MR. BASH:  And my wife will kill me if I don't get back to Texas tonight, so I'm not going to take a lot of the Court's time.

THE REPORTER:  Wait.  Slow down.

MR. BASH:  I'm talking too fast.  I'm sorry.

THE COURT:  My court reporter is going to -- well, I

80

won't go there.

MR. BASH:  It's not the first time.

Do we have the plurality of magnets section up?  And I'm going to really try to limit myself to five minutes on this.

THE COURT:  Sure.

MR. BASH:  Do I need to tell the court reporter which outlet it is?

THE CLERK:  It's already on.  I'm just waiting for them.

MR. BASH:  Okay.  Thank you, your Honor.

So the question here is whether Apple is entitled to summary judgment on two -- really two different grounds, that these devices, as a matter of law, don't literally infringe the plurality of magnets limitation, and they can't possibly under the Doctrine of Equivalents.

And when I say "these devices," I'm of course referring to a subset of the accused products that have what Apple calls a monolithic magnet, so a single piece of metal. We're going to talk about that.

So let's go to the next one.

So this was the Court's claim construction as relevant here.  "Magnet" was a body that produces a magnetic field based on the body's dipolar nature, and "plurality of magnets" was construed as at least two physically distinct

81

magnets.  And I'll linger on the word "distinct," because really a lot of this comes down to that, at least on literal infringement.

So we go to the next slide.

The first one is I think a picture that everybody agrees would meet this limitation, which is clearly two separate magnets.  One with a north and south pole, space in between, another with a north and south pole.

The second is an example, although there is variations on this, of the Apple monolithic patent, where you see a single piece of metal, but you have these two distinct zones.  North and south on one side, north and south on the other, and a transition zone, rather than a space in between.

So that's what we're talking about, does this second type of configuration infringe or, more specifically, could a jury so find?

Next, please.

I won't linger on this.  This is just to show physically the thing we just saw in a drawing.

So you see on the left with the separate magnets, when you put ferrofluid on them, it wants to go to the edges, because that's how magnets work.  And please don't ask me more detail on how magnets work, but I think it's common ground that that's how it works.

When you go to the monolithic, or I should say the

82

so-called monolithic magnet, the same thing happens, because there is basically two separate magnetic regions within this one block of metal.  And that's different than if you just had a single piece with one north and one south.  Then it would just go to the edges of the big piece, not that line down the middle.  So that's that.

Next, please.

Oh, okay.  So why don't we ask you-all to step out a minute.  I don't even know if we really need to do this, but we're going to zoom past it, so...

(Mr. Biggs and Mr. Steinberg exit courtroom.)

MR. BASH:  Okay.  So let's go to the next one.

This is just testimony from -- or excuse me, part of Dr. Oliver's report that shows what I just said, which is that there are north and south poles on each side, different magnetic regions, and it's his analysis for why these are, you know, separate magnets.

Let's go to the next one.

Again, this is Dr. Oliver, our expert, saying that the dead zone is physically distinct, meaning you can visually distinguish between these things.  There is one side that has a north and a south, a middle part that's a dead zone, and another side that has a north and a south.

Let's go to the next one.  If someone wants to get our clients, that's okay.

83

(Mr. Biggs and Mr. Steinberg reenter the courtroom.)

MR. BASH:  Okay.  So going back to these definitions, I think it's pretty clear that each side of that unified structure is a magnet, because each side has a -- is a body that produces a magnetic field based on the body's dipolar nature.

Each side of that so-called monolithic magnet does that.  It's dipolar.  It produces a magnetic field.  I'm not sure if Apple contests that point.  They may.  But I think each side of those is a magnet.

The second piece is, does it satisfy this Court's construction of plurality of magnets as at least two physically distinct magnets.

And our submission to the Court, knowing full well that the Court knows what it thought when it chose words, is that there is a difference between the word "distinct" and the word "discrete."

I looked it up.  "Distinct" typically means physically distinguishable.  You can tell one from the other.  "Discrete" usually means separate and distinct.  It's physically separate from another thing of the same type.  And the case this Court cited in that part of the construction, *August Technology* used those terms distinctly -- not to have a pun, but used those terms differently.

If you can go to the next slide.

COMPUTER-AIDED TRANSCRIPTION

84

This is the example I thought of, your Honor.  If you think of a roll of stamps, they are all connected, and they were probably all printed together with some sort of perforation machine, but they are distinct.  You can tell one stamp from the other, but they are not discrete.  It's not a discrete stamp.  You would use that term to refer to one that's been broken off and is just hanging out ready to be put on a letter.

So I think this is an example of something that is distinct but not discrete.  And this Court chose the word "distinct" -- let's go to the next one.

Let's just keep going, because I want to go a little faster.

As I said, *August Technology* is the case that the Court cited, and it's very particular -- next slide, please -- about using "distinct" when it's talking about just different wafers, but then it uses the word "discrete" to define a wafer as something that's not connected to other ones.

