Roger A. Denning (SBN 228998)
denning@fr.com
Christopher S. Marchese (SBN 170239)
marchese@fr.com
Seth M. Sproul (SBN 217711)
sproul@fr.com
John W. Thornburgh (SBN 154627)
thornburgh@fr.com
Ryan P. O'Connor (SBN 253596)
oconnor@fr.com
Joy B. Kete (SBN 355859)
kete@fr.com
Tyler R. Train (SBN 318998)
train@fr.com
Madelyn S. McCormick (SBN 320063)
mmccormick@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070 / Fax: (858) 678-5099

*Additional Counsel listed on Signature Page*

Attorneys for Defendant Apple Inc.

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

TACTION TECHNOLOGY, INC.,

Plaintiff,

v.

APPLE INC.,

Defendant.

Case No. 3:21-cv-00812-TWR-JLB

**DEFENDANT APPLE INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL (FED. R. CIV. P. 50(b), 59)**

**PUBLIC VERSION**

District Judge: Hon. Todd W. Robinson
Magistrate Judge: Jill L. Burkhardt

# NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that pursuant to the Court's September 29, 2026 Order Regarding Motions for Judgment as a Matter of Law (Dkt. 718), Defendant Apple Inc. will and hereby does move under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law that Apple does not infringe the asserted claims, that Apple has proved the asserted claims are invalid, and that Plaintiff Taction Technology, Inc. is entitled to no damages and, in the alternative and conditionally under Rules 50(c)(1) and 59, for a new trial on damages, validity, and infringement.

This motion is based on this notice of motion, the accompanying memorandum of points and authorities, the trial record, the pleadings and papers on file in this action, and such further argument as the Court may permit.

# TABLE OF CONTENTS

**Page(s)**


I. INTRODUCTION ........ 1
II. BACKGROUND ........ 3
A. Taction's Damages Case Is Excluded Pretrial. ........ 3
B. Taction Presents No Quantitative Evidence Of Damages And Tells The Jurors That Damages Are "Up To You." ........ 4
C. Taction Fails To Present Substantial Evidence Of Infringement. ........ 6
D. Apple Shows The Asserted Patents Are Invalid. ........ 8
E. After The Court Takes Apple's 50(a) Motions Under Submission, The Jury Finds Liability And Awards $5.7 Billion In Damages. ........ 8
III. LEGAL STANDARDS ........ 9
IV. ARGUMENT ........ 10
A. The Court Should Grant JMOL Of No Damages. ........ 10
1. No evidence supports a $5.7 billion award. ........ 10
2. Taction failed to present evidence from which the jury could determine an apportioned damages award. ........ 13
B. The Court Should Grant JMOL Of No Infringement For All Products Because Dr. Oliver's Testing Method Is Legally Deficient. ........ 19
1. Dr. Oliver did not measure "the output of the transducer." ........ 21
2. Dr. Oliver rigged his test by varying the input voltage amplitude at each frequency to produce the desired output. ........ 22
3. Dr. Oliver's ±10 dB range reads "substantially uniform or flat" out of the Court's construction. ........ 25
C. The Court Should Grant JMOL Of Invalidity Because Taction's Infringement Theory Renders The Asserted Claims Invalid. ........ 26
1. Accepting Dr. Oliver's test renders the claims indefinite. ........ 27
2. The asserted claims fail the written description requirement. ........ 29
3. The asserted claims fail the enablement requirement. ........ 31
D. The Court Also Should Grant JMOL Of No Infringement For Both Single-Magnet Products And Untested Products. ........ 34
1. The disclosure-dedication rule bars Taction's DOE theory for single-magnet products as a matter of law. ........ 34

2. Taction failed to present substantial evidence of infringement for any untested accused products. ....................35

E. Alternatively, The Court Should Order A New Trial. ....................36

1. The damages award is against the clear weight of the evidence. ....................37

2. The infringement and validity verdicts are against the clear weight of the evidence. ....................38

3. If the Court grants JMOL on any subset of products, a new trial on damages is required. ....................39

4. Any new trial must include infringement and invalidity. ....................39

V. CONCLUSION ....................40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*01 Communique Lab'y, Inc. v. Citrix Sys., Inc.*,
889 F.3d 735 (Fed. Cir. 2018) ... 26

*Abbott Lab'ys v. Sandoz, Inc.*,
566 F.3d 1282 (Fed. Cir. 2009) ... 35

*AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.,*
*759 F.3d 1285, 1299-300 (Fed. Cir. 2014)* ... 33

*Amgen Inc. v. Sanofi*,
598 U.S. 594 (2023) ... 31, 33

*Amgen Inc. v. Sanofi, Aventisub LLC*,
987 F.3d 1080 (Fed. Cir. 2021), *aff'd*, 598 U.S. 594 (2023) ... 31, 32, 33

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ... 14

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc) ... 30, 31

*Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*,
501 F.3d 1274 (Fed. Cir. 2007) ... 33

*Brita LP v. Int'l Trade Comm'n*,
156 F.4th 1326 (Fed. Cir. 2025) ... 31

*In re California Expanded Metal Prods. Co.*,
No. 2023-1140, 2024 WL 1190943 (Fed. Cir. Mar. 20, 2024) ... 37

*Castro v. Cnty. of Los Angeles*,
833 F.3d 1060 (9th Cir. 2016) (en banc) ... 9

*Chiron Corp. v. Genentech, Inc.*,
363 F.3d 1247 (Fed. Cir. 2004) ... 32

*Cordis Corp. v. Bos. Sci. Corp.*,
658 F.3d 1347 (Fed. Cir. 2011) ... 20, 21, 25

*Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*,
803 F.3d 620 (Fed. Cir. 2015) ... 27, 29

*Dupree v. Younger*,
598 U.S. 729 (2023) ... 29

*EcoFactor, Inc. v. Google LLC*,
137 F.4th 1333 (Fed. Cir. 2025) (en banc)........ 15

*Eli Lilly & Co. v. Hospira, Inc.*,
933 F.3d 1320 (Fed. Cir. 2019)........ 35

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014)........ 17, 18, 19

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018)........ 18

*Finesse Wireless LLC v. AT&T Mobility LLC*,
156 F.4th 1221 (Fed. Cir. 2025)........ 21, 26

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018)........ 13

*FMC Corp. v. Sharda USA, LLC*,
145 F.4th 1326 (Fed. Cir. 2025)........ 26

*Fundamental Innovation Sys. Int'l LLC v. Anker Innovations Ltd.*,
No. 21-339-RGA, 2026 WL 2923930 (D. Del. Sept. 29, 2026)........ 2, 10, 16, 40

*G+ Commc'ns, LLC v. Samsung Elecs. Co.*,
No. 2:22-cv-00078-JRG, 2024 WL 896343 (E.D. Tex. Mar. 1, 2024)........ 38

*Garretson v. Clark*,
111 U.S. 120 (1884)........ 13

*Gasoline Prods. Co. v. Champlin Ref. Co.*,
283 U.S. 494 (1931)........ 39

*Gray v. Hudson*,
28 F.4th 87 (9th Cir. 2022)........ 29

*Jiaxing Super Lighting Electric Appliance, Co., Ltd. v. CH Lighting Technology Co., Ltd.*,
146 F.4th 1098 (Fed. Cir. 2025)........ 14

*Johns Hopkins Univ. v. Datascope Corp.*,
543 F.3d 1342 (Fed. Cir. 2008)........ 21, 26

*Johnson & Johnston Associates Inc. v. R.E. Serv. Co., Inc.*,
285 F.3d 1046 (Fed. Cir. 2002) (en banc)........ 35

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
10 F.4th 1330 (Fed. Cir. 2021)........ 31

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997)........ 30, 31

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) .......... 10, 11, 18, 38

*MLC Intell. Prop., LLC v. Micron Tech., Inc.*,
10 F.4th 1358 (Fed. Cir. 2021) .......... 14

*MobileMedia Ideas LLC v. Apple Inc.*,
780 F.3d 1159 (Fed. Cir. 2015) .......... 28

*Molski v. M.J. Cable, Inc.*,
481 F.3d 724 (9th Cir. 2007) .......... 9

*Morris v. W. Hayden Estates First Addition Homeowners Ass'n, Inc.*,
104 F.4th 1128 (9th Cir. 2024) .......... 9, 14, 37

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) .......... 27, 29

*NTP, Inc. v. Rsch. in Motion, Ltd.*,
418 F.3d 1282 (Fed. Cir. 2005) .......... 39

*Oiness v. Walgreen Co.*,
88 F.3d 1025 (Fed. Cir. 1996) .......... 11

*Open Text S.A. v. Box, Inc.*,
No. 13-CV-04910-JD, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015) .......... 16

*Pantech Corporation v. OnePlus Technology (Shenzhen) Co., Ltd.*,
2024 WL 5510402 (E.D. Tex. 2024) .......... 36

*Peralta v. Dillard*,
744 F.3d 1076 (9th Cir. 2014) (en banc) .......... 29

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*,
315 F.3d 1335 (Fed. Cir. 2003) .......... 32

*Promega Corp. v. Life Techs. Corp.*,
875 F.3d 651 (Fed. Cir. 2017) .......... 37

*Provisur Techs., Inc. v. Weber, Inc.*,
119 F.4th 948 (Fed. Cir. 2024) .......... 17

*Rearden, LLC v. Walt Disney Pictures*,
152 F.4th 1058 (9th Cir. 2025) .......... 9

*Rex Med., L.P. v. Intuitive Surgical, Inc.*,
156 F.4th 1289 (Fed. Cir. 2025) .......... *passim*

*Rivera v. Int'l Trade Comm'n*,
857 F.3d 1315 (Fed. Cir. 2017) .......... 30

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
No. 2023-1218, 2026 WL 122544 (Fed. Cir. Jan. 16, 2026) .......... 14

*Taction Tech., Inc. v. Apple Inc.*,
No. 2023-2349, 2025 WL 2336950 (Fed. Cir. Aug. 13, 2025) .......... 34

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) .......... 1, 10, 13

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015) .......... 27

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) .......... 27, 29

*Toro Co. v. White Consolidated Indus., Inc.*,
383 F.3d 1326 (Fed. Cir. 2004) .......... 35

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) .......... 18

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) .......... 39

*VirnetX, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) .......... 13, 18

*In re Wands*,
858 F.2d 731 (Fed. Cir. 1988) .......... 31, 32, 33

*Weisgram v. Marley Co.*,
528 U.S. 440 (2000) .......... 37, 39

**Statutes**

35 U.S.C. § 112 .......... 2, 31, 40

**Other Authorities**

Fed. R. Civ. P. 50 .......... 9, 37, 40

Fed. R. Civ. P. 59 .......... 9, 37

Fed. R. Evid. 702 .......... 11, 38

Fed. R. Evid. 403 .......... 11

# I. INTRODUCTION

The jury's award of $5.7 billion in damages—the largest patent verdict in history, by more than $3 billion—is untethered to any evidence at all. It is [redacted] higher than the measure of damages Taction itself had proposed pretrial. An award of that size, moored to nothing, shows that Taction left the jury with no choice but to engage in impermissible guesswork on a massive scale.