So, you know, I hope the Court was invoking this, that's what we think.  Again, the Court knows what it was doing, but we do think that going back to these magnets, they are physically distinct in the sense that you can identify one, you can identify the dead zone and you can identify another one.  They are not discrete in the sense that they

85

are not physically separate from each other.

But if the Court disagrees with everything I just said, to me, this is a pretty easy Doctrine of Equivalents case.  I never like to say a case is easy, but the test for Doctrine of Equivalents is whether there are insubstantial differences between the literal claim language and the way the product -- whatever the difference is in the product, whether that's insubstantial.

The Supreme Court and the Federal Circuit have applied two different levels of generality for that test.  One is the high level that I just said.  The other is the function-way-result test.  Is it insubstantially different -- does it perform substantially the same function in substantially the form way to achieve substantially the same result.  And the kind of incredible thing about this case is I don't think Apple has actually disputed that.

I haven't heard anything where Apple has explained why the two magnets being on the same piece of metal versus separate makes any difference whatsoever for anything.  I mean, I don't even know what to respond to because I don't think they have actually made that argument.

They said two things.  One, they have said, well, that vitiates a claim limitation if that's true.  In my experience, Judge, this is what defendants say all the time with a Doctrine of Equivalents.  They cite this general

86

language from the Federal Circuit that says the application of that doctrine can't vitiate a claim limitation.

But as the Federal Circuit has said many times -- can we go to that case, *Deere*.  The Federal Circuit has said many times that is essentially a truism.  It means that you have to carefully apply the doctrine, because if you apply it to a limitation that's not equivalent, then you would be vitiating it.

It doesn't mean that you can't substitute the equivalent thing for the claim.  That's the whole point of the doctrine.  There would be no doctrine if you couldn't do that.  Every time you apply the doctrine, you're not literally practicing one of the limitations.  That's the whole point.

The other way I've seen vitiation used -- although Apple doesn't cite these cases -- is sometimes doing the doctrine will make some other limitation pointless, and that can vitiate that; but that's not at issue here.

So the only other thing Apple says -- and we can go to the next slide and I'll end on this -- is that Dr. Oliver's report on Doctrine of Equivalents should be struck.

And if we go to their -- this was the motion they made on this point.  They said that the only thing we did was show photos of a deconstructed taptic engine with a single

87

magnet.  In other words, we showed photos of where we think the infringement is.  It's that block of metal.  They call it a single magnet.  We call it two magnets stuck together.  But we showed a photo.

Their objection was that we did not explain how it could infringe, but this is the point that the Federal Circuit reversed on.  The Federal Circuit said we didn't have to show how.  We only had to show where.  And so that's, as far as I could tell, their only argument for why his report on this should be struck.

So in summary, we think this literally infringes because these two magnetic regions are two different magnets that are distinct, even if not discrete, meaning separate. But even if you don't agree with that, Apple really has no argument under the Doctrine of Equivalents that at least the jury should get to decide whether the thing that's stuck together is the equivalent of the plurality that's separate.

Thank you.

THE COURT:  Okay.  Thank you.

MR. DENNING:  Your Honor, Mr. Sproul will address this issue.

THE COURT:  Okay.

MR. SPROUL:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

MR. SPROUL:  I will be relatively brief here to save

88

Mr. Bash's marriage.  I'll wait until we have our slides up here.  You have our deck in front of you, and I guess I can refer to that.

If you can go to Slide 99.  This goes back to the Court's construction.

The issue for infringement here is one both under literal infringement and under infringement under the Doctrine of Equivalents that this Court has already addressed.

This issue of one versus two magnets was central to the claim construction dispute, and not only do we believe this Court knew what it was doing when it construed the claims as it did, but Taction itself knew exactly what we were disputing and the issue that it lost.

Slide 100, please, the next slide.

Taction's contentions clearly showed a single magnet as satisfying the plurality of magnets limitation.  Now, this impacts a subset of the accused products in this case.  Some products do have two separate, physically distinct magnets.

There was a subset of products we call the monolithic accused products or the monolithic products that have a single magnet with special magnetic properties, multiple magnetic domains, if you will, as they have explained it.

This issue was known before claim construction.

89

It's why the dispute was brought to the Court, and it's exactly what we understood the issue to be when the Court was construing the claim.

So if we can go to the next slide.

Apple anticipated some flavor of what Taction would ultimately argue, that the two equals one here. And, again, this is the dispute that was brought to the Court.

Slide 102, please. That's the issue that this Court then addressed. Taction's contention that the claimed magnets can be subsidiary pieces of material on a single body is not supported by the claim language.

I'm doing these lines out of order, but the claim language, this is what your order wrote and what you found, your Honor. "The claim language supports Apple's contention that the claimed 'magnets' must be separate, physically distinct bodies."

I appreciate Taction's counsel's explication of the differences between distinct and discrete. That's not what we understood these words to mean. Again, your Honor is the one who wrote them. But the parties understood what the dispute was, physically separate pieces of material. That was the dispute. That is what you ruled on.

And the result of that is a clear noninfringement for the monolithic products. Those products with a single magnet can't infringe a claim that requires a plurality of

90

magnets under this Court's construction.