The evidence was legally insufficient to support a damages award of any size. Before trial, this Court struck the opinions of Taction's damages expert for failing to properly apportion the royalty rate from Taction's one prior license agreement. The Court also denied Taction's attempt to replace its apportionment analysis on the eve of trial. At trial, the Court excluded Taction's damages expert entirely, kept out of evidence the financial terms of Taction's prior license, and sustained objections to Taction's repeated attempts to violate the pretrial rulings excluding this evidence.

That left no evidence to support ***any*** award of damages, let alone evidence to support the jury's drastic award. Taction told the jury it was "just looking for a reasonable royalty for its contribution," Tr. 1318:17-20, but never offered evidence of what that contribution was worth. Instead, it asked the jury to "award a reasonable royalty that y'all think is appropriate." Tr. 1328:12-13. Taction failed to meet its burden to present evidence that would allow the jury to "adequately tie a dollar amount to the infringing acts"—that is, to apportion any royalty to the marginal contribution of Taction's claimed invention, not reward Taction for the value of preexisting technology or Apple's own inventions. *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020). Without any such evidence, the jury was left to speculate, contrary to the Court's instructions and binding Federal Circuit case law.

Because Taction failed to meet its burden, judgment as a matter of law of no damages is warranted. *Rex Med., L.P. v. Intuitive Surgical, Inc.*, 156 F.4th 1289, 1299 (Fed. Cir. 2025) (Section 284 "does not require an award of damages if none are proven," and, before a court awards damages, "[t]here must at the least be enough

evidence in the record to allow the factfinder to formulate a royalty."); *Fundamental Innovation Sys. Int'l LLC v. Anker Innovations Ltd.*, No. 21-339-RGA, 2026 WL 2923930, at *8-13 (D. Del. Sept. 29, 2026) (granting JMOL of no damages).

Although the jury's damages verdict is particularly shocking, Taction's failure of proof was not limited to damages. Apple is also entitled to judgment as a matter of law of no infringement. Apple's Taptic Engine—the component of iPhones and Watches that was central to Taction's infringement theory—is fundamentally different from Taction's technology. Taction's patents require that "the output of the transducer is highly damped (*i.e.*, the output is substantially uniform or flat over the normal operating frequency range of the device)," while Apple's Taptic Engines rely on a resonance peak and do not have a uniform or flat frequency response.

No reasonable juror could find that "the output of the transducer is highly damped" in the accused products, as required by the Court's construction. Rather than assess highly damped output by using the test in the patent, Taction's infringement theory rested on a legally erroneous test rigged by Dr. Oliver for this case. The only evidence of the transducer's actual output, including Taction's pre-filing and infringement contentions testing, was introduced by Apple and those tests showed a peaked response that Dr. Oliver conceded was not highly damped.

Taction's reliance on Dr. Oliver's result-oriented test also created multiple fatal problems for patent validity under 35 U.S.C. § 112, and Apple is entitled to judgment as a matter of law that Taction's patents are invalid. First, because the patents already disclosed a test to determine highly damped output, Taction's use of a new test meant that two tests exist for assessing whether the highly damped output requirement is met. As the record indisputably showed, these tests produced opposite results—making it impossible to determine claim scope and thus rendering the claims indefinite. Second, Taction's infringement test measured the output of Apple's sophisticated position-based closed-loop controller. But nothing in the specification describes or enables such a controller: the patents do not discuss closed-loop

controllers at all, let alone how to make or use one; and a skilled artisan's background knowledge cannot supply what the patent itself lacks. The patents therefore lack written description and are not enabled.

Finally, Taction's proof failed in other ways as to two subsets of accused products. First, Taction relied on the doctrine of equivalents for products with a single magnet, but the disclosure-dedication rule bars it from relying on equivalents for the relevant limitation. Second, Taction failed to test most accused iPhones or any Apple Watches, and it did not offer substantial evidence that the untested products would produce similar output as the tested products.

If the Court does not grant Apple judgment as a matter of law on liability, then the Court should at least grant a new trial on all issues other than willfulness.

## II. BACKGROUND

### A. Taction's Damages Case Is Excluded Pretrial.

Taction's only disclosed damages theory prior to trial was that it could derive a reasonable royalty from its license with Corsair, a headphone manufacturer. *See* Dkt. 293-14. The Corsair license covered at least two distinct sets of patents: (1) the asserted patents (and two unasserted parent patents with different scope); and (2) the '139 patent, which claims a "notch filter." TX962 at Schedule A; TX2046; Tr. 522:14-523:14. In addition to compensating Taction for its patent rights, the Corsair license also compensated Taction for physical "Transporter" units, drive electronics, accompanying firmware and software, and engineering support. TX961; Tr. 261:17-19, 660:6-21, 662:6-11; 663:16-20, 664:16-24; TX1684 (Syed at 226:7-16, 226:23-227:5). Mr. Steinberg, Taction's CEO, agreed that the Corsair agreement covered mostly technology, not patents. Tr. 655:12-15, 660:18-21, 662:14-17, 666:25-667:9.

For Taction to rely on the Corsair license as a basis for damages, therefore, it needed to perform at least two apportionment steps. Dkt. 298-2 (Oliver Corr. Rpt.) ¶¶ 1233-1245; Dkt. 293-14 (Kennedy Amd. Rpt.) ¶ 305, Am. Sched. 1.4. First, Taction needed to account for the relative value of the asserted patents versus the other

technology contained within the license. Second, Taction had to account for the value of the asserted patents versus Apple's technology within the accused products. Taction relied on its technical expert, Dr. Oliver, to do that analysis. The Court excluded Taction's apportionment evidence as unreliable because Dr. Oliver relied on Dr. Biggs's undisclosed testing. Dkt. 545 at 28-30 (citing Rule 702 and *Daubert*). The Court then excluded the reasonable-royalty opinions of Taction's damages expert, Dr. Kennedy, which rested on that undisclosed and untestable technological apportionment. *Id.* That ruling excluded Taction's only timely damages theory.

The Court then properly refused Taction's request to substitute new testing by Dr. Oliver two weeks before trial, holding that the supplement was "neither substantially justified nor harmless," and denied Taction's alternative request to bifurcate liability and damages. Dkt. 599 at 13-14.

### B. Taction Presents No Quantitative Evidence Of Damages And Tells The Jurors That Damages Are "Up To You."

At trial, Taction persisted with its flawed Corsair theory by proposing to have Dr. Kennedy present his framework with blanks for the jury to fill in. Tr. 440:11-441:7; Dkt. 625-2 at 70. The Court analyzed Dr. Kennedy's proposed testimony under the Federal Circuit's comparable-licenses caselaw and held that reliance on the Corsair license required apportionment. Tr. 458:6-460:25. Taction proposed to ask "the jury to, in effect, perform what is otherwise properly a 702 expert determination of apportionment." Tr. 460:19-25. The Court was "unaware of any legal authority" permitting that line of testimony, and excluded Dr. Kennedy entirely. Tr. 458:6-463:3.

Taction still tried to elicit testimony about the relative value of the asserted patents within the Corsair license. Apple consistently objected, and the Court sustained those objections, striking Dr. Biggs's volunteered "two-thirds" apportionment along with other attempts to introduce testimony about the relative value of the asserted patents versus the notch filter patent, Tr. 269:7-271:24 (sustaining objection to "two-thirds"), 278:16-22 (striking the "answer regarding two-

thirds"), and improper lay testimony about the scope of Taction's patents, Tr. 666:7-20, 668:11-19. Taction also repeatedly tried to introduce the rates included in the Corsair license, which the Court also excluded. Tr. 554:20-24, 556:20-24, 655:20-24, 657:20-22. As a result, the jury never saw any royalty rate from the Corsair license.

Taction also introduced evidence about the costs of ferrofluid, a component in the Transporter product Taction licensed to Corsair, as well as the cost of Apple's Taptic Engine. *See* Dkt. 658. Taction never tied those costs to the value of the asserted patents, and the Court either excluded Taction's efforts to tie a reasonable royalty to those costs or Taction disclaimed that theory on its own. *See* Tr. 1321:22-1325:17 (excluding ferrofluid argument); Dkt. 679 at 2 and Tr. 1326:6-18 (Taction agreeing it would not argue cost of Taptic Engine); *see also* Tr. 752:3-766:21, 784:1-786:16.

Besides the unapportioned Corsair and material cost evidence, Taction presented generic unquantified evidence about the value of haptics to Apple—for example, that Apple promoted "haptic effects" in marketing materials and that customers "loved Haptic Touch." TX1685 (Sweet at 56:19-109:23, 123:21-126:1). None of that evidence was specific to features purportedly enabled by Taction's patents. And Apple had invested in haptics long before Dr. Biggs's patents; Apple used haptics in the original Apple Watch and the trackpad of early MacBooks, Tr. 756:16-757:25, and Apple and its suppliers obtained several patents on haptics, *see* TX2028, 2030, 2010, 2896, 2034, 3939, and 2022. It was undisputed that Dr. Biggs did not invent haptics, linear resonant actuators, the use of ferrofluid for damping, or the use of ferrofluid in haptics generally. Tr. 606:8-607:4; *see also* Tr. 864:14-882:18 (Mr. Slutzky describing development of prior art haptic motors for Apple Watch, including patents on haptic motors). Taction also told the jury that other headphone manufacturers had at least discussed licensing Taction's technology, though the testimony was not specific to the asserted patents, and Taction had not actually signed any additional licenses. Tr. 672:24-673:4.

By the close of evidence, Taction had no damages expert, no admissible royalty

rate, no apportionment figures, and no damages number. The Court acknowledged Taction's lack of damages evidence during closing arguments. When Taction attempted to argue damages based on the material cost of ferrofluid it sold to Corsair, the Court correctly ruled in a sidebar that this number "had nothing to do with the technology" at issue and was not "a proper basis upon which to tether a damages award." Tr. 1321:22-1324:24. The Court then granted Apple's motion to strike the portion of Taction's closing argument "about the cost of ferrofluid in the Corsair headsets" and instructed the jury to "disregard" it. Tr. 1324:25-1325:17. Shortly thereafter, when Taction displayed a slide containing the cost of a Taptic Engine, Apple objected before Taction's counsel referred to the number on the record, and Taction's counsel acknowledged that he was "not going to do anything with that." Tr. 1326:6-18. Taction concluded its closing argument without referring to any dollar figure or even attempting to quantify damages. Tr. 1326:20-1328:15. Instead, Taction told the jury the reasonable royalty "is going to be up to you, ladies and gentlemen, based on all the evidence you've heard," and asked the jury to "award a reasonable royalty that y'all think is appropriate." Tr. 1327:15-20, 1328:7-13.

**C. Taction Fails To Present Substantial Evidence Of Infringement.**

Taction accused more than 50 models of iPhones and Watches of infringing three claims. All claims require (1) "the output of the transducer is highly damped (*i.e.*, the output is substantially uniform or flat over the normal operating frequency range of the device)," and (2) "at least two physically distinct magnets." *See* Dkt. 141 at 28-29; Dkt. 437 at 9.