Taction, of course, pivots to the Doctrine of Equivalents, but for the very same reasons that literal infringement can't apply, the Doctrine of Equivalents can't apply, either.  Two versus one, two is not one.  The claim specifically requires two magnets, two or more magnets.  It does not allow for one.

This is -- contrary to what counsel asserted, this is actually a very straightforward vitiation application.  If they are allowed to assert DOE, and say that a single body satisfies the plurality of magnets limitation, it would destroy or obliterate the claim language requiring a plurality of magnets.

It would, furthermore, countermand your Honor's clear ruling in the claim construction order on this issue. It would vitiate what your Honor ordered as the meaning of a plurality of magnets.

And so as easy as it is for Taction to assert that it's -- surely you can find two equals one or one equals two in this case, doing so would destroy a very clear and concise claim limitation that the public has a right to rely on.

But this Court -- your Honor, this Court has already resolved that issue, and I think summary judgment is appropriate, both for literal infringement and under the Doctrine of Equivalents.

91

I will briefly address the motion-to-strike issue.

We stand on our papers on the literal -- the striking of the literal infringement, the disclosure of that theory in their contentions.

With respect to the disclosure and their contentions of the Doctrine of Equivalents theory, I will note -- if your Honor could turn to Slide 111. If we can go to Slide 111, please.

The sum total of the disclosure of the insubstantial differences theory, referenced by counsel, in Taction's amended contentions is one sentence. It is perfunctory. It is conclusory. It provides no detail or analysis. The difference between the claimed "a plurality of magnets" and the configurations of magnets in the accused products is insubstantial, period. That's it.

Dr. Oliver then in his report goes into a significant amount of detail on insubstantial differences. None of that is disclosed in his -- excuse me, in Taction's contentions.

Taction provides slightly more detail on the function-way-result analysis in its contentions. Again, Dr. Oliver doesn't use the same theory provided in the contentions for his DOE analysis. He focuses on the magnetic domains, a phrase, a concept, an understanding not contained in their contentions at all.

92

At the very least, we understand that this is somewhat of an uphill battle, given the Court -- the Federal Circuit's ruling on the disclosure requirement from the patent local rules.  We think Taction hasn't satisfied its obligations even under the Federal Circuit's ruling.

But if your Honor is going to allow them to proceed under a DOE theory, we would ask that your Honor allow us some very limited discovery going forward on these magnetic domain issues, if we're going to do discovery in this case.  Again, we think these -- Dr. Oliver's theories are properly struck.

Your Honor doesn't even need to get there.  Unlike the last go-around for the literal infringement question, where the noninfringement argument relied on the striking of Dr. Oliver's new theory, your Honor can find no literal infringement and no infringement under the Doctrine of Equivalents, regardless of whether or not you grant the motion to strike; so those are unrelated issues.

And with that, your Honor, I'll sit down.

THE COURT:  Okay.  Thank you.

MR. BASH:  Thank you, your Honor.  Three very brief rebuttal points.

One, even if the vitiation idea had more legs than it actually has under Federal Circuit law, this doesn't render plurality of magnets a pointless limitation.  If there

93

was a single magnet with a north and a south, that is not covered under either equivalents or literal infringement.

The problem here is it's essentially a plurality of magnets, even if you disagree with us on distinct, because you have a north and a south here, you have a dead zone, and then you have a north and a south here. So it's almost as if they were just sliced together -- spliced together.

That doesn't vitiate it, because the limitation would still have force if you were actually just talking about one magnet with a north and a south. So they are wrong about that.

On Dr. Oliver's report, I think my friend basically admitted it, but his argument is a "how" argument, that there was not enough explanation about a Doctrine of Equivalents. That's what the Federal Circuit has now said is not required. I didn't hear a dispute that we identified where. Of course, we did. We submitted a photo of the magnet that we say satisfies the limitation.

The last point is this discovery request. I think that's new. I'm not sure if that was new from the podium or somehow relates to the other discovery requests they are asking for, but either way, this is way too late for more discovery into these theories. I don't know of any basis for the Court to grant that request.

So with that, I'll sit down. Thank you.

94

THE COURT:  Okay.  Thank you very much.

All right.  As has been true throughout these proceedings in this case, I very much appreciate all of the written submissions by the parties and your comments here today.  It's a pleasure to have such forceful advocacy on both sides.

So thank you very much.  I will take this matter under submission and issue a written order in due course.

Have a nice flight back to Texas, or wherever the rest of you are from; that was not covered.

But have a good evening.  Thank you.

MR. DENNING:  Thank you, your Honor.

(Proceedings concluded at 3:58 p.m.)

--oOo--

C E R T I F I C A T I O N

I hereby certify that I am a duly appointed, qualified and acting official court reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the aforementioned cause; that said transcript is a true and correct transcription of my stenographic notes; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.

DATED:  November 26, 2025, at San Diego, California.

S/CAMERON P. KIRCHER
CAMERON P. KIRCHER

COMPUTER-AIDED TRANSCRIPTION