As to the first requirement, Taction failed to present any evidence at trial that the Taptic Engine is highly damped. Indeed, both Dr. Biggs's initial testing and Taction's infringement contentions—as well as Apple's internal testing—showed that the accused products were not highly damped. TX3805A; TX3529; Tr. 336:19-22.

The trial evidence showed that Apple's Taptic Engines are linear resonant actuators (or transducers) that exhibit a strong resonance response around the

frequency of 120-130 Hz. Tr. 786:25-787:3, 788:13-16; 804:14-18; 806:17-24. Although Apple allows for many types of vibrations, most of Apple's haptics vibrations occur around the resonance frequency because it takes less power to move the movable mass at or near that frequency. Tr. 744:15-22; 747:3-10. Apple's haptics technology in its iPhones and Watches can provide unique vibrations, such as micro-taps and mini-taps. Tr. 753:16-754:18; 816:19-817:5. These unique vibrations require specific waveforms—patterns of movement for the movable mass in Apple's Taptic Engines. Tr. 753:2-7, 754:4-11, 795:22-796:2, 1056:20-1057:17. Because Apple's Taptic Engines are highly resonant, Apple uses a sophisticated closed-loop controller (CLC) to track the position of the movable mass and adjust the input voltage as necessary—[redacted]. Tr. 795:13-17; 796:18-21; 797:13-19. To properly tune the electronics of the closed-loop controller to the hardware, [redacted], which it uses as an input to the CLC. Tr. 794:24-795:17; 796:3-17; TX2168; Tr. 802:5-15; 812:12-13; 1078-1079.

To mask the differences between the Taptic Engine and the patents, Taction discarded a conventional method of measuring damping (as described in the patents) and instead relied on a never-before-seen test for measuring output, devised by its expert specifically for this case—a test that the expert had never done before, and that he readily admitted he had never seen in any textbook or publication. Tr. 578:12-579:13. That test did not perform the traditionally accepted measure of damping as a function of frequency but instead measured whether Apple's closed-loop controller could alter the input supplied to the Taptic Engine to output a fixed intensity.

As to the second requirement, the Court found no literal infringement of the magnet limitation for the majority of accused products, which use a "monolithic magnet." Dkt. 437 at 24-25. Taction therefore relied on the doctrine of equivalents. Tr. 407:11-21. But the asserted patents themselves and their priority application

disclose (but do not claim) an embodiment with a single magnet. Given that disclosure of an unclaimed single magnet embodiment, the disclosure-dedication doctrine legally precludes infringement under the doctrine of equivalents. Taction also did not test most of the accused iPhone models and tested none of the accused Watch models.

**D. Apple Shows The Asserted Patents Are Invalid.**

Taction's infringement theory at trial required that the jury accept two premises: (1) that Dr. Oliver's made-for-litigation test was a valid measure of damping; and (2) that the asserted claims cover the use of a closed-loop controller to produce a "highly damped output." Accepting either premise renders the claims invalid. Dr. Oliver's competing test for highly damped output produces much different results from the conventional approach, so accepting it as valid would leave a skilled artisan unable to determine the scope of the claims. Tr. 994:9-18. Similarly, every witness, including the inventor, agreed that the specification does not describe a closed-loop controller or give any guidance on how to make or use one, while unrebutted testimony showed that Apple's team of highly qualified engineers spent years developing its controller. Tr. 343:24-344:10, 344:18-20 (Biggs); Tr. 1265:2-12 (Okamura); Tr. 1085:17-22, 1093:1-9 (Zinn); Tr. 817:14-25 (Lee).

**E. After The Court Takes Apple's 50(a) Motions Under Submission, The Jury Finds Liability And Awards $5.7 Billion In Damages.**

Before the close of evidence, Apple moved for judgment as a matter of law on infringement, willfulness, damages, and invalidity. Tr. 731:10-11, 1286:11-14; Dkt. 657, 686. The Court took the motion under submission and submitted the case to the jury. Tr. 689:24-690:1, 1286:16-1287:5. The jury found infringement, rejected Apple's invalidity defenses, found no willfulness, and awarded $5,721,961,750. Dkt. 707 at 2-5. Before the award was read, the Court called counsel to sidebar and observed that it was "not sure that the figure that appears on the verdict form is what the jury meant to convey." Tr. 1400:8-11. The Court has not yet entered judgment on the verdict but has ordered the parties to file Rule 50(b)/59 motions. Dkt. 718.

**III. LEGAL STANDARDS**

A party may renew its motion for judgment as a matter of law after trial and "may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). A court may grant judgment as a matter of law where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Rearden, LLC v. Walt Disney Pictures*, 152 F.4th 1058, 1066 (9th Cir. 2025) (quoting Fed. R. Civ. P. 50(a)(1)). Judgment as a matter of law is proper "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc). If the Court grants the renewed motion, it "must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c)(1).

The Court may grant a new trial "on all or some of the issues." Fed. R. Civ. P. 59(a)(1). A new trial is warranted if "the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007). "On a Rule 59 motion for a new trial, unlike on a JMOL motion, the trial court may weigh the evidence and assess the credibility of witnesses and is not required to view the evidence in the light most favorable to the verdict." *Morris v. W. Hayden Estates First Addition Homeowners Ass'n, Inc.*, 104 F.4th 1128, 1152 (9th Cir. 2024). The Court has "the duty . . . to weigh the evidence as the court saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in the court's conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Molski*, 481 F.3d at 729 (cleaned up). Traditional grounds for granting a new trial include the trial court's determination "that the verdict is against the weight of the evidence" and "that the damages are excessive." *Molski*, 481 F.3d at 729.

## IV. ARGUMENT

### A. The Court Should Grant JMOL Of No Damages.

Taction bore the burden to prove, by a preponderance of the evidence, both (1) the amount of damages and (2) apportionment. *Rex,* 156 F.4th at 1298-1301. Taction never came forward with sufficient evidence of either. Where the record contains no reliable evidence of an apportioned damages number, a judgment of no damages is proper. *Id.* at 1298-1301 (affirming JMOL of no damages where plaintiff lacked evidence of apportionment); *TecSec*, 978 F.3d at 1291 (§ 284 "does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts."); *Fundamental*, 2026 WL 2923930, at *8-13.

#### 1. No evidence supports a $5.7 billion award.

The jury's award of $5.7 billion has absolutely no basis in the record. The sheer size of the award, which dwarfs any ask from Taction's own experts, conclusively illustrates that the jury engaged in evidence-free speculation. A damages award must be vacated where it is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310 (Fed. Cir. 2009). Each is true of the award here, and each provides an independent reason the award must be vacated.

The jury was instructed that Taction had to prove damages with reasonable certainty, that it could not award damages "based on guesswork," and that any award must be "based only on the value of the patented features." Final Jury Instr. Nos. 25, 31. The verdict shows that the jury did not heed the Court's instructions—because Taction did not give them the evidence needed to do anything *but* guess. While it is entirely unclear how the jury could have calculated the number it did from any evidence it received, if viewed as a per-unit royalty, the rate is around $[redacted], more than [redacted] Taction's pretrial demand and more than [redacted] the cost of Apple's Taptic Engine. That amount is "grossly excessive." *Lucent*, 580 F.3d at 1310. Taction introduced no evidence from which the jury could have arrived at that enormous

number. Whatever argument Taction could make about the value of haptics generally, *e.g.*, Tr. 1315:8-18, the jury had *nothing* showing that Taction's asserted patents contributed so much value that Apple would have agreed to pay billions of dollars and several times more than the entire cost of its haptics modules for a license to two patents. *Lucent*, 580 F.3d at 1335-36 (vacating damages where "[t]he evidence does not sustain a finding that, at the time of infringement, Microsoft and Lucent would have agreed to a lump-sum royalty payment subsequently amounting to approximately 8% of Microsoft's revenues for the sale of Outlook.").

The award is also clearly unsupported by the evidence and based only on speculation and guesswork. *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1030 (Fed. Cir. 1996). No witness quantified the value of the asserted patents to Apple (or any other potential licensee). That evidentiary failure was a problem of Taction's own making. Taction attempted a theory that turned on "non-disclosed testing and unrecorded conversations" between an expert and a lay witness to tease out the alleged value of the patents from a multi-patent license to Corsair; Taction's theory "failed to meet [Taction's] burden of demonstrating the admissibility" of the expert's opinions under *Daubert* and Rule 702 and the Court excluded it. Dkt. 545 at 29. Taction stuck to that theory in the lead-up to trial and late into Taction's case-in-chief, despite clear and correct rulings from the Court under Rules 403 and 702 that it would not admit backdoor lay opinions on the value of the Corsair license, *e.g.*, Tr. 269:7-271:24, or the license rates reflected in Corsair, *e.g.*, Tr. 657:20-22.

Because the jury never heard any royalty rate from the Corsair license, that license itself does not support the jury's ultimate award. The jury had no way to understand how Taction and Corsair valued Taction's technology in that license, nor to adjust from the circumstances of the Corsair license to those of the hypothetical negotiation with Apple. Even if the jury had received sufficient evidence to recognize the differences between Corsair and Apple—*e.g.*, the products they make, their size and market power—it still received no evidence comparing the roles the asserted

patents played in the Corsair and Apple products. The jury would have needed to speculate as to whether Apple would have found the asserted patents more valuable, less valuable, or the same as Corsair. And even then, quantifying that value would require further speculation. That evidentiary gap alone is fatal to any theory based on the Corsair license. *See Rex*, 156 F.4th at 1299 (Damages "must not be left to conjecture by the jury. They must be proved, and not guessed at.").

During trial, Taction tried to shift its strategy to use material costs of a component of Taction's Transporter units—specifically, the $0.20 per-headset cost of ferrofluid. Tr. 282:15-21. The jury's award is not based on that cost—it is more than [redacted] higher. And basing damages on that cost would lack support anyway, because Taction's own CEO explained that Taction charged for ferrofluid to prevent "the possibility of counterfeiting or back-door sales" by Chinese manufacturers, Tr. 663:14-664:1, not because ferrofluid represented the value of Taction's asserted patents. In fact, no one testified that ferrofluid costs represented a reasonable royalty or the value of the invention. *Infra* § IV.A.2. The Court therefore correctly prevented Taction from making this argument in closing. Tr. 1323:22-1324:24.

Taction's other evidence was merely qualitative testimony that Taction's invention was valuable to headphone makers—when packaged into "Taction solutions" including "the two Transporter units, the drive circuit, and any firmware or software that is needed to drive those circuits." TX1684 (Syed at 129:15-130:12; 226:7-227:5). What that means in terms of value to Apple or the outcome of a hypothetical negotiation is, again, pure speculation. And Taction invited that speculation in closing, telling the jury to "wonder why" Apple chose not to present "any evidence about what they typically do in licensing discussions," and suggesting it was because Apple "couldn't tell [the jurors] with a straight face that Apple wouldn't have paid a significant amount of money to license Dr. Biggs' inventions." Tr. 1314:20-1315:7. But the burden to prove damages *was Taction's*, and it had no evidence that Apple *would* have paid "a significant amount of money" for the patents.

The "jury received insufficient evidence from which it could … reasonably infer a reasonable royalty award" and judgment of no damages is appropriate. *Rex*, 156 F.4th at 1298.

**2. Taction failed to present evidence from which the jury could determine an apportioned damages award.**

Taction failed a second legal requirement for damages as well: "When the accused technology does not make up the whole of the accused product, apportionment is required." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014) ("No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features."). Taction bore the burden to "give evidence tending to separate or apportion the [infringer]'s profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Garretson v. Clark*, 111 U.S. 120, 121 (1884).

The record here provides no basis from which the jury could "adequately tie a dollar amount to the infringing acts," making judgment of no damages appropriate. *Rex*, 156 F.4th at 1299 (quoting *TecSec*, 978 F.3d at 1291). The situation here is even stronger in Apple's favor than it was in *Rex*—a case the Court already found "very instructive," Tr. 549:3-8—where the jury heard a lump-sum license amount, but the Federal Circuit affirmed a JMOL of no damages because the patentee failed to apportion, presented no expert testimony, relied on lay testimony that could not bridge the gap, and then offered no other evidence from which a jury could properly compute damages. *Rex*, 156 F.4th at 1298-1301. Awarding damages here "would require improper guesswork," so the Court should grant "JMOL of no damages." *Id.* at 1301.

***Corsair License:*** Setting aside that the Corsair license royalty rate was not before the jury, other major evidentiary gaps were fatal to any damages theory based on the Corsair license. As the jury heard, the Corsair license covered at least two

distinct groups of patents—the asserted patents and the ’139 notch filter patent. Tr. 522:14-523:14. The Corsair license also compensated Taction for physical Transporter units, including the ferrofluid within those units, and accompanying technology. TX961; Tr. 261:17-19, 660:6-21, 662:6-11, 663:16-20, 664:16-24; TX1684 (Syed at 226:7-16, 226:23-227:5, 227:15-19).

To use the Corsair license in determining a reasonable royalty, the jury would have had to apportion the value of the asserted patents out of the (never admitted) license rate to “account for differences in the technologies” of the other licensed patents and the non-patent value reflected in the license. *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 971 (Fed. Cir. 2022) (cleaned up); *see also MLC Intell. Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1373-75 (Fed. Cir. 2021); Tr. 458:6-463:3 (excluding Dr. Kennedy’s reasonable royalty opinions for failure to apportion). There was no evidence from which a jury could have made that necessary determination.

*First*, Taction offered no evidence apportioning the substantial non-patent value out of the Corsair license—a threshold step “to accurately determine the value of a bare license to its patents in a hypothetical negotiation.” *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, No. 2023-1218, 2026 WL 122544, at *21 (Fed. Cir. Jan. 16, 2026) (affirming exclusion of unapportioned damages opinion); *Apple*, 25 F.4th at 973 (finding an opinion that ignores how a license valued the patents it covered is “untethered to the facts of this case”).

*Second,* even considering only the patent rights within the Corsair license, Taction admitted it must first apportion the Corsair royalty between the ’139 patent and the asserted patents, and then further apportion to account for the smaller contribution the asserted patents allegedly make to damping in the accused products. Tr. 224:11-225:13; *Jiaxing Super Lighting Electric Appliance, Co., Ltd. v. CH Lighting Technology Co., Ltd.*, 146 F.4th 1098, 1110-12 (Fed. Cir. 2025) (requiring apportionment of portfolio license); *MLC*, 10 F.4th at 1374-75 (affirming exclusion of damages expert for failure to apportion across licensed patents). Taction presented

no evidence from which the jury could do that apportionment; Dr. Oliver agreed the notch filter covered by the ’139 patent was “separate technology” and offered no opinion about the value of the asserted patents versus the notch filter. Tr. 523:8-14.

*Third*, Taction’s lay witnesses also did not supply any basis for apportioning a value to Apple from the Corsair license. Mr. Steinberg testified that, as he understood it, “[t]he notch filter provided a small portion of resonance reduction that allowed [Taction] to use less ferrofluid.” Tr. 665:16-18. But Mr. Steinberg admitted that he is “not an engineer” and does “not feel qualified” on the technical questions apportionment requires. Tr. 675:12-14, 716:8-719:5. An unsupported assertion by a fact witness who lacks the necessary foundation is not substantial evidence of apportionment. *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1344 (Fed. Cir. 2025) (en banc) (CEO’s “testimony amounts to an unsupported assertion on behalf of EcoFactor that the $X rate was applied to calculate the lump-sum payment amounts”); *Rex*, 156 F.4th at 1299-1300 (lay witness testimony from CEO did not provide substantial evidence of damages). In any event, Mr. Steinberg did not testify about the value of the asserted patents to “resonance reduction” in Apple’s Taptic Engine.

Dr. Biggs offered no testimony supporting apportionment either—he testified to the cost of ferrofluid, not to the value the asserted patents contribute to Apple’s products. Tr. 282:15-283:15; TX1056. As explained below, the cost of ferrofluid is unconnected to the value of the asserted patents (let alone the value of the asserted patents as reflected in Apple’s products), and no witness suggested otherwise.

At bottom, the jury had no way of knowing what value Taction’s asserted patents had to Corsair, separating the value of the asserted patents from the value of the other technology covered by the license, and no way of converting any Corsair value to the value of the asserted patents *to Apple*.

***Material costs:*** Taction’s reliance on material costs as a proxy for the value of the asserted patents also fails to satisfy the apportionment requirement. Taction pointed to the price of the ferrofluid ($0.20) included in each Corsair headset; the

price of Taptic Engine hardware ($[redacted][1]); and the difference in price ($[redacted]) between a Taptic Engine and a prior art iPhone 6 Plus vibration module. Dkt. 658 at 2-3; TX387 at 30; Tr. 1160:14-1165:24. None can supply an apportioned royalty, and the Court rightfully noted they could not. Tr. 1323:22-1324:24; Tr. 1164:6-1165:24.

As a threshold matter, the cost approach to patent damages does not apply to the evidence Taction introduced. The recognized cost approach to a reasonable royalty measures the costs the alleged infringer *saved* by using the invention, not the cost *incurred*. *See Open Text S.A. v. Box, Inc.*, No. 13-CV-04910-JD, 2015 WL 349197, at *2 (N.D. Cal. Jan. 23, 2015) (the cost approach "looks to the cost of obtaining the same benefits through alternative technologies"). Here, the cost of the Taptic Engine and the cost of ferrofluid are costs incurred in assembly, not costs saved from using the asserted patents or costs reflecting the value of the asserted patents.

Even if the cost approach applied, any cost-based theory would also still require apportionment to the asserted patents, and Taction failed to meet its burden. *Fundamental*, 2026 WL 2923930, at *8-13. In *Fundamental*, the court granted JMOL of no damages because the plaintiff had not "properly apportioned damages," rejecting its argument that a "cost-savings" approach "absolve[d]" it of the "duty to apportion." *Id.* at *11. The same result is appropriate here.

Dr. Biggs testified that the ferrofluid in the Corsair headphones cost about $0.20 per headset. Tr. 282:15-21. But the jury heard that ferrofluid is not the claimed invention, Dr. Biggs did not invent ferrofluid, and ferrofluid existed decades before Taction's asserted patents. *See, e.g.*, Tr. 306:21-307:17, 606:8-12. Taction nonetheless attempted to argue that the cost of ferrofluid represents the value of the asserted patents because Corsair "would only have spent that 20 cents a unit" to buy ferrofluid from Taction "if they knew that it was unlocking something greater." Tr.

---

[1] The Taptic Engine in iPhone 12 Pro (one accused product) costs $[redacted]. TX1686 (Rollins at 123:11-123:16, 134:5-135:16, 135:17-136:23); TX214B.

1323:22-1325:17. In other words, Taction wanted to invite the jury to speculate that there was some "greater value" that was both (1) tied to the asserted patents but (2) not reflected in the per-unit license royalty that Mr. Steinberg had attributed to the patent family that includes the asserted patents. The Court correctly rejected that argument, finding that the ferrofluid cost "had nothing to do with the technology" and that pegging a reasonable royalty to it would invoke the evidence "for an improper purpose," so the Court told the jury to disregard it. *Id*.

Like the cost of ferrofluid, the cost of a Taptic Engine is not an appropriate number to use in determining damages because Taction did not establish what, if any, portion of that cost is attributable to the asserted patents. *See Ericsson, Inc. v. D-Link Sys., Inc.,* 773 F.3d 1201, 1233 (Fed. Cir. 2014) ("[T]he patent holder should only be compensated for the approximate incremental benefit derived from his invention."). Taction itself acknowledged this when it represented "it will not argue that $[redacted] is an appropriate royalty amount." Dkt. 679 at 2.

It is undisputed that Taptic Engines are pieces of physical hardware that include many parts and functions beyond the asserted claims. Tr. 742:8-743:25, 752:23-756:7, 784:1-786:16, 814:20-817:8 (Mr. Lee describing benefits of Apple-designed Taptic Engines in Watch and iPhone); TX2731 at 7, 17, 20-21. No evidence in the record apportions out that unaccused value. *Provisur Techs., Inc. v. Weber, Inc.*, 119 F.4th 948, 957 (Fed. Cir. 2024) ("We have required any royalties be apportioned between infringing and noninfringing features of the accused product.").

The trial record also conclusively establishes that the relevant structural components of the Taptic Engines in the accused products were present in the prior art, such as Apple's iPhone 6 Plus, and in unaccused products, such as the iPhone 6S and Apple Watch 3. *See* Tr. 739:17-767:19, 781:18-789:18 (Mr. Lee describing Apple's prior art haptic technology); Tr. 869:4-870:3, 871:15–880:20, 881:5–882:8 (Mr. Slutzky describing prior art vibration modules); Tr. 1086:4–16 (Dr. Zinn comparing Apple Watch 3 and Apple Watch 4); TX3211; TX2453; TX2141 at 32;

TX2034 at Figs. 1-3; TX3939 at Fig. 2; TX2022. No evidence apportions out that value, either. *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) ("the patent owner must apportion or separate the damages between the patented improvement and the conventional components of the multicomponent product").

Moreover, any attempt to rely on the entire cost of the Taptic Engine to justify the jury's award would violate the "entire market value" rule and "skew the damages horizon" by suggesting the asserted patents account for all value of the Taptic Engine. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011); *accord VirnetX*, 767 F.3d at 1326-28; *Ericsson*, 773 F.3d at 1226. Without evidence about how to adjust the cost of the Taptic Engine to reflect only the value of the asserted patents, the cost of the Taptic Engine cannot support any apportioned damages calculation. And the jury's award is more than [redacted] this cost in any event.

Taction also introduced evidence that the prior art iPhone 6 Plus vibration module cost $[redacted]. TX387 at 30; Tr. 1160:4-17. Taction then compared that to the $[redacted] cost of the Taptic Engine in the accused iPhone 12. Tr. 1160:18-21. Apple objected to this line of questions, and the Court ultimately instructed Taction to "move on" because "the fact that there is a price differential … could be attributed to a number of different things, [including] the relative bargaining [positions] of the parties with respect to the components of the Taptic Engine." Tr. 1160:4-1165:25. As the Court rightly recognized, there is no evidence that the $[redacted] difference in cost between these vibration modules is attributable to the asserted patents. *See* Tr. 1164:6-1165:24. In fact, the evidence showed otherwise: Apple made the Taptic Engine in the iPhone 7 and later generations "larger, more powerful," Tr. 793:21-794:3, which would account for increased material costs—not the asserted patents. For that same reason, the evidence of the price differential is legally insufficient to support the damages award. *Lucent*, 580 F.3d at 1327.

***Remaining evidence:*** The jury had no other evidence showing the relative

value of the asserted patents to the accused iPhones and Watches as a whole or to the Taptic Engine. In fact, the jury did not even have the price of *any* iPhone or Watch in evidence. The jury instead heard that Taction wished to license its technology to headset manufacturers that sold headsets at prices "from below $100 to well into the hundreds and even into the thousands." Tr. 721:18-722:6. And Taction was largely unsuccessful, licensing the technology only once and for an amount never introduced into evidence. Tr. 672:16-673:4. The jury had no way of determining "the incremental value that the patented invention adds to the end product," whether the end product was headsets, smartphones, or smartwatches. *Ericsson*, 773 F.3d at 1226. Where, as here, the record "does not provide evidence from which the jury could find or infer a damages number for a license to the [asserted] patent … [n]or does there appear to be any other record evidence that would allow reasonable apportionment," judgment as a matter of law is appropriate. *Rex*, 156 F.4th at 1300.

Dr. Oliver's testimony that ferrofluid contributes "approximately 40 percent" of the damping in the accused products does not fill the gap. Tr. 504:20-505:2; *see id.* at 605:24-606:2. That 40% is a technical measure of ferrofluid damping, which Dr. Biggs did not invent, *id.* at 606:8-607:4, not a measure of the value of the patents, and no witness connected it to any dollar figure. It was one input into the excluded apportionment calculation, which also required the Corsair-side apportionment the Court excluded. Dkt. 545 at 28-30; Dkt. 599 at 13. Without that other half, and without any rate to apply it to, Dr. Oliver's 40% figure gives a jury nothing to compute.

This leaves Taction with no way to support *any* damages award, not just the shocking record-setting award from the jury.

### B. The Court Should Grant JMOL Of No Infringement For All Products Because Dr. Oliver's Testing Method Is Legally Deficient.

The jury's infringement verdict is not supported by substantial evidence for any product. Every asserted claim requires that "the output of the transducer is highly damped (*i.e.*, the output is substantially uniform or flat over the normal operating

frequency range of the device)." Dkt. 437 at 9. Taction's only evidence that the accused products meet that limitation was a test Dr. Oliver devised for this case. Tr. 578:12-579:13. But that test cannot support the verdict for at least three independent reasons: (1) it measured an output of the whole device, not "the output of the transducer"; (2) rather than following the procedure in the patent, it varied the input voltage amplitude at each frequency by commanding Apple's closed-loop controller to deliver the same output at every measured frequency, so it could not measure whether the transducer's output is highly damped; and (3) Dr. Oliver improperly derived and inconsistently applied his standard for deciding whether output is "substantially uniform or flat." Each flaw reveals Dr. Oliver's failure to apply the Court's construction, the governing law, or both, not a credibility dispute. Because expert testimony "based on an incorrect understanding of the claim construction" must be disregarded, and nothing else in the record supports a required element of Taction's infringement claim, JMOL of no infringement follows. *Cordis Corp. v. Bos. Sci. Corp.*, 658 F.3d 1347, 1357-58 (Fed. Cir. 2011).[2]

Strip away Dr. Oliver's legally deficient test, and the remaining evidence points only one way. Every test that used constant input voltage amplitude and measured the output of the transducer, including Taction's pre-suit and infringement contentions testing, showed a peaked frequency response that even Taction's witnesses conceded was not highly damped. Tr. 336:15-22, 561:7-562:22; TX3805A; TX3529.

---

[2] The jury's infringement verdict also cannot be upheld on an indirect infringement theory because (a) indirect infringement requires an underlying act of direct infringement, which Taction failed to prove for the reasons explained in this section; (b) Taction elected not to present contributory infringement under § 271(c) to the jury; and (c) Taction also did not offer substantial evidence of Apple's intent to cause direct infringement, which is required to prove an inducement claim.

**1. Dr. Oliver did not measure "the output of the transducer."**

An infringement verdict cannot rest on expert testimony that misunderstands the Court's construction. *Cordis*, 658 F.3d at 1357-58. The construction here requires that "the output of the ***transducer***" be highly damped. Dkt. 437 at 9. Dr. Oliver confirmed that the recited highly damped output is "the output of the transducer" and even agreed that, in the accused products, the transducer is the Taptic Engine. Tr. 476:16-21. Yet when he tested accused products to determine whether the highly damped output limitation was met, Dr. Oliver did not test the output of the Taptic Engine. Instead, he "tested the whole phone," including the output of Apple's closed-loop controller. Tr. 566:24-567:2.

Dr. Oliver knew how to test whether a transducer's output is highly damped, as required by the Court's construction. When he tested the prior-art iPhone 6 Plus, he "took the vibration module out of the phone and tested the module itself," applying "constant amplitude sine tones." Tr. 565:22-567:7; *see also* Tr. 565:1-15. Dr. Oliver conceded that this was a different test than the one he applied to accused products. Tr. 565:16-21, 567:8-13. Nevertheless, Dr. Oliver opined that this testing showed that the iPhone 6 Plus did not have a highly damped output. Tr. 479:18-480:13.

Taction cannot have it both ways. When the party with the burden "rests its case on an expert's self-contradictory testimony," the evidence is insufficient. *Finesse Wireless LLC v. AT&T Mobility LLC*, 156 F.4th 1221, 1227 (Fed. Cir. 2025); *see Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1349 (Fed. Cir. 2008) (similar). Thus, Dr. Oliver's internally inconsistent testimony is enough to warrant JMOL of no infringement. Furthermore, if Dr. Oliver were correct that testing the whole device is required, Taction's proof of infringement then necessarily fails for the accused products he never tested. *See infra* § IV.D.2.

In addition, the clear weight of the evidence shows Apple does not infringe. Like Apple's prior art vibration module, Apple's Taptic Engines are designed to resonate, because "driving on or near resonance is the most efficient place to drive an

actuator." Tr. 744:15-22, 747:3-10 (Lee). Thus, every measurement in the record of the output of a *transducer* from the accused products—including testing performed by Taction—shows that the output is not highly damped. As Dr. Oliver conceded, when Taction tested the accused Taptic Engines on their own, outside the iPhone or Watch, for its infringement contentions (as reproduced here), the resulting output was not highly damped. TX3805A.0148 (Fig. 1-8, iPhone 14 Plus); Tr. 560:25-562:22. Dr. Biggs tested Taptic Engines the same way before filing suit and again for Taction's contentions, using "just a Taptic Engine, no phone involved." Tr. 330:12-20, 341:21-343:2. He measured a Q-factor[3] of 12.9, reflecting a peaked (i.e., non-flat) response. Tr. 336:19-22. Apple's own non-litigation measurements show the same peaked response. TX2168 at 20 (PTF graph); Tr. 806:12-807:11. Apple's non-litigation documents report Q-factors, which measure both mechanical and electrical damping, that range from about 5 to 11.5 for the iPhones Dr. Oliver tested and from about 9.5 to 13 for Apple Watches, again reflecting a peaked response. Tr. 1080:23-1081:24; TX4001.



Under the Court's construction, the question is whether the *transducer's* output is highly damped, not the device as a whole. Because it misapplies that construction, Dr. Oliver's test is legally erroneous and cannot support the verdict.

**2. Dr. Oliver rigged his test by varying the input voltage amplitude at each frequency to produce the desired output.**

[3] Q-factor is "a standard engineering measure" of damping; a critically damped transducer (whose output is flat) has a Q-factor of 0.5; anything higher is underdamped and displays a peaked response. Tr. 895:2-11 (Visell); *see* Tr. 331:13-15 (Biggs). Apple engineers design the Taptic Engines to be underdamped, targeting Q-factors of 6 to 10. Tr. 802:19-803:14 (Lee).

Whether an output is "substantially uniform or flat over the normal operating frequency range" turns on the "frequency response"—how the output changes as the input frequency changes. But a frequency response is meaningful only if the amplitude of the input signal is held constant as the frequency changes. Tr. 1026:13-1027:23. Otherwise, as Dr. Zinn explained, "I don't even know what you're measuring." Tr. 1063:23-1065:8. Applying a constant voltage "would be the standard" way to measure the frequency response of this type of actuator. Tr. 1069:24-1070:2; *see* Tr. 896:13-17 (Visell). Dr. Biggs used the same procedure in his own work. Tr. 290:18-294:4. Dr. Oliver did the same when he tested the prior art. Tr. 567:3-7. The patents follow the same convention; even Dr. Oliver conceded that the only frequency response in the specification, Figure 5C, "was obtained by applying a sinusoidal voltage of constant magnitude to the coil of the transducer." Tr. 545:15-22; TX1 at 3:53-58, Fig. 5C.

Dr. Oliver's test did not hold the input voltage constant.[4] Instead, he used Apple's Core Haptics API to control the Taptic Engine, setting the requested intensity to "1" at every frequency he tested. Tr. 580:21-581:3. The intensity setting specifies an output: "how strong or how soft you feel the haptics." Tr. 581:4-6. An intensity of "1" "will produce the maximum intensity that the device can produce." Tr. 581:7-15. Dr. Oliver explained he chose that setting to "guarantee[] that the closed-loop controller will account for the mass of the device and adjust the intensity underneath the hood so that the sensation is the same." Tr. 616:19-25. In other words, he told Apple's controller to produce the same output at every frequency, then measured whether it did so. As Dr. Zinn explained, an intensity of "1" tells the controller "I want the output to be one…. [T]he controller is doing whatever it needs to [do] to

[4] Apple does not contend that the claims require a particular input; the Court has held they do not. Dkt. 437 at 19. The point is that a test that adjusts the input at each frequency cannot measure damping, whatever input the claims permit.

give him the output he is asking for." Tr. 1070:18-24; *see also id.* at 898:7-12 (Visell: Dr. Oliver asked the device "to output tones of constant amplitude"). The controller "isn't interested in forming the frequency response. It wants to do what you're asking it to do." Tr. 1063:23-1065:8. Apple's controller satisfied the request by varying the input voltage at every frequency tested to ensure maximum intensity. Tr. 1053:15-22; Tr. 897:9-10; *see also* Tr. 856:2-857:5 (explaining that the "voltage would be changing in Dr. Oliver's test … [s]o at each frequency, you're not using the same voltage as the frequency before"). As a result, Dr. Oliver's test did not measure the frequency response of the transducer; it was rigged to make allegedly flat lines.

Dr. Oliver admitted that the result he obtained reflected nothing but the setting he requested. By varying the intensity, he explained, "[y]ou could make the frequency response do whatever you like." Tr. 617:1-12. Dr. Zinn agreed: because the controller will, "within its capability, . . . do exactly what you asked," Dr. Oliver "could have chosen different intensities to create any shape he wanted to," so the resulting curve "says nothing about the [T]aptic [E]ngine, nothing about resonances in the [T]aptic [E]ngine." Tr. 1065:9-24. Dr. Oliver even admitted he experimented with different intensities and other parameters before settling on the one he used, and he disclosed none of the discarded results. Tr. 600:1-22.

Dr. Oliver further admitted that his methodology "is not the methodology set forth in the patents," that he "developed" it for this case, that he had never used it before, and that no publication or practitioner had ever relied on it to measure highly damped output. Tr. 578:12-579:13. His test differed from the patents' test in every respect that matters: it used a variable amplitude voltage input rather than a constant one; measured power rather than acceleration; covered 80-230 Hz rather than 40-200 Hz; and labeled as "substantially uniform or flat" an output that may span ±10 decibels rather than ±0.15 g (or ±3 decibels). Tr. 897:6-19; Tr. 579:20-22, 581:22-24. Both Dr. Visell and Dr. Zinn testified that no person of ordinary skill would use Dr. Oliver's test. Tr. 897:18-19, 1078:13-15. This defect does not depend on whether

the patents require use of their only disclosed test. Whatever method is used, a frequency response measured while the input is adjusted at each frequency does not measure damping at all.

Dr. Oliver's departure from the patents matters for another reason. If his test were an equally valid way to measure the same limitation, the patents would permit two tests that yield opposite results, and the claims would be indefinite. *See* § IV.C.1, *infra*. On the other hand, if the Court finds that the patents' disclosed test saves the patents from invalidity, then that test establishes noninfringement as a matter of law.

**3. Dr. Oliver's ±10 dB range reads "substantially uniform or flat" out of the Court's construction.**

The Court's construction requires an output that is "substantially uniform or flat." Dkt. 437 at 9. Dr. Oliver treated an output as flat if it fell within a range of ±10 decibels. Tr. 567:21-24. But that range, too, is flawed, for several reasons.

First, by Dr. Oliver's own account, a ±10 dB range spans from "half as loud" to "twice as loud"—i.e., a range of 4 times. Tr. 424:17-426:14; Tr. 624:24-625:12 ("that span of 20 dB is half to twice"). Under that standard, a television that played commercials four times as loud as the program would deliver "substantially uniform" sound. No reasonable juror would describe it that way; treating a fourfold range as "substantially uniform" renders the word "substantially" meaningless and no reasonable juror applying the construction as written could find otherwise. A reading of the construction that makes one of its terms "meaningless" cannot support a verdict. *Cordis*, 658 F.3d at 1356.

Second, Dr. Oliver himself could not apply the standard consistently. Shown a speaker's frequency response that fell entirely within a ±10 dB band (reproduced here), he conceded it was not "substantially uniform or flat." Tr.



571:22-573:10; DDX4.2. Dr. Oliver's testimony thus cannot supply substantial evidence because it is self-contradictory. *Finesse*, 156 F.4th at 1227; *Johns Hopkins*, 543 F.3d at 1349.

Third, the ±10 dB figure does not appear in the asserted patents; it is from a provisional application. TX10 at [0072]. But as a matter of law, Taction could not rely on this range because it was removed from the nonprovisional application. *FMC Corp. v. Sharda USA, LLC*, 145 F.4th 1326, 1331-32 (Fed. Cir. 2025) (overturning construction based on material found only in a provisional application).

Finally, Dr. Oliver's range also contradicts the clear weight of evidence at trial. Dr. Zinn testified that the only flat output in the patents, Figure 5C, varies by about ±0.15 g, or "approximately ±3 dB, which is a much more standard metric," and that Dr. Biggs's own development documents used the same ±3 dB range. Tr. 1074:8-21, 1176:19-1177:6; *see also* Tr. 290:18-293:1. He also testified—and Dr. Visell agreed—that a skilled artisan would not use a ±10 dB range to measure flatness of a transducer's output. Tr. 1177:15-19, 898:21-24.

### C. The Court Should Grant JMOL Of Invalidity Because Taction's Infringement Theory Renders The Asserted Claims Invalid.

If the infringement verdict stands, the asserted claims are necessarily invalid. To prove infringement, Taction presented Dr. Oliver's made-for-litigation test as a measure of "highly damped output" and argued that the asserted claims cover Apple's closed-loop controller. Tr. 343:7-9 (Biggs); *id.* at 537:20-538:8 (Oliver). But a patent may not be read one way for infringement and another way for invalidity. *01 Communique Lab'y, Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 743 (Fed. Cir. 2018). Read as Taction does, the claims are invalid in three ways. First, any juror who accepts Dr. Oliver's test must find there are at least two methods for measuring "highly damped output" that produce opposite results, rendering the claims indefinite. Second, under Taction's reading, the claims cover technology that the patents never describe, and a skilled artisan's background knowledge cannot fill that gap. And third,

the specification does not enable a skilled artisan to make or use Apple's controller.

**1. Accepting Dr. Oliver's test renders the claims indefinite.**

The Court should grant judgment as a matter of law of invalidity if the jury's infringement verdict stands. Taction's sole theory of infringement required the jury to accept that Dr. Oliver's testing methodology—created for this litigation—yields a valid measurement of the flatness of a transducer's output and thus whether that output is "highly damped." But the record is undisputed that Dr. Oliver's method is *not* the method outlined in the patent itself, and every test performed using the method in the patent produced results opposite to Dr. Oliver's. *Supra* § IV.B.1. Any reasonable factfinder who accepts Taction's infringement theory, and thus accepts Dr. Oliver's testing method, must also conclude that there are at least two different tests for highly damped output, that they produce different results, and thus that a skilled artisan cannot determine with reasonable certainty the scope of the asserted claims.

A claim is indefinite if it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Indefiniteness is a question of law that may rest on factual findings. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332 (2015); *see* Dkt. 437 at 13. A claim is indefinite where a term can be measured by different methods that yield materially different results, but the patent does not say which to use, *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341-45 (Fed. Cir. 2015), and "even more clearly indefinite" where the method plaintiff uses is "not even an established method but rather one developed for this particular case." *Dow Chem. Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620, 631-35 (Fed. Cir. 2015).

At the charge conference, the Court concluded that indefiniteness implicated three potentially dispositive factual questions: (1) "there are multiple methods of measurement that one of ordinary skill in the field of invention could reasonably use to evaluate a claim term"; (2) "those methods of measurement produce materially different results"; and (3) "the patent does not provide guidance as to which method

should be used." Tr. 968:23-973:3, 986:7-1001:22. The Court ultimately submitted those factual questions to the jury. Final Jury Instr. No. 24, Dkt. 712 at 33.

A reasonable juror must conclude, on this record, that for Taction's infringement theory to succeed, all three answers must be "yes." First, if Dr. Oliver's test is accepted, there are two different measurement methods. The sole frequency response result described in the patents was obtained with a constant-magnitude voltage input, and the experts agreed that is the conventional way to measure a transducer's output. Tr. 545:15-22, 896:13-17, 1069:24-1070:2. Dr. Oliver instead let Apple's controller vary the input at each frequency, using a method he "developed" for this case. Tr. 578:12-579:13, 1053:15-22; *see* § IV.B.2, *supra*. Dr. Oliver admitted that his methodology "is not the methodology set forth in the patents." Tr. 578:12-16. Second, the two methods give opposite answers for the same products. Dr. Oliver's method yielded what he called "a uniform substantially flat frequency response" for every iPhone he tested, Tr. 426:19-427:4, but he conceded that the constant-input measurements in Taction's own contentions "do not show a highly damped output," Tr. 561:7-562:22. Dr. Zinn testified that Apple's testing—also using the conventional method—confirmed the Taptic Engine "most definitely is not" highly damped. Tr. 1078:16-1081:24; *see also* Tr. 803:15-804:18, 856:2-5. Thus, the two tests disagree as to whether the accused products infringe. Third, any juror who accepts Dr. Oliver's test (to find infringement) must conclude that a skilled artisan would not know from the specification or claims whether to hold the input constant, as the patents' only example did, or to let a controller vary it, as Dr. Oliver did.

The testimony from Taction's invalidity expert, Dr. Okamura, does not resolve the dilemma. While she testified that "highly damped output" was definite (Tr. 1241:9-12), such conclusory statements are "insufficient to sustain a jury's verdict." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015) (reversing denial of JMOL). Nor is her opinion supported; Dr. Okamura contrasted the parties' numerical thresholds for flatness, Tr. 1229:4-1233:25, 1238:6-1239:3, but

never addressed the fundamental problem of two different testing methodologies that yield conflicting results to compare to those thresholds or explained how a person of ordinary skill would choose between the competing methods.

Nor does the Court's earlier denial of summary judgment preclude granting Apple's motion. A denial of summary judgment "is never law of the case," because a factual dispute "may disappear as the record develops," *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014) (en banc), and the evidence at trial also may give the court "new insights into the legal sufficiency of the evidence," *Gray v. Hudson*, 28 F.4th 87, 102-03 (9th Cir. 2022); *see also, e.g.*, *Dupree v. Younger*, 598 U.S. 729, 734 (2023) (trial record supersedes the summary judgment record). In any case, the indefiniteness issue presented by the trial record is different than those addressed at summary judgment. *Compare* Dkt. 437 at 19-20 (determining that the claims do not limit the input supplied to the transducer, and that acceleration and mechanical power are not materially different measures), *with* Tr. 994:9-18 (asking whether a skilled artisan "would adopt Dr. Oliver's test as opposed to the test that's articulated in the patent," and whether "there is a material difference in the results of those two tests"); *see also* Tr. 988:2-6, 989:2-18, 998:16-999:2, 1273:20-1274:4.

Apple disputes that Dr. Oliver's test measures damping at all. But a jury that accepted it, as this jury must have done to find infringement, could not reasonably find that only one method exists or that the two methods produce the same result. As a result, a skilled artisan necessarily cannot determine with reasonable certainty what the claims cover, and the claims must be indefinite. *Teva*, 789 F.3d at 1341-45; *Dow*, 803 F.3d at 631-35; *Nautilus*, 572 U.S. at 901.

**2. The asserted claims fail the written description requirement.**

The Court also should grant judgment as a matter of law of invalidity because the asserted patents do not contain an adequate written description of any claim scope that includes Apple's accused products.

The written description must "reasonably convey[]" to a skilled artisan that "the

inventor had possession of the claimed subject matter as of the filing date," based on "an objective inquiry into the four corners of the specification." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). "[A] description that merely renders the invention obvious" is not enough. *Id.* at 1352; *see also, e.g.*, *Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315, 1322 (Fed. Cir. 2017).

Although compliance with the written description requirement is a question of fact, *Ariad*, 598 F.3d at 1355, no reasonable jury could find it satisfied here. Taction's infringement theory depended on Apple's closed-loop controller to meet the claims' requirement that the output of the Taptic Engine be "highly damped." Tr. 343:6-9; 1085:23-1086:3. Because the claims have the same scope for infringement and written description analyses, *Rivera*, 857 F.3d at 1319-1323, any juror that accepts Taction's infringement theory must also examine whether the specification adequately describes a system using such a controller. And although the Court denied summary judgment based on fact issues raised by Dr. Okamura's opinion that a skilled artisan would understand the patents to cover non-mechanical damping, Dkt. 437 at 21-22, the record shows no genuine dispute exists. Every witness agreed that the specification never references closed-loop control. Tr. 344:3-4, 344:18-20 (Biggs); Tr. 1265:2-12 (Okamura); Tr. 1085:17-22 (Zinn: "Those words aren't even used."); *see generally*, TX1, TX3. Even Dr. Oliver admitted that Dr. Biggs did not invent closed-loop control. Tr. 578:4-5. And Dr. Zinn agreed that the patents do not "show that Dr. Biggs had possession of closed-loop control." Tr. 1095:12-14.

At best, Dr. Okamura offered that a skilled artisan "would have realized that closed-loop control is an option for providing electrical damping"; this does not defeat JMOL. Tr. 1265:2-14; *see also, e.g.*, Tr. 1268:25-1269:5. A skilled artisan's "background knowledge" cannot "supplement the teaching in the specification." *Rivera*, 857 F.3d at 1322; *see also, e.g.*, *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571-72 (Fed. Cir. 1997). What that artisan would have found obvious is immaterial to the written-description inquiry. *Ariad*, 598 F.3d at 1352; *Rivera*, 857

F.3d at 1322. "One shows that one is 'in possession' of *the invention* by describing *the invention*, … not that which makes it obvious." *Lockwood*, 107 F.3d at 1572; *see also Ariad*, 598 F.3d at 1351 ("the hallmark of written description is disclosure"). The specification does not describe the full scope of the claims as asserted; it never mentions using a controller to achieve a highly damped output.

Finally, Dr. Okamura treated the highly damped output requirement as purely functional—in her view, the claims encompass any damping means whatsoever. *E.g.*, Tr. 1220:13-1221:11. But for functional claims, "the written description 'must demonstrate that the applicant has made a generic invention that achieves the claimed result … by showing that the applicant has invented species sufficient to support a claim to the functionally-defined genus.'" *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1335-38 (Fed. Cir. 2021) (quoting *Ariad*, 598 F.3d at 1349); *see also, e.g.*, *Brita LP v. Int'l Trade Comm'n*, 156 F.4th 1326, 1335 (Fed. Cir. 2025). Dr. Okamura did not attempt to show Dr. Biggs invented species that support a claim covering all damping mechanisms.

**3. The asserted claims fail the enablement requirement.**

The Court should also grant judgment as a matter of law of invalidity because any reasonable juror that accepts the claim scope Taction asserted in its infringement case must also conclude that Apple showed, by clear and convincing evidence, that the asserted patents fail to "enable a person skilled in the art to make and use … the full scope of the invention as defined by its claims" without "undue experimentation." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 610 (2023) ("the more one claims, the more one must enable"); *Brita*, 156 F.4th at 1336-37; *see* 35 U.S.C. § 112(a). Enablement is a question of law based on underlying facts. *Amgen Inc. v. Sanofi, Aventisub LLC*, 987 F.3d 1080, 1084 (Fed. Cir. 2021), *aff'd*, 598 U.S. 594 (2023). "Whether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988) (listing factors); *accord Amgen*, 987 F.3d at 1084. "[T]he

enablement inquiry for claims that include functional requirements can be particularly focused on the breadth of those requirements, especially where predictability and guidance fall short." *Amgen*, 987 F.3d at 1086.

As noted above (at § IV.C.2), Taction's infringement position requires that the claims cover a transducer whose output is made highly damped by Apple's closed-loop controller. But the patents say nothing about how to make or use such a controller. Dr. Biggs admitted the patents do not "describe any closed-loop control." Tr. 344:18-20. Dr. Okamura agreed. *Id.* at 1265:2-14. And Apple presented unrebutted testimony that a skilled artisan would not be able to create a closed-loop controller like Apple's without undue experimentation. Dr. Zinn explained that Apple's controller is "very complex": it "is implemented on several chips inside the phone," uses "dedicated sensors," and runs software containing "many mathematical equations." Tr. 1090:5-11. [redacted] "inversion-based feedforward control" [redacted] Tr. 794:24-797:19 (Lee); TX2141 at 16. Developing it took Apple "several years" and "a team of engineers, the vast majority of whom had advanced degrees," and none of it is "even hinted at" in the patents. Tr. 1093:1-14. Closed-loop position control was known in other fields, such as hard disk drives, but Dr. Zinn knew of no one using it for vibration modules when Apple developed its controller. Tr. 1093:1-24. Indeed, Apple successfully patented its innovative closed-loop controller after the claimed priority date of the asserted patents. Tr. 799:4-800:8. That later "first success" is evidence of the difficulty that preceded it. *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1344 (Fed. Cir. 2003); *cf. Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1254 (Fed. Cir. 2004) ("Nascent technology … must be enabled with a 'specific and useful teaching.'"). Dr. Zinn also addressed all of the factors outlined in *Wands*, 858 F.2d at 737, and showed how the factors indicate that the asserted patents fail the enablement

requirement. Tr. 1087:2-1095:17.

Taction presented no meaningful response. Only Dr. Okamura discussed enablement, and she never discussed the *Wands* factors. Instead, she pointed to a generic statement that damping can be accomplished "using a suitable approach," followed by examples of purely mechanical damping. Tr. 1224:17-23; TX1 at 19, 4:6-9 ("shearing of a layer of ferrofluid, oil, grease, gel, or foam, or the passage of air through an orifice"). Dr. Okamura then opined that, because skilled artisans "know about control systems, they would think of those as options and one of the suitable approaches" beyond the listed examples. Tr. 1225:3-6. But neither the phrase "suitable approach" nor a list of passive mechanical dampers enables any undisclosed technology, much less an active, sensor-driven controller like Apple's. *See, e.g.*, *Auto. Techs. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1282-83, 1285 (Fed. Cir. 2007) (finding claims drawn to both mechanical and electronic side-impact sensors not enabled because "[d]isclosure of only mechanical side impact sensors" did not enable the claims "as broadly as [they were] claimed"). Furthermore, where, as here, a plaintiff "seeks to monopolize an entire class of things defined by their function," it "must enable a person skilled in the art to make and use the entire class," not merely give readers "research assignments." *Amgen*, 598 U.S. at 610, 614; *see also Amgen*, 987 F.3d at 1086-87. The disclosed examples are all passive mechanical damping mechanisms—not one involves any type of electrical damping, much less active sensing—so, if the full scope of Taction's claim "is analogized to a plot of land, the disclosed species and guidance 'only abide in a corner'" of that plot. *Id.* at 1087 (quoting *AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1299-300 (Fed. Cir. 2014)). Nor does the specification "disclose some general quality running through the class that gives it a peculiar fitness for the particular purpose." *Amgen*, 598 U.S. at 611 (citation modified). The only guidance provided in the specification is that the damping mechanism must be "suitable."

Dr. Okamura's testimony about the classes she teaches also does not change

the result. *See* Tr. 1225:20-1228:2. Dr. Okamura did not testify to the time frame in which she gave those classes. *Id.* That she teaches students today—or at some other unspecified time—how to create simple controllers says nothing about what a skilled artisan knew twelve years ago, at the time of the patent applications in 2014.

The Federal Circuit's decision at an earlier stage of this case also does not preclude JMOL on a developed record. The Federal Circuit held that the asserted claims are not limited to mechanical damping, relying on the specification's statement that damping may be achieved by "a suitable approach." *Taction Tech., Inc. v. Apple Inc.*, No. 2023-2349, 2025 WL 2336950, at *5 (Fed. Cir. Aug. 13, 2025). That holding concerned claim construction, but it did not address whether the specification enables or describes the full scope of that construction.

Thus, a reasonable jury, properly weighing the evidence under the clear and convincing standard, must have concluded that the patents do not enable a person of ordinary skill in 2014 to practice the full scope of the asserted claims, including the use of Apple's sophisticated closed-loop controller to achieve highly damped output. The Court should grant JMOL of invalidity for lack of enablement.

### D. The Court Also Should Grant JMOL Of No Infringement For Both Single-Magnet Products And Untested Products.

#### 1. The disclosure-dedication rule bars Taction's DOE theory for single-magnet products as a matter of law.

Every asserted claim requires "a plurality of magnets," construed as "at least two physically distinct magnets." Dkt. 437 at 24. The Court granted summary judgment that the majority of accused products—those with a single "monolithic" magnet—do not literally meet that limitation, *id.* at 25, but did not address the disclosure-dedication rule. Taction therefore pursued infringement of those products only under the doctrine of equivalents. Tr. 407:11-21; Dkt. 712 at 19-21. As Dr. Oliver told the jury, those products have "two distinct regions" or "domains of dipolar magnet" separated by unmagnetized areas, and he opined that such monolithic

magnets are equivalent to a plurality of magnets. Tr. 407:14-21, 408:9-17.

But the disclosure-dedication rule forecloses Taction's invocation of the doctrine of equivalents. When a patentee "discloses but declines to claim subject matter," it "dedicates that unclaimed subject matter to the public" and cannot recapture it through the doctrine of equivalents. *Johnson & Johnston Associates Inc. v. R.E. Serv. Co., Inc.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (en banc). The disclosure need only be "of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed." *Toro Co. v. White Consolidated Indus., Inc.*, 383 F.3d 1326, 1334 (Fed. Cir. 2004). The relevant disclosure can be found in the asserted patent or in a prior application, including a provisional application. *See, e.g., Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282, 1297 (Fed. Cir. 2009); *Eli Lilly & Co. v. Hospira, Inc.,* 933 F.3d 1320, 1334 (Fed. Cir. 2019). Application of the rule is a matter of law for the Court. *Toro*, 383 F.3d at 1331.

Here, Taction disclosed single-magnet designs but chose not to claim them. The asserted patents describe a vibration module with a single "thin magnet 1302 polarized along the thin axis." TX1 at 12:32-45, Figs. 13A-B. And a provisional application to which the asserted patents claim priority explains that "a single magnet, flux guide, and coil, if elongated, can do the same job" as an "array" of such elements. TX11 at 45, ¶¶ [0060]-[0061]. Patents in the same family include claims that recite "one or more magnets," showing Taction knew how to claim a single magnet when it wanted to. TX2047 at 44. The asserted claims, however, recite only "a plurality of magnets." Taction cannot now use the doctrine of equivalents "to recapture subject matter" that it disclosed but "deliberately left unclaimed." *Johnson*, 285 F.3d at 1054. The Court should grant JMOL of no infringement as to the single-magnet products.

**2. Taction failed to present substantial evidence of infringement for any untested accused products.**

Taction told the jury that it is necessary to test an entire device to determine whether the highly damped output is met. *See, e.g.,* Tr. 423:21-424:6, Tr. 475:8-11,

Tr. 1309:8-1310:2. Yet Dr. Oliver tested only seven of the 50+ accused iPhone models and not a single accused Watch. Tr. 426:21-24, 428:6-10, 592:15-23; TX1668; DDX-6. Taction relied on those test results to show that the tested products have a "generally uniform and flat frequency response" to prove infringement. Tr. 477:7-19. For untested products, Taction relied on teardowns showing "the same components" in "similar configurations." Tr. 426:21-428:5, 428:11-22. But that proof fails under Taction's own theory; a teardown cannot show a device's output response across frequencies.

Dr. Oliver admitted he *could not* run his test on any Watches and acknowledged that Watches and iPhones are very different shapes and sizes. Tr. 428:6-10. His remaining explanation, that Apple's controller "tries to make the same sensation across from a watch to a very large phone," *id.* at 595:6-9, amounts to speculation that a Taptic Engine in a Watch produces the same output when installed in an iPhone.

Even as to iPhones, Dr. Oliver offered no adequate explanation for his scanty testing. Dr. Oliver admitted iPhones differ in size and produce different results, and that he "wouldn't expect them to be precisely the same." Tr. 427:5-15, 595:10-23. And he admitted that he did not test any iPhone 11, 15, 16, or 17. Tr. 598:8-599:2.

Because Dr. Oliver testified he would need particular testing to prove infringement but failed to do that testing, his testimony was "speculative" and thus fails to provide substantial evidence to support the verdict as to Watches and untested iPhones. *Pantech Corporation v. OnePlus Technology (Shenzhen) Co., Ltd.*, 2024 WL 5510402, *6-*7 (E.D. Tex. 2024) (granting JMOL of no infringement).

**E. Alternatively, The Court Should Order A New Trial.**

As explained above, the proper remedy here is judgment of no damages and no liability. If the Court denies Apple's motion on infringement and invalidity but agrees that the record does not support the damages verdict, Taction should not get a new trial on damages. Taction had a full opportunity to prove damages and chose to rest on evidence that did not allow for a jury to arrive at an apportioned damages award.

Given the insufficient trial record, Taction's repeated attempts to pursue an excluded damages theory (specifically, a rate derived from the Corsair license), and refusal to shift to any other valid theory of damages, JMOL rather than new trial is appropriate. *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 665 (Fed. Cir. 2017) (affirming denial of new trial where patentee, on notice its damages theory might fail, "declined to use its opportunity to establish entitlement to an alternative, smaller damages award"); *see also Rex*, 156 F.4th at 1301 (affirming denial of a new damages trial); *In re California Expanded Metal Prods. Co.*, No. 2023-1140, 2024 WL 1190943, at *1, *2-3 (Fed. Cir. Mar. 20, 2024) (affirming post-trial order setting aside a jury's royalty award where the patentee "did not provide adequate testimony tying [its] evidence to any particular royalty rate"); *Weisgram v. Marley Co.*, 528 U.S. 440, 454-56 (2000) (verdict winner that had notice of the evidentiary deficiency before the close of evidence was not unfairly deprived of a new trial).

In the alternative, if the Court does not grant JMOL, it should grant a new trial because the verdict is against the clear weight of the evidence. On a Rule 59 motion, the Court "may weigh the evidence and assess the credibility of witnesses and is not required to view the evidence in the light most favorable to the verdict." *Morris*, 104 F.4th at 1152. Weighed fairly, the evidence does not support the verdict. Any new trial, including a conditional new trial under Rule 50(c)(1), should be on all issues except willfulness. The Court should not grant a new trial only on damages.

**1. The damages award is against the clear weight of the evidence.**

The damages award dwarfs every figure that Taction put before the Court. Taction's pretrial damages demand based on Corsair was [redacted]; the unapportioned rate from Corsair was [redacted]. Dkt. 293-14 ¶ 305 & Sch. 1.4. The entire cost of the iPhone 6 Plus haptic module was [redacted] and that of the Taptic Engine in the accused products was [redacted]—both of which Taction disclaimed as a basis for

calculating a royalty. Dkt. 679 at 2; Dkt. 675 at 1-2. Yet the jury's award, to the extent it represents a per-unit royalty, is around $[redacted], over [redacted] the highest of those figures, Tr. 730:5-17, 1160:18-21. No evidence supports the number the jury wrote down or even connects the verdict to the record. *See also supra* § IV.A.

If the Court denies JMOL, therefore, a new trial is warranted. *Lucent*, 580 F.3d at 1335, 1340 (ordering new trial where jury's award vastly overstated value of the accused feature). For example, in *Lucent*, the Federal Circuit ordered a new trial where "the evidence does not sustain a finding that, at the time of infringement, Microsoft and Lucent would have agreed to a lump-sum royalty payment subsequently amounting to approximately 8% of Microsoft's revenues for the sale of Outlook" to obtain a license to a minor date-picker feature. *Id.* And in *G+ Communications*, the court ordered a new damages trial on its own motion where the per-unit rate implied by the award "exceeds Plaintiff's highest requested per-unit rate" and "exceeds any evidentiary support." *G+ Commc'ns, LLC v. Samsung Elecs. Co.*, No. 2:22-cv-00078-JRG, 2024 WL 896343, at *3 (E.D. Tex. Mar. 1, 2024). The award here exceeds Taction's own ceiling and has no connection to the evidence.

**2. The infringement and validity verdicts are against the clear weight of the evidence.**

Taction's infringement case rested on one witness and one made-for-litigation test. That witness, Dr. Oliver, abandoned his deposition testimony on what his own threshold for "substantially uniform or flat" meant (Tr. 582:9-583:4), withdrew his opinion that the Apple Watch 3 infringed after learning from Taction's counsel that it lacks a closed-loop controller (Tr. 538:1-539:4), and discarded every preliminary result that did not fit his expectations (Tr. 600:1-22). Dr. Visell and Dr. Zinn explained why Dr. Oliver's test measures the controller rather than the transducer. Tr. 897:6-899:2, 1070:14-1071:8, 1078:3-15; *supra* § IV.B.1. The clear weight of the evidence shows that the accused transducers are not highly damped.

Apple also maintains that Dr. Oliver's testing is unreliable and should have

been excluded under F.R.E. 702. Dkt. 491 at 15; *see* Dkt. 545 at 26-28. Testimony that should have been excluded "contributes nothing to a 'legally sufficient evidentiary basis.'" *Weisgram*, 528 U.S. at 454.

As to invalidity, Dr. Okamura was Taction's sole witness, and her testimony deserves little weight. Her signed June 5, 2026 report stated that "[a] controller is not a damper," that ±10 dB "is not the substantially critically damped output the claims require," and that the claimed transducer "produces a substantially uniform mechanical output when driven by a constant-magnitude sinusoidal input." Tr. 1249:1-5, 1256:1-5, 1258:2-12. Each statement contradicts Taction's infringement case. After communicating with Taction's counsel, she made what she accepted were more than 30 substantive changes across her reports. Tr. 1262:22-1263:17. Without her testimony, Apple's invalidity case is unrebutted.

**3. If the Court grants JMOL on any subset of products, a new trial on damages is required.**

Granting JMOL of no infringement as to any subset of products—for example, the untested Watches, the untested iPhones, or the monolithic magnet products—would also necessitate a new trial on damages, because the scope of infringement would materially change and there is no way to reverse engineer the jury's damages award to account for that changed scope. Where there is a partial reversal of liability, "the normal rule would require a new trial as to damages." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007); *see also NTP, Inc. v. Rsch. in Motion, Ltd.,* 418 F.3d 1282, 1326 (Fed. Cir. 2005) (remanding for further consideration of damages in light of a partial reversal and a general verdict).

**4. Any new trial must include infringement and invalidity.**

A new trial may be limited to one issue only when "the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931); *see* Dkt. 599 at 11. In *Gasoline Products*, the error was in the damages instructions, yet

the Supreme Court required a new trial on both damages and liability, because the question of damages was "so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial." *Id.* This Court applied that standard before trial and held that damages and liability here are not separable "[c]onsidering the relatedness between the issues of liability and damages in this case." Dkt. 599 at 14. Trial confirmed that what, if anything, ferrofluid contributes to the output of Apple's Taptic Engines was in dispute as to both infringement and damages. *See, e.g.*, Tr. 222:3-223:12, 504:20-505:2. Likewise, Apple's Section 112 invalidity arguments were expressly based on how the jury applied the term "highly damped output."

The only issue that would not need a new trial is Taction's post-suit willfulness claim. Willfulness evidence did not overlap with infringement, validity, and damages evidence; Taction did not press willfulness in closing; and the evidence of willfulness was essentially limited to Taction's attorney argument that Apple should have designed around the patents after Taction filed suit. *See Fundamental*, 2026 WL 2923930, at *8 (granting JMOL of no willfulness where evidence "show[ed], at most, that Defendants infringed the patents-in-suit and that Defendants knew of these patents' existence"). Because the (lack of) evidence of willfulness is separable from the evidence on other issues, no retrial is necessary.

## V. CONCLUSION

The Court should enter judgment as a matter of law that Taction is entitled to no damages, that Apple does not infringe the asserted claims, and that the asserted claims are invalid. In the alternative, and conditionally under Rule 50(c)(1), the Court should order a new trial on infringement, invalidity, and damages.

Dated: October 13, 2026

FISH & RICHARDSON P.C.

By: */s/ Roger A. Denning*
Roger A. Denning (SBN 228998)
denning@fr.com
Christopher S. Marchese (SBN 170239)
marchese@fr.com
Seth M. Sproul (SBN 217711)
sproul@fr.com
John W. Thornburgh (SBN 154627)
thornburgh@fr.com
Ryan P. O'Connor (SBN 253596)
oconnor@fr.com
Joy B. Kete (SBN 355859)
kete@fr.com
Tyler R. Train (SBN 318998)
train@fr.com
Madelyn S. McCormick (SBN 320063)
mmccormick@fr.com
FISH & RICHARDSON P.C.
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel: (858) 678-5070 / Fax: (858) 678-5099

Qiuyi Wu (*pro hac vice)*
qwu@fr.com
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
Tel: (617) 542-5070 / Fax: (617) 542-8906

Jacqueline Tio (*pro hac vice)*
tio@fr.com
FISH & RICHARDSON P.C.
1180 Peachtree Street N.E., 21st Floor
Atlanta, GA 30309
Tel: (404) 892-5005 / Fax: (404) 892-5002

Jeff Quilici
jquilici@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
200 West 6th Street, Suite 2250
Austin, TX 78701
Tel: (512) 582-6916 / Fax: (512) 582-6949

Counsel for *Defendant Apple Inc.